**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF NORTH CAROLINA**

| | | |
|---|---|---|
| O.V., et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | 1:17cv691 |
| | ) | |
| DURHAM PUBLIC SCHOOLS BOARD OF EDUCATION, et al., | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND RECOMMENDATION**
**OF UNITED STATES MAGISTRATE JUDGE**

This case comes before the undersigned United States Magistrate Judge for a recommendation on the "Motion to Dismiss Amended Complaint" (Docket Entry 42) (the "State Dismissal Motion") filed by Mark Johnson, William Hussey (collectively, the "State Officials") and the North Carolina State Board of Education (the "SBE," and collectively with State Officials, the "State Defendants") and the "Motion to Dismiss Amended Complaint" (Docket Entry 47) (the "Local Dismissal Motion," and collectively with the State Dismissal Motion, the "Dismissal Motions") filed by Kristin Bell, Lessley Mader, Ashley Bunn, Sheri Allen, Julie Haase (collectively, the "Individual Local Defendants"), Bert L'Homme, and Durham Public Schools Board of Education (the "Board," and collectively with Individual Local Defendants, the "Local Defendants"). For the reasons that follow, the Court should grant the State Dismissal Motion and grant in part and deny in part the Local Dismissal Motion.

## FACTUAL AND PROCEDURAL HISTORY

Minh Pham ("M.P.") and Peter Varlashkin ("P.V."), individually and on behalf of their minor child, O.V., (collectively, the "Plaintiffs"), initiated this action against L'Homme, Local Defendants, and the North Carolina Department of Public Instruction (the "NCDPI") for their alleged "failure to provide O.V. a free appropriate public education" (a "FAPE") and "discriminatory conduct against Plaintiffs based on O.V.'s disability in an education program receiving federal funds." (Docket Entry 1 (the "Complaint") at 1-2.) In response to NCDPI's motion to dismiss, Plaintiffs sought leave to amend their Complaint. (See Docket Entry 30.) After the Court (per the undersigned) granted their amendment request (see Docket Entry 33 at 4), Plaintiffs filed an amended "Complaint for Damages" (Docket Entry 36) (the "Amended Complaint"), which replaced NCDPI with State Defendants as defendants in this action (see, e.g., id., ¶¶ 40-52 (identifying parties)). Thereafter, all defendants moved to dismiss the Amended Complaint. (See Docket Entries 42, 47.)

As relevant to the Dismissal Motions, the Amended Complaint alleges:

At all pertinent times, O.V., a child "with Down syndrome, Mixed Receptive-Expressive Language Disorder, Lack of Coordination, Apraxia of speech, and other Symbolic Dysfunction," has resided with his parents in Durham County. (Docket Entry 36, ¶¶ 40, 41,

54.)  O.V. enrolled in the Durham Public School system (the "DPS")
as a preschooler for the 2009-2010 school year, and continued
attending public school in Durham until November 9, 2015, when his
parents "withdrew [him] from the DPS and enrolled him in Pinewoods
Montessori, a private school in Hillsborough, North Carolina" (id.,
¶ 254).  (See id., ¶¶ 84-255.)

The Individuals with Disability Education Act (the "IDEA"), 20
U.S.C. § 1400 et seq., imposes a "Least Restrictive Environment"
(the "LRE") requirement for the education of disabled children,
pursuant to which, "[t]o the maximum extent appropriate, children
with disabilities . . . are educated with children who are
non-disabled" (Docket Entry 36, ¶ 79 (alterations in original)).
(See also id., ¶ 16.)  Throughout O.V.'s DPS enrollment, State
Defendants published a "Procedural Safeguards:  Handbook on
Parents' Rights" (the "Handbook") that "erroneously and
misleadingly define[d]" the IDEA's LRE requirement "as follows:
'The IEP Team must consider educating a child with a disability in
an environment that is appropriate for that child.  Some children
are educated in a more restrictive environment than others due to
the significance of their needs.'"  (Id., ¶ 78.)  This "patently
wrong . . . definition is intentionally misleading to parents who
might seek an inclusive placement for their child."  (Id., ¶ 80.)

Throughout O.V.'s DPS enrollment, "[L'Homme and Individual
Local] Defendants worked in concert to systematically institute and

carry out [the] Board's unwritten and illegal policy of removing disabled children from general education classrooms by the third (3rd) grade if [the] Board believes the disabled child will be unsuccessful on the state mandated end of grade tests or requires a modified curriculum." (Id., ¶ 74.)[1] As the Board's Executive Director of Exceptional Children, Bell bore responsibility "for ensuring [the] Board is implementing and complying with the IDEA and corresponding state law for all students in the DPS, including O.V." (Id., ¶ 44.) "The data reported by [the] Board and Bell to" State Defendants "demonstrated [the Board and Bell's] custom, policy, and practice of placing children with intellectual disabilities in the segregated setting." (Id., ¶ 118.)

For instance, during the 2011-2012 school year, "of the 128 children in the entire district identified under the category of Intellectual Disability — Moderate, [they] relegated 126 children or ninety-nine percent (99%) to the segregated setting." (Id.) In the 2012-2013 school year, "of the 125 children identified under the category of Intellectual Disability — Moderate, just two (2) children were placed in the Regular education setting and ninety-seven percent (97%) were segregated from their non-disabled

---

[1] L'Homme served as DPS Superintendent from 2014 through the initiation of this federal action. (See id., ¶ 49.)

peers." (Id., ¶ 137.)[2]  In the final three years of O.V.'s DPS enrollment, none of the 115, 123, and 123 children, respectively, "identified under the category of Intellectual Disability — Moderate that year . . . was placed in the Regular education setting." (Id., ¶¶ 185, 192, 200.)

As "signatory to [the] Board's applications for IDEA funds, [L'Homme] had direct and full knowledge of the disproportionate number of students with disabilities excluded from regular education placements." (Id., ¶ 77.)  As such, the Board, State Defendants, and "L'Homme knew children like O.V. had a protected federal right to be integrated into the general student population yet failed to act, despite having actual knowledge of the segregation of children with low incidence disabilities in the DPS." (Id., ¶ 82.)

As part of O.V.'s enrollment in DPS, the "Board conducted a psychoeducational evaluation of O.V. on May 7, 2009," which revealed borderline development and deficient adaptive behavior skills, but "no behavior problems." (Id., ¶ 91.)  Based on these results, the "Board determined [that] O.V. was eligible for services under the IDEA in the category of Developmentally Delayed and . . . required occupational, physical, and speech therapies as related services in order to benefit from special education."

_____

    2  The numbers alleged by Plaintiffs — 126 of 128 and 123 of 125 — actually equate to a percentage of 98.44 and 98.4, respectively.

(Id., ¶ 92.) Having "predetermined" upon meeting him that "they would place [O.V.] in the most restrictive environment," namely, "in the separate classroom, segregated from his non-disabled peers" (id., ¶ 85), Bell and the Board developed O.V.'s first individualized education program (an "IEP"), pursuant to which, "O.V. would not have *any* access to his non-disabled peers" (id., ¶ 94 (emphasis in original)). This IEP "provided for special education for two (2) days per week for 270 minutes in the Exceptional Children's (EC) classroom and occupational, speech, and physical therapies." (Id.)

During the two years that O.V. attended DPS preschool, M.P. and P.V. "continuously requested [that] O.V. be permitted to be educated with his non-disabled peers, but [the] Board and Bell explained O.V.'s disabilities rendered him unfit to have full access to children who did not have disabilities." (Id., ¶ 88.) During this period, "[the Board and Bell] never considered a less restrictive environment and never considered what supports and services might allow O.V. to be successful in the regular preschool classroom, even though O.V. could have been integrated into the regular education setting with supplemental aids and services." (Id., ¶ 86.) In addition, they "manipulated the IEP documents in IEP meetings to support their plan for O.V. to be perpetually assigned to the separate classroom." (Id., ¶ 95.) For example, the Board and Bell falsely documented that the IEP "'Team discussed

all placement options and rejected serving [O.V.] in any placement option other than a [special education] classroom'" even though they never discussed "all placement options with O.V.'s parents," M.P. and P.V., and "no record of any discussion of any inclusive preschool placement" exists. (Id. (alterations in original).)

At an IEP meeting in July 2009, the Board and Bell "increased O.V.'s time in the special education classroom from 270 minutes to 390 minutes — the entire school day" (id., ¶ 97 (emphasis omitted)) — without "discuss[ing] providing O.V.'s specially designed instruction in any location other than the segregated special education classroom" (id., ¶ 98). At O.V.'s annual IEP meeting in April 2010, M.P. and P.V. "expressed that they 'would like to see [O.V.] in a class with typical children' and 'would like to see him talk more.' In response, [the] Board and Bell decided that O.V. would remain in a separate class, completely segregated from his non-disabled peers, and then decreased O.V.'s speech therapy services." (Id., ¶ 99 (first set of brackets in original).) On the IEP forms for that meeting, the Board and Bell "omitted O.V.'s parents' request that O.V. be placed with typical children, and [they] failed to provide any information about why they decreased O.V.'s speech services." (Id., ¶ 100.) Then, at an IEP meeting in August 2010, the "Board and Bell increased O.V.'s time in the separate setting from two (2) days to three (3) days per week for 390 minutes each day." (Id., ¶ 101.)

"[T]o provide O.V. access to his non-disabled peers, [M.P. and P.V.] placed O.V. in a private preschool with his non-disabled peers for two (2) days each week." (Id., ¶ 102.) The "Board and Bell refused to provide O.V.'s specially designed instruction in the private preschool setting alongside his non-disabled peers" (id.), but on IEP forms in November 2010 and March 2011, the "Board and Bell misleadingly recorded O.V.'s placement to reflect his attendance at the private school, for which his parents paid, to give the impression that O.V. was receiving services in this location" (id., ¶ 103). In addition, although M.P. and P.V. "expressed that they would like for O.V. 'to talk, write and do things as a more typical child,'" the Board and Bell "changed O.V.'s educational placement to the Separate Class setting" on his March 2011 IEP. (Id., ¶ 104.)

At a May 2011 IEP meeting regarding "O.V.'s transition to kindergarten" (id., ¶ 105), the Board and Bell failed to consider whether O.V. could "be educated in a regular education classroom like other students enrolling in kindergarten" before deciding that "O.V. would receive specially designed instruction for 330 minutes per day, as well as all of his related services (i.e., occupational therapy, physical therapy, and speech/language therapy) in the most restrictive setting: the special education (or EC) classroom" (id., ¶ 106). "During O.V.'s kindergarten year, [the] Board and Bell never considered a less restrictive environment and never

considered what supports and services could allow O.V. to be successful in a regular education classroom." (Id., ¶ 109.) M.P. and P.V. "continued to request O.V. be permitted to be educated with his non-disabled peers, but [the] Board and Bell acted as though O.V.'s disabilities rendered him unfit to even sit in the same room as other children who did not have disabilities." (Id., ¶ 112.) In December 2011, O.V.'s IEP Team met to discuss O.V.'s recent evaluations and formulate a new IEP. (Id., ¶ 115.) Although M.P. and P.V. asked that O.V. "'be exposed to a regular class for routines and models at least twice a week'" (id.), the Board and Bell

> ignored Plaintiffs' request and maintained O.V.'s placement in the Separate setting five (5) days per week for 330 minutes, provided all O.V.'s related services away from his non-disabled peers, and removed O.V. from participating in physical education with his non-disabled peers, limiting his potential contact with his non-disabled peers to library, music/art, and computer

(id., ¶ 116).

During the 2012-2013 school year, "O.V.'s first (1st) grade year, [his] parents continued to request O.V. be permitted to be educated with his non-disabled peers." (Id., ¶ 120.) In September 2012, the IEP Team met to modify O.V.'s IEP. (Id., ¶ 127.) At that meeting, the "Board and Bell determined O.V. would participate in the general education class for literacy, because 'the IEP Team felt that O.V.[] would benefit from the socialization/communication experiences gained by participating in a general education class.'"

(Id., ¶ 128 (brackets omitted).)  However, "other than an assistant to escort [O.V.] to and from the classroom," they "refused to provide O.V. with any supplemental aids and services to enable him to access his education with non-disabled peers." (Id., ¶ 129.)

At O.V.'s annual IEP meeting in November 2012 (see id., ¶ 130), the "Board and Bell refused to even consider placing O.V. in the regular setting with his non-disabled peers" (id., ¶ 131). Instead, "despite reporting O.V. was making progress, [they] decided O.V. could no longer attend literacy in the general education classroom; however, as a consolation, he was now permitted to eat lunch and play on the playground with his non-disabled peers and join in morning circle time for fifteen (15) minutes each day." (Id., ¶ 132.)  In response to the LRE Justification Statement's requirement "to 'explain why the services cannot be delivered with non-disabled peers with the use of supplemental aids and services,'" Bell and the Board stated only "that 'O.V. would be removed from non-disabled peers for direct instruction[,]'" as "'he needs the repetitions and the small group setting for academic success.'" (Id., ¶ 134 (brackets omitted).) However, Bell and the Board did not "document the removal of O.V. from literacy instruction with his non-disabled peers" on his IEP forms. (Id., ¶ 136.)

O.V. began second grade in the 2013-2014 school year. (See id., ¶ 139.)  At this time, Mader served as "a Director of

Exceptional Children for [the] Board" (id., ¶ 45), and Haase and Allen served as DPS special education teachers (id., ¶¶ 47, 48). For the 2013-2014 through 2015-2016 school years, Haase and Allen served as O.V.'s special education teachers. (Id., ¶¶ 47, 48.)

During the 2013-2014 school year, M.P. and P.V. "again requested [that] O.V. be educated with his non-disabled peers" (id., ¶ 139), but the "Board, Bell, and Mader continued to refuse to consider placing O.V. in the regular education classroom or what supports and services could allow O.V. to be successful in a regular education classroom" (id., ¶ 140). At O.V.'s annual IEP review on November 15, 2013 (see id., ¶ 145), P.V. and M.P. "requested [that the] Board, Bell, and Mader change O.V.'s placement to a general education first (1st) grade classroom" (id., ¶ 146). "Without even considering whether any supplemental aids and services could enable O.V. to access his education with non-disabled peers, [the] Board and Bell rejected O.V.'s parents' proposal and, instead, *increased* the time O.V. would spend in the separate special education classroom, isolated from his non-disabled peers." (Id., ¶ 147 (emphasis in original).)

"Shortly after the November 15, 2013 IEP Meeting, O.V.'s parents sought legal counsel." (Id., ¶ 149.) "[A]fter legal intervention, on December 6, 2013, [the] Board, Bell, and Mader determined O.V. would be placed in a regular education second (2nd) grade classroom and would receive pull out resource services."

(Id., ¶ 150.)  However, "to support their plan for O.V. to be perpetually assigned to the separate classroom . . . . despite changing O.V.'s educational placement, [the Board, Bell, and Mader] purposefully *did not* amend O.V.'s IEP, as required, to reflect his change in placement to a less restrictive setting."  (Id., ¶ 151 (emphasis in original).)  The Board's refusal to "change O.V.'s placement in his IEP" was designed "to prevent a less restrictive setting from becoming O.V.'s 'stay put' placement in the future." (Id., ¶ 344.)[3]

The "Board, Bell, and Mader placed O.V. in Mr. Montgomery's second (2nd) grade regular education classroom," but neither provided Mr. Montgomery with "specialized training in educating children with developmental or intellectual disabilities" nor arranged for him to meet regularly with special education teachers to plan O.V.'s instruction (id., ¶ 152), even though, according to Mader, Mr. Montgomery "'ha[d] to completely change the curriculum for [O.V.]'" (id., ¶ 169).  Moreover:

> Without any specialized knowledge as to how to instruct O.V. or address O.V.'s unique challenges, and without a valid IEP to implement, at the suggestion of an untrained paraprofessional, Mr. Montgomery placed O.V. behind a cardboard partition at the back of the classroom

---

3  Typically, unless the parents and educational authorities agree otherwise, a "child shall remain in the then-current educational placement of the child" during IDEA-authorized proceedings to resolve disputes between the parents and educational agency regarding the child's FAPE.  20 U.S.C. § 1415(j).

for academic instruction, effectively enclosing O.V. within the cardboard and the walls.

(Id., ¶ 153.)[4]

At an IEP meeting on February 5, 2014, "Mr. Montgomery reported O.V. was making academic progress." (Id., ¶ 154.) At that same meeting, the "Board, Mader, Bell, and Allen proposed conducting a comprehensive reevaluation of O.V." (id.) and "refused to amend O.V.'s IEP to reflect his change in placement" (id., ¶ 156). "On May 9, 2014, the IEP Team convened to discuss the recent evaluations." (Id., ¶ 157.) At that meeting, the "Board, Mader, Bell, Haase, and Allen changed O.V.'s eligibility category from Developmental Delay to Intellectual Disability — Moderate" (id., ¶ 159) and, without "notice to Plaintiffs, . . . reduced O.V.'s occupational therapy and physical therapy services" (id., ¶ 162). Also at that meeting, "O.V.'s speech therapist . . . reported [that] O.V. was making progress." (Id., ¶ 160.)

"On June 4, 2014, the IEP Team convened to develop O.V.'s Annual Review IEP. Both Plaintiffs' and [the] Board's counsel attended the meeting." (Id., ¶ 163.) "Plaintiffs continued to advocate for O.V. to be placed in the regular education setting with his non-disabled peers." (Id., ¶ 165.) Because "O.V. would be entering third grade in the fall, the IEP Team discussed whether

_____

4 M.P. and P.V. did not learn that "O.V. sat in the back of the classroom behind a cardboard partition over fifty percent (50%) of the time" until May 2014. (Id., ¶ 161.)

O.V. would be assessed on the standard state wide assessment ('End of Grade' or 'EOG') or the alternate assessment ('EXTEND1'), and whether O.V. would be taught on the Common Core curriculum or Extended Content Standards." (<u>Id.</u>, ¶ 167.) Mader falsely told Plaintiffs that "'the decision of the test influences the educational placement as they are based on 2 different curriculums which are taught in 2 different classes.'" (<u>Id.</u>, ¶ 168.) The "Board's counsel did not correct . . . Mader's false assertion that if O.V. was educated on the Extended Content Standards, he could not receive services with his non-disabled peers." (<u>Id.</u>)

Further, "[c]ontinuing to ignore Plaintiffs' request that O.V. be provided supplemental aids and services in the general education classroom, [the] Board, Mader, Bell, Haase, and Allen determined O.V. would 'get all of his support in Exceptional Children's classroom.'" (<u>Id.</u>, ¶ 170.) In addition, "[the] Board, Mader, Bell, Haase, and Allen discussed O.V.'s educational placement" (<u>id.</u>, ¶ 171), as follows:

> "On the continuum he is still considered 'separate' because he needs extensive instruction due to his foundational skill sets." The [Prior Written Notice[5]]

---

5  Under the IDEA, a school board

must provide the parents with written notice ("Prior Written Notice" or "PWN") before the [school board] proposes or refuses "to initiate or change the identification, evaluation, or educational placement of the child or provision of FAPE to the child." 34 C.F.R. § 300.503(a); 20 U.S.C. § 1415(b)(3). The IDEA requires that the PWN include certain information, including "a

> failed to provide notice of the team's decision that O.V.
> would be placed in the Separate setting, and instead
> stated "the team rejected determining [educational]
> placement and service delivery."

(Id. (alterations omitted).)  Due to some outstanding scheduling issues, the IEP Team agreed to "reconvene shortly in order to finalize O.V.'s IEP."  (Id., ¶ 172.)

"On June 13, 2014, the IEP Team convened and finalized O.V.'s IEP for the upcoming school year.  Prior to the meeting, the principal of O.V.'s elementary school determined O.V. would be retained for second (2nd) grade."  (Id., ¶ 173.)  Mader, Bell, Haase, Allen, and Bunn attended this meeting.  (Id., ¶ 174.)  At that time, Bunn "did not yet know O.V., because she had only recently accepted a transfer to O.V.'s elementary school to teach the students assigned to the third through fifth (3rd – 5th) grade segregated class."  (Id., ¶ 175.)  "Without conducting an evaluation of or collecting any data on O.V.'s behavior, much less discussing strategies to address it, [Local Defendants] impermissibly used O.V.'s short attention span and distracting behaviors" to justify "completely separating O.V. from his non-disabled peers in the regular education classroom."  (Id.,

> description of the action proposed or refused by the
> agency" and "an explanation of why the agency proposes or
> refuses to take the action and a description of each
> evaluation procedure, assessment, record, or report the
> agency used as a basis for the proposed or refused
> action."  20 U.S.C. § 1415(c)(1).

(Docket Entry 36, ¶ 25.)

¶ 177.)  Without explaining "why O.V. could not receive any specially designed instruction in the regular education classroom, and despite O.V.'s significant, documented advances in the general education classroom, [Local Defendants] determined O.V. would receive _all_ academic instruction in the EC classroom." (Id., ¶ 180 (emphasis in original).)

On July 22, 2014, the Board and Plaintiffs participated in mediation and "reached a confidential settlement agreement" (the "Mediation Agreement").  (Id., ¶ 184.)  "On November 14, 2014, uncertain whether [the Board] would continue to implement the Mediation Agreement, Plaintiffs filed a Petition for a Contested Case Hearing in the Office of Administrative Hearings Docket No. 14-EDC-09295 ('2014 Petition') to preserve their claims."  (Id., ¶ 261.)  "The 2014 Petition alleged that [the Board] violated the procedural and substantive requirements of the IDEA, 20 U.S.C. §§ 1400 _et seq._, and the North Carolina special education statutes, N.C. Gen. Stat. §§ 115C-106 _et seq._, while providing educational services to O.V."  (Id., ¶ 262.)

Following assurances from the Board's counsel to Plaintiffs' counsel on November 14, 2014, "that the [Board] was in 'full compliance' with the Mediation Agreement" (id., ¶ 263), "[t]he parties entered into a Settlement Agreement and Release of Claims ('Settlement Agreement') on November 26, 2014, which wholly incorporated the Mediation Agreement" (id., ¶ 264).  Given "the

ongoing implementation of the Settlement Agreement for the remainder of the 2014-[20]15 academic year, Plaintiffs refused to dismiss the 2014 Petition with prejudice and only agreed to file a Voluntary Dismissal *Without* Prejudice" (id., ¶ 266 (emphasis in original)), which they did on November 26, 2014 (id., ¶ 267). However, the Board "did not implement the compensatory services and [M]ediation [A]greement as outlined in the Settlement Agreement, thus breaching the terms of the [Settlement] Agreement." (Id., ¶ 268.) For instance, the Board "routinely postponed the *monthly* parent-teacher conferences agreed to in the Settlement Agreement" (id., ¶ 269 (emphasis in original)) and (as discussed below) failed to instruct O.V. "with a co-teaching model as agreed to by the parties" (id., ¶ 270).

After Plaintiffs' resort to mediation, Local Defendants "created a hostile environment that discouraged and prevented O.V.'s parents from stepping foot onto school property and participating in O.V.'s day-to-day educational activities in which any parent would be expected to participate." (Id., ¶ 190.) To begin with, although M.P. had previously "served as a frequent volunteer in O.V.'s classroom and was permitted to visit O.V. daily at school," Local Defendants "began restricting [M.P.'s] access to O.V.'s classroom." (Id., ¶ 188.) For instance, Bunn told M.P. "that she now must obtain permission via the principal's office to even visit O.V.'s special education classroom. Nearly every time

17

[M.P.] attempted to visit the classroom, [Local] Defendants refused to allow her to visit. The *only* time she was able to visit the classroom, O.V. was not even present." (Id. (emphasis in original).) Additionally, M.P. "was no longer permitted to park and walk O.V. to class in the morning; instead, she was required to drop him at the curb, so he could be escorted by school personnel to his classroom." (Id., ¶ 189.) Yet, "parents of other children, disabled and non-disabled, were permitted to walk their children into school each day and visit their children's classroom without such restrictions." (Id., ¶ 191.)

Moreover, "[d]uring O.V.'s second second (2nd) grade year, [Local Defendants] claimed to implement the [S]ettlement [A]greement, yet purposefully acted to sabotage O.V.'s time and progress in the general education setting." (Id., ¶ 187.) In August 2014, the IEP team met and agreed to follow the July 2014 Mediation Agreement. (See id., ¶ 194.) In accordance with the Mediation Agreement, the IEP from that meeting "documented O.V.'s lack of progress while he was in the special education classroom, and his increased progress during the time Defendants Board [sic] permitted O.V. to be present in the general education classroom" during the previous school year. (Id., ¶ 197.) "[Local Defendants] documented in the PWN from the meeting that O.V. would spend 220 minutes per day in the general education classroom, with 45 minutes of this time in guided reading and math instruction with

a 'co-teaching model.'" (Id., ¶ 196.)[6] "Despite changing O.V.'s educational placement due to the [M]ediation [A]greement, [Local Defendants] maintained O.V. required the *same* inadequate supplemental aids, services, accommodations, and modifications: consistent redirection, supervision for redirection, and incremental rewards." (Id., ¶ 198 (emphasis in original).)

The Board assigned O.V. to Ms. Turner's second grade classroom (id., ¶ 203), but failed to either "provide Ms. Turner *any* specialized training in educating children with disabilities, let alone O.V.'s particular disabilities" (id., ¶ 204 (emphasis in original)), or arrange for her to regularly meet with special education teachers "to take advantage of their specialized knowledge regarding educating children with disabilities" (id., ¶ 206). "Ms. Turner did not put forth any effort to attempt to accommodate O.V.'s disabilities and allow O.V. to learn in her classroom. Ms. Turner did not even understand what apraxia, one of O.V.'s documented disabilities that affects his ability to speak, was." (Id., ¶ 205.) Ms. Turner further admitted that she "did not modify O.V.'s work[] because 'it takes an extensive amount of time to work with [O.V.] and he's not the only one in my class, sorry.'" (Id., ¶ 207 (final set of brackets in original).) This refusal to

_____

6 Following the principal's "decision to retain O.V. in the second (2nd) grade, [Local] Defendants allowed O.V. to receive academic instruction in the general education classroom because O.V. would no longer be entering third (3rd) grade where students take the EOG." (Id. at n.2.)

modify the regular curriculum for O.V. occurred "even though a modified curriculum existed, was readily available, and was designed exactly for that purpose." (Id., ¶ 68.)

The Board, Bell, and Mader assigned Allen and Haase to work with O.V. in Ms. Turner's classroom for 30 minutes and 15 minutes, respectively, each day. (Id., ¶ 208.) Nevertheless, the Board, Bell, and Mader failed to provide Allen and Haase "with any training on O.V.'s documented disabilities or including children with disabilities in the regular education classroom." (Id.)

> Throughout the school year, O.V.'s special education services were not delivered as agreed upon at the August 2014 IEP Meeting and documented in the PWN. [Local Defendants] claimed [that] Haase and Allen were co-teaching O.V., pursuant to the Mediation Agreement, for a total of forty-five (45) minutes per day. Co-teaching is an evidence-based form of instruction where a special education teacher and a regular education teacher collaborate to provide both nondisabled and disabled children instruction at the same time.
>
> . . . Haase and Allen[] and Ms. Turner all testified that they did _not_ co-teach O.V. during their depositions. Each was able to define co-teaching, and each admitted that she was not co-teaching. . . . .

(Id., ¶¶ 209-10 (emphasis in original).) Throughout this school year, though, Local Defendants "falsely assured Plaintiffs that the co-teaching was being implemented in O.V.'s classroom." (Id., ¶ 211.) "[Local] Defendants' refusal to co-teach O.V. caused educational harm to O.V. and resulted in a denial of FAPE to O.V." (Id., ¶ 212.) Moreover, although "M.P. offered to pay for training on modifying the curriculum and including children with low

incidence disabilities in the regular education setting, [Local] Defendants refused." (Id., ¶ 213.)

Throughout this school year, in an orchestrated effort, sanctioned by Bell and Mader (see id., ¶ 215), "to create a false record of O.V.'s inability to function and make progress" in the general education classroom, O.V.'s teachers, including Allen, Bunn, and Haase, "took extensive amounts of 'data' on the number of times the teacher redirected O.V." (Id., ¶ 214.) This analytically meaningless (see id., ¶ 216) "practice of redirecting O.V. and collecting data of those redirections . . . demonstrated the poor quality of instruction delivered to O.V., caused educational harm to O.V., and resulted in a denial of FAPE to O.V." (id., ¶ 215). As part of this effort, Allen, Bunn, and Haase "redirected O.V. to an extent that impeded his ability to respond, especially as a child with verbal apraxia" (id., ¶ 217), causing even the Administrative Law Judge (the "ALJ"), "who found in favor of [the Board] on *every single* issue at the administrative level" to find that "'[t]he redirection data itself certainly raises questions regarding the quality of educational instruction O.V. received from Ms. Bunn, Ms. Allen, and Ms. Haase'" (id., ¶ 218 (emphasis in original)). For instance, on one occasion, "Allen redirected [O.V.] ninety-eight (98) times in just ten (10) minutes, or one redirection every 6.1 seconds." (Id., ¶ 217.)

In addition, under Bell and Mader's supervision, Bunn "failed to provide O.V. with specially designed instruction to meet O.V.'s unique needs" during the 170 minutes each day that O.V. spent with "Bunn to receive specially designed instruction." (Id., ¶ 219.) For instance, Bunn "failed to develop individualized lesson plans" and instead utilized "prefabricated, generic, and identical [lesson plans] for all students in each grade level." (Id., ¶ 222.) Moreover, these lesson plans only applied to third through fifth graders, meaning that "not a single lesson plan for the entire school year was designed for O.V.," a second grader. (Id., ¶ 223.) Additionally, "Bunn held extremely low expectations for O.V.," failing to adjust his goals as he mastered them (id., ¶ 220), and "'taught' through showing multiple videos" (id., ¶ 221). According to Local Defendants' own data, O.V. "regress[ed] in multiple areas in th[is] separate setting." (Id., ¶ 228.)

Despite Local Defendants' "refusal to prepare O.V.'s teachers to teach O.V., or implement O.V.'s IEP with regards to co-teaching, the data collected by [Local] Defendants overwhelmingly supported that O.V. made greater progress in an inclusive setting with his non-disabled peers than in the segregated setting." (Id., ¶ 225.) This data included periodic progress reports, report cards, and the tracking of IEP goals on data sheets that Allen, Bunn, Haase, and Ms. Turner prepared. (Id., ¶ 226.) "By all accounts, O.V. made more progress in the general education classroom — despite [Local

Defendants'] failure to appropriately serve O.V. — than he did in the special education classroom." (Id., ¶ 227.) Further, on each progress report, Ms. Turner indicated "that O.V. consistently works without disturbing others — the highest level a child can achieve." (id., ¶ 231 (emphasis in original).) Additionally,

> [a]ligned with [Local Defendants'] concerted effort to bar O.V. from the regular education classroom, and to create a paper trail that supported the decision, on every progress report, . . . Bunn falsely reported that O.V. was making sufficient progress to meet his annual reading, writing, and math goals, despite the fact that none of the data collected by his teachers supported this analysis — especially in the separate setting[, where O.V.] was actually regressing . . . .

(Id., ¶ 228.)

On May 20, 2015, O.V.'s IEP Team met for his annual IEP review. (Id., ¶ 233.) At this meeting, the information that Local Defendants reported on O.V.'s IEP (1) did not reflect the progress monitoring data provided to P.V. and M.P. during the 2014-2015 school year (id., ¶ 235); (2) lacked appropriate IEP goals (id., ¶ 237); (3) "excluded O.V.'s progress in the inclusive setting" and "misleadingly . . . reported O.V.'s progress in the separate setting," such as by indicating that he "identified '12 out of 26 letter sounds which is 46% accuracy 1 out of 4 trials'" without stating that he identified zero, zero, and three sounds on the remaining three tests in the separate setting (id., ¶ 238); and (4) differed from the draft IEP sent to M.P. and P.V. shortly before the meeting in ways that "appear designed to support the

elimination of direct service in occupational therapy," such as by changing the "Present Level" assessment that "'[O.V.] is making good progress with his self-help skills'" to "'[O.V.] is independent with his self-help skills at school'" (id., ¶ 239 (alterations in original)). In addition, "[d]espite O.V.'s documented progress in the speech sessions conducted in the general education setting, now that the timeframe for implementing the Mediation Agreement was ending, [Local Defendants] eliminated the dedicated provision of speech services to O.V. in the general education setting." (Id., ¶ 236.) They also "summarily determined that O.V. was not eligible for [extended school year] services" despite his demonstrated need for ongoing support and repetition, as well as his emerging skills in literacy, math, and occupational therapy. (Id., ¶ 240.)

At the beginning of the IEP meeting, M.P. expressed her desire for O.V. to attend college and her belief that "he [was] capable" of "going to college." (Id., ¶ 242 (internal quotation marks omitted; alteration in original).) Nevertheless, Local Defendants provided only a cursory explanation of the differences between regular EOG and EXTEND1 EOGs (id., ¶ 241) and "deliberately withheld . . . that O.V.'s trajectory, if taught on the Extended Content Standards and if taking the Extend 1 test, would be to receive a certificate rather than a high school diploma" (id., ¶ 242), a necessary precursor for college (see id., ¶ 243).

Moreover, when "M.P. explained that O.V. does not have test anxiety and may be able to take the regular EOG, [] Mader told [] M.P. that '[O.V.] would not be appropriate for the EOG and [Mader] could not recommend he take that test,'" even though "the IEP Team is tasked with determining which test is appropriate for the child — not which child is appropriate for the test." (Id., ¶ 241 (penultimate set of brackets in original).) "Contrary to the express purposes of the IDEA, . . . [Local Defendants'] proposed course would foreclose the option of a diploma, preclude college as an option for O.V.[, ]and likely lead to participation in a sheltered workshop and perpetual dependence on his family and the state." (Id., ¶ 243.)

Expressing the view that, notwithstanding all the data verifying his progress in the inclusive setting, "it was not 'appropriate for [O.V.] to *sit* in the general education classroom' as his skills were below that of his non-disabled peers" (id., ¶ 245 (emphasis and alteration in original)), "Mader proposed that the DPS cease providing O.V. any academic services in a co-teaching model in the general education classroom" (id.). In response to M.P.'s objections to this proposal, "Mader reminded the IEP Team: '[W]e do not have to come to a consensus, as the [Board] can make the final decision.'" (Id., ¶ 246.) Ultimately, even "[t]hough [Local Defendants] agreed O.V. made academic, communication, social progress, and functional growth during the 2014-[20]15 school year,

[Local] Defendants removed O.V. from the regular classroom for all core academic instruction and, again, changed O.V.'s placement to 'separate.'" (Id., ¶ 244.)

On August 13, 2015, M.P. and P.V. "filed a Petition for a Contested Case Hearing in the Office of Administrative Hearings Docket No. 15-EDC-05966 ('2015 Petition')," which incorporated by reference the 2014 Petition. (Id., ¶ 272.) They also "invoke[d] O.V.'s stay put placement," which prevented the Board, Allen, Bell, Bunn, and Haase from "segregat[ing] O.V. from his non-disabled peers as planned in the fall of 2015." (Id., ¶ 247.) However, the Board, Allen, Bell, Bunn, and Haase "continued to restrict O.V.'s mother's access to O.V.'s classroom because Plaintiffs asserted their rights under the IDEA" (id., ¶ 250), and, "again, took no actions to provide any training to O.V.'s new teachers[,] who continued the same practices of recording data on the number of redirections they decided to impose upon O.V., refusing to modify his work, and failing to instruct O.V. in a recognized co-teaching model" (id., ¶ 249). Additionally, the "Board and Bell failed to provide O.V. any compensatory services for the remainder of the 2015-[20]16 school year and failed to provide the compensatory services owed for the summer of 2016." (Id., ¶ 252.)

In discovery regarding the 2015 Petition, the Board "provided even more evidence that it had never complied with the material portions of the Settlement Agreement." (Id., ¶ 273.) For

instance, "during depositions, all of O.V.'s teachers stated that they never used a co-teaching model with O.V. — a key covenant of the Settlement Agreement." (Id., ¶ 274.) "On November 9, 2015, due to [the] Board, Bell, Haase, Allen, and Bunn's retaliation and creation of a hostile environment and ongoing refusal to provide O.V. a FAPE in the LRE, Plaintiffs finally withdrew O.V. from the DPS and enrolled him in Pinewoods Montessori" (id., ¶ 254), where his "private program enabled O.V. to make meaningful progress, which continue[d]" through the filing of the Amended Complaint (id., ¶ 255). "For example, where O.V.'s May 20, 2015, IEP aspired for O.V. to learn to write 26 letter sounds over an entire year, after just a few months at Pinewoods, O.V. was writing *words* that he was independently spelling by looking at a picture or an object." (Id., ¶ 256 (emphasis in original).)

In early November 2015, the Board filed a motion for partial summary judgment in the administrative proceedings, "seeking to limit Plaintiffs' claims to those occurring after November 26, 2014." (Id., ¶ 299.) "On January 6, 2016, Judge Elkins granted [the Board's] Motion for Partial Summary Judgment, limiting Plaintiffs' claims to those arising after November 26, 2014, because the Office of Administrative Hearings had no authority to set aside a release in a private contract between parties." (Id., ¶ 300.) The parties proceeded to trial on Plaintiffs' remaining claims before ALJ Melissa Lassiter. (See id., ¶¶ 303-14.) On

February 2017, Judge "Lassiter issued the Final Decision in this matter," which "ordered that all of Plaintiffs' claims be dismissed with prejudice." (Id., ¶ 315.)

Plaintiffs appealed this decision to the SBE, which assigned State Review Officer (the "SRO") Lisa Lukasik to the appeal. (Id., ¶¶ 316-17.) On April 26, 2017, the SRO issued a decision in this matter, which affirmed in part and reversed in part the ALJ's decision. (See id., ¶¶ 318-23.) In particular, "the SRO affirmed the ALJ's decision that Plaintiffs failed to meet their burden to prove that [the Board] failed to provide O.V. a FAPE in the LRE from November 27, 2014, through June 12, 2015, based on the stipulation from both parties that O.V. made progress during that time." (Id., ¶ 320.) However, the SRO "reversed the ALJ's decision that Plaintiffs failed to meet their burden to prove that O.V.'s May 20, 2015 IEP failed to offer O.V. a FAPE in the LRE." (Id., ¶ 321.) The SRO remanded the question of appropriate relief on that issue to the ALJ. (See id., ¶ 324.) The issue of appropriate relief remained pending when Plaintiffs filed the Amended Complaint. (See id., ¶ 325.)

Meanwhile, "[o]n February 1, 2016, Plaintiffs filed a [c]omplaint in the Durham County Superior Court, regarding [the Board's] breach of the Settlement Agreement." (Id., ¶ 279.) This action alleged that the Board

> breached the Settlement Agreement by failing to provide
> O.V. with instruction using a co-teaching model during

the 2014-[20]15 school year[;] [the Board] fraudulently
induced Plaintiffs to enter into the Settlement Agreement
by falsely assuring Plaintiffs that O.V.'s teachers were
instructing him using a co-teaching model; and [the
Board] breached its duty to act in good faith and make
reasonable efforts to perform its obligations under the
Settlement Agreement by failing to meet with Plaintiffs
monthly as agreed upon in the Settlement Agreement.

(Id.)  The Board moved to dismiss that state action.  (See id.,

¶ 280.)  The state court granted the Board's motion "as to

Plaintiffs' tort claims for fraudulent inducement and breach of

good faith and fair dealing and Plaintiffs' breach of contract

claim for any claims arising on or before November 26, 2014," but

denied it "as to Plaintiffs' claim for breach of contract for any

breach arising after November 26, 2014." (Id., ¶ 281.)  On October

21, 2016, Plaintiffs dismissed their state action without prejudice

pursuant to North Carolina Rule of Civil Procedure 41, which

authorizes a plaintiff to dismiss his lawsuit "'any time before

. . . rest[ing] his case'" and commence "'a new action based on the

same claim . . . within one year after such dismissal.'"  (Id.,

¶ 283.)

Plaintiffs initiated the instant federal action on July 25,

2017.  (See Docket Entry 1 at 87.)  The Amended Complaint asserts

seven counts against the Board, five counts against the SBE, and

one count against L'Homme, State Officials, and Individual Local

Defendants.  More specifically, Plaintiffs contend that the Board

and SBE (1) violated the IDEA (Docket Entry 36, ¶¶ 333-62);

(2) discriminated against O.V. and retaliated against M.P. in

29

violation of Section 504 of the Rehabilitation Act ("Section 504")
(id., ¶¶ 363-76); (3) discriminated against O.V. and retaliated
against M.P. in violation of the Americans with Disabilities Act
(the "ADA") (id., ¶¶ 377-86); (4) violated the North Carolina
Special Education Statutes (the "NCSES") (id., ¶¶ 387-89); and
(5) violated the North Carolina Persons with Disabilities
Protection Act (the "NCPDPA") (id., ¶¶ 390-94).   The Amended
Complaint further alleges that the Board violated the Fourteenth
Amendment (id., ¶¶ 395-405) and breached the Settlement Agreement
(id., ¶¶ 406-24).  Finally, Plaintiffs pursue claims pursuant to 42
U.S.C. § 1983 against L'Homme, State Officials, and Individual
Local Defendants for allegedly violating O.V.'s rights under the
Fourteenth Amendment.  (Id., ¶¶ 395-405.)

## DISCUSSION

### I.  Motion to Dismiss Standards

Pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules
of Civil Procedure (the "Rules"), State Defendants move to dismiss
Plaintiffs' claims against them in their entirety.  (See Docket
Entries 42, 43.)   Under the same Rules, L'Homme and Local
Defendants move to dismiss (1) Plaintiffs' Section 504, ADA,
Section 1983, breach of contract, NCSES, and NCPDPA claims in their
entirety and (2) Plaintiffs' IDEA claims to the extent they arise
prior to November 26, 2014.  (See Docket Entry 47 at 1-2; see also
Docket Entry 36, ¶¶ 333-424 (detailing claims).)  In particular,

L'Homme and Local Defendants seek Rule 12(b)(1) dismissal of Plaintiffs' IDEA, Section 504, ADA, Section 1983, NCSES, and NCPDPA "claims arising prior to November 26, 2014" (Docket Entry 48 at 8), for failure to exhaust administrative remedies. (See id. at 8-12.) L'Homme and Local Defendants also pursue Rule 12(b)(6) dismissal of the remaining portions of Plaintiffs' Section 504, ADA, Section 1983, NCSES, and NCPDPA claims. (See id. at 12-15, 17-30.) Finally, L'Homme and Local Defendants contend that "the Court should decline supplemental jurisdiction" (id. at 15) over Plaintiffs' breach of contract claim. (See id. at 15-17.)

Because the defendants do not contest the validity of the Amended Complaint's jurisdictional allegations (see id. at 8-12, 15-17; Docket Entry 43 at 9-13), they present a facial challenge to the Court's subject matter jurisdiction. See Kerns v. United States, 585 F.3d 187, 192 (4th Cir. 2009) (describing "two ways" that "a defendant may challenge subject matter jurisdiction," namely by contending that (1) "a complaint simply fails to allege facts upon which subject matter jurisdiction can be based" or (2) "the jurisdictional allegations of the complaint are not true" (internal quotation marks and alteration omitted)); see also Willner v. Dimon, 849 F.3d 93, 99 (4th Cir. 2017) (describing administrative exhaustion contentions as a "facial challenge to [the] complaint"). In such circumstances, a "plaintiff, in effect, is afforded the same procedural protection as he would receive

under a Rule 12(b)(6) consideration." Kerns, 585 F.3d at 192 (internal quotation marks omitted). In other words, "the facts alleged in the complaint are taken as true, and the motion must be denied if the complaint alleges sufficient facts to invoke subject matter jurisdiction." Id.

In turn, to avoid Rule 12(b)(6) dismissal, a complaint must contain sufficient factual allegations "to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). To qualify as plausible, a claim needs sufficient factual content to support a reasonable inference of the defendant's liability for the alleged misconduct. Id. Nevertheless, the complaint need not contain detailed factual recitations, as long as it provides the defendant "fair notice of what the claim is and the grounds upon which it rests." Twombly, 550 U.S. at 555 (internal quotation marks and alteration omitted).

In reviewing a motion to dismiss, the Court must "accept the facts alleged in the complaint as true and construe them in the light most favorable to the plaintiff." Coleman v. Maryland Court of Appeals, 626 F.3d 187, 189 (4th Cir. 2010), aff'd sub nom., Coleman v. Court of Appeals of Md., 566 U.S. 30 (2012). The Court must also "draw all reasonable inferences in favor of the plaintiff." E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc., 637 F.3d 435, 440 (4th Cir. 2011) (internal quotation marks

omitted). "At bottom, determining whether a complaint states . . . a plausible claim for relief . . . will 'be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.'" Francis v. Giacomelli, 588 F.3d 186, 193 (4th Cir. 2009) (quoting Iqbal, 556 U.S. at 679).

In ruling on a Rule 12(b)(6) motion, "a court evaluates the complaint in its entirety, as well as documents attached or incorporated into the complaint." E.I. du Pont, 637 F.3d at 448. The Court may also consider documents "attached to the motion to dismiss, so long as they are integral to the complaint and authentic." Philips v. Pitt Cty. Mem'l Hosp., 572 F.3d 176, 180 (4th Cir. 2009). Generally, a "court cannot go beyond these documents" without "convert[ing] the motion into one for summary judgment," an action from which courts should refrain "where the parties have not had an opportunity for reasonable discovery." E.I. du Pont, 637 F.3d at 448.

Notably, a Rule 12(b)(6) motion "tests the sufficiency of a complaint," but "does not resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." Republican Party of N.C. v. Martin, 980 F.2d 943, 952 (4th Cir. 1992). Thus, "claims lacking merit may be dealt with through summary judgment under Rule 56" rather than through a Rule 12(b)(6) motion. Swierkiewicz v. Sorema N. A., 534 U.S. 506, 514 (2002). Nonetheless, dismissal remains "appropriate when the face of the

complaint clearly reveals the existence of a meritorious affirmative defense." Brooks v. City of Winston-Salem, N.C., 85 F.3d 178, 181 (4th Cir. 1996).

## II. Administrative Exhaustion Challenges

The SBE, L'Homme, and Local Defendants seek dismissal of certain of Plaintiffs' claims for failure to exhaust administrative remedies.[7] In particular, L'Homme and Local Defendants assert that "Plaintiffs' claims arising prior to November 26, 2014[,] must be dismissed because Plaintiffs have failed to exhaust their

---

    7 The defendants maintain that Plaintiffs' alleged failure to exhaust administrative remedies deprives the Court of subject matter jurisdiction over such claims. (See Docket Entry 48 at 8; see also Docket Entry 43 at 2, 8, 10.) Although the United States Court of Appeals for the Fourth Circuit "once indicated, without analysis, that the exhaustion requirement was jurisdictional," the United States Supreme Court has subsequently "clarified the difference between jurisdictional requirements and mere claims processing provisions," raising questions regarding the "jurisdictional" nature of the IDEA exhaustion requirement. Southard v. Wicomico Cty. Bd. of Educ., 79 F. Supp. 3d 552, 556 (D. Md. 2015); see also E.L. ex rel. G.L. v. Chapel Hill-Carrboro Bd. of Educ., 975 F. Supp. 2d 528, 533 n.5 (M.D.N.C. 2013) (detailing evolution and resulting questions about exhaustion under the IDEA), aff'd sub nom. E.L. ex rel. Lorsson v. Chapel Hill-Carrboro Bd. of Educ., 773 F.3d 509 (4th Cir. 2014). In the context of this case, however, whether failure to exhaust administrative remedies under the IDEA constitutes a "jurisdictional" defect or a mere "claims processing provision" makes no practical difference, for at least two reasons. First, various defendants raised the administrative exhaustion issue, obviating questions regarding the Court's obligation to sua sponte consider such issue. See E.L., 975 F. Supp. 2d at 533 n.5. Second, the Dismissal Motions "invoke[] both Rule 12(b)(1) and 12(b)(6) and, because [their] jurisdictional challenge[s are] facial, the standard under the two rules is identical." Southard, 79 F. Supp. 3d at 557; see also id. at 556 (noting that, in such circumstances, questions regarding the "potentially jurisdictional character of the IDEA's exhaustion requirement" qualify as "entirely academic").

administrative remedies for those claims." (Docket Entry 48 at 8.)
Conversely, the SBE seeks dismissal of Plaintiffs' IDEA, Section
504, and ADA claims in their entirety for failure to exhaust. (See
Docket Entry 43 at 9-13.) The SBE further maintains that, "because
Plaintiffs failed to exhaust with respect to their federal claims
against the State Defendants, this Court should also dismiss
[Plaintiffs' NCSES and NCPDPA claims,] which allege violations of
state law only." (Id. at 13.)[8] Plaintiffs oppose these dismissal
requests. (See Docket Entries 50, 51, 54, 55.)

## A. Administrative Exhaustion Requirements

"The IDEA provides for a system of administrative review
before any claims arising under it may be pursued in state or
federal court." E.L. ex rel. G.L. v. Chapel Hill-Carrboro Bd. of
Educ., 975 F. Supp. 2d 528, 531 (M.D.N.C. 2013), aff'd sub nom.
E.L. ex rel. Lorsson v. Chapel Hill-Carrboro Bd. of Educ., 773 F.3d
509 (4th Cir. 2014). In North Carolina,

> [a] person wishing to sue under the IDEA first files a
> petition with [the North Carolina Office of
> Administrative Hearings (the "OAH")]. N.C. Gen. Stat.
> § 115C-109.6. OAH, a state agency, appoints an ALJ to
> hear and decide the case. Id. After this initial
> hearing and decision, any aggrieved party may appeal the
> ALJ's decision. N.C. Gen. Stat. § 115C-109.9. The
> [SBE], through its Exceptional Children Division,
> appoints an SRO to review the ALJ's findings appealed and

---

8    As discussed below, both the NCPDPA and NCSES claims
against the SBE remain subject to dismissal (as statutorily barred
and for failure to exhaust administrative remedies, respectively).
Therefore, the Court need not resolve the SBE's arguments regarding
supplemental jurisdiction over those claims.

> issue an independent decision. Id. The SRO's decision
> is final unless an aggrieved party timely files a civil
> action pursuant to 20 U.S.C. § 1415(i)(2)(A).

E.L., 975 F. Supp. 2d at 532.[9]

The United States Court of Appeals for the Fourth Circuit "ha[s] consistently held that a plaintiff must exhaust her administrative remedies before bringing such an action." Lorsson, 773 F.3d at 513–14. Furthermore, "[w]hen parents of a disabled child challenge multiple IEPs in court, they must have exhausted their administrative remedies for *each academic year* in which an IEP is challenged." MM ex rel. DM v. School Dist. of Greenville Cty., 303 F.3d 523, 536 (4th Cir. 2002) (emphasis in original).

Courts recognize "only three narrow exceptions to this exhaustion requirement . . .: (1) when the administrative process would have been futile; (2) when a school board failed to give parents proper notification of their administrative rights; or (3) when administrative exhaustion would have worked severe harm upon a disabled child." Id. The party asserting an exception to the exhaustion requirement bears the burden of proving it applies. Koster v. Frederick Cty. Bd. of Educ., 921 F. Supp. 1453, 1455 (D.

---

9 This exhaustion requirement applies equally to NCSES claims. See N.C. Gen. Stat. §§ 115C-109.6, 115C-109.9; see also id. § 115C-106.2(b) ("In addition to the purposes listed in subsection (a) of this section, the purpose of th[e NCSES] is to enable the [SBE] and local educational agencies to implement IDEA in this State. If th[e NCSES] is silent or conflicts with IDEA, and if IDEA has specific language that is mandatory, then IDEA controls.").

Md. 1996).  To meet this burden, the party "must demonstrate,"
inter alia, "that the underlying purposes of exhaustion would not
be furthered by enforcing the [exhaustion] requirement." Learning
Disabilities Ass'n of Md., Inc. v. Board of Educ. of Balt. Cty.,
837 F. Supp. 717, 724 (D. Md. 1993) (internal quotation marks
omitted).  "Whether a plaintiff has properly exhausted all
administrative remedies is a pure question of law . . . ."
Lorsson, 773 F.3d at 514.

Notably, the administrative exhaustion requirement extends
beyond a strictly IDEA claim.  Pursuant to 20 U.S.C. § 1415(*l*),

> [n]othing in [the IDEA] shall be construed to
> restrict or limit the rights, procedures, and remedies
> available under the Constitution, the [ADA], title V of
> the Rehabilitation Act of 1973, or other Federal laws
> protecting the rights of children with disabilities,
> except that before the filing of a civil action under
> such laws seeking relief that is also available under
> [the IDEA], the [IDEA's administrative procedures] shall
> be exhausted to the same extent as would be required had
> the action been brought under [the IDEA].

As the Supreme Court recently explained,

> [t]he first half of § 1415(*l*) (up until "except
> that") "reaffirm[s] the viability" of federal statutes
> like the ADA or Rehabilitation Act "as separate
> vehicles," no less integral than the IDEA, "for ensuring
> the rights of handicapped children."  H.R. Rep. No.
> 99-296, p. 4 (1985); see *id.*, at 6.  According to that
> opening phrase, the IDEA does not prevent a plaintiff
> from asserting claims under such laws even if . . . those
> claims allege the denial of an appropriate public
> education (much as an IDEA claim would).  But the second
> half of § 1415(*l*) (from "except that" onward) imposes a
> limit on that "anything goes" regime, in the form of an
> exhaustion provision.  According to that closing phrase,
> a plaintiff bringing suit under the ADA, the
> Rehabilitation Act, or similar laws must in certain

circumstances — that is, when "seeking relief that is also available under" the IDEA — first exhaust the IDEA's administrative procedures.

Fry v. Napoleon Cmty. Sch., __ U.S. __, __, 137 S. Ct. 743, 750 (2017) (second set of brackets in original).

In ascertaining whether claims require administrative exhaustion, "a court should look to the substance, or gravamen, of the plaintiff's complaint" to determine whether it "seek[s] relief for the denial of a FAPE." Id. at __, 137 S. Ct. at 752. If it does, administrative exhaustion requirements apply. See id.; see also id. at __, 137 S. Ct. at 754 ("[Section] 1415(*l*)'s exhaustion rule hinges on whether a lawsuit seeks relief for the denial of a free appropriate public education. If a lawsuit charges such a denial, the plaintiff cannot escape § 1415(*l*) merely by bringing her suit under a statute other than the IDEA — as when, for example, the plaintiffs in Smith [*v. Robinson*, 468 U.S. 992 (1984)] claimed that a school's failure to provide a FAPE also violated the Rehabilitation Act."). However, if "a complaint brought under [the ADA] and [Section] 504 . . . instead seek[s] relief for simple discrimination, irrespective of the IDEA's FAPE obligation," then its ADA and Section 504 claims escape the IDEA's administrative exhaustion requirements. Id. at __, 137 S. Ct. at 756.

To assist in identifying a complaint's gravamen, the Supreme Court offered

a pair of hypothetical questions. First, could the plaintiff have brought essentially the same claim if the

alleged conduct had occurred at a public facility that was *not* a school — say, a public theater or library? And second, could an *adult* at the school — say, an employee or visitor — have pressed essentially the same grievance? When the answer to those questions is yes, a complaint that does not expressly allege the denial of a FAPE is also unlikely to be truly about that subject; after all, in those other situations there is no FAPE obligation and yet the same basic suit could go forward. But when the answer is no, then the complaint probably does concern a FAPE, even if it does not explicitly say so; for the FAPE requirement is all that explains why only a child in the school setting (not an adult in that setting or a child in some other) has a viable claim.

Id. (emphasis in original). A further clue "that the gravamen of a suit is the denial of a FAPE" may lie in the history of the proceedings, particularly whether "a plaintiff has previously invoked the IDEA's formal procedures to handle the dispute — thus starting to exhaust the [IDEA's] remedies before switching midstream." Id. at __, 137 S. Ct. at 757. Although not dispositive, "prior pursuit of the IDEA's administrative remedies will often provide strong evidence that the substance of a plaintiff's claim concerns the denial of a FAPE, even if the complaint never explicitly uses that term." Id.

**B. Analysis**

The complaint at issue in Fry did not explicitly mention the child's FAPE or IEP. See id. at __, 137 S. Ct. at 758 ("The complaint contains no allegation about the denial of a FAPE or about any deficiency in [the child's] IEP. . . . And nothing in the nature of the [plaintiffs'] suit suggests any implicit focus on the adequacy of [the child's] education."). As detailed above,

however, Plaintiffs' Amended Complaint explicitly (and extensively) asserts the denial of a FAPE to O.V. (<u>See also, e.g.</u>, Docket Entry 36, ¶ 1 ("M.P. and P.V. file this complaint against [the d]efendants for their failure to provide O.V. a free appropriate public education, in violation of the [IDEA] . . . .").)[10] Nevertheless, in opposing the Local Dismissal Motion, Plaintiffs maintain that their "non-IDEA claims are premised on O.V.'s right to equal access to the general education classroom and curriculum, *not* the adequacy of O.V.'s special education services," and thus do not require exhaustion. (Docket Entry 55 at 10 (emphasis in original); <u>see also</u> Docket Entry 51 at 15-16 (asserting that "Plaintiffs were not required to exhaust their ADA and Section 504 claims" against the SBE under <u>Fry</u>).) That argument lacks merit.

As a preliminary matter, Local Defendants' alleged failure to educate O.V. amid his nondisabled contemporaries using the general curriculum comprises a pivotal aspect of Plaintiffs' IDEA claims. (<u>See, e.g.</u>, Docket Entry 36, ¶¶ 55 ("Beginning with O.V.'s enrollment in the DPS in 2009, [the d]efendants intentionally and

---

10 In fact, Plaintiffs' Section 504 and Section 1983 claims expressly allege violations of the IDEA and denial of a FAPE. (<u>See, e.g.</u>, <u>id.</u>, ¶¶ 369 (alleging, regarding Section 504 claims, that "[the Board] failed to provide O.V. with a FAPE and reasonable accommodations due to his disability-related behaviors"), 401 (alleging, regarding Section 1983 claims, that "[the d]efendants knew or should have known that their response to Plaintiffs' request for O.V. to receive academic instruction in a general education classroom was contrary to the [LRE] mandates of the IDEA and other laws").)

collectively participated in the systematic exclusion of O.V. from the regular education environment, and the separation of O.V. from his non-disabled peers." (first factual allegation against any defendant in the Amended Complaint's "Summary of Facts" (emphasis omitted)), 339 ("As a result of the segregation, O.V. did not develop appropriate academic, social, and communication skills, and has experienced stunted academic, communication, and social growth." (IDEA claims)), 342 ("From 2009 through 2015, O.V. could have been educated satisfactorily in the regular education setting with supplemental aids and services, yet, contrary to the scientifically-based research on the education of students with intellectual disabilities, [the Board] repeatedly predetermined O.V.'s placement in the Separate setting, segregated from his non-disabled peers." (IDEA claims)).)[11] Local Defendants' handling

---

[11] Indeed, O.V.'s placement animates Plaintiffs' every claim, whether or not brought under the IDEA. (See, e.g., id., ¶¶ 372 ("As a result of the segregation, O.V. did not develop appropriate academic, social, and communication skills, and has experienced stunted academic, communication, and social growth." (Section 504 claims)), 382 (same (ADA claims)), 392 (same (NCPDPA claims)), 402 (same (Section 1983 claims)); see also ¶¶ 370-71 ("[The Board] refused to allow O.V. to access his education in the general education setting with his non-disabled peers and denied O.V. the opportunity to participate in an education program that was not separate or different; [The Board] refused to provide O.V. an appropriate education that was designed to meet his individual educational needs as adequately as the needs of nonhandicapped persons are met." (Section 504 claims) (internal quotation marks omitted)); 388 ("As detailed in [the IDEA claims], [the Board] failed to provide O.V. with a free appropriate public education in violation of state law provisions . . . ." (NCSES claims)); 401 ("[The d]efendants knew or should have known that their response to Plaintiffs' request for O.V. to receive academic instruction in a

of O.V.'s placement, Plaintiffs allege, deprived O.V. of a FAPE. (See, e.g., id., ¶¶ 334, 336-40.) Given these allegations, it seems self-evident that "[P]laintiff[s] must first submit [their] case to an IDEA hearing officer, experienced in addressing exactly the issues [they] raise[]." Fry, __ U.S. at __, 137 S. Ct. at 754.

Consideration of the Supreme Court's "clue[s regarding] whether the gravamen of a complaint against a school concerns the denial of a FAPE, or instead addresses disability-based discrimination," id. at __, 137 S. Ct. at 756, reinforces this conclusion. To begin with, given the relevant conduct — failure to educate O.V. alongside his nondisabled contemporaries using the general curriculum — O.V. could not bring essentially the same claim against another public facility, such as a theater or library. See id.; see also id. at __, 137 S. Ct. at 757 (offering example of lawsuit where alleged discriminatory conduct involved "failing to provide remedial tutoring in mathematics," and asking, "can anyone imagine the student making the same claim against a public theater or library?"). Nor could an adult at the school lodge "essentially the same grievance." Id. at __, 137 S. Ct. at

---

general education classroom was contrary to the [LRE] mandates of the IDEA and other laws." (Section 1983 claims)); 408-09 ("[T]he Settlement Agreement included a provision whereby [the] Board would place O.V. in the general education classroom for two hundred five (205) minutes each day, with forty-five (45) minutes of this instruction to be provided with a co-teaching model. [The] Board breached the Settlement Agreement, because [the Board] failed to provide O.V. with the forty-five (45) minutes of instruction provided with a co-teaching model." (breach of contract claim)).)

756; see also id. at __, 137 S. Ct. at 757 (asking whether anyone
can "imagine an adult visitor or employee suing the school to
obtain a math tutorial?").  As such, in this case, the answer to
Fry's two hypothetical questions "is no," id. at __, 137 S. Ct. at
756.[12]

Furthermore, the history of these proceedings "provide[s]
strong evidence that the substance of [Plaintiffs'] claim[s]
concerns the denial of a FAPE."  Id. at __, 137 S. Ct. at 757.
Plaintiffs pursued administrative remedies on their claims and,
indeed, exhausted administrative remedies on certain of their

---

12  In arguing to the contrary, Plaintiffs rely on Abraham P.
v. Los Angeles Unified School District, No. CV 17-3105, 2017 WL
4839071 (C.D. Cal. Oct. 5, 2017), a case arising from alleged
physical abuse of a child at a fully segregated special education
school, prior to his transition to a school where, for the first
time in ten years, he "[wa]s now able to spend time in school with
non-disabled peers," id. at *3. (See Docket Entry 51 at 11-12, 15-
16 (discussing Abraham P.); Docket Entry 55 at 7-8, 10-11 (same).)
In that case, the plaintiff resolved his IDEA claims through the
administrative process and "later filed another due process request
in relation to statutes other than the IDEA, including the statutes
he sue[d] under [in his federal lawsuit]," but the office of
administrative hearings "dismissed that complaint because it lacked
jurisdiction over those claims." Abraham P., 2017 WL 4839071, at
*3.  Thereafter, seeking only monetary damages rather than any
educational relief, the plaintiff filed suit under the ADA, Section
504, and Section 1983 regarding the alleged physical abuse and
segregation.  See id. at *1, *5.  Under the circumstances
presented, the Abraham P. court concluded that the gravamen of the
plaintiff's complaint "d[id] not seek redress that is available
under the IDEA" and, alternatively, that the "[p]laintiff
sufficiently exhausted the IDEA's administrative procedures and
that any further exhaustion would be futile." Id. at *5. Here, by
contrast, Plaintiffs explicitly seek relief for the denial of a
FAPE, the deprivation of which constitutes the gravamen of the
Amended Complaint.  As such, Abraham P. does not support
Plaintiffs' position.

claims prior to initiating this federal suit. (<u>See, e.g.</u>, Docket Entry 36, ¶¶ 272, 284-85, 315-18.) This "prior pursuit of the IDEA's administrative remedies," <u>Fry</u>, __ U.S. at __, 137 S. Ct. at 757, confirms that the denial of a FAPE constitutes the gravamen of Plaintiffs' Amended Complaint.

Under these circumstances, Plaintiffs' ADA, Section 504, and Section 1983 claims remain subject to the IDEA's administrative exhaustion requirement.

### i. Claims against the Board

Alternatively, Plaintiffs maintain that "[their] claims against [the] Board arising prior to November 26, 2014, should not be dismissed, as Plaintiffs exhausted administrative remedies." (Docket Entry 54, ¶ 1.) As support for this contention, Plaintiffs present two arguments.

First, Plaintiffs seek refuge in the futility exception. (<u>See</u> Docket Entry 55 at 9.) More particularly, they assert that they "had no reason to specifically appeal the decision" of ALJ Elkins "dismiss[ing] Plaintiffs' claims arising prior to November 26, 2014, due to the release contained in the Settlement Agreement," as the SRO could not offer Plaintiffs the relief they sought, namely "declar[ing] the Settlement Agreement voided due to [the Board']s breach." (<u>Id.</u>) However, regardless of her power "to declare the Settlement Agreement voided" (<u>id.</u>), the SRO possessed authority to overrule ALJ Elkins' dismissal of Plaintiffs' claims as barred by

its release.  See N.C. Gen. Stat. § 115C-109.9(a) ("Any party aggrieved by the findings and decision of a hearing officer . . . may appeal the findings and decision within 30 days after receipt of notice of the decision . . . .  The [SRO] shall conduct an impartial review of the findings and decision appealed under this section.  The [SRO] conducting this review shall make an independent decision upon completion of the review."). Accordingly, Plaintiffs cannot establish that futility excused their exhaustion obligation.  See Koster, 921 F. Supp. at 1455 ("The burden of proving an exception to the exhaustion requirement rests on the party asserting the exception.").

Second, Plaintiffs maintain that they satisfied their exhaustion requirement by appealing ALJ Lassiter's final decision, which they argue "included the Order dismissing Plaintiffs' claims."  (Docket Entry 55 at 10.)  Although ALJ Lassiter's decision acknowledges ALJ Elkins' dismissal order (see, e.g., Docket Entry 17-1 at 6 (noting that said order "limited claims in this contested case to claims arising after November 26, 2014")), it does not address the merits of that order (see, e.g., id. at 29).  Rather, in light of that order, the decision limits the relevant "Issue[] for Hearing" to "Whether [the Board] provided O.V. a FAPE in the LRE from November 27, 2014, through June 12, 2015?"  (Id.)  Moreover, Plaintiffs concede that they "did not submit written arguments concerning this specific aspect of the

ALJ's decision" to the SRO. (Docket Entry 55 at 10.) Given that the SRO "ha[s] jurisdiction to review only those findings and decisions *appealed*," Lorsson, 773 F.3d at 516 (emphasis in original), Plaintiffs' actions failed to bring the merits of ALJ Elkins' decision before the SRO. Indeed, the SRO's decision explicitly notes as much:

> The parties stipulated that . . . [ALJ] Elkins II, in an Order granting [the Board's] Motion for Partial Summary Judgment on January 6, 2016, limited the issues to be presented for hearing in the above-captioned matter to those arising after November 26, 2014. Neither party submitted an appeal of ALJ Elkins's January 6, 2016, Order. Thus, neither ALJ Elkins's January 6, 2016 Order, nor any issues arising prior to November 26, 2014, are presented for review.

(Docket Entry 17-2 at 8.) Under the circumstances, Plaintiffs failed to exhaust administrative remedies on their claims arising prior to November 26, 2014.

In sum, Plaintiffs' IDEA, Section 504, ADA, Section 1983, and NCSES claims require administrative exhaustion,[13] which Plaintiffs did not achieve for their claims arising prior to November 26,

_____

13   The Board also maintains that Plaintiffs' NCPDPA claims require administrative exhaustion, as they "repeat[] the Section 504 claims." (Docket Entry 48 at 11.) The Board does not offer any authority in support of this argument (see id.), and Plaintiffs fail to address this contention (see generally Docket Entry 55), perhaps because Plaintiffs concede that the "NCPDPA[] does not allow a plaintiff to file claims under the NCPDPA simultaneously with Section 504 claims" (Docket Entry 54, ¶ 9). In light of this acknowledged statutory bar, see N.C. Gen. Stat. § 168A-11(c), the Court need not resolve whether Plaintiffs' NCPDPA claims also fail for lack of administrative exhaustion.

2014.  Accordingly, the Court should dismiss those claims for failure to exhaust administrative remedies.[14]

### ii. Claims against the SBE

Unlike with the Board, Plaintiffs failed to pursue administrative exhaustion of any claims against the SBE.  (See, e.g., Docket Entry 17-2 at 1 (identifying the Board as the respondent in the SRO decision).)  Accordingly, the SBE seeks dismissal of the claims against it in their entirety.  (See, e.g., Docket Entry 43 at 9-13.)  In response, Plaintiffs first contend that they need not exhaust under Fry.  (See Docket Entry 51 at 10-12, 15-16.)  For reasons previously discussed, that argument lacks merit.

Plaintiffs further maintain that "[a]dministrative exhaustion is not required when suing a state educational agency for violations of the IDEA" (id. at 12 (emphasis omitted)) and that administrative exhaustion "would have been futile" (id. at 14 (emphasis omitted)).  (See id. at 12-15.)  More particularly, Plaintiffs contend that, under "the structure of the IDEA, it is

---

14  Local Defendants and L'Homme alternatively contend that Plaintiffs' "claims related to the IDEA arising prior to August 13, 2014[,] are barred by the applicable statute of limitations" (Docket Entry 48 at 13 (emphasis omitted)), as well as that the statute of limitations bars Plaintiffs' Section 1983 "claims that arose prior to July 26, 2014" (id. at 28).  Plaintiffs dispute these contentions.  (Docket Entry 54, ¶¶ 3, 7.)  In light of Plaintiffs' failure to exhaust administrative remedies, the Court need not resolve whether the statute of limitations would independently bar such claims.

clear state educational agencies (SEAs) were not intended to be parties in due process hearings." (Id. at 13.) Plaintiffs also contend that the Amended Complaint "challenge[s] the State Defendants' systemic practice of allowing the exclusion of children with disabilities from the regular education classroom" and "[a] claim challenging systemic practices does not require exhaustion." (Id. at 14.) The SBE disputes these contentions. (See Docket Entry 57 at 4-7.)

Although the IDEA explicitly addresses the participation of local educational agencies in due process hearings, it offers less clarity regarding state educational agencies. For instance, the IDEA frequently details obligations of both the "state educational agency" and the "local educational agency," see, e.g., 20 U.S.C. § 1415(e)(1) (mandating that such agencies create mediation procedures), but also refers generically to the participating "agency," see, e.g., 20 U.S.C. § 1415(e)(2)(F)(ii) (providing that, if "a resolution is reached to resolve the complaint through the mediation process, the parties shall execute a legally binding agreement that . . . is signed by both the parent and a representative of the agency who has the authority to bind such agency"). Moreover, as regards the due process hearing, the IDEA expressly recognizes "the right of a parent to file a complaint with the State educational agency," 20 U.S.C. § 1415(f)(3)(F), and contemplates the participation of multiple parties in the hearing,

see 20 U.S.C. § 1415(f)(2)(A) ("Not less than 5 business days prior to a hearing conducted pursuant to paragraph (1), each party shall disclose to all other parties all evaluations completed by that date, and recommendations based on the offering party's evaluations, that the party intends to use at the hearing."). Finally, the IDEA authorizes an award of attorney's fees "to a prevailing party who is a State educational agency or local educational agency," 20 U.S.C. § 1415(i)(3)(B)(i)(III), in a "civil action with respect to the complaint presented pursuant to this section" brought by a "party aggrieved by the findings and decision" from a due process hearing, 20 U.S.C. § 1415(i)(2)(A). Accordingly, at a minimum, the IDEA does not foreclose participation of the SBE in the due process hearing.

Furthermore, courts diverge on whether administrative exhaustion requirements apply to suits against state educational agencies. (Compare Docket Entry 57 at 4-7 (discussing decisions requiring exhaustion), with Docket Entry 51 at 12-15 (discussing decisions excusing exhaustion).) However, the three decisions on which Plaintiffs rely — W.H. by & through his parents (M.H. & D.R.) v. Tennessee Department of Education, Civ. Action No. 3:15-1014, 2016 WL 236996 (M.D. Tenn. Jan. 20, 2016), I.L. through Taylor v. Knox County Board of Education, 257 F. Supp. 3d 946 (E.D. Tenn. 2017), and D.M. v. New Jersey Department of Education, 801 F.3d 205

(3d Cir. 2015) (see Docket Entry 51 at 12-15) — involved circumstances very different from those presented here.

For example, one case involved a challenge to statewide financial allocations and explicitly noted that no child's educational needs were at issue in the parties' dispute:

> [T]he express purpose behind the administrative exhaustion requirement — the ability to review educational placements at the local level — does not apply to the issues in this action. The plaintiffs are not asking the court to conduct a thorough review of all aspects of the plaintiffs' educational needs. Rather, they are raising the very pointed question of whether — in meeting those needs — particular systemic practices, namely the promulgation and consideration of improper financial incentives within the framework of allocating state funding for the plaintiffs' education, caused the plaintiffs to be placed in more restrictive environments than necessary, contrary to federally mandated LRE requirements. . . . The court does not require a full administrative record regarding the plaintiffs' disabilities and recommended services — matters that do not appear to be at issue in this action — in order to answer this question.

W.H., 2016 WL 236996, at *5. Here, however, O.V.'s educational needs remain at the core of the parties' dispute. Moreover, Plaintiffs present not a statewide systemic challenge, but rather challenge the practice of one local educational agency, which the SBE purportedly failed to correct. (See, e.g., Docket Entry 36, ¶ 74 (alleging that L'Homme and Individual Local Defendants implemented the "Board's unwritten and illegal policy of removing disabled children from general education classrooms by the third (3rd) grade if [the] Board believes the disabled child will be unsuccessful on the state mandated end of grade tests or requires

a modified curriculum" and that, because the "Board annually reported these decisions to [the SBE], [State Defendants] knew of this policy and effectively sanctioned it by allowing it to continue unabated").)

Additionally, both W.H. and I.L. rest in part on concerns that, under the particular administrative system in place in Tennessee, the involvement of the state as a defendant might compromise the neutrality of the administrative hearing officers. See I.L., 257 F. Supp. 3d at 958 ("The state educational agency has one main job:  to act as a neutral third party who holds due-process hearings.  And the inability to appeal from state hearings reveals that there is no risk of the state agency being impartial, since it is not a party."); W.H., 2016 WL 236996, at *5 (finding that "it would clearly be futile for the plaintiffs in this action to attempt to exhaust their particular claims regarding the defendants' systemic practices through state administrative procedures" in part because "the state is a defendant in this action and has an interest in upholding, rather than changing, its current practices").  Here, by contrast, the hearing officers involved in North Carolina's administrative review process possess independence from the SBE.  See N.C. Gen. Stat. § 115C-109.9(b) ("No person may be appointed as a Review Officer if that person is an employee of the [SBE], the [NCDPI], or the local educational agency that has been involved in the education or care of the child

whose parents have filed the petition."); <u>Lorsson</u>, 773 F.3d at 513, 515 (observing that, instead of the SBE, "another entity," namely the OAH, appoints the "ALJs [who] conduct the due process hearings required by the IDEA").

The final decision upon which Plaintiffs rely involved a school and parents' joint challenge to a state's allegedly "arbitrary and capricious" regulation of the school, which prevented the school from continuing certain practices specified in the child's IEP. <u>See</u> <u>D.M.</u>, 801 F.3d at 208. The <u>D.M.</u> court thus considered whether the lawsuit qualified as an IDEA proceeding pursuant to which the parents could invoke the IDEA's "stay-put" provision. <u>See</u> <u>id.</u> at 211. Unlike in <u>D.M.</u>, this case does not involve a dispute between a jointly aligned local educational facility and parents against a state agency that allegedly arbitrarily and capriciously interfered in the school's implementation of a child's IEP.

In sum, the decisions on which Plaintiffs depend for their exhaustion argument differ in material respects from the circumstances presented here, and, as such, fail to compel a like result in this case.

Furthermore, federal courts — including other courts within this Circuit — routinely require administrative exhaustion of IDEA-related lawsuits against state educational agencies. <u>See, e.g.</u>, <u>C.P. v. Tennessee Dep't of Educ.</u>, No. 3:16-cv-2938, 2018 WL

1566819, at *6 n.3 (M.D. Tenn. Mar. 30, 2018) ("find[ing] *I.L.* distinguishable from this action"); B.I. v. Montgomery Cty. Bd. of Educ., 750 F. Supp. 2d 1280, 1284-85 (M.D. Ala. 2010) ("[B]ecause [the state department of education] was not a party to the impartial due process hearing, [the p]laintiffs failed to exhaust administrative remedies with respect to [it].") (collecting cases); McGraw v. Board of Educ. of Montgomery Cty., 952 F. Supp. 248, 254-55 (D. Md. 1997) ("[The p]laintiffs' allegations under IDEA are not properly before the [c]ourt, as [the p]laintiffs have failed to exhaust administrative remedies against the [s]tate [d]efendants. . . . [The state department of education] was not a party to the administrative proceedings that are on appeal in this [c]ourt, no claims were raised against the [s]tate defendants in those proceedings, and thus no issues regarding the [s]tate [d]efendants' conduct should be included in an appeal in this case.").

This approach makes good sense, for as the United States Court of Appeals for the Fifth Circuit has observed:

> [The] IDEA allows [courts] to review the administrative proceedings, including the evidentiary due process hearing, but does not provide for [courts] to act as the first hearing body. 20 U.S.C. § 1415(i)(2)(C). . . . [T]he state education agency is best situated to hear and resolve IDEA complaints. By failing to exhaust the IDEA's administrative remedies, the [plaintiffs] did not give the State an appropriate opportunity to resolve their complaints prior to filing suit against the State. *See Marvin H. v. Indep. Sch. Dist.*, 714 F.2d 1348, 1358 (5th Cir. 1983) (noting the procedural frameworks set out in the IDEA's predecessor, the EAHCA, allows parents and educators an opportunity to make joint decisions

> regarding a disabled child's education and focuses on a
> non-judicial resolution of conflicts).

<u>Papania-Jones v. Dupree</u>, 275 F. App'x 301, 303-04 (5th Cir. 2008).

Here, in addition to providing the SBE an opportunity to resolve
this dispute prior to the initiation of a federal lawsuit,
exhaustion would have enabled development of a factual record
regarding Plaintiffs' allegation that the SBE's publications
mislead parents regarding the LRE requirement, a fact about which
the parties disagree. (<u>Compare</u> Docket Entry 36, ¶¶ 78-80, <u>with</u>
Docket Entry 43 at 14-15.)

As such, Plaintiffs have not satisfied their burden of showing
that they need not administratively exhaust their claims against
the SBE. <u>See</u> <u>Koster</u>, 921 F. Supp. at 1455 (explaining that the
party seeking relief from the exhaustion requirement bears the
burden of establishing an exemption); <u>Learning Disabilities</u>, 837 F.
Supp. at 724 (observing that such party must show that exhaustion
would not fulfill the requirement's underlying purposes). The
Court should therefore dismiss Plaintiffs' IDEA, ADA, Section 504,
and NCSES claims against the SBE for failure to exhaust.[15]

---

15   As discussed below, the Court should also dismiss
Plaintiffs' NCPDPA claim against the SBE as statutorily barred.

## III.  Release Contention

Local Defendants and L'Homme also assert that the Settlement Agreement bars any claims arising prior to November 26, 2014.[16] Plaintiffs dispute this contention.  (<u>See</u> Docket Entry 55 at 11-12.)  "As a preliminary matter, [Plaintiffs contend that] it would be inappropriate to dismiss claims based on the release contained in the Settlement Agreement without first resolving the separate claim of whether [the Board] breached the Settlement Agreement, thus voiding the release."  (<u>Id.</u> at 11.)  Contrary to Plaintiffs' contention, mere breach of an agreement does not automatically void such agreement; instead, if one party commits a material breach that "go[es] to the heart of the agreement," the other party may seek to declare the agreement "null and void," thereby rescinding its own obligations under the agreement.  <u>Jackson v. Mecklenburg Cty.</u>, No. 3:07-cv-218, 2008 WL 2982468, at *4 (W.D.N.C. July 30, 2008) (internal quotation marks omitted).  However, if contractual damages could adequately compensate the injured party, rescission remains unavailable.  <u>See</u> <u>Morris v. Scenera Research, LLC</u>, 368 N.C. 857, 867, 788 S.E.2d 154, 161 (2016) ("[R]escission cannot be the

_____

16   Local Defendants and L'Homme submitted the Settlement Agreement in support of their motion to dismiss.  (<u>See</u> Docket Entry 17-4; <u>see also</u> Docket Entry 47 at 2-3.)  The Court can consider the Settlement Agreement in resolving the Local Dismissal Motion because the Amended Complaint explicitly relies upon it (<u>see, e.g.,</u> Docket Entry 36, ¶¶ 264-68, 278), and Plaintiffs do not contest the authenticity of the submitted document (<u>see, e.g.,</u> Docket Entry 55 at 11-12).  <u>See</u> <u>Philips</u>, 572 F.3d at 180.

remedy for every material breach.  A party may pursue rescission only when a material breach occurs *and* all legal remedies falls short of compensating the injured party for its loss." (emphasis in original)).  Here, Plaintiffs neither seek rescission of the Settlement Agreement nor contest the availability of contractual damages.  (See, e.g., Docket Entry 36, ¶¶ 406-24 (detailing breach of contract claim, for which Plaintiffs seek "damages in excess of . . . $10,000" (id., ¶ 424)).)  Accordingly, Plaintiffs' "preliminary" argument fails.

Plaintiffs further contend that the Settlement Agreement bars only Plaintiffs' IDEA and NCSES claims.  (See Docket Entry 55 at 11-12.)  This argument possesses merit, at least in regard to Plaintiffs' Section 504, Section 1983, and ADA claims.[17]  According to the Settlement Agreement, Plaintiffs filed a petition on November 14, 2014, claiming that the Board "violated the procedural and substantive requirements of the [IDEA] . . . and the [NCSES] . . . while providing educational services to O.V."  (Docket Entry 17-4 at 1.)  The Settlement Agreement's "Voluntary Dismissal of Petition and Release of Claims" subsection specifies:

> [Plaintiffs] acknowledge that the petition filed at OAH Docket No. 14-EDC-09295 was filed to preserve their claims for alleged violations of the procedural and

---

17   The parties do not specifically address whether the release applies to Plaintiffs' NCPDPA claims.  (See Docket Entry 48 at 12-13; Docket Entry 55 at 11-12.)  As with the administrative exhaustion issue, see supra note 13, the Court need not resolve whether the release applies to those (statutorily barred) claims.

substantive requirements of the IDEA in the event [Plaintiffs] and [the Board] were unable to reach an agreement on the terms or implementation of the compensatory services and mediation agreement in general. The parties agree that this Agreement resolves and releases the claims arising out of or on account of the petition filed at OAH Docket No. 14-EDC-09295. Contemporaneous with the full execution of this Agreement, [Plaintiffs] agree to dismiss the petition filed at OAH Docket No. 14-EDC-09295.

(Id. at 2.)

Plaintiffs concede that this release applies to their IDEA and NCSES claims, but argue that it "does not bar [their] non-IDEA claims" (Docket Entry 55 at 11). (See id. at 11-12.) For a release to bar an ADA, Section 504, or Section 1983 claim, the release must "contain[] a knowing and intelligent waiver of the [p]laintiffs' right to bring such a claim," Shirey ex rel. Kyger v. City of Alexandria Sch. Bd., No. 99-1127, 229 F.3d 1143, 2000 WL 1198054, at *3 (4th Cir. 2000) (unpublished) (addressing ADA and Rehabilitation Act claims); see also Funderburk v. Coley, No. 1:15-cv-275, 2015 WL 8179542, at *4 (M.D.N.C. Dec. 7, 2015) ("A release of claims under section 1983 is valid only if it results from a decision that is voluntary, deliberate, and informed." (internal quotation marks omitted)). Given the Settlement Agreement's exclusive focus on IDEA and NCSES claims, without "mention of a waiver or release of any rights or claims under federal discrimination laws" or Section 1983, the release does not "amount[] to a waiver of [Plaintiffs' non-IDEA] federal claims." Shirey, 2000 WL 1198054, at *3-4. Therefore, the Settlement

57

Agreement's release bars Plaintiffs' IDEA and NCSES claims arising prior to November 26, 2014 (see Docket Entry 17-4 at 1 (identifying November 26, 2014, as the Settlement Agreement's effective date)), but not their ADA, Section 1983, and Section 504 claims.

Thus, independently of the failure to exhaust, Plaintiffs' IDEA and NCSES claims arising prior to November 26, 2014, remain subject to dismissal as barred by the Settlement Agreement.

## IV.  Breach of Contract Claim

The Board next seeks dismissal of Plaintiffs' breach of contract claim for lack of subject matter jurisdiction. (See Docket Entry 48 at 15-17.)  In the Board's view, "[supplemental] jurisdiction should not be extended under the[] circumstances" of this case. (Id. at 16.)[18]  More specifically, the Board argues that, "[u]nder ordinary circumstances, the breach of contract claim here could be considered closely related to the IDEA claims and therefore supplemental jurisdiction might be appropriate. Here, however, [P]laintiffs have twice abandoned this

_____

18    The Board also argues that, "[t]o the extent that Plaintiffs claim that there is federal question jurisdiction regarding their breach of contract claims via the IDEA's language authorizing enforcement of mediation agreements, see 20 U.S.C. § 1415(e)(2)(F)(iii), their claims are barred by the IDEA's one-year statute of limitations." (Docket Entry 48 at 15.)  The Amended Complaint asserts only supplemental jurisdiction regarding Plaintiffs' breach of contract claim (see Docket Entry 36, ¶ 422), and Plaintiffs expressly disclaim reliance on federal question jurisdiction for this claim in their opposition to the Local Dismissal Motion (see Docket Entry 55 at 19).  Accordingly, the Board's statute of limitations contention does not affect the jurisdictional analysis.

claim in different fora and should not be permitted a third bite at the apple."  (Id.)

In support of this contention, the Board first emphasizes that Plaintiffs "raise[d] a breach of contract claim . . . only as a responsive effort to prevent the partial dismissal" of their pre-November 2014 IDEA claims, and failed to appeal the order dismissing those claims to the SRO.  (Id. at 16-17.)  The Board also highlights that Plaintiffs voluntarily dismissed their state court action after the state court dismissed their fraudulent inducement claim, breach of good faith and fair dealings claim, and any breach of contract claim arising before November 26, 2014. (See id. at 17; see also Docket Entry 36, ¶ 281.)  The Board contends that "this is a compelling reason to decline supplemental jurisdiction under 28 U.S.C. § 1367(c)(4) in this particular case." (Docket Entry 48 at 17.)

The statute governing this Court's supplemental jurisdiction provides that the Court

> may decline to exercise supplemental jurisdiction over a claim . . . if —
>
> (1) the claim raises a novel or complex issue of State law,
>
> (2) the claim substantially predominates over the claim or claims over which the [Court] has original jurisdiction,
>
> (3) the [Court] has dismissed all claims over which it has original jurisdiction, or

>     (4) in exceptional circumstances, there are other
>     compelling reasons for declining jurisdiction.

28 U.S.C. § 1367(c). This case does not present the "exceptional circumstances" required under Section 1367(c)(4).

To begin with, ALJ Elkins' order expressly states that the administrative "[t]ribunal is not the appropriate forum for a claim of breach or a request to void the Settlement [Agreement]." (Docket Entry 17-3 at 3.) Thus, Plaintiffs' decision to pursue their "allegations about fraud and misrepresentation related to the Settlement [Agreement]" and their breach of contract claim(s) in an "appropriate forum" (id.), rather than through the administrative proceeding, does not constitute an "exceptional circumstance[]" or "compelling reason[] for declining jurisdiction," 28 U.S.C. § 1367(c)(4). Moreover, given that (1) North Carolina law authorized Plaintiffs to dismiss and refile their state claims and (2) Plaintiffs raise only their (surviving) breach of contract claim in this forum, their pursuit of their breach of contract claim in the same proceeding as their related federal claims does not constitute a "compelling reason[]," id., or "exceptional circumstance[] that would warrant [declining jurisdiction] under the § 1367(c)(4) catchall," Regenicin, Inc. v. Lonza Walkersville, Inc., 997 F. Supp. 2d 1304, 1312 (N.D. Ga. 2014) (rejecting request to decline jurisdiction over state-law breach of contract claims). As such, the Court should deny the Board's request to dismiss the breach of contract claim.

## V.  NCPDPA Claims

The SBE and the Board also ask the Court to dismiss Plaintiffs' NCPDPA claims.  (See Docket 43 at 13; Docket Entry 48 at 18-19.)  In particular, the Board contends that the NCPDPA bars Plaintiffs from pursuing NCPDPA claims simultaneously with ADA and Section 504 claims based on the same conduct.  (See Docket Entry 48 at 18.)  The NCPDPA provides that

> [n]o court shall have jurisdiction over an action filed under th[e NCPDPA] where the plaintiff has commenced federal judicial or administrative proceedings under . . . Section 504 . . . or under the [ADA] . . . involving or arising out of the facts and circumstances involved in the alleged discriminatory practice under th[e NCPDPA].

N.C. Gen. Stat. § 168A-11(c).  Plaintiffs' NCPDPA claims arise from the same facts and circumstances as their ADA and Section 504 claims.  (Compare Docket Entry 36, ¶¶ 363-86, with id., ¶¶ 390-94.)  Thus, as Plaintiffs concede (see Docket Entry 54, ¶ 9), Section 168A-11(c) bars their NCPDPA claims.  The Court should therefore dismiss these claims.

## VI.  NCSES Claims

The Board additionally requests dismissal of Plaintiffs' NCSES claims as duplicative of their IDEA claims.  (See Docket Entry 48 at 17-18.)  In their response to the Local Dismissal Motion, "Plaintiffs agree that North Carolina's special education statutes do not provide any relief beyond that available under the IDEA, and therefore claims brought under these statutes are duplicative of

61

IDEA claims." (Docket Entry 54, ¶ 8.) Furthermore, Plaintiffs included no arguments against dismissal of their NCSES claims in their opposition memorandum. (See generally Docket Entry 55.) Under the circumstances, the Court should deem Plaintiffs' NCSES claims abandoned and dismiss them accordingly. See, e.g., Southard v. Wicomico Cty. Bd. of Educ., 79 F. Supp. 3d 552, 562 (D. Md. 2015) (dismissing claim as abandoned where the plaintiff failed to object to the defendant's dismissal argument, noting that "her opposition to the [defendant's] motion to dismiss does not mention [the claim] at all").

### VII. ADA and Section 504 Claims

The Board next asserts that the Amended Complaint fails to state a claim under either the ADA or the Rehabilitation Act. More specifically, the Board maintains that the Amended Complaint fails to allege that Local Defendants acted with "bad faith or gross misjudgment." (Docket Entry 48 at 20.) In the Board's view, "Plaintiffs' conclusory allegations regarding efforts to 'sabotage' O.V.'s general education time" fail to "support an inference of professional bad faith or gross misjudgment," as the illustrative "'examples' of 'sabotage' presented in the [Amended] Complaint are all discretionary educational decisions that courts routinely leave to professional educators." (Id.) Plaintiffs dispute this assessment, pointing to multiple allegations that, in their view, establish bad faith and gross misjudgment. (Docket Entry 55 at 20-

62

23.)  They also emphasize that their Section 504 and ADA claims
"are not solely . . . based on [the Board's] failure to provide
O.V. a FAPE under the IDEA.  Rather, Plaintiffs allege [that the
Board] denied O.V. *access* to an education program with his
nondisabled peers solely on the basis of his disability . . . ."
(Id. at 23 (emphasis in original).)  In this regard,

> Plaintiffs allege [that the Board] discriminated against
> O.V. solely on the basis of his disability, Down
> syndrome, which is evident from his physical appearance,
> and [the Board's] discriminatory misconceptions about
> O.V.'s ability to learn from the time he enrolled in the
> DPS.  Though O.V.'s measured intelligence upon enrollment
> was in the borderline range (i.e., below average, but not
> in the range of an intellectual disability), and O.V.
> demonstrated no behavior problems, [the Board]
> immediately segregated O.V., denied him access to the
> general education program, and placed him on an
> educational trajectory leading to certificate of
> attendance, employment at a sheltered workshop, and no
> skills for independent living.  [The Board] continued to
> discriminate against O.V. and deny him access to, or
> provide barely *de minimis* access to, the general
> education classroom and curriculum until O.V.'s parents
> retained legal counsel.

(Id. (citations omitted).)[19]

Section 504 and Title II of the ADA both prohibit disability-
based discrimination against qualified individuals.  See 29 U.S.C.
§ 794(a) ("No otherwise qualified individual with a disability
. . . shall, solely by reason of her or his disability, be excluded
from the participation in, be denied the benefits of, or be

---

19  The Board did not counter Plaintiffs' Section 504 and ADA
arguments.  (See Docket Entries dated Mar. 7, 2018, to present
(lacking reply from Local Defendants and L'Homme).)

subjected to discrimination under any program or activity receiving
Federal financial assistance . . . .”); 42 U.S.C. § 12132 (“[N]o
qualified individual with a disability shall, by reason of such
disability, be excluded from participation in or be denied the
benefits of the services, programs, or activities of a public
entity, or be subjected to discrimination by any such entity.”).
Moreover:

> Because the language and purpose of both Acts is
> substantially the same, the same analysis applies to
> claims brought under both statutes.  To establish a
> violation of either statute, a plaintiff must prove:
> (1) that []he has a disability; (2) that []he is
> otherwise qualified for the benefit or program in
> question, and (3) that []he was excluded from the benefit
> or program due to discrimination solely on the basis of
> the disability.

Shirey, 2000 WL 1198054, at *4 (citation omitted).[20]

---

20  Similarly, “retaliation claims under § 504 are subject to
the same standard as ADA retaliation claims.”  S.B. ex rel. A.L. v.
Board of Educ. of Harford Cty., 819 F.3d 69, 78 n.6 (4th Cir.
2016).  For such claims:

> Absent direct evidence of retaliation, [a plaintiff] may
> proceed under the familiar burden-shifting framework of
> McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802
> (1973), making a prima facie case of retaliation by
> showing (1) that [s]he engaged in protected activity,
> (2) that the [defendant] took an adverse action against
> h[er], and (3) that the adverse action was causally
> connected to h[er] protected activity.  If [the
> plaintiff] can meet this burden, then the [defendant]
> must articulate a “legitimate nonretaliatory reason for
> its actions,” at which point the burden shifts back to
> [the plaintiff] to “demonstrate that the proffered reason
> is a pretext for forbidden retaliation.”

Id. at 78 (citation omitted).  Although arguing that Plaintiffs’
ADA and Section 504 claims “should be dismissed in [their]

However, "[t]o prove discrimination in the education context, 'something more than a mere failure to provide the "free appropriate education" required by [IDEA] must be shown.'" <u>Sellers by Sellers v. School Bd. of City of Mannassas</u>, 141 F.3d 524, 529 (4th Cir. 1998) (final set of brackets in original). More specifically, in "the context of education of handicapped children," a plaintiff must show "either bad faith or gross misjudgment" to establish a Section 504 (or ADA) violation. <u>Id.</u> (internal quotation marks omitted). "What constitutes bad faith or gross misjudgment in this context has not been well defined." <u>K.D. ex rel. J.D. v. Starr</u>, 55 F. Supp. 3d 782, 790 (D. Md. 2014); <u>see also id.</u> at 790-91 (collecting and analyzing cases).

Mere negligence does not suffice, nor, standing alone, does "an incorrect evaluation[] or a substantively faulty individualized education plan." <u>Sellers</u>, 141 F.3d at 529 (internal quotation marks omitted). Conclusory allegations of gross misjudgment or bad faith without further factual development also fall short. <u>See Charlotte-Mecklenburg Bd. of Educ. v. B.H. ex rel. C.H. & W.H.</u>, No. 3:07cv189, 2008 WL 4394191, at *7 (W.D.N.C. Sept. 24, 2008) (explaining that "simply labeling the conduct at issue as having been performed in bad faith is insufficient to allege[] that the actions in question rise to that level"). However, courts have

---

entirety" (Docket Entry 48 at 21), the Board does not address M.P.'s ADA and Section 504 retaliation claims (<u>see id.</u> at 19-21).

declined to dismiss under Rule 12(b)(6) where the complaint contains allegations that, <u>inter alia</u>, "teachers consistently failed to honor the agreed-upon accommodations," <u>K.D.</u>, 55 F. Supp. 2d at 792, the school board engaged in a "pattern of . . . making unilateral decisions outside of the IEP process," <u>A.B. v. Baltimore City Bd. of Sch. Comm'rs,</u> Civ. Action No. 14-3851, 2015 WL 4875998, at *5 (D. Md. Aug. 13, 2015), and school officials "abrupt[ly] deci[ded] to discontinue significant parts of [the child's] educational program, without proper assessments and evaluations," <u>N.T. v. Baltimore City Bd. of Sch. Comm'rs</u>, No. CIV. 11-356, 2011 WL 3747751, at *8 (D. Md. Aug. 23, 2011), and/or lied to parents in IEP meetings and relied on such falsehoods in formulating the child's IEP, <u>see</u> <u>D.N. v. Louisa Cty. Pub. Sch.</u>, 156 F. Supp. 3d 767, 776-77 (W.D. Va. 2016).

Here, the Amended Complaint alleges that the Board follows a policy of segregating children it deems unlikely to succeed on EOGs from the regular educational environment. (<u>See</u> Docket Entry 36, ¶ 74.) As support for that proposition, the Amended Complaint details the near-universal exclusion of children classified as Intellectual Disability — Moderate from the regular educational environment in DPS and the erroneous definition of the LRE requirement provided to DPS parents in the Handbook. (<u>See</u> <u>id.</u>, ¶¶ 78-81, 118, 137, 185, 192, 200.) It further asserts that, upon meeting O.V., a child with obvious disabilities, DPS personnel

refused to permit him to attend an inclusive preschool setting and instead relegated him to a separate classroom. (See id., ¶¶ 54, 85-88, 94, 95, 97-101.) Then, they allegedly falsely represented on his IEP forms that they provided services at the private, inclusive preschool his parents paid for him to attend. (See id., ¶¶ 102, 103.) The Amended Complaint further maintains that, throughout O.V.'s preschool, kindergarten, and first grade school years, DPS officials consistently refused to entertain the prospect of him participating in the regular educational environment, and only relented once his parents involved legal counsel in the matter during O.V.'s first year in second grade. (See, e.g., id., ¶¶ 99, 106, 109, 116, 120-23, 131, 132, 134, 149, 150.)

However, purportedly to prevent this setting from becoming O.V.'s "stay put" option as he transitioned into third grade, Local Defendants refused to correct his IEP form to reflect his new, more-inclusive educational setting. (See id., ¶¶ 151, 344.) Further, Local Defendants reportedly failed to train O.V.'s second grade teachers regarding either O.V.'s disabilities or the inclusion of children with disabilities in the regular education classroom (and even rejected Plaintiffs' offer to pay for such training) (see id., ¶¶ 152, 204, 206, 208, 213, 249), notwithstanding that school officials relied on such teachers "'to completely change the curriculum for [O.V.]'" (id., ¶ 169). Moreover, O.V.'s initial second grade teacher allegedly segregated

him behind a cardboard partition at the back of the classroom (id., ¶ 153), and his subsequent second grade teacher purportedly refused to "modify O.V.'s work, because 'it takes an extensive amount of time to work with [O.V.]'" (id., ¶ 207 (alteration in original)).

Additionally, in an asserted effort to justify excluding O.V. from the inclusive setting, O.V.'s teachers began a campaign of extensively "redirecting" him, a practice so prevalent that it hindered his ability to respond, particularly in light of his verbal apraxia. (See id., ¶¶ 214-18.) For instance, on one occasion, a special education teacher tasked with co-teaching O.V. allegedly redirected him nearly 100 times in ten minutes, or approximately once every six seconds. (See id., ¶¶ 208, 209, 217.) Finally, on multiple occasions, Local Defendants purportedly represented to M.P. and P.V. that they engaged in co-teaching during O.V.'s repeat year in second grade, but his teachers later admitted that they did not, in fact, co-teach him that year. (See id., ¶¶ 209-11.)

At the IEP meeting to determine O.V.'s third grade placement, M.P. allegedly expressed her desire for O.V. to attend college and her belief that he possessed the capability to do so, but Local Defendants failed to disclose that their proposed plan for O.V. to take the EXTEND1 curriculum (rather than the regular curriculum and EOGs) would place him on an educational trajectory that precluded a high school diploma and college attendance. (See id., ¶¶ 241-

43.)  Moreover, notwithstanding data "overwhelmingly" indicating that O.V. made more progress in the inclusive setting than the segregated one, Local Defendants insisted that O.V. return to the segregated setting.  (See id., ¶¶ 225, 244, 245.)  Significantly, the same school official who proposed that Local Defendants cease co-teaching O.V. in the inclusive setting also stated that "'[O.V.] would not be appropriate for the EOG and [she] could not recommend he take that test'" (id., ¶ 241 (first set of brackets in original)).

Taken collectively, these allegations describe more than mere negligence or differing professional judgments regarding O.V.'s appropriate education.  Rather, accepting the Amended Complaint's allegations as true and drawing all reasonable inferences in Plaintiffs' favor, as required at this stage of proceedings, a reasonable factfinder could find that Local Defendants acted with bad faith and/or gross misjudgment.  See, e.g., N.T., 2011 WL 3747751, at *8 ("[A] jury could reasonably infer that the abrupt decisions to discontinue significant parts of [the child's] educational program, without proper assessments and evaluations, were made in bad faith or were gross misjudgments."); K.D., 55 F. Supp. 3d at 791-92 (finding bad faith or gross misjudgment where, inter alia, (1) the school rescinded a previously provided accommodation "without reason, over the [p]arents' protests" and despite knowing that evaluators "continu[ed] to find additional

areas of weakness" and (2) teachers consistently failed to provide the child's accommodations and/or required the child to ask for her accommodations despite being aware that her language and self-advocacy difficulties made such requests "particularly problematic," noting that, "[t]aken together, these facts could reasonably support the conclusion that [the school system] was no longer acting in good faith in seeking to address [the child's] needs fully").

The Court should therefore deny Local Defendants' motion to dismiss Plaintiffs' ADA and Section 504 claims that arise after November 26, 2014. See J.S., III by and through J.S. Jr. v. Houston Cty. Bd. of Educ., 877 F.3d 979, 986-87 (11th Cir. 2017) (concluding that allegations of a special education paraprofessional removing a child from the regular classroom to work in the weight room sufficiently showed that the child "was, with some frequency, excluded and isolated from his classroom and peers on the basis of his disability," and thus "state[d] a claim of intentional discrimination" under the ADA and Section 504 rather than "merely a FAPE violation under the IDEA"); Bess v. Kanawha Cty. Bd. of Educ., No. 2:08cv1020, 2009 WL 3062974, at *10 (S.D. W. Va. Sept. 17, 2009) ("Here, the plaintiffs allege more than the defendants' poor educational decisions such as a failure to diagnose disability or a failure to implement the IEP. The plaintiffs allege that [the child] was excluded from school and

from other educational activities because of his disability.  These allegations, if proven, would support a claim for disability discrimination under the ADA or § 504." (citations omitted)).

### VIII.  **Section 1983 Claims**

Finally, State Officials, L'Homme, and Local Defendants seek dismissal of Plaintiffs' Section 1983 claims for failure to state a claim.  (See, e.g., Docket Entry 43 at 13 ("[State Officials] are referenced in approximately sixteen paragraphs of the factual allegations section of the 426-paragraph [Amended] Complaint.  None provides sufficient grounds for sustaining an actionable claim."); Docket Entry 48 at 21-26 (contending that Plaintiffs do not adequately plead a violation of O.V.'s rights under the Fourteenth Amendment).)  Plaintiffs dispute these contentions.  (See Docket Entry 50, ¶ 1; Docket Entry 54, ¶ 5.)

To establish a Section 1983 claim, Plaintiffs must prove (1) that the relevant defendant(s) "deprived [them] of a right secured by the Constitution and laws of the United States[] and (2) that [such defendant(s)] deprived [them] of this constitutional right under color of [State] statute, ordinance, regulation, custom, or usage." Mentavlos v. Anderson, 249 F.3d 301, 310 (4th Cir. 2001) (internal quotation marks omitted; final set of brackets in original).[21]  However, "[b]ecause [the] IDEA provides a

---

21  To satisfy the second element, "the deprivation must be caused by the exercise of some right or privilege created by the State . . . or by a person for whom the State is responsible, and

comprehensive remedial scheme for violations of its own requirements, . . . parties may not sue under section 1983 for an IDEA violation." Sellers, 141 F.3d at 529. Instead, Plaintiffs may only pursue Section 1983 claims for alleged "constitutional failures," id. at 531, regarding O.V.

As a preliminary matter, Plaintiffs' Section 1983 claims expressly rely on IDEA violations. (See, e.g., Docket Entry 36, ¶ 401 ("[The d]efendants knew or should have known that their response to Plaintiffs' request for O.V. to receive academic instruction in a general education classroom was contrary to the [LRE] mandates of the IDEA and other laws.").) Accordingly, Sellers precludes Plaintiffs' Section 1983 claims to the extent those claims replicate their IDEA claims. See id., 141 F.3d at 529; see also, e.g., McNulty v. Board of Educ. of Calvert Cty., No. CIV.A. 2003-2520, 2004 WL 1554401, at *8 (D. Md. July 8, 2004) (granting motion to dismiss, explaining that "[the plaintiff] may not base a § 1983 claim, as he has attempted to do, on an IDEA violation" (internal quotation marks omitted)).

Nevertheless, Plaintiffs maintain that their Section 1983 claims "are not entirely related to the IDEA violations, and instead, stand on their own as specific violations of the

---

the party charged with the deprivation must be a person who may fairly be said to be a state actor. [S]tate employment is generally sufficient to render the defendant a state actor." West v. Atkins, 487 U.S. 42, 49 (1988) (internal quotation marks and citation omitted; ellipses and brackets in original).

Fourteenth Amendment for which Plaintiffs seek non-IDEA remedies." (Docket Entry 55 at 24; <u>see also</u> Docket Entry 51 at 16 ("Plaintiffs stated actionable claims against [State Officials]" (emphasis omitted).) In particular, Plaintiffs assert that State Officials, L'Homme, and Local Defendants violated (1) O.V.'s due process rights by depriving him of "a property interest in educational benefits and a liberty interest in the freedom to gain the requisite skills for independent living" (Docket Entry 55 at 24; Docket Entry 51 at 20) and (2) his equal protection rights by denying him "equal access to an education" (Docket Entry 55 at 27; <u>see also</u> Docket Entry 51 at 20 (alleging "intentional unequal treatment of O.V. as compared to all students entitled to an education in the DPS")).

## A. Due Process Claims

Under the Due Process Clause of the Fourteenth Amendment, States may not "deprive any person of life, liberty, or property, without due process of law." U.S. Const. Amend. XIV, § 1. Procedural due process provides "a guarantee of fair procedures — typically notice and an opportunity to be heard." <u>Kendall v. Balcerzak</u>, 650 F.3d 515, 528-29 (4th Cir. 2011) (internal quotation marks omitted). Thus, to succeed on their procedural due process claims, Plaintiffs must establish "(1) a cognizable liberty or property interest; (2) the deprivation of that interest by some form of state action; and (3) that the procedures employed were

constitutionally inadequate." Id. at 528 (internal quotation marks omitted).

North Carolina provides a free public education "to every person of the State less than 21 years old, who has not completed a standard high school course of study." N.C. Gen. Stat. § 115C-1. Therefore, "on the basis of state law, [O.V.] plainly had legitimate claims of entitlement to a public education," Goss v. Lopez, 419 U.S. 565, 573 (1975), and this "legitimate entitlement to a public education [constitutes] a property interest which is protected by the Due Process Clause," id. at 574. Notably, though, "[t]he property interest in education created by the [S]tate is participation in the entire process. The myriad activities which combine to form that educational process cannot be dissected to create hundreds of separate property rights, each cognizable under the Constitution." Pegram v. Nelson, 469 F. Supp. 1134, 1139 (M.D.N.C. 1979) (internal quotation marks and emphasis omitted). In other words, "[w]ith respect to public education, citizens possess a property interest not in the particulars of the educational experience, but rather in participation in the educational process as a whole." K.U. By & Through Michael U. v. Alvin Indep. Sch. Dist., 991 F. Supp. 599, 606 (S.D. Tex.), aff'd sub nom. K.U. v. Alvin Indep. Sch. Dist., 166 F.3d 341 (5th Cir. 1998); see also Pegram, 469 F. Supp. at 1140 (explaining that

"there is not a property interest in each separate component of the 'educational process'").

Here, "Plaintiffs claim [that] O.V. was denied access to the regular classroom and curriculum on the basis of his disability, depriving him of 'participation in the educational process as a whole.'" (Docket Entry 55 at 24.) This argument merely reprises Plaintiffs' IDEA claims, which cannot form the basis of Section 1983 claims. See Sellers, 141 F.3d at 529. Moreover, the Amended Complaint reveals that State Officials, L'Homme, and Local Defendants did not suspend or otherwise prevent O.V. from attending DPS schools, where he obtained a free public education until his parents withdrew him from DPS and enrolled him in Pinewoods Montessori. (See generally Docket Entry 36.) Accordingly, because the Amended Complaint does not plausibly allege that State Officials, L'Homme, and/or Local Defendants deprived O.V. of a protected property interest, Plaintiffs' Section 1983 property-related due process claims fail as a matter of law. See Kendall, 650 F.3d at 528.

Nor have Plaintiffs provided authority for the existence of any purported liberty interest. (See Docket Entry 55 at 25.) Instead, Plaintiffs contend that

> [L'Homme and Local D]efendants would hardly contest the
> education of a typically-developing student is designed
> to provide the foundation for future opportunities: the
> prospect of further schooling, a job, economic
> independence, daily living skills, etc. The liberty
> afforded to every student permitted access to the regular

classroom — to learn and be prepared to function in the world that exists after school — was denied to O.V.

(Id.) As with Plaintiffs' property claims, this assertion merely reformulates their IDEA claims. (See, e.g., Docket Entry 36, ¶¶ 336-40 (alleging that the failure to educate O.V. "in the regular education setting" caused O.V. to "experience[] stunted academic, communication, and social growth," had "a negative impact on his employability, earnings, and earning capacity," and "deprived [him] of the ability to become an independent adult").) Thus, particularly in the absence of any legal authority supporting the existence of the alleged liberty interest, the Court should dismiss this aspect of Plaintiffs' Section 1983 claims as well. See Kendall, 650 F.3d at 528.

## B. Equal Protection Claims

Plaintiffs also assert that L'Homme, Local Defendants, and State Officials violated O.V.'s rights under the Equal Protection Clause by denying him "equal access to an education, . . . [a] right [to which] _all_ students are entitled." (Docket Entry 55 at 28 (emphasis in original); see also Docket Entry 51 at 17 (asserting that State Officials "effectively sanctioned" the "Board's known discriminatory practice of segregating children with intellectual disabilities").) As the Fourth Circuit has explained,

> [t]he equal protection requirement "does not take from the States all power of classification," but "keeps governmental decisionmakers from treating differently persons who are in all relevant respects alike." To succeed on an equal protection claim, [a plaintiff] "must

first demonstrate that he has been treated differently from others with whom he is similarly situated and that the unequal treatment was the result of intentional or purposeful discrimination."  If he makes this showing, "the court proceeds to determine whether the disparity in treatment can be justified under the requisite level of scrutiny."  To state an equal protection claim, [a plaintiff] must plead sufficient facts to satisfy each requirement . . . .

Veney v. Wyche, 293 F.3d 726, 730–31 (4th Cir. 2002) (citations omitted; emphasis added).

In the educational context, this standard obliges a plaintiff to "prove [both that] a school board intended to treat children differently because of their disabilities," Sellers, 141 F.3d at 530, and that such "decision was without any rational basis," id. at 531.  See also id. at 530-31 (explaining that "the Supreme Court has yet to classify disabled persons as a suspect class" and "also has not identified education as a fundamental right").[22]  Notably,

_____

22  In this regard, the Fourth Circuit noted:

[D]ifferent standards of liability appl[y] to constitutional equal protection claims and to statutory IDEA claims . . . .  Under IDEA, the simple failure to provide a child with a free appropriate public education constitutes a violation of the statute.  20 U.S.C. § 1412(1).  By contrast, plaintiffs must meet a higher standard of liability to prevail on a constitutional claim.  The Supreme Court's decision in *Washington v. Davis*, 426 U.S. 229, 239 (1976), requires that an equal protection claim be supported by evidence of purposeful discrimination.  In the context of education of disabled children, *Washington*'s purpose requirement is similar to that recognized under [S]ection 504 . . . .  And even if a plaintiff can prove a school board intended to treat children differently because of their disabilities, another hurdle would remain.  Because the Supreme Court has yet to classify disabled persons as a suspect class,

"[t]he deference afforded to the government under the rational basis test is so deferential that even if the government's actual purpose in creating classifications is not rational, a court can uphold the [governmental action] if the court can envision some rational basis for the classification." Guerra v. Scruggs, 942 F.2d 270, 279 (4th Cir. 1991) (emphasis omitted); see also United States v. Carpio-Leon, 701 F.3d 974, 982 (4th Cir. 2012) (describing "rational-basis level of scrutiny" as "a low hurdle").

Here, the Amended Complaint alleges that, as DPS Superintendent since 2014 (see Docket Entry 36, ¶ 49), L'Homme "was signatory to [the] Board's applications for IDEA funds, and had direct and full knowledge of the disproportionate number of students with disabilities excluded from regular education placements" (id., ¶ 77), "yet failed to act" to correct this situation (id., ¶ 82). The Amended Complaint similarly alleges that, because the Board annually reported statistics regarding the

_____

see City of Cleburne v. Cleburne Living Ctr., Inc., 473 U.S. 432, 445-46 (1985), and because the Court also has not identified education as a fundamental right, San Antonio Indep. Sch. Dist. v. Rodriguez, 411 U.S. 1, 33-37 (1973), a plaintiff in this context would have to prove that a school board's decision was without any rational basis. Naturally school boards will be subject to liability for statutory IDEA violations much more frequently than for similarly pled constitutional claims. It is easy therefore to understand why Congress intended to subject school boards to the more expansive remedies available under section 1983 for their more culpable constitutional failures, yet not for breaches of IDEA.

Sellers, 141 F.3d at 530-31.

number of students in the segregated educational setting (see, e.g., id., ¶ 118), State Officials "knew of" the "Board's unwritten and illegal policy of removing disabled children from general education classrooms by the third (3rd) grade if [the] Board believes the disabled child will be unsuccessful on the state mandated end of grade tests or requires a modified curriculum. . . . and effectively sanctioned [this policy] by allowing it to continue unabated." (Id., ¶ 74.) Lastly, the Amended Complaint asserts that State Defendants "are responsible for publishing and issuing the [Handbook]" (id., ¶ 78), which contains a "patently wrong" and "intentionally misleading" definition of the LRE requirement (id., ¶ 80).

Even construed in the light most favorable to Plaintiffs and taking all reasonable inferences in their favor, these factual assertions simply do not suggest, let alone plausibly allege, that L'Homme and State Officials "intended to treat [O.V.] differently because of [his] disabilities," Sellers, 141 F.3d at 530, much less that they took action regarding O.V. "without any rational basis," id. at 531. See RM by & through MM v. Charlotte-Mecklenburg Cty. Bd. of Educ., No. 3:16-cv-528, 2017 WL 2115108, at *7 (W.D.N.C. May 15, 2017) (dismissing § 1983 claims as "unsupported by any allegation of fact describing alleged . . . disability-based discrimination by the individual defendants," and noting that "there are no facts put forth to show that one of the individual

defendants, [a school system superintendent], ever interacted with [the plaintiff-child] at the time of the alleged violations"); see also Giacomelli, 588 F.3d at 193 ("[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged — but it has not shown — that the pleader is entitled to relief, as required by Rule 8." (alterations and internal quotation marks omitted)). As such, Plaintiffs have failed to assert an equal protection claim against L'Homme and State Officials. See Ekweani v. Board of Educ. of Howard Cty., No. CIV. 07-3432, 2008 WL 5525606, at *3 (D. Md. Dec. 31, 2008) ("[T]he plaintiffs' complaint is devoid of any factual allegations that [the board-chairman defendant] individually engaged in conduct that deprived [the plaintiff-child] of a federal right. As plaintiffs have failed to put forth factual allegations that raise a right to relief above the speculative level, their § 1983 claim . . . will be dismissed." (citation and internal quotation marks omitted)); see also Marks v. Dann, 600 F. App'x 81, 84-85 (4th Cir. 2015) ("[T]he pleaded facts must state a claim to relief that is plausible on its face and allow the court to draw the reasonable inference that [the defendant] is personally liable . . . for the misconduct alleged." (alteration, internal quotation marks, and citation omitted)).

As to Local Defendants, the Amended Complaint contains some further allegations pertinent to an equal protection claim. In

Plaintiffs' view, these allegations (discussed below) establish that the Board "discriminated against O.V. solely on the basis of his disability, Down syndrome, which is evident from his physical appearance, and [the Board's] discriminatory misconceptions about O.V.'s ability to learn from the time he enrolled in the DPS." (Docket Entry 55 at 23.) However, the factual allegations in the Amended Complaint do not support such characterization of Plaintiffs' claims. Rather, the Amended Complaint mentions O.V.'s Down syndrome in only one of its more than four hundred paragraphs, and then only as one of O.V.'s multiple disabilities. (See Docket Entry 36, ¶ 54 ("O.V. is an eleven (11) year old boy who . . . has been diagnosed with Down syndrome, Mixed Receptive-Expressive Language Disorder, Lack of Coordination, Apraxia of speech, and other Symbolic Dysfunction.").) Indeed, to the extent that the Amended Complaint focuses on a particular one of O.V.'s disabilities, it emphasizes his verbal apraxia. (See id., ¶¶ 205 ("Ms. Turner did not even understand what apraxia, one of O.V.'s documented disabilities that affects his ability to speak, was."), 217 ("Haase, Allen, and Bunn redirected O.V. to an extent that impeded his ability to respond, especially as a child with verbal apraxia, shamefully causing educational harm to O.V., as the [redirection] 'data' were collected for the sole purpose of exiting O.V. from the regular education classroom.").)

Nor does the Amended Complaint set forth factual allegations showing that Local Defendants targeted children with Down syndrome for segregation in the exceptional children's room and instruction on an educational track that precludes graduation with a high school diploma. (See generally Docket Entry 36.) Instead, the Amended Complaint alternately identifies the relevant pupils as, inter alia, "disabled children" (id., ¶ 74), "children with certain disabilities" (id., ¶ 76), "children with intellectual disabilities" (id., ¶ 118), and "children with low incidence disabilities" (id., ¶ 119). Furthermore, although the Amended Complaint asserts that a "disproportionate number of students with disabilities [were] excluded from regular education placements" (id., ¶ 77), it limits its statistical support for that proposition to children "identified under the category of Intellectual Disability — Moderate" (id., ¶¶ 118, 137, 185, 192, 200). In this regard, it bears noting that O.V. did not reach the Intellectual Disability — Moderate classification until May 2014, five years after an initial psychoeducational evaluation resulted in the determination that "O.V. was eligible for services under the IDEA in the category of Developmentally Delayed" (id., ¶ 92). (See id., ¶¶ 91, 157, 159.) As such, the Amended Complaint appears to present either a "class of one" claim, Village of Willowbrook v. Olech, 528 U.S. 562, 564 (2000) (internal quotation marks omitted), or, alternatively, a claim regarding the treatment of children

82

identified under the Intellectual Disability — Moderate IDEA eligibility category.[23]

Regardless, when viewed in the light most favorable to Plaintiffs, the Amended Complaint alleges that Local Defendants follow a policy of segregating from the general education classroom some subset of children (including, at least, O.V.) whose intellectual challenges signify likely difficulty passing EOG tests. (See, e.g., Docket Entry 36, ¶¶ 59, 74, 118, 119.) The Amended Complaint further alleges that, pursuant to this policy, Local Defendants strove to ensure O.V.'s placement in the separate educational setting. (See, e.g., id., ¶¶ 55, 59, 71, 75, 76, 85-101, 214-18, 241, 244-46, 345.) Local Defendants appear to tacitly concede that these allegations satisfy the first component of an equal protection claim, namely that they "intended to treat [O.V.] differently because of [his] disabilities," Sellers, 141 F.3d at 530. (See Docket Entry 48 at 25-26 (containing no argument on this point).)

However, Local Defendants maintain that Plaintiffs cannot satisfy the second component of such claim, namely that Local Defendants' decisions regarding O.V.'s educational placement

---

23    Accordingly, the fact that, as discussed below, the Amended Complaint does not contain appropriate factual content to make out a claim that Local Defendants' treatment of O.V. lacked a rational basis would not preclude, in suitable circumstances, a viable equal protection claim by children with Down syndrome for educational segregation arising from "discriminatory misconceptions about [their] ability to learn" (Docket Entry 55 at 23).

"w[ere] without any rational basis," <u>Sellers</u>, 141 F.3d at 531. (<u>See</u> Docket Entry 48 at 25-26.) In response, Plaintiffs did not develop any argument challenging the notion that the Amended Complaint reveals rational grounds for educating O.V. in a segregated educational setting using a different curriculum. (<u>See</u> Docket Entry 55 at 26-28.) Nor does it appear they could, as, for instance, the Amended Complaint acknowledges that O.V. suffers from a "short attention span and distracting behaviors" (Docket Entry 36, ¶ 177) and possessed "skills . . . below that of his non-disabled peers" (<u>id.</u>, ¶ 245). The Amended Complaint further concedes that O.V.'s intelligence measured "in the borderline range" and his "adaptive behavior skills" qualified as "deficient." (<u>Id.</u>, ¶ 91.) As a final example, the Amended Complaint documents that Local Defendants perceived O.V. as needing "'repetitions and [a] small group setting for academic success'" (<u>id.</u>, ¶ 134), as well as "'extensive instruction due to his foundational skill sets'" (<u>id.</u>, ¶ 171).

Those considerations — even if grossly misapplied in violation of the IDEA, the ADA, and/or Section 504 — all qualify as rational bases (in the context of the Equal Protection Clause) for educating O.V. via a separate curriculum in the exceptional children's room rather than with some version of the standard curriculum in the regular classroom. See <u>Bess</u>, 2009 WL 3062974, at *8 (explaining, in dismissing equal protection claim, that "there was clearly a

rational basis . . . for excluding [the plaintiff] from certain classes at school," as he "is a special-needs child who requires more attention from the teachers than other children who do not have special needs"). Accordingly, Plaintiffs failed to plausibly allege an equal protection claim against Local Defendants. <u>See</u> <u>Sellers</u>, 141 F.3d at 530-31; <u>see also</u> <u>Bess</u>, 2009 WL 3062974, at *8 ("Although such conduct may contravene [the plaintiff's] IEP, it does not violate the Constitution. The defendants had a rational basis for their actions, and the plaintiffs have failed to sufficiently allege that [the child] was denied equal protection.").[24]

In sum, like their due process claims, Plaintiffs' Section 1983 claims predicated on the Equal Protection Clause cannot withstand Rule 12(b)(6) dismissal.[25]

## CONCLUSION

Plaintiffs failed to exhaust their IDEA, Section 504, ADA, Section 1983, and NCSES claims against the SBE. They also failed

---

24  As such, any purported supervisory liability claim against State Officials and/or L'Homme (<u>see</u> Docket Entry 51 at 19-21), also fails.

25  Because Plaintiffs fail to plausibly allege that Individual Local Defendants, L'Homme, and/or State Officials violated Plaintiffs' constitutional rights, qualified immunity also shields such defendants from Plaintiffs' Section 1983 claims. <u>See</u> <u>Raub v. Campbell</u>, 785 F.3d 876, 881 (4th Cir. 2015) (observing that the qualified immunity analysis inquires, <u>inter alia</u>, "whether the plaintiff has established the violation of a constitutional right").

to exhaust such claims arising prior to November 26, 2014, against the Board. In addition, the Settlement Agreement's release bars Plaintiffs' IDEA and NCSES claims arising prior to November 26, 2014. Further, Plaintiffs abandoned any remaining NCSES claims against the Board. Moreover, given their ADA and Section 504 claims, Plaintiffs cannot pursue NCPDPA claims in this litigation. Nor does the Amended Complaint plausibly allege Section 1983 claims against Local Defendants, L'Homme, and/or State Officials. However, it sufficiently states ADA and Section 504 claims against the Board. Finally, this case does not present "extraordinary circumstances" warranting declination of supplemental jurisdiction over Plaintiffs' breach of contract claim.

**IT IS THEREFORE RECOMMENDED** that the State Dismissal Motion (Docket Entry 42) be granted.

**IT IS FURTHER RECOMMENDED** that the Local Dismissal Motion (Docket Entry 47) be granted in part and denied in part as follows: (1) Plaintiffs' Section 1983 and NCPDPA claims against L'Homme and Local Defendants should be dismissed for failure to state a claim; (2) Plaintiffs' IDEA, Section 504, ADA, and NCSES claims arising prior to November 26, 2014, should be dismissed for failure to exhaust administrative remedies (and, as to such IDEA and NCSES claims, pursuant to the Settlement Agreement's release); (3) Plaintiffs' remaining NCSES claims should be dismissed as

abandoned; and (4) Plaintiffs' breach of contract claim and remaining IDEA, Section 504, and ADA claims should proceed against the Board.

This 6th day of June, 2018.

_____/s/ L. Patrick Auld_____<br>
**L. Patrick Auld**<br>
**United States Magistrate Judge**