## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| O.V.,[1] et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | 1:17cv691[2] |
| | ) | |
| DURHAM PUBLIC SCHOOLS BOARD OF EDUCATION, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

This case comes before the Court on "Defendant Durham Public Schools Board of Education's Motion for Judgment on the Administrative Record" (Docket Entry 108) (the "Durham Board's Administrative Motion"), "Defendant Durham Public Schools Board of Education's Motion for Summary Judgment" (Docket Entry 110) (the "Durham Board's Summary Judgment Motion"), "Plaintiffs' Motion for Judgment on the Record" (Docket Entry 112) (the "Plaintiffs' Administrative Motion"), and "Plaintiffs' Motion for Summary Judgment" (Docket Entry 114) (the "Plaintiffs' Summary Judgment Motion"). For the reasons that follow, the Court will deny the Durham Board's Administrative Motion, grant in part and deny in

---

1  Federal Rule of Civil Procedure 5.2(a)(3) mandates the use of initials when referring to O.V., a minor.

2  Pursuant to the parties' consent, "the Court ordered the consolidation of cases 1:17cv691 with 1:17cv690 with all filings to be made in 1:17cv691." (Text Order dated July 20, 2018.) Accordingly, all Docket Entry citations refer to filings in 1:17cv691 (and utilize the CM/ECF footer's pagination).

part Plaintiffs' Administrative Motion (collectively, the "Administrative Motions"), and grant in part and deny in part both the Durham Board's Summary Judgment Motion and Plaintiffs' Summary Judgment Motion (collectively, the "Summary Judgment Motions").[3]

## BACKGROUND

### I. Procedural Background

The Durham Public Schools Board of Education (the "Durham Board" or "Respondent") filed "an action seeking relief from the State Hearing Review Officer's partial reversal of the Administrative Law Judge's decision dismissing all of [Minh Pham ('M.P.'), Peter Varlashkin ('P.V.'), and O.V.'s] claims with prejudice in the underlying administrative hearing." <u>Durham Public Sch. Bd. of Educ. v. O.V.</u> ("<u>DPS v. O.V.</u>"), No. 1:17cv690, Docket Entry 1 (the "Durham Board's Complaint"), ¶ 1 (M.D.N.C. July 25, 2017). Per the Durham Board's Complaint, State Review Officer (the "SRO") Lisa Lukasik erroneously reversed the decision of Administrative Law Judge (the "ALJ") Melissa Lassiter "specifically on the question of least restrictive environment" (the "LRE") in O.V.'s "proposed [Individualized Education Program (the "IEP")] for the 2015-[20]16 school year" (at times, the "May 2015 IEP"), <u>id.</u>,

_____

3  Pursuant to the parties' consent, United States District Judge Catherine C. Eagles referred cases 1:17cv691 and 1:17cv690 to the undersigned United States Magistrate Judge for all proceedings. (<u>See</u> Docket Entry 64 at 1; Docket Entry 64-1 at 2); <u>see also</u> <u>Durham Public Sch. Bd. of Educ. v. O.V.</u> ("<u>DPS v. O.V.</u>"), No. 1:17cv690, Docket Entry 15 at 2 (M.D.N.C. Nov. 8, 2017); <u>DPS v. O.V.</u>, Docket Entry 16 at 1 (M.D.N.C. Nov. 27, 2017).

¶ 20. See id., ¶ 17(c). "Because ALJ Lassiter had dismissed all claims and therefore not ordered any remedy, the [SRO] remanded to ALJ Lassiter for determination on," id., ¶ 21, "what appropriate relief were the parents entitled to as a remedy," id., ¶ 17(e). During the pendency of that remand, see id., ¶ 21, "[t]he [Durham] Board, having been aggrieved by the decision of the [SRO], [filed an] action seeking relief from the [SRO's] reversal of the ALJ's decision on the issue of the May 20, 2015 IEP's appropriateness," id., ¶ 22.

Separately, M.P. and P.V., individually and on behalf of their minor child, O.V., (collectively, the "Plaintiffs" or "Petitioners"), initiated an action against the Durham Board, various Durham Public School System (the "DPS") employees, and the North Carolina Department of Public Instruction (the "NCDPI") for their alleged "failure to provide O.V. a free appropriate public education" (a "FAPE"), their alleged "discriminatory conduct against Plaintiffs based on O.V.'s disability in an education program receiving federal funds," and certain defendants' alleged "breach[ of] a settlement agreement." (Docket Entry 1 (the "Complaint") at 1-2.) In response to NCDPI's motion to dismiss, Plaintiffs sought leave to amend their Complaint. (See Docket Entry 30.) After the Court (per the undersigned) granted their amendment request (see Docket Entry 33 at 4), Plaintiffs filed an amended "Complaint for Damages" (Docket Entry 36) (the "Amended

3

Complaint"), which replaced NCDPI with the North Carolina State Board of Education (the "State Board") and certain state officials as defendants in this action (see, e.g., id., ¶¶ 40-52 (identifying parties)). Thereafter, all defendants moved to dismiss the Amended Complaint. (See Docket Entries 42, 47.)

As relevant here, the Court (per United States District Judge Catherine C. Eagles) granted the various dismissal motions, except as to Plaintiffs' breach of contract claim and their claims against the Durham Board, arising on or after November 26, 2014, under the Individuals with Disabilities Education Act, 20 U.S.C. § 1400 et seq. (the "IDEA"), the Americans with Disabilities Act, 42 U.S.C. § 12101 et seq. (the "ADA"), and Section 504 of the Rehabilitation Act, 29 U.S.C. § 794 et seq. ("Section 504"). (See Docket Entry 61 at 1-2.) Prior to the dismissal motions' resolution, Plaintiffs moved for leave to file a supplemental complaint challenging "the final administrative decision" (Docket Entry 46 at 3) regarding the decisions on remand from the original SRO decision (see generally Docket Entry 46-2). The Court (per the undersigned) granted Plaintiffs leave, authorizing the filing of their "First Supplemental Complaint" (Docket Entry 45) (see Text Order dated Feb. 22, 2018 (granting "[the] Motion for Leave to File Supplemental Complaint and accepting [Plaintiffs'] First Supplemental Complaint")). Accordingly, the following claims remain in this litigation: (1) Plaintiffs' challenge both (A) to

4

the ALJ's and SRO's determination that "Plaintiffs failed to meet
their burden to prove that [Durham Board] failed to provide O.V. a
FAPE in the LRE from November 27, 2014, through June 12, 2015,
based on the stipulation from [the] parties that O.V. made progress
during that time" (Docket Entry 36, ¶ 320) and (B) to the SRO's
affirmation of the ALJ's finding that Plaintiffs failed to
establish "the appropriateness of Plaintiffs' private placement and
tuition reimbursement" (id., ¶ 323); (2) Plaintiffs' challenge to
"the [SRO's] Decision on Remand," which Plaintiffs contend
"impermissibly delegate[s the SRO's] authority to determine relief
to [the Durham Board] and improperly fail[s] to designate the
decision as upholding in part and reversing in part the ALJ's
Decision on Remand" (Docket Entry 45, ¶ 332.32); (3) Plaintiffs'
ADA and Section 504 claims against the Durham Board that arise on
or after November 26, 2014 (see Docket Entry 61 at 2);
(4) Plaintiffs' breach of contract claim against the Durham Board
(see id.); and (5) the Durham Board's challenge to the SRO's
"determination that it did not offer a [FAPE] in the [LRE] to
[O.V.] in the IEP developed on May 20, 2015," DPS v. O.V., Docket
Entry 1, ¶ 3.

## II.  Plaintiffs' Allegations

As relevant to the remaining claims,[4] the Amended Complaint alleges:

At all pertinent times, O.V., a child "with Down syndrome, Mixed Receptive-Expressive Language Disorder, Lack of Coordination, Apraxia of speech, and other Symbolic Dysfunction," has resided with his parents in Durham County. (Docket Entry 36, ¶¶ 40, 41, 54.)  O.V. enrolled in DPS as a preschooler for the 2009-2010 school year, and continued attending public school in Durham until November 9, 2015, when his parents "withdrew [him] from the DPS and enrolled him in Pinewoods Montessori, a private school in Hillsborough, North Carolina" (id., ¶ 254). (See id., ¶¶ 84-255.) Throughout O.V.'s DPS enrollment, the Durham Board practiced an "unwritten and illegal policy of removing disabled children from general education classrooms by the third (3rd) grade if [the Durham] Board believes the disabled child will be unsuccessful on the state mandated end of grade tests or requires a modified curriculum." (Id., ¶ 74.)

As part of O.V.'s enrollment in DPS, the "[Durham] Board conducted a psychoeducational evaluation of O.V. on May 7, 2009,"

_____

4  Although Plaintiffs cannot recover for any discriminatory actions before November 26, 2014 (see Docket Entry 61 at 2), such time-barred "discriminatory allegation[s] may still constitute relevant background evidence for valid claims." Evans v. Technologies Applications & Serv. Co., 80 F.3d 954, 962 (4th Cir. 1996) (citing United Air Lines, Inc. v. Evans, 431 U.S. 553, 558 (1977)).

which revealed borderline development and deficient adaptive behavior skills, but "no behavior problems." (Id., ¶ 91.) Based on these results, the Durham "Board determined [that] O.V. was eligible for services under the IDEA in the category of Developmentally Delayed and . . . required occupational, physical, and speech therapies as related services in order to benefit from special education." (Id., ¶ 92.) Having "predetermined" upon meeting him that "they would place [O.V.] in the most restrictive environment," namely, "in the separate classroom, segregated from his non-disabled peers" (id., ¶ 85), Dr. Kristin Bell, the Durham Board's Executive Director of Exceptional Children (see id., ¶ 44), and the Durham Board developed O.V.'s first IEP, pursuant to which "O.V. would not have *any* access to his non-disabled peers" (id., ¶ 94 (emphasis in original)). This IEP "provided for special education for two (2) days per week for 270 minutes in the Exceptional Children's (EC) classroom and occupational, speech, and physical therapies." (Id.)

During the two years that O.V. attended DPS preschool, M.P. and P.V. "continuously requested [that] O.V. be permitted to be educated with his non-disabled peers, but [the Durham] Board and [Dr.] Bell explained O.V.'s disabilities rendered him unfit to have full access to children who did not have disabilities." (Id., ¶ 88.) During this period, "[the Durham Board and Dr. Bell] never considered a less restrictive environment and never considered what

7

supports and services might allow O.V. to be successful in the regular preschool classroom, even though O.V. could have been integrated into the regular education setting with supplemental aids and services." (<u>Id.</u>, ¶ 86.) In addition, they "manipulated the IEP documents in IEP meetings to support their plan for O.V. to be perpetually assigned to the separate classroom." (<u>Id.</u>, ¶ 95.) For example, the Durham Board and Dr. Bell falsely documented that the IEP "'Team discussed all placement options and rejected serving [O.V.] in any placement option other than a [special education] classroom'" even though they never discussed "all placement options with O.V.'s parents," M.P. and P.V., and "no record of any discussion of any inclusive preschool placement" exists. (<u>Id.</u> (alterations in original).)

At an IEP meeting in July 2009, the Durham Board and Dr. Bell "increased O.V.'s time in the special education classroom from 270 minutes to 390 minutes — the entire school day" (<u>id.</u>, ¶ 97 (emphasis omitted)) — without "discuss[ing] providing O.V.'s specially designed instruction in any location other than the segregated special education classroom" (<u>id.</u>, ¶ 98). At O.V.'s annual IEP meeting in April 2010, M.P. and P.V. "expressed that they 'would like to see [O.V.] in a class with typical children' and 'would like to see him talk more.' In response, [the Durham] Board and [Dr.] Bell decided that O.V. would remain in a separate class, completely segregated from his non-disabled peers, and then

decreased O.V.'s speech therapy services." (Id., ¶ 99 (first set of brackets in original).) On the IEP forms for that meeting, the Durham Board and Dr. Bell "omitted O.V.'s parents' request that O.V. be placed with typical children, and [they] failed to provide any information about why they decreased O.V.'s speech services." (Id., ¶ 100.) Then, at an IEP meeting in August 2010, the "[Durham] Board and [Dr.] Bell increased O.V.'s time in the separate setting from two (2) days to three (3) days per week for 390 minutes each day." (Id., ¶ 101.)

"[T]o provide O.V. access to his non-disabled peers, [M.P. and P.V.] placed O.V. in a private preschool with his non-disabled peers for two (2) days each week." (Id., ¶ 102.) "[The Durham] Board and [Dr.] Bell refused to provide O.V.'s specially designed instruction in the private preschool setting alongside his non-disabled peers" (id.), but on IEP forms in November 2010 and March 2011, "[the Durham] Board and [Dr.] Bell misleadingly recorded O.V.'s placement to reflect his attendance at the private school, for which his parents paid, to give the impression that O.V. was receiving services in this location" (id., ¶ 103). In addition, although M.P. and P.V. "expressed that they would like for O.V. 'to talk, write and do things as a more typical child,'" the Durham Board and Dr. Bell "changed O.V.'s educational placement to the Separate Class setting" on his March 2011 IEP. (Id., ¶ 104.)

9

At a May 2011 IEP meeting regarding "O.V.'s transition to kindergarten" (id., ¶ 105), the Durham Board and Dr. Bell failed to consider whether O.V. could "be educated in a regular education classroom like other students enrolling in kindergarten" before deciding that "O.V. would receive specially designed instruction for 330 minutes per day, as well as all of his related services (i.e., occupational therapy, physical therapy, and speech/language therapy) in the most restrictive setting:  the special education (or EC) classroom" (id., ¶ 106). "During O.V.'s kindergarten year, [the Durham] Board and [Dr.] Bell never considered a less restrictive environment and never considered what supports and services could allow O.V. to be successful in a regular education classroom."  (Id., ¶ 109.)  M.P. and P.V. "continued to request O.V. be permitted to be educated with his non-disabled peers, but [the Durham] Board and [Dr.] Bell acted as though O.V.'s disabilities rendered him unfit to even sit in the same room as other children who did not have disabilities."  (Id., ¶ 112.)  In December 2011, O.V.'s IEP Team met to discuss O.V.'s recent evaluations and formulate a new IEP.  (Id., ¶ 115.)  Although M.P. and P.V. asked the Durham Board and Dr. Bell to "'expose[ O.V.] to a regular class for routines and models at least twice a week'" (id.):

> [They] ignored Plaintiffs' request and maintained O.V.'s placement in the Separate setting five (5) days per week for 330 minutes, provided all O.V.'s related services away from his non-disabled peers, and removed O.V. from

10

participating in physical education with his non-disabled peers, limiting his potential contact with his non-disabled peers to library, music/art, and computer.

(Id., ¶ 116.)

During the 2012-2013 school year, "O.V.'s first (1st) grade year, [his] parents continued to request O.V. be permitted to be educated with his non-disabled peers." (Id., ¶ 120.) In September 2012, the IEP Team met to modify O.V.'s IEP. (Id., ¶ 127.) At that meeting, "[the Durham] Board and [Dr.] Bell determined O.V. would participate in the general education class for literacy, because 'the IEP Team felt that O.V.[] would benefit from the socialization/communication experiences gained by participating in a general education class.'" (Id., ¶ 128 (brackets omitted).) However, "other than an assistant to escort [O.V.] to and from the classroom," they "refused to provide O.V. with any supplemental aids and services to enable him to access his education with non-disabled peers." (Id., ¶ 129.)

At O.V.'s annual IEP meeting in November 2012 (see id., ¶ 130), "[the Durham] Board and [Dr.] Bell refused to even consider placing O.V. in the regular setting with his non-disabled peers" (id., ¶ 131). Instead, "despite reporting O.V. was making progress, [they] decided O.V. could no longer attend literacy in the general education classroom; however, as a consolation, he was now permitted to eat lunch and play on the playground with his non-disabled peers and join in morning circle time for fifteen (15)

11

minutes each day." (Id., ¶ 132.) In response to the LRE Justification Statement's requirement "to 'explain why the services cannot be delivered with non-disabled peers with the use of supplemental aids and services,'" Dr. Bell and the Durham Board stated only "that 'O.V. would be removed from non-disabled peers for direct instruction[,]'" as "'he needs the repetitions and the small group setting for academic success.'" (Id., ¶ 134 (brackets omitted).) However, Dr. Bell and the Durham Board did not "document the removal of O.V. from literacy instruction with his non-disabled peers" on his IEP forms. (Id., ¶ 136.)

O.V. began second grade in the 2013-2014 school year. (See id., ¶ 139.) At that time, Lessley Mader served as "a Director of Exceptional Children for [the Durham] Board" (id., ¶ 45), and Julie Haase and Sherri Allen served as DPS special education teachers (id., ¶¶ 47, 48). For the 2013-2014 through 2015-2016 school years, Ms. Haase and Ms. Allen served as O.V.'s special education teachers. (Id., ¶¶ 47, 48.)

During the 2013-2014 school year, M.P. and P.V. "again requested [that] O.V. be educated with his non-disabled peers" (id., ¶ 139), but "[the Durham] Board, [Dr.] Bell, and [Ms.] Mader continued to refuse to consider placing O.V. in the regular education classroom or what supports and services could allow O.V. to be successful in a regular education classroom" (id., ¶ 140). At O.V.'s annual IEP review on November 15, 2013 (see id., ¶ 145),

12

P.V. and M.P. "requested [that the Durham] Board, [Dr.] Bell, and [Ms.] Mader change O.V.'s placement to a general education first (1st) grade classroom" (id., ¶ 146). "Without even considering whether any supplemental aids and services could enable O.V. to access his education with non-disabled peers, [the Durham] Board and [Dr.] Bell rejected O.V.'s parents' proposal and, instead, *increased* the time O.V. would spend in the separate special education classroom, isolated from his non-disabled peers." (Id., ¶ 147 (emphasis in original).)

"Shortly after the November 15, 2013 IEP Meeting, O.V.'s parents sought legal counsel." (Id., ¶ 149.) "[A]fter legal intervention, on December 6, 2013, [the Durham] Board, [Dr.] Bell, and [Ms.] Mader determined O.V. would be placed in a regular education second (2nd) grade classroom and would receive pull out resource services." (Id., ¶ 150.) However, they maintained "their plan for O.V. to be perpetually assigned to the separate classroom . . . ." (Id., ¶ 151.) Specifically, "despite changing O.V.'s educational placement, [the Durham Board, Dr. Bell, and Ms. Mader] purposefully *did not* amend O.V.'s IEP, as required, to reflect his change in placement to a less restrictive setting." (Id. (emphasis in original).) This refusal to "change O.V.'s placement in his

13

IEP" served "to prevent a less restrictive setting from becoming O.V.'s 'stay put' placement in the future." (Id., ¶ 344.)[5]

"[The Durham] Board, [Dr.] Bell, and [Ms.] Mader placed O.V. in Mr. Montgomery's second (2nd) grade regular education classroom" (id., ¶ 152), but neither provided Mr. Montgomery with "specialized training in educating children with developmental or intellectual disabilities" (id.) nor arranged for him to meet regularly with special education teachers to plan O.V.'s instruction (see id.), even though, according to Ms. Mader, Mr. Montgomery "'ha[d] to completely change the curriculum for [O.V.]'" (id., ¶ 169). Moreover:

> Without any specialized knowledge as to how to instruct O.V. or address O.V.'s unique challenges, and without a valid IEP to implement, at the suggestion of an untrained paraprofessional, Mr. Montgomery placed O.V. behind a cardboard partition at the back of the classroom for academic instruction, effectively enclosing O.V. within the cardboard and the walls.

(Id., ¶ 153.)[6]

At an IEP meeting on February 5, 2014, "Mr. Montgomery reported O.V. was making academic progress." (Id., ¶ 154.) At that same meeting, "[the Durham] Board, [Ms.] Mader, [Dr.] Bell,

---

5 Typically, unless the parents and educational authorities agree otherwise, a "child shall remain in the then-current educational placement of the child" during IDEA-authorized proceedings to resolve disputes between the parents and educational agency regarding the child's FAPE. 20 U.S.C. § 1415(j).

6 M.P. and P.V. did not learn that "O.V. sat in the back of the classroom behind a cardboard partition over fifty percent (50%) of the time" until May 2014. (Id., ¶ 161.)

and [Ms.] Allen proposed conducting a comprehensive reevaluation of O.V." (id.) and "refused to amend O.V.'s IEP to reflect his change in placement" (id., ¶ 156). "On May 9, 2014, the IEP Team convened to discuss the recent evaluations." (Id., ¶ 157.) At that meeting, "[the Durham] Board, [Ms.] Mader, [Dr.] Bell, [Ms.] Haase, and [Ms.] Allen changed O.V.'s eligibility category from Developmental Delay to Intellectual Disability — Moderate" (id., ¶ 159) and, without "notice to Plaintiffs, . . . reduced O.V.'s occupational therapy and physical therapy services" (id., ¶ 162). Also at that meeting, "O.V.'s speech therapist . . . reported [that] O.V. was making progress." (Id., ¶ 160.)

"On June 4, 2014, the IEP Team convened to develop O.V.'s Annual Review IEP. Both Plaintiffs' and [the Durham] Board's counsel attended the meeting." (Id., ¶ 163.) "Plaintiffs continued to advocate for O.V. to be placed in the regular education setting with his non-disabled peers." (Id., ¶ 165.) Because "O.V. would be entering third grade in the fall, the IEP Team discussed whether O.V. would be assessed on the standard state wide assessment ('End of Grade' or 'EOG') or the alternate assessment ([at times, the] 'EXTEND1'), and whether O.V. would be taught on the Common Core curriculum or Extended Content Standards." (Id., ¶ 167.) Ms. Mader falsely told Plaintiffs that "'the decision of the test influences the educational placement as they are based on 2 different curriculums which are taught in 2

15

different classes.'" (Id., ¶ 168.) "[The Durham] Board's counsel did not correct . . . [Ms.] Mader's false assertion that if O.V. was educated on the Extended Content Standards, he could not receive services with his non-disabled peers." (Id.)

Further, "[c]ontinuing to ignore Plaintiffs' request that O.V. be provided supplemental aids and services in the general education classroom, [the Durham] Board, [Ms.] Mader, [Dr.] Bell, [Ms.] Haase, and [Ms.] Allen determined O.V. would 'get all of his support in Exceptional Children's classroom.'" (Id., ¶ 170.) In addition, "[the Durham] Board, [Ms.] Mader, [Dr.] Bell, [Ms.] Haase, and [Ms.] Allen discussed O.V.'s educational placement" (id., ¶ 171), as follows:

> "On the continuum he is still considered 'separate' because he needs extensive instruction due to his foundational skill sets." The [Prior Written Notice[7] (at times, the "PWN")] failed to provide notice of the team's decision that O.V. would be placed in the Separate setting, and instead stated "the team rejected

_____

7  Under the IDEA, a school board

must provide the parents with written notice before the [school board] proposes or refuses "to initiate or change the identification, evaluation, or educational placement of the child or provision of FAPE to the child."  34 C.F.R. § 300.503(a); 20 U.S.C. § 1415(b)(3).  The IDEA requires that the [written notice] include certain information, including "a description of the action proposed or refused by the agency" and "an explanation of why the agency proposes or refuses to take the action and a description of each evaluation procedure, assessment, record, or report the agency used as a basis for the proposed or refused action."  20 U.S.C. § 1415(c)(1).

(Docket Entry 36, ¶ 25 (parenthetical omitted).)

16

determining [educational] placement and service delivery."

(Id. (alterations omitted).) Due to some outstanding scheduling issues, the IEP Team agreed to "reconvene shortly in order to finalize O.V.'s IEP." (Id., ¶ 172.)

"On June 13, 2014, the IEP Team convened and finalized O.V.'s IEP for the upcoming school year. Prior to the meeting, the principal of O.V.'s elementary school determined O.V. would be retained for second (2nd) grade." (Id., ¶ 173.) Ms. Mader, Dr. Bell, Ms. Haase, Ms. Allen, and Ashley Bunn attended this meeting. (Id., ¶ 174.) At that time, Ms. Bunn "did not yet know O.V., because she had only recently accepted a transfer to O.V.'s elementary school to teach the students assigned to the third through fifth (3rd – 5th) grade segregated class." (Id., ¶ 175.) "Without conducting an evaluation of or collecting any data on O.V.'s behavior, much less discussing strategies to address it, [the Durham] Board, [Ms.] Mader, [Dr.] Bell, [Ms.] Haase, [Ms.] Allen, and [Ms.] Bunn [(collectively, the "Local Defendants")] impermissibly used O.V.'s short attention span and distracting behaviors" to justify "completely separating O.V. from his non-disabled peers in the regular education classroom." (Id., ¶ 177.) Without explaining "why O.V. could not receive any specially designed instruction in the regular education classroom, and despite O.V.'s significant, documented advances in the general education classroom, [Local Defendants] determined O.V. would

17

receive _all_ academic instruction in the EC classroom." (Id., ¶ 180 (emphasis in original).)

On July 22, 2014, the Durham Board and Plaintiffs participated in mediation and "reached a confidential settlement agreement" (the "Mediation Agreement"). (Id., ¶ 184.) "On November 14, 2014, uncertain whether [the Durham Board] would continue to implement the Mediation Agreement, Plaintiffs filed a Petition for a Contested Case Hearing in the Office of Administrative Hearings [(the 'OAH')] Docket No. 14-EDC-09295 ([the] '2014 Petition') to preserve their claims." (Id., ¶ 261.) "The 2014 Petition alleged that [the Durham Board] violated the procedural and substantive requirements of the IDEA, 20 U.S.C. §§ 1400 _et seq._, and the North Carolina special education statutes, N.C. Gen. Stat. §§ 115C-106 _et seq._, while providing educational services to O.V." (Id., ¶ 262.)

Following assurances from the Durham Board's counsel to Plaintiffs' counsel on November 14, 2014, "that the [Durham Board] was in 'full compliance' with the Mediation Agreement" (id., ¶ 263), "[t]he parties entered into a Settlement Agreement and Release of Claims ([the] 'Settlement Agreement') on November 26, 2014, which wholly incorporated the Mediation Agreement" (id., ¶ 264). Given "the ongoing implementation of the Settlement Agreement for the remainder of the 2014-[20]15 academic year, Plaintiffs refused to dismiss the 2014 Petition with prejudice and only agreed to file a Voluntary Dismissal _Without_ Prejudice" (id.,

18

¶ 266 (emphasis in original)), which they did on November 26, 2014 (id., ¶ 267). However, the Durham Board "did not implement the compensatory services and [M]ediation [A]greement as outlined in the Settlement Agreement, thus breaching the terms of the [Settlement] Agreement." (Id., ¶ 268.) For instance, the Durham Board "routinely postponed the *monthly* parent-teacher conferences agreed to in the Settlement Agreement" (id., ¶ 269 (emphasis in original)) and (as discussed below) failed to instruct O.V. "with a co-teaching model as agreed to by the parties" (id., ¶ 270).

After Plaintiffs' resort to mediation, Local Defendants "created a hostile environment that discouraged and prevented O.V.'s parents from stepping foot onto school property and participating in O.V.'s day-to-day educational activities in which any parent would be expected to participate." (Id., ¶ 190.) To begin, although M.P. had previously "served as a frequent volunteer in O.V.'s classroom and was permitted to visit O.V. daily at school," Local Defendants "began restricting [M.P.'s] access to O.V.'s classroom." (Id., ¶ 188.) For instance, Ms. Bunn told M.P. "that she now must obtain permission via the principal's office to even visit O.V.'s special education classroom. Nearly every time [M.P.] attempted to visit the classroom, [Local] Defendants refused to allow her to visit. The *only* time she was able to visit the classroom, O.V. was not even present." (Id. (emphasis in original).) Additionally, M.P. "was no longer permitted to park

19

and walk O.V. to class in the morning; instead, she was required to drop him at the curb, so he could be escorted by school personnel to his classroom." (Id., ¶ 189.) Yet, "parents of other children, disabled and non-disabled, were permitted to walk their children into school each day and visit their children's classroom without such restrictions." (Id., ¶ 191.)

Moreover, "[d]uring O.V.'s second second (2nd) grade year, [Local Defendants] claimed to implement the [S]ettlement [A]greement, yet purposefully acted to sabotage O.V.'s time and progress in the general education setting." (Id., ¶ 187.) In August 2014, the IEP team met and agreed to follow the July 2014 Mediation Agreement. (See id., ¶ 194.) In accordance with the Mediation Agreement, the IEP from that meeting "documented O.V.'s lack of progress while he was in the special education classroom, and his increased progress during the time . . . O.V. [was] present in the general education classroom" during the previous school year. (Id., ¶ 197.) "[Local Defendants] documented in the PWN from the meeting that O.V. would spend 220 minutes per day in the general education classroom, with 45 minutes of this time in guided reading and math instruction with a 'co-teaching model.'" (Id., ¶ 196.)[8] "Despite changing O.V.'s educational placement due to the

_____

8 Following the principal's "decision to retain O.V. in the second (2nd) grade, [Local] Defendants allowed O.V. to receive academic instruction in the general education classroom because O.V. would no longer be entering third (3rd) grade where students
(continued...)

20

[M]ediation [A]greement, [Local Defendants] maintained O.V. required the *same* inadequate supplemental aids, services, accommodations, and modifications: consistent redirection, supervision for redirection, and incremental rewards." (Id., ¶ 198 (emphasis in original).)

The Durham Board assigned O.V. to Ms. Turner's second grade classroom (id., ¶ 203), but failed to either "provide Ms. Turner *any* specialized training in educating children with disabilities, let alone O.V.'s particular disabilities" (id., ¶ 204 (emphasis in original)), or arrange for her to regularly meet with special education teachers "to take advantage of their specialized knowledge regarding educating children with disabilities" (id., ¶ 206). "Ms. Turner did not put forth any effort to attempt to accommodate O.V.'s disabilities and allow O.V. to learn in her classroom. Ms. Turner did not even understand what apraxia, one of O.V.'s documented disabilities that affects his ability to speak, was." (Id., ¶ 205.) Ms. Turner further admitted that she "did not modify O.V.'s work[] because 'it takes an extensive amount of time to work with [O.V.] and he's not the only one in my class, sorry.'" (Id., ¶ 207 (final set of brackets in original).) This refusal to modify the regular curriculum for O.V. occurred "even though a

_____

8(...continued)
take the EOG." (Id. at n.2.)

21

modified curriculum existed, was readily available, and was designed exactly for that purpose." (Id., ¶ 68.)

The Durham Board, Dr. Bell, and Ms. Mader assigned Ms. Allen and Ms. Haase to work with O.V. in Ms. Turner's classroom for 30 minutes and 15 minutes, respectively, each day. (Id., ¶ 208.) Nevertheless, the Durham Board, Dr. Bell, and Ms. Mader failed to provide Ms. Allen and Ms. Haase "with any training on O.V.'s documented disabilities or including children with disabilities in the regular education classroom." (Id.)

> Throughout the school year, O.V.'s special education services were not delivered as agreed upon at the August 2014 IEP Meeting and documented in the PWN. [Local Defendants] claimed [that Ms.] Haase and [Ms.] Allen were co-teaching O.V., pursuant to the Mediation Agreement, for a total of forty-five (45) minutes per day. Co-teaching is an evidence-based form of instruction where a special education teacher and a regular education teacher collaborate to provide both nondisabled and disabled children instruction at the same time.

> [Ms. Haase, Ms.] Allen, and Ms. Turner all testified that they did _not_ co-teach O.V. during their depositions. Each was able to define co-teaching, and each admitted that she was not co-teaching.

(Id., ¶¶ 209-10 (emphasis in original).) Throughout this school year, though, Local Defendants "falsely assured Plaintiffs that the co-teaching was being implemented in O.V.'s classroom." (Id., ¶ 211.) "[Local] Defendants' refusal to co-teach O.V. caused educational harm to O.V. and resulted in a denial of FAPE to O.V." (Id., ¶ 212.) Moreover, although "M.P. offered to pay for training on modifying the curriculum and including children with low

22

incidence disabilities in the regular education setting, [Local] Defendants refused." (Id., ¶ 213.)

Throughout this school year, in an orchestrated effort, sanctioned by Dr. Bell and Ms. Mader (see id., ¶ 215), "to create a false record of O.V.'s inability to function and make progress" in the general education classroom, O.V.'s teachers, including Ms. Allen, Ms. Bunn, and Ms. Haase, "took extensive amounts of 'data' on the number of times the teacher redirected O.V." (Id., ¶ 214.) This analytically meaningless (see id., ¶ 216) "practice of redirecting O.V. and collecting data of those redirections . . . demonstrated the poor quality of instruction delivered to O.V., caused educational harm to O.V., and resulted in a denial of FAPE to O.V." (id., ¶ 215). As part of this effort, Ms. Allen, Ms. Bunn, and Ms. Haase "redirected O.V. to an extent that impeded his ability to respond, especially as a child with verbal apraxia" (id., ¶ 217), causing even ALJ Lassiter, "who found in favor of [the Durham Board] on *every single* issue at the administrative level" to find that "'[t]he redirection data itself certainly raises questions regarding the quality of educational instruction O.V. received from Ms. Bunn, Ms. Allen, and Ms. Haase'" (id., ¶ 218 (emphasis in original)). For instance, on one occasion, Ms. "Allen redirected [O.V.] ninety-eight (98) times in just ten (10) minutes, or one redirection every 6.1 seconds." (Id., ¶ 217.)

23

In addition, under Dr. Bell and Ms. Mader's supervision, Ms. Bunn "failed to provide O.V. with specially designed instruction to meet O.V.'s unique needs" during the 170 minutes each day that O.V. spent with Ms. "Bunn to receive specially designed instruction." (Id., ¶ 219.) For instance, Ms. Bunn "failed to develop individualized lesson plans" and instead utilized "prefabricated, generic, and identical [lesson plans] for all students in each grade level." (Id., ¶ 222.) Moreover, these lesson plans only applied to third through fifth graders, meaning that "not a single lesson plan for the entire school year was designed for O.V.," a second grader. (Id., ¶ 223.) Additionally, Ms. "Bunn held extremely low expectations for O.V.," failing to adjust his goals as he accomplished them (id., ¶ 220), and "'taught' through showing multiple videos" (id., ¶ 221). According to Local Defendants' own data, O.V. "regress[ed] in multiple areas in th[is] separate setting." (Id., ¶ 228.)

Despite Local Defendants' "refusal to prepare O.V.'s teachers to teach O.V., or implement O.V.'s IEP with regards to co-teaching, the data collected by [Local] Defendants overwhelmingly supported that O.V. made greater progress in an inclusive setting with his non-disabled peers than in the segregated setting." (Id., ¶ 225.) This data included periodic progress reports, report cards, and the tracking of IEP goals on data sheets that Ms. Allen, Ms. Bunn, Ms. Haase, and Ms. Turner prepared. (Id., ¶ 226.) "By all accounts,

24

O.V. made more progress in the general education classroom —
despite [Local Defendants'] failure to appropriately serve O.V. —
than he did in the special education classroom." (Id., ¶ 227.)
Further, on each progress report, Ms. Turner indicated "that O.V.
consistently works without disturbing others — the highest level a
child can achieve." (Id., ¶ 231 (emphasis in original).)
Additionally,

> [a]ligned with [Local Defendants'] concerted effort to
> bar O.V. from the regular education classroom, and to
> create a paper trail that supported the decision, on
> every progress report, . . . [Ms.] Bunn falsely reported
> that O.V. was making sufficient progress to meet his
> annual reading, writing, and math goals, despite the fact
> that none of the data collected by his teachers supported
> this analysis — especially in the separate setting[,
> where O.V.] was actually regressing . . . .

(Id., ¶ 228.)

On May 20, 2015, O.V.'s IEP Team met for his annual IEP
review. (Id., ¶ 233.) At this meeting, the information that Local
Defendants reported on O.V.'s IEP (1) did not reflect the progress
monitoring data provided to P.V. and M.P. during the 2014-2015
school year (id., ¶ 235); (2) lacked appropriate IEP goals (id.,
¶ 237); (3) "excluded O.V.'s progress in the inclusive setting" and
"misleadingly . . . reported O.V.'s progress in the separate
setting," such as by indicating that he "identified '12 out of 26
letter sounds which is 46% accuracy 1 out of 4 trials'" without
stating that he identified zero, zero, and three sounds on the
remaining three tests in the separate setting (id., ¶ 238); and

25

(4) differed from the draft IEP sent to M.P. and P.V. shortly before the meeting in ways that "appear designed to support the elimination of direct service in occupational therapy," such as by changing the "Present Level" assessment that "'[O.V.] is making good progress with his self-help skills'" to "'[O.V.] is independent with his self-help skills at school'" (<u>id.</u>, ¶ 239 (alterations in original)). In addition, "[d]espite O.V.'s documented progress in the speech sessions conducted in the general education setting, now that the timeframe for implementing the Mediation Agreement was ending, [Local Defendants] eliminated the dedicated provision of speech services to O.V. in the general education setting." (<u>Id.</u>, ¶ 236.) They also "summarily determined that O.V. was not eligible for [extended school year] services" despite his demonstrated need for ongoing support and repetition, as well as his emerging skills in literacy, math, and occupational therapy. (<u>Id.</u>, ¶ 240.)

At the beginning of the IEP meeting, M.P. expressed her desire for O.V. to attend college and her belief that "he [was] capable" of "going to college." (<u>Id.</u>, ¶ 242 (internal quotation marks omitted; alteration in original).) Nevertheless, Local Defendants provided only a cursory explanation of the differences between regular EOG and EXTEND1 EOGs (<u>id.</u>, ¶ 241) and "deliberately withheld . . . that O.V.'s trajectory, if taught on the Extended Content Standards and if taking the Extend 1 test, would be to

26

receive a certificate rather than a high school diploma" (id., ¶ 242), a necessary precursor for college (see id., ¶ 243). Moreover, when "M.P. explained that O.V. does not have test anxiety and may be able to take the regular EOG, [Ms.] Mader told [] M.P. that '[O.V.] would not be appropriate for the EOG and [Ms. Mader] could not recommend he take that test,'" even though "the IEP Team is tasked with determining which test is appropriate for the child — not which child is appropriate for the test." (Id., ¶ 241 (penultimate set of brackets in original).) "Contrary to the express purposes of the IDEA, . . . [Local Defendants'] proposed course would foreclose the option of a diploma, preclude college as an option for O.V.[, ]and likely lead to participation in a sheltered workshop and perpetual dependence on his family and the state." (Id., ¶ 243.)

Expressing the view that, notwithstanding all the data verifying his progress in the inclusive setting, "it was not 'appropriate for [O.V.] to *sit* in the general education classroom' as his skills were below that of his non-disabled peers" (id., ¶ 245 (emphasis and alteration in original)), Ms. "Mader proposed that the DPS cease providing O.V. any academic services in a co-teaching model in the general education classroom" (id.). In response to M.P.'s objections to this proposal, Ms. "Mader reminded the IEP Team: '[W]e do not have to come to a consensus, as the [Durham Board] can make the final decision.'" (Id., ¶ 246.)

27

Ultimately, even "[t]hough [Local Defendants] agreed O.V. made academic, communication, social progress, and functional growth during the 2014-[20]15 school year, [Local] Defendants removed O.V. from the regular classroom for all core academic instruction and, again, changed O.V.'s placement to 'separate.'" (<u>Id.</u>, ¶ 244.)

On August 13, 2015, M.P. and P.V. "filed a Petition for a Contested Case Hearing in the [OAH] Docket No. 15-EDC-05966 ('2015 Petition')," which incorporated by reference the 2014 Petition. (<u>Id.</u>, ¶ 272.) They also "invoke[d] O.V.'s stay put placement," which prevented the Durham Board, Ms. Allen, Dr. Bell, Ms. Bunn, and Ms. Haase from "segregat[ing] O.V. from his non-disabled peers as planned in the fall of 2015." (<u>Id.</u>, ¶ 247.) However, the Durham Board, Ms. Allen, Dr. Bell, Ms. Bunn, and Ms. Haase "continued to restrict O.V.'s mother's access to O.V.'s classroom because Plaintiffs asserted their rights under the IDEA" (<u>id.</u>, ¶ 250), and, "again, took no actions to provide any training to O.V.'s new teachers[,] who continued the same practices of recording data on the number of redirections they decided to impose upon O.V., refusing to modify his work, and failing to instruct O.V. in a recognized co-teaching model" (<u>id.</u>, ¶ 249). Additionally, "[the Durham] Board and [Dr.] Bell failed to provide O.V. any compensatory services for the remainder of the 2015-[20]16 school year and failed to provide the compensatory services owed for the summer of 2016." (<u>Id.</u>, ¶ 252.)

28

In discovery regarding the 2015 Petition, the Durham Board "provided even more evidence that it had never complied with the material portions of the Settlement Agreement." (Id., ¶ 273.) For instance, "during depositions, all of O.V.'s teachers stated that they never used a co-teaching model with O.V. — a key covenant of the Settlement Agreement." (Id., ¶ 274.) "On November 9, 2015, due to [the Durham] Board, [Dr.] Bell, [Ms.] Haase, [Ms.] Allen, and [Ms.] Bunn's retaliation and creation of a hostile environment and ongoing refusal to provide O.V. a FAPE in the LRE, Plaintiffs finally withdrew O.V. from the DPS and enrolled him in Pinewoods Montessori" (id., ¶ 254), where his "private program enabled O.V. to make meaningful progress, which continue[d]" through the filing of the Amended Complaint (id., ¶ 255). "For example, where O.V.'s May 20, 2015, IEP aspired for O.V. to learn to write 26 letter sounds over an entire year, after just a few months at Pinewoods, O.V. was writing *words* that he was independently spelling by looking at a picture or an object." (Id., ¶ 256 (emphasis in original).)

The Durham Board filed a motion for partial summary judgment in the administrative proceedings, "seeking to limit Plaintiffs' claims to those occurring after November 26, 2014." (Id., ¶ 299.) "[ALJ] Elkins granted [the Durham Board's] Motion for Partial Summary Judgment, limiting Plaintiffs' claims to those arising after November 26, 2014, because the [OAH] had no authority to set

29

aside a release in a private contract between parties." (Id., ¶ 300.) The parties proceeded to trial on Plaintiffs' remaining claims before ALJ Lassiter (see id., ¶¶ 303-14), who "issued the Final Decision in this matter" (the "ALJ Decision"), which "ordered that all of Plaintiffs' claims be dismissed with prejudice" (id., ¶ 315).

Plaintiffs appealed the ALJ Decision to the State Board, which assigned SRO Lukasik to the appeal. (Id., ¶¶ 316-17.) SRO Lukasik thereafter issued a decision (the "SRO Decision"), which affirmed in part and reversed in part the ALJ Decision. (See id., ¶¶ 318-23.) In particular, "the SRO [Decision] affirmed the ALJ[ D]ecision [as to] Plaintiffs fail[ing] to meet their burden to prove that [the Durham Board] failed to provide O.V. a FAPE in the LRE from November 27, 2014, through June 12, 2015, based on the stipulation from [the] parties that O.V. made progress during that time." (Id., ¶ 320.) Conversely, the SRO Decision "reversed the ALJ[ D]ecision [as to] Plaintiffs fail[ing] to meet their burden to prove that O.V.'s May 20, 2015 IEP failed to offer O.V. a FAPE in the LRE." (Id., ¶ 321.) The SRO Decision remanded the question of appropriate relief on that issue to the ALJ. (See id., ¶ 324.) The determination of such appropriate relief remained pending when Plaintiffs filed the Amended Complaint. (See id., ¶ 325.)

However, according to the Supplemental Complaint:

30

In October 2017, "the ALJ issued the [ALJ] Decision on Remand" (Docket Entry 45, ¶ 332.6), which ordered the Durham Board to:

a) Request all available educational information from O.V.'s current educational placement;

b) Seek input from O.V.'s current teachers and service providers regarding his current academic and functional needs, his present educational setting, and any supplementary aids or services currently being provided to him;

c) Offer to have any relevant private providers participate in the IEP meeting and make reasonable efforts to schedule the meeting such that desired participants can attend;

d) Give first consideration to educating O.V. in the general education setting, with removal from his non-disabled peers only for the portions of his school day when O.V. cannot be successfully educated in the general education setting with supplementary aids and services; and

e) If, after development of the new IEP, [Plaintiffs] choose to enroll O.V. in a DPS school, [to] identify the general education teachers who will teach O.V. core academics, and evaluate their training and experience regarding modification of the general curriculum and classwork for students with intellectual disabilities. If any lack of training or experience is identified, [the Durham Board] must ensure that O.V.'s teachers receive such training prior to or immediately upon O.V.'s return to DPS.

(Id., ¶ 332.7.)

Plaintiffs appealed the ALJ Decision on Remand. (See id., ¶ 332.8.) Pursuant to that appeal, a different SRO (see Docket Entry 105-1 at 240), issued a decision (the "SRO Decision on Remand"), which the SRO classified as "'uph[olding], and

31

expand[ing,] the ALJ Decision on Remand'" (Docket Entry 45, ¶ 332.13). The SRO Decision on Remand ordered the Durham Board to:

[a]) Hold an IEP meeting to develop a new IEP for O.V. that reflects his [LRE]. This meeting should take place as soon as practicable.

[b]) Request all available educational information from O.V.'s current educational placement;

[c]) Seek input from O.V.'s current teachers and service providers regarding his current academic and functional needs, his present educational setting, and any supplementary aids or services currently being provided to him;

[d]) Offer to have any relevant private providers participate in the IEP meeting and make reasonable efforts to schedule the meeting such that desired participants can attend;

[e]) Obtain the services of, or contract with a mutually agreed upon "Inclusion Specialist" to assist in the development of an IEP for O.V., and provide assistance to the IEP team and parents for one (1) grading period. . . ;

[f]) Give first consideration to educating O.V. in the general education setting, with removal from his non-disabled peers only for the portions of his school day when O.V. cannot be successfully educated in the general education setting with supplementary aids and services.

[g]) Identify the general education teachers who will teach O.V. core academics, and evaluate their training and experience regarding modification of the general curriculum and classwork for students with intellectual disabilities if, after development of the new IEP, Plaintiffs choose to enroll O.V. in a DPS school. If any lack of training or experience is identified, [the Durham Board] must ensure that O.V.'s teachers receive such training prior to or immediately upon O.V.'s return to DPS.

(Id.)

32

**DISCUSSION**

**I. Administrative Motions**

**A. Relevant Standards**

**i. IDEA Overview**

As the United States Supreme Court recently explained:

[The IDEA] offers States federal funds to assist in educating children with disabilities.  84 Stat. 175, as amended, 20 U.S.C. § 1400 et seq.; *see Arlington Central School Dist. Bd. of Ed. v. Murphy*, 548 U.S. 291, 295 (2006).  In exchange for the funds, a State pledges to comply with a number of statutory conditions.  Among them, the State must provide . . . a FAPE . . . to all eligible children.  § 1412(a)(1).

A FAPE, as the [IDEA] defines it, includes both "special education" and "related services."  § 1401(9).  "Special education" is "specially designed instruction . . . to meet the unique needs of a child with a disability"; "related services" are the support services "required to assist a child . . . to benefit from" that instruction.  §§ 1401(26), (29).  A State covered by the IDEA must provide a disabled child with such special education and related services "in conformity with the [child's]" . . . IEP.  § 1401(9)(D).

The IEP is "the centerpiece of the statute's education delivery system for disabled children."  *Honig v. Doe*, 484 U.S. 305, 311 (1988).  A comprehensive plan prepared by a child's "IEP Team" (which includes teachers, school officials, and the child's parents), an IEP must be drafted in compliance with a detailed set of procedures.  § 1414(d)(1)(B) (internal quotation marks omitted).  These procedures emphasize collaboration among parents and educators and require careful consideration of the child's individual circumstances.  § 1414.  The IEP is the means by which special education and related services are "tailored to the unique needs" of a particular child.  [*Board of Educ. of Hendrick Hudson Cent. Sch. Dist., Westchester Cnty. v.*] *Rowley*, 458 U.S.[ 176,] 181 [(1982)].

33

The IDEA requires that every IEP include "a statement of the child's present levels of academic achievement and functional performance," describe "how the child's disability affects the child's involvement and progress in the general education curriculum," and set out "measurable annual goals, including academic and functional goals," along with a "description of how the child's progress toward meeting" those goals will be gauged. §§ 1414(d)(1)(A)(i)(I)-(III). The IEP must also describe the "special education and related services . . . that will be provided" so that the child may advance appropriately toward attaining the annual goals" and, when possible, "be involved in and make progress in the general education curriculum." § 1414(d)(1)(A)(i)(IV).

Endrew F. ex rel. Joseph F. v. Douglas Cnty. Sch. Dist. RE-1, __ U.S. __, __, 137 S. Ct. 988, 993-94 (2017) (certain ellipses and brackets in original) (parallel citations omitted).

## ii. Dispute Resolution Standards

Where disagreements arise over a child's IEP, the IDEA provides both informal and formal dispute resolution methods. See id. at ___, 137 S. Ct. at 994 (observing that parties may resolve disagreements through process ranging from informal "preliminary meeting" and "somewhat more formal[]" mediation, to "due process hearing[s]" and state or federal litigation (internal quotation marks and brackets omitted)). In particular, the IDEA

requires states to hold a due process hearing whenever a parent lodges a complaint regarding services provided to his or her child. 20 U.S.C. § 1415(f). States may choose to conduct these hearings through either the state educational agency or the local agency "responsible for the education of the child." Id. § 1415(f)(1)(A); 34 C.F.R. § 300.511(b) (2014). Where the local educational agency [(the "LEA")] conducts the initial hearing, the IDEA provides a right of review to the state agency. 20 U.S.C. § 1415(g).

34

In North Carolina, ALJs conduct the due process hearings required by the IDEA. The North Carolina [OAH] appoints these ALJs through a memorandum of agreement with the State Board. N.C. Gen. Stat. § 115C-109.6(a), (j) (2013). North Carolina further provides for review by a State Board-appointed review officer[, namely, the SRO]. *Id.* § 115C-109.9(a).

E.L. ex rel. Lorsson v. Chapel Hill-Carrboro Bd. of Educ., 773 F.3d 509, 513 (4th Cir. 2014).

Under North Carolina law, "[t]he [SRO] shall conduct an impartial review of the findings and decision appealed [from the ALJ]. The [SRO] conducting this review shall make an independent decision upon completion of the review." N.C. Gen. Stat. § 115C-109.9(a); accord 20 U.S.C. § 1415(g)(2). "The SRO's decision is final unless an aggrieved party timely files a civil action pursuant to 20 U.S.C. § 1415(i)(2)(A)." E.L. ex rel. G.L. v. Chapel Hill-Carrboro Bd. of Educ., 975 F. Supp. 2d 528, 532 (M.D.N.C. 2013), aff'd sub nom. Lorsson, 773 F.3d 509. On appeal, the district court "(i) shall receive the records of the administrative proceedings; (ii) shall hear additional evidence at the request of a party; and (iii) basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate." 20 U.S.C. § 1415(i)(2)(C).[9]

---

9 "[T]he burden on each issue is 'properly allocated to the party bringing the civil action to challenge the state administrative decision' — [t]here the SRO's decision — as to that issue." R.S. v. Board of Dirs. of Woods Charter Sch. Co., No. 1:16cv119, 2019 WL 1025930, at *8 (M.D.N.C. Mar. 4, 2019) (quoting Spielberg ex rel. Spielberg v. Henrico Cnty. Pub. Sch., 853 F.2d (continued...)

35

"Under this standard, the district court must conduct an independent, de novo review, albeit one generally cabined by the record of the administrative proceedings." <u>Lorsson</u>, 773 F.3d at 517. "In this posture, the district court must give 'due weight' to the administrative proceedings, bearing in mind that a hearing officer's findings of fact are entitled to 'be considered prima facie correct,'" <u>id.</u> (citation omitted), a standard "akin to the traditional sense of permitting a result to be based on such fact-finding, but not requiring it," <u>Doyle v. Arlington Cnty. Sch. Bd.</u>, 953 F.2d 100, 105 (4th Cir. 1991).

"In a two-tiered system, such as North Carolina's, a review officer's decision is also entitled to deference unless it departs from the 'normal process of fact-finding.'" <u>Lorsson</u>, 773 F.3d at 517.[10]  Further, in a two-tiered system where "the [h]earing [o]fficer and [r]eviewing [o]fficer have reached the same conclusion, a reviewing court is obliged to accord greater

---

9(...continued)
256, 258 n.2 (4th Cir. 1988)), <u>aff'd sub nom.</u> <u>R.S. by & through Soltes v. Board of Dirs. of Woods Charter Sch. Co.</u>, 806 F. App'x 229 (4th Cir. 2020).

10  "[I]n deciding what is the due weight to be given an administrative decision . . .[,] a reviewing court should examine the way in which the state administrative authorities have arrived at their administrative decision and the methods employed." <u>Doyle</u>, 953 F.2d at 105; <u>see also</u> <u>J.P. ex rel. Peterson v. County Sch. Bd. of Hanover Cnty.</u>, 516 F.3d 254, 259 (4th Cir. 2008) ("When determining whether a hearing officer's findings were regularly made, our cases have typically focused on the *process* through which the findings were made." (emphasis in original)).

deference to their findings." G ex rel. RG v. Fort Bragg Dependent Sch., 343 F.3d 295, 302-03 (4th Cir. 2003) (internal quotation marks omitted). Conversely, "where a reviewing officer or board reaches a factual conclusion opposed to one reached by the hearing officer but in doing so departs from the normal process of fact-finding, its decision may be entitled to little or no deference." Id. at 303 (citing Doyle, 953 F.2d at 105-06). Nevertheless, if the SRO's factual findings differ from the ALJ's factual findings but remain "regularly made, they, too, [a]re entitled to due weight by the district court." Sumter Cnty. Sch. Dist. 17 v. Heffernan ex rel. TH, 642 F.3d 478, 485 (4th Cir. 2011).

Furthermore, "when fact-findings are regularly made and entitled to *prima facie* correctness, the district court, if it is not going to follow them, is required to explain why it does not." Doyle, 953 F.2d at 105. "After giving the administrative fact-findings such due weight, if any, the district court then is free to decide the case on the preponderance of the evidence, as required by the statute." Id.[11] In other words, "[t]he district court must give 'due weight' to the administrative proceedings, but the findings of fact and ultimate decision as to whether the state

---

[11] "No deference is accorded an IDEA administrative officer's conclusions of law." R.S., 2019 WL 1025930, at *3; see also E.L., 975 F. Supp. 2d at 537 ("[The due weight] deference is limited to factual findings. A district court must review findings about the IDEA's legal requirements *de novo*.").

37

has complied with the IDEA are made by the district court." <u>Sumter Cnty.</u>, 642 F.3d at 484; <u>see also</u> <u>R.S. v. Board of Dirs. of Woods Charter Sch. Co.</u>, No. 1:16cv119, 2019 WL 1025930, at *3 (M.D.N.C. Mar. 4, 2019) ("[O]nce the district court concludes its factfinding — including a 'due weight' determination — the court makes an independent legal determination 'on the preponderance of the evidence, as required by the statute.'" (quoting <u>Doyle</u>, 953 F.2d at 105)), <u>aff'd sub nom.</u> <u>R.S. by & through Soltes v. Board of Dirs. of Woods Charter Sch. Co.</u>, 806 F. App'x 229 (4th Cir. 2020).

In that regard, the Court possesses authority

> to disagree with an ALJ's findings.  Congress included judicial review in the statute for a purpose.  Yet if a district court is going to disagree with regularly made factual findings, then it must "explain how it, despite the fact that it was reviewing a cold record, reached a conclusion completely contrary to that of the ALJ, who conducted the proceedings."

<u>N.P. by S.P. v. Maxwell</u>, 711 F. App'x 713, 718 (4th Cir. 2017) (quoting <u>A.B. ex rel. D.B. v. Lawson</u>, 354 F.3d 315, 327 (4th Cir. 2004)).  In addition, even where the district court (or SRO) determines that the ALJ's factual findings qualify as "regularly made," it can still properly conclude that the evidence as a whole justifies a different conclusion than the ALJ reached, as the United States Court of Appeals for the Fourth Circuit has explained:

> The district court acknowledged and accepted the [ALJ's] factual findings, but the court believed that the evidence considered as a whole pointed to a different legal conclusion than that reached by the [ALJ].  This

38

was entirely appropriate and consistent with the district
court's obligation to make its own independent
determination of whether the [school d]istrict had
provided [the child] with a FAPE.

Sumter Cnty., 642 F.3d at 485; see also id. ("Like the district

court, the SRO was obligated under the IDEA to review the record

and make an independent decision based on his view of the

preponderance of the evidence.").

Finally, in assessing whether a school provided a FAPE,

"courts should endeavor to rely upon objective factors, such as

actual educational progress, in order to avoid substituting [their]

own notions of sound educational policy for those of the school

authorities which [they] review." MM ex rel. DM v. School Dist. of

Greenville Cnty., 303 F.3d 523, 532 (4th Cir. 2002) (internal

quotation marks and brackets omitted).    Indeed, "it is a

longstanding policy in IDEA cases to afford great deference to the

judgment of education professionals." N.P., 711 F. App'x at 717

(internal quotation marks omitted).    Viewed from another

perspective,

[t]he [IDEA] vests [school] officials with responsibility
for decisions of critical importance to the life of a
disabled child.  The nature of the IEP process, from the
initial    consultation    through    state    administrative
proceedings,    ensures    that    parents    and    school
representatives will fully air their respective opinions
on the degree of progress a child's IEP should pursue.
By the time any dispute reaches court, school authorities
will have had a complete opportunity to bring their
expertise and judgment to bear on areas of disagreement.
A reviewing court may fairly expect those authorities to
be able to offer a cogent and responsive explanation for
their decisions that shows the IEP is reasonably

39

calculated to enable the child to make progress appropriate in light of his circumstances.

Endrew F., __U.S. at __, 137 S. Ct. at 1001-02 (citations omitted).

### iii. FAPE Standards

"To meet its substantive obligation under the IDEA, a school must offer an IEP reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances." Id. at __, 137 S. Ct. at 999. "The 'reasonably calculated' qualification reflects a recognition that crafting an appropriate program of education requires a prospective judgment by school officials. The [IDEA] contemplates that this fact-intensive exercise will be informed not only by the expertise of school officials, but also by the input of the child's parents or guardians." Id. (citation omitted). Further, "[a]ny review of an IEP must appreciate that the question is whether the IEP is reasonable, not whether the court regards it as ideal." Id. (emphasis in original).

Nevertheless, as the Supreme Court recently explained:

> The IEP must aim to enable the child to make progress. After all, the essential function of an IEP is to set out a plan for pursuing academic and functional advancement. See [20 U.S.C.] §§ 1414(d)(1)(A)(i)(I)-(IV). This reflects the broad purpose of the IDEA, an "ambitious" piece of legislation enacted "in response to Congress' perception that a majority of handicapped children in the United States 'were either totally excluded from schools or [were] sitting idly in regular classrooms awaiting the time when they were old enough to "drop out."'" Rowley, 458 U.S.[] at 179 (quoting H.R. Rep. No. 94-332, p. 2[ ](1975)). A substantive standard not focused on student progress

40

would do little to remedy the pervasive and tragic academic stagnation that prompted Congress to act.

That the progress contemplated by the IEP must be appropriate in light of the child's circumstances should come as no surprise. A focus on the particular child is at the core of the IDEA. The instruction offered must be "*specially* designed" to meet a child's "*unique* needs" through an "*[i]ndividualized* education program." §§ 1401(29), (14) (emphasis added). An IEP is not a form document. It is constructed only after careful consideration of the child's present levels of achievement, disability, and potential for growth. §§ 1414(d)(1)(A)(i)(I)-(IV), (d)(3)(A)(i)-(iv). As [the Supreme Court] observed in *Rowley*, the IDEA "requires participating States to educate a wide spectrum of handicapped children," and "the benefits obtainable by children at one end of the spectrum will differ dramatically from those obtainable by children at the other end, with infinite variations in between." 458 U.S.[] at 202.

*Rowley* sheds light on what appropriate progress will look like in many cases. There, the [Supreme] Court recognized that the IDEA requires that children with disabilities receive education in the regular classroom "whenever possible." *Ibid.* (citing § 1412(a)(5)). When this preference is met, "the system itself monitors the educational progress of the child." *Id.*[] at 202-203. "Regular examinations are administered, grades are awarded, and yearly advancement to higher grade levels is permitted for those children who attain an adequate knowledge of the course material." *Id.*[] at 203. Progress through this system is what our society generally means by an "education." And access to an "education" is what the IDEA promises. *Ibid.* Accordingly, for a child fully integrated in the regular classroom, an IEP typically should, as *Rowley* put it, be "reasonably calculated to enable the child to achieve passing marks and advance from grade to grade." *Id.*[] at 203-204.

This guidance is grounded in the statutory definition of a FAPE. One of the components of a FAPE is "special education," defined as "specially designed instruction . . . to meet the unique needs of a child with a disability." §§ 1401(9), (29). In determining what it means to "meet the unique needs" of a child with

41

a disability, the provisions governing the IEP
development process are a natural source of guidance: It
is through the IEP that "[t]he 'free appropriate public
education' required by the [IDEA] is tailored to the
unique needs of" a particular child. *Id.*[] at 181.

The IEP provisions reflect *Rowley*'s expectation
that, for most children, a FAPE will involve integration
in the regular classroom and individualized special
education calculated to achieve advancement from grade to
grade. Every IEP begins by describing a child's present
level of achievement, including explaining "how the
child's disability affects the child's involvement and
progress in the general education curriculum."
§ 1414(d)(1)(A)(i)(I)(aa). It then sets out "a statement
of measurable annual goals . . . designed to . . . enable
the child to be involved in and make progress in the
general education curriculum," along with a description
of specialized instruction and services that the child
will receive. §§ 1414(d)(1)(A)(i)(II), (IV). The
instruction and services must likewise be provided with
an eye toward "progress in the general education
curriculum." § 1414(d)(1)(A)(i)(IV)(bb). Similar IEP
requirements have been in place since the time the States
began accepting funding under the IDEA.

. . . . [T]he [IEP's procedural requirements] are
there for a reason, and their focus provides insight into
what it means, for purposes of the FAPE definition, to
"meet the unique needs" of a child with a disability.
§§ 1401(9), (29). When a child is fully integrated in
the regular classroom, as the [IDEA] prefers, what that
typically means is providing a level of instruction
reasonably calculated to permit advancement through the
general curriculum.

*Rowley* had no need to provide concrete guidance with
respect to a child who is not fully integrated in the
regular classroom and not able to achieve on grade level.
That case concerned a young girl who was progressing
smoothly through the regular curriculum. If that is not
a reasonable prospect for a child, his IEP need not aim
for grade-level advancement. But his educational program
must be appropriately ambitious in light of his
circumstances, just as advancement from grade to grade is
appropriately ambitious for most children in the regular
classroom. The goals may differ, but every child should
have the chance to meet challenging objectives.

Of course this describes a general standard, not a
formula. But whatever else can be said about it, this
standard is markedly more demanding than the "merely more
than *de minimis*" test applied by [certain courts]. It
cannot be the case that the [IDEA] typically aims for
grade-level advancement for children with disabilities
who can be educated in the regular classroom, but is
satisfied with barely more than *de minimis* progress for
those who cannot.

When all is said and done, a student offered an
educational program providing "merely more than *de
minimis*" progress from year to year can hardly be said to
have been offered an education at all. For children with
disabilities, receiving instruction that aims so low
would be tantamount to "sitting idly . . . awaiting the
time when they were old enough to 'drop out.'" *Rowley*,
458 U.S.[] at 179 (some internal quotation marks
omitted). The IDEA demands more. It requires an
educational program reasonably calculated to enable a
child to make progress appropriate in light of the
child's circumstances.

Endrew F., __ U.S. __, 137 S. Ct. at 999-1001 (emphasis in

original) (certain brackets and ellipsis added) (footnote and

parallel citations omitted).

### iv. LRE Principles

Under the IDEA, children with disabilities remain entitled to

a FAPE in the LRE. 20 U.S.C. § 1412(a)(1) & (5); see also Endrew

F., __ U.S. at __, 137 S. Ct. at 999 ("[T]he IDEA requires that

children with disabilities receive education in the regular

classroom 'whenever possible.'"). Known as a "mainstreaming

requirement[]," DeVries by DeBlaay v. Fairfax Cnty. Sch. Bd., 882

F.2d 876, 878 (4th Cir. 1989), the IDEA provides:

To the maximum extent appropriate, children with
disabilities, including children in public or private
institutions or other care facilities, are educated with

43

children who are not disabled, and special classes,
separate schooling, or other removal of children with
disabilities from the regular educational environment
occurs only when the nature or severity of the disability
of a child is such that education in regular classes with
the use of supplementary aids and services cannot be
achieved satisfactorily.

20 U.S.C. § 1412(a)(5)(A).

As such, IEP teams "must give first *consideration* to placement
of a disabled student in the regular classroom with appropriate
aids and services before a more restrictive placement can be
considered." Letter to Cohen, 25 IDELR 516 (OSEP 1996) (emphasis
in original).[12] Further, "[i]n determining whether regular class
placement would be appropriate for an individual disabled student,
the team must thoroughly consider the full range of supplementary
aids and services, in light of the student's abilities and needs,
that could be provided to facilitate the student's placement in the
regular educational environment." Id.

The IEP team also cannot remove a disabled child from the
"regular classroom[] solely because of needed modifications in the
general education curriculum." 34 C.F.R. § 300.116(e). However,
the Fourth Circuit has "held that mainstreaming is not required
where (1) the disabled child would not receive an educational
benefit from mainstreaming into a regular class; (2) any marginal
benefit from mainstreaming would be significantly outweighed by
benefits which could feasibly be obtained only in a separate

---

12  Letter to Cohen appears at Docket Entry 88-1.

44

instructional setting; or, (3) the disabled child is a disruptive force in a regular classroom setting." Hartmann by Hartmann v. Loudoun Cnty. Bd. of Educ., 118 F.3d 996, 1001 (4th Cir. 1997) (citing DeVries, 882 F.2d at 879).

## B. The Durham Board's Administrative Motion

The Durham Board challenges the SRO's reversal of "the ALJ's decision regarding educational placement in the May 2015 IEP" (Docket Entry 109 at 8 (emphasis omitted)), contending that "the [SRO] departed from the accepted norm of fact-finding in abandoning the ALJ's findings on the May 2015 educational placement issue" (id.). More specifically, the Durham Board asserts that "the [SRO] improperly reversed the ALJ's well-founded credibility determinations in rehabilitating the credibility of Plaintiffs' main witness[, Dr. Kurth,] and inappropriately re-analyzed certain progress monitoring data that was not analyzed by any witness." (Id.; see generally id. at 8-16.) Although the SRO did go too far in one aspect of her critique of the ALJ's analysis of Dr. Kurth's testimony, the Durham Board's contentions ultimately do not warrant reinstating the ALJ's adverse credibility findings or otherwise warrant entry of judgment in the Durham Board's favor on its Administrative Motion.

## i. Credibility Challenge

The Durham Board presents three challenges to the SRO's credibility-related determinations. First, the Durham Board

appears to argue that an SRO can never overturn an ALJ's credibility finding. (See id. at 9-10 (asserting, inter alia, that "credibility determinations are the province of the fact-finder who hears the live testimony" and that "[t]he SRO *must* defer to the credibility determinations made by the hearing officer because he or she had the opportunity to hear the testimony" (internal quotation marks omitted) (emphasis in original)); see also Docket Entry 121 at 1-3 (arguing "that the ALJ's credibility determinations should not be disturbed, even by the SRO" (id. at 1)).)[13] Next, the Durham Board asserts that the SRO's "lengthy justification of her abandonment of the ALJ's credibility determinations regarding Plaintiffs' expert witnesses addressed only two of the many bases the ALJ had identified for discrediting Dr. Kurth," and "entirely ignored multiple other findings in the ALJ's decision justifying the ALJ's skepticism." (Docket Entry 109 at 10; see also id. at 12-13 ("The [S]RO did not address three of those reasons in any way. The fact that the [S]RO had a different interpretation of two of them does not change the fact that the ALJ made a properly supported, appropriate decision to give little

_____

13  The exact nature of the Durham Board's contention remains unclear given that, in pressing this contention, the Durham Board relies on a quotation explicitly recognizing the ability to reverse an ALJ's credibility determination. (See id. at 9 ("'[T]he Fourth Circuit has required that the court find evidence to be so overwhelmingly compelling that it is of the nature and quality that would require the hearing officer to accept it before reversing an IDEA hearing officer's credibility determination.'" (emphasis omitted)).)

weight to Dr. Kurth's testimony.").)   Finally, the Durham Board asserts, without development, that the SRO erred in her interpretation of the remaining two factors. (See id. at 13 ("Even if the [S]RO were correct in these two disagreements — and she is not — that would still not entitle her to abandon the ALJ's overall credibility determination.").)[14]   Based on these arguments, the Durham Board maintains that "[t]he ALJ's sound credibility determinations should be restored, and, given that Plaintiffs' entire case was built on Dr. Kurth's days-long testimony, the ALJ's finding against Dr. Kurth's credibility requires a conclusion that

---

14  This assertion appears in the midst of the Durham Board's argument regarding the SRO's alleged failure to consider all relevant factors in the ALJ's credibility determination:

> After hearing from Dr. Kurth for the better part of four days, the ALJ made clear that she did not find Dr. Kurth credible for numerous reasons:
>
> [(listing reasons)]
>
> The [S]RO did not address three of those reasons in any way.  The fact that the [S]RO had a different interpretation of two of them does not change the fact that the ALJ made a properly supported, appropriate decision to give little weight to Dr. Kurth's testimony. Even if the [S]RO were correct in these two disagreements — and she is not — that would still not entitle her to abandon the ALJ's overall credibility determination. *S.H. v. Fairfax Cnty. Bd. of Educ.*, 875 F. Supp. 2d 633, 646 (E.D. Va. 2012) (stating that "a single factual error contained in an alternative basis for a credibility determination" is not a sufficient basis to ignore explicit findings on credibility). . . .

(Docket Entry 109 at 12-13.)

the Board prevails on all issues." (Id.)  These contentions miss
the mark.

To begin, the Durham Board's assertion that the SRO lacked
authority to depart from the ALJ's credibility determination
heavily relies on the Fourth Circuit's Doyle decision.  (See id. at
9-10.)  In that decision, the Fourth Circuit explained:

> The local hearing officer [had] examined the
> historical facts with respect to disability with some
> care, as well as the statutory requirements.  The
> reviewing officer for the State Board of Education did
> not do the same but stated that he would have found the
> same facts on the same evidence.  The only point on which
> the local and state hearing officers differed in any
> consequence was in the credibility of one of the
> witnesses for the plaintiffs[]. . . . .  That witness was
> a Dr. Solomon, who was a teacher at the Lab School and
> had observed [the child's] current class at the Lab
> School as well as the proposed class at Nottingham.  She
> testified that [the child] was one of the most, if not
> the most, complex learning disabled children she had ever
> encountered and that, in her opinion, a highly
> individualized program such as Lab's was the only
> methodology which would suffice for [the child].  Without
> stating any reason other than the heading of a report
> which Dr. Solomon had prepared and called "The
> Appropriate Program:  The Lab School of Washington" and
> that Dr. Solomon had stated that, in her opinion, a
> highly individualized program was the only methodology
> which would suffice for [the child], the reviewing
> officer concluded that Dr. Solomon saw her role as that
> of an advocate and found her testimony not to be
> credible.   While it is true that by statute and
> regulation the reviewing officer is required to make an
> independent decision, we are of opinion that his reason
> for discrediting a witness who he had not seen or heard
> testify, in the face of the crediting of that same
> witness by a hearing officer who had seen and heard the
> witness testify, is so far from the accepted norm of a
> fact-finding process designed to discover truth that we
> think the due weight which should be accorded the
> decision of the reviewing fact-finding officer depending
> on that credibility decision is none.

48

Doyle, 953 F.2d at 104 (emphasis added).

Accordingly, rather than prohibiting deference to any SRO credibility determination that conflicts with that of an ALJ, Doyle found that the particular reviewing officer's rationale for discrediting the hearing officer's credibility determination departed too greatly from the normal fact-finding process to warrant such deference. See id. Admittedly, subsequent decisions have, at times, failed to capture this nuance in citing to Doyle. See, e.g., Sumter Cnty., 642 F.3d at 485 (describing Doyle as "explaining that if an administrative officer departs 'so far from the accepted norm of a fact-finding process designed to discover truth' — for example, by rejecting credibility determinations made by the hearing officer — the findings cannot be considered 'regularly made' and those findings are entitled to no weight"). However, the Fourth Circuit has more recently reiterated that even ALJ credibility determinations remain subject to rejection, so long as the reviewing entity appropriately explains the reasons for disagreeing with the ALJ's finding. See N.P., 711 F. App'x at 718.

Moreover, that approach comports with the Supreme Court's recognition that an appellate body may overturn the trier of fact's credibility finding "when[,] although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." Anderson v. City of Bessemer City, 470 U.S. 564, 573 (1985)

(internal quotation marks omitted).[15] Further, although credibility

determinations merit particular deference,

> [t]his is not to suggest that the trial judge may
> insulate his findings from review by denominating them
> credibility determinations, for factors other than
> demeanor and inflection go into the decision whether or
> not to believe a witness. Documents or objective
> evidence may contradict the witness' story; or the story
> itself may be so internally inconsistent or implausible
> on its face that a reasonable factfinder would not credit
> it. Where such factors are present, the court of appeals
> may well find clear error even in a finding purportedly
> based on a credibility determination.

Id. at 575.

Accordingly, any contention that the SRO lacked authority to

depart from the ALJ's credibility determination lacks merit. The

Durham Board's contention that the SRO failed to address all of the

reasons that the ALJ offered for discounting Dr. Kurth's testimony

also falls short.

For instance, the Durham Board posits that the SRO improperly

failed to address the alleged "inherent contradiction of Dr.

---

15  Although the Anderson Court made this observation in the
context of Federal Rule of Civil Procedure 52(a), see id., 470 U.S.
at 573-76, it remains instructive here, particularly given that
Doyle analogized to Rule 52(a) in finding that the reviewing
officer's proffered rationale impermissibly departed from
appropriate fact-finding procedures. See Doyle, 953 F.2d at 104
("[H]is reason for discrediting a witness . . ., is so far from the
accepted norm of a fact-finding process . . . that we think the due
weight which should be accorded the decision of the reviewing
fact-finding officer depending on that credibility decision is
none. For example, [Rule] 52(a) provides that '. . . due regard
shall be given to the opportunity of the trial court to judge the
credibility of the witnesses.'" (final ellipsis in original)).

50

Kurth's position" (Docket Entry 109 at 10) on the gathered data.

(Id. at 10-11.)  More specifically, the ALJ found:

> Dr. Kurth opined that there was "simply not enough data
> to make any decisions with," (Tr. Vol. I, 146), and that
> statistical analysis would be "invalid" due to the small
> sample size.  (Tr. Vol. III, 296)  Yet, she still
> concluded, based solely on that data, that O.V. had made
> more progress in the general education classroom.  (Tr.
> Vol. I, 148, 153).

(Docket Entry 17-1, Findings ¶ 73.)

Contrary to the Durham Board's contentions (see Docket Entry

109 at 10-11), the SRO did address this alleged inconsistency:

> On O.V.'s benchmark to identify all letter sounds
> with 100% accuracy on 3 of 5 attempts, O.V. scored an
> average of 62% accuracy in the regular-education
> classroom and an average of 23% accuracy in the
> separate-education classroom.  In the final three
> attempts in the inclusive classroom in April and May
> 2015, O.V. scored a solid 81% accuracy, 87% accuracy, and
> 87% accuracy.  On the other hand, in the separate,
> self-contained classroom in O.V.'s final three
> assessments at the end of the year, he scored 0%
> accuracy, 19% accuracy, and 0% accuracy.  It does not
> take a formal statistical analysis to conclude that
> documented performance on this benchmark is better in the
> regular-education classroom than in the self-contained
> classroom.  An ordinary person considering these test
> scores easily recognizes, for example, that an average of
> 62%, with a finishing score of 87%, is better than an
> average of 23%, with a finishing score of 0%.

(Docket Entry 17-2, Findings ¶ 142; see also id., Findings ¶ 146

(explaining that, although "neither of O.V.'s parents nor any

expert hired by them conducted a formal statistical analysis of the

[data, a] formal statistical analysis was not necessary . . . in light of the plain meaning of all objective data considered").)[16]

Moreover, Dr. Kurth's statement that "[t]here's simply not enough data to make any decisions with" concerned "changes in instructional methods or considerations for the student's rate of learning" (Docket Entry 101-1 at 146) and similar factors necessary to accurately assess how various approaches impacted achievement. (See, e.g., id. at 145 ("There's just really very little data provided on math instruction and progress monitoring. So again, it would be very difficult I think for a teacher to make instructional decisions based on the data that's presented here.").) She further clarified that, although it would "be more beneficial to have more data" (id. at 148), the data that existed reflected, inter alia, "that O.[V.] may have a higher percentage of accurate responses in the inclusive setting compared to the self-contained setting"

_____

16  The SRO further observed:

DPS makes much of the fact that the quantity of data on many goals is too small to conduct sophisticated formal statistical analysis of the aggregate results or to conclusively assert whether O.V. is performing better or worse on his goals and benchmarks in the regular-education classroom. But the data in the record is, in fact, "extensive" overall, [ALJ] Decision, Finding of Fact 76. And the existing performance data *overwhelmingly* supports better educational outcomes in the regular as opposed to separate classroom. Thus, on existing data, removal from regular education now makes no sense, even if no formal statistical analysis was presented by an expert.

(Id. at 40 n.13 (emphasis in original).)

52

(id.).  (See also, e.g., id. at 146 ("The data that is provided
starts to paint a picture that he did perform somewhat better in
the inclusive setting in his math progress, but again, more data
would certainly be needed to help justify their decision making,
but it does appear that he's had somewhat greater progress
making---").)

The following exchange similarly undermines the Durham Board's
contention that Dr. Kurth's data-related testimony contained an
"inherent contradiction" (Docket Entry 109 at 10):

> [Respondent's Counsel:] Q   Dr. Kurth, you ended your
> testimony yesterday talking about your observations of
> O.[V.] and that you felt your observations are a valid
> means of assessing O.[V.]'s needs; correct?
>
> [Dr. Kurth:] A  Correct.
>
> Q  [Plaintiffs' Counsel] also had you review what . . .
> was referred to as empirical data that was collected by
> O.[V.]'s teachers; correct?
>
> A  Yes.
>
> Q  As a researcher have you done any formal analysis of
> that data?
>
> A   Have I analyzed O.[V.]'s – the data collected by
> O.[V.]'s teachers?
>
> Q  Yes.  Have you done any formal analysis of that data?
>
> A  I have looked at the data in terms of looking broadly
> at trends and how he was performing and comparing data
> from one setting versus another.
>
> Q  Did you run any ---
>
> A  (interposing) In the (inaudible).

53

The Reporter: I didn't understand that. Can you have her repeat it?

Q Can you repeat your answer?

A Yes. I have examined O.[V.]'s data looking at trends in that, so looking at what happened across time, and then looked at comparisons of his accurate responses in the self-contained setting as compared to the inclusive setting.

Q Did you do any formal analysis to determine if any differences were statistically significant?

A It's not possible to do a statistical analysis with a sample size — with such a small sample size. That would be invalid.

(Docket Entry 101-3 at 7-9.) As the SRO correctly found, understanding "trends in [O.V.'s data, by] looking at what happened across time, and then look[ing] at comparisons of [O.V.'s] accurate responses in the self-contained setting as compared to the inclusive setting" (id. at 8-9), "does not [require] a formal statistical analysis" (Docket Entry 17-2, Findings ¶ 142).

The Durham Board additionally contends that the SRO erred by not addressing the ALJ's finding that Dr. Kurth failed to provide a "specific basis for" opining "that O.V. needed [Extended School Year ('ESY')] services" (Docket Entry 17-1, Findings ¶ 103) and that "she was not familiar with the standards for ESY eligibility in North Carolina to any level of detail" (id.). (See Docket Entry 109 at 11-12.) The SRO did not overturn the ALJ's ESY determination (see Docket Entry 17-2, Findings ¶¶ 210-16) and thus did not need to address this finding, which solely concerned the

54

ESY question (see Docket Entry 17-1, Findings ¶ 103 ("Without providing any basis for her opinion, Dr. Kurth's testimony lacks credibility on this point." (emphasis added)).)

Next, the Durham Board appears to assert that the SRO failed to address the ALJ's conclusion that Plaintiffs' experts' testimony reflected mere pedagogical preferences, a notion intertwined with the ALJ's finding that their failure to observe O.V. in his public school reduces their credibility (see Docket Entry 17-1, Conclusions ¶ 36). (See Docket Entry 109 at 10-13 (reflecting that SRO addressed failure to observe rationale and seeming to suggest that SRO addressed alleged legal errors (see id. at 12 (arguing that "[t]he [S]RO's further insistence that Dr. Kurth should be given extra credibility, or at minimum latitude for the weaknesses in her testimony, because she was a first-time expert witness is similarly unpersuasive")), but not clearly identifying which reasons SRO allegedly addressed and failed to address).) The Durham Board further argues that the SRO erroneously rejected the ALJ's observation-related credibility determinations. (See id. at 11-12.) In this regard, the ALJ found:

> At hearing, Petitioners were unable to provide any anecdotal testimony about O.V.'s performance in the school setting for two reasons. First, neither Petitioners nor their experts observed O.V. during the 2014-15 school year. Second, Petitioners did not call any school staff to testify at hearing. In contrast, Respondent showed there was more than sufficient data and other information on which the IEP team could make decisions. Dr. Crossland's general assessment was that O.V.'s August 2014 IEP was appropriate in two ways. . . .

55

(Docket Entry 17-1, Findings ¶ 78.)  The ALJ further stated:

> Similarly here, Petitioners' experts clearly preferred
> particular pedagogical methods, and held a particular
> educational philosophy.  However, their lack of direct
> knowledge of O.V., his needs, and the circumstances and
> environment of his public education render their opinions
> of limited value in resolving this matter.  Further,
> general criticisms of special education classrooms
> nationwide, or even district-wide within DPS, have little
> bearing on the appropriateness of O.V.'s educational
> placement, especially when both Petitioners and their
> experts have never been in the special education
> classroom at Hillandale Elementary to observe the
> instruction O.V. received there.

(Id., Conclusions ¶ 36.)

The SRO fully considered, and appropriately rejected, these

determinations at multiple points throughout her decision.  As an

initial matter, she noted:

> Respondent also argues, and the ALJ found[,] that
> Dr. Kurth could not be credible on questions about O.V.'s
> education because Dr. Kurth had not observed O.V. in his
> public-school classrooms. Petitioners specifically asked
> DPS to allow an expert on their behalf to observe O.V. in
> his public-school setting.  Respondent objected and
> refused.  Respondent successfully secured an order
> denying Petitioners[] the ability to accomplish an
> independent expert observation in the classroom.  In that
> order, the ALJ also limited Respondent's ability to
> "mak[e] any argument that Petitioners' expert witness is
> unqualified, unprepared, or otherwise uninformed about
> any information that expert would have gathered from
> observing O.V.'s typical, full [public] school day."
> While the record is not clear whether Dr. Kurth or some
> other expert would have observed O.V. at that time, the
> record is clear that Petitioners[] were prepared to have
> some expert observe when they were refused access to the
> school and classroom, and the record is clear that Dr.
> Kurth observed O.V. in other learning environments,
> including with his tutor at his home and at the
> private-school placement.

(Docket Entry 17-2 at 34 n.10 (emphasis and third and fourth sets of bracket in original).)

The SRO further explained:

> the record reflects that Respondent's expert, Dr. Cathy Crossland, also did not observe O.V. in his public-school classroom, but neither Respondent nor, apparently, the ALJ found this fact discrediting in her case. The ALJ, instead, quoted Dr. Crossland's testimony without qualification. *See* [ALJ] Decision, Finding of Fact ¶¶ 45 & 46, p. 12. Selective application of this purported credibility factor renders it unpersuasive in light of all the other evidence in the record regarding the credibility and integrity of Petitioners' expert witnesses and the active resistance to their ability to observe in the public-school setting.

(Docket Entry 17-2 at 52 n.17.)[17]

In addition, the SRO noted:

> 186. ALJ Lassiter afforded O.V.'s teachers' testimony heightened credibility relative to Petitioners and their experts in part because she found that "Petitioners were unable to provide any anecdotal testimony about O.V.'s performance in the school setting . . . [because] neither Petitioners nor their experts observed O.V. during the 2014-2015 school year . . . ." [ALJ] Decision, Finding of Fact ¶ 178, p. 18.
>
> 187. Contrary to these findings, the record reflects (1) that Petitioner P.V. *did* provide anecdotal testimony about O.V.'s performance in the school setting, and (2) although Petitioners' experts only observed O.V. in

_____

17    Indeed, unlike Dr. Kurth and Dr. Orlando, who met and personally observed O.V. in a variety of contexts (<u>see, e.g.</u>, Docket Entry 101-1 at 81 (indicating that Dr. Kurth "know[s]" O.V. and "was able to observe him interacting with his family at home, [she] observed him interacting with his tutor at home, and then observed him in his classroom"); Docket Entry 101-5 at 124 (indicating that Dr. Orlando met and observed O.V. at his home and school and "observe[d] his communication abilities with others")), Dr. Crossland never met, observed, or evaluated O.V. (<u>see</u> Docket Entry 101-14 at 59).

educational settings outside the public schools, this was
due to Respondent's own actions; Respondent refused to
permit Petitioners' expert to observe, fought
Petitioners' resulting Motion to Compel Entry Upon Land
to facilitate an expert observation, and secured an order
denying that motion. Although Petitioners' effort to
secure an expert observation of O.V. came after the
2014-2015 school year, when they learned that Respondent
was removing O.V. to a "separate" placement, "stay put"
guaranteed that O.V. would have remained in the same
placement as the 2014-2015 school year for the
observation requested. Respondent also denied M.P.'s
requests to visit her son's classroom throughout the
school year.

(Id., Findings ¶¶ 186-87 (emphasis, ellipses, and first set of

brackets in original).)

The SRO further elaborated:

200. The [SRO] rejects the ALJ's findings
discrediting Petitioners' experts (and M.P.) for failing
to observe O.V. in the public-school setting. Respondent
sought and obtained an order preventing them from doing
so. Additionally, Respondent stipulated in open court
that it could not make any "argument that Petitioners'
expert witness is unqualified, unprepared, or otherwise
uninformed about any information that expert would have
gathered from observing O.V.'s typical full school day,"
and ALJ Elkins granted Petitioners' request for
alternative relief binding Respondent to this
stipulation.[18]

201. Petitioners['] experts personally observed O.V.
in educational settings outside the public schools and
reviewed the voluminous records regarding O.V.'s progress

---

18    The Durham Board argues that it adhered to this
prohibition. (See Docket Entry 109 at 11.) It did not: the
proposed final decision that it provided to ALJ Lassiter explicitly
faults Plaintiffs and their experts for failing to observe O.V. in
the relevant DPS setting (see Docket Entry 205-1 at 43
("Petitioners were unable to provide any anecdotal testimony about
O.V.'s performance in the school setting because neither they nor
their experts observed him during the 2014-15 school year
. . . .").)

58

in the public schools, giving the application of their impressive expertise on low-incidence disabilities and inclusion merit on the facts of this case.

(Id., Findings ¶¶ 200-01.)  As such, the SRO concluded that "[a] comprehensive review of the entire record affirms Petitioners' experts' credibility on special education of students with low-incidence disabilities and on inclusion of students with low-incidence disabilities."  (Id., Findings ¶ 203.)[19]

The SRO's detailed, record-based findings adequately "describe[e] what led" her to "reject[] the ALJ's credibility determinations," N.P., 711 F. App'x at 718, regarding Dr. Kurth's (and Dr. Orlando's) knowledge of O.V., and, as such, the SRO's "regularly made" findings "[a]re entitled to due weight," Sumter Cnty., 642 F.3d at 485.  Nor does the Court accept the Durham Board's characterization of the SRO's refusal to uphold the ALJ's selective application of the failure-to-observe criteria as "nonsensical" (Docket Entry 109 at 12).[20]

---

19  This credibility determination applies to Dr. Orlando as well as Dr. Kurth, yet the Durham Board only challenges the SRO's assessment of Dr. Kurth's credibility.  (See Docket Entry 109 at 9-13; Docket Entry 121 at 1-3.)

20  The Durham Board maintains that its refusal to permit the requested observations "is consistent with . . . federal guidance on the issue, see Letter to Mamas, 42 IDELR 10 (OSEP 2004); Letter to Savit, 64 IDELR 250 (OSEP 2014)."  (Docket Entry 109 at 12.)  However, the cited decisions provide little, if any, support for the Durham Board's actions here.  See Letter to Mamas, 42 IDELR 10 (appearing at Docket Entry 76-1) (recognizing that, because IDEA does not "provide a general entitlement for parents of children with disabilities, or their professional representatives, to (continued...)

59

As a preliminary matter, given the IDEA's recognition of the "important role" parents play "in the evaluation and educational placement of their children," Letter to Savit, 64 IDELR 250 (OSEP 2014), the SRO reasonably could conclude that, where a school district refuses to permit parents and their experts to directly observe a child's education in the public school setting, the resulting lack of observational knowledge should not undermine the position of the parents and/or the credibility of their experts. See generally School Comm. of Town of Burlington v. Department of Educ. of Mass., 471 U.S. 359, 370 (1985) (concluding that "Congress undoubtedly did not intend [a] result" that would render "the parents' right to participate fully in developing a proper IEP[] and all of the procedural safeguards . . . less than complete").

_____

20(...continued)
observe their children in any current classroom or proposed educational placement[, t]he determination of who has access to classrooms may be addressed by State and/or local policy," but "encourag[ing] school district personnel and parents to work together in ways that meet the needs of both the parents and the school, including providing opportunities for parents to observe their children's classrooms and proposed placement options," and recognizing that "there may be circumstances in which access may need to be provided," including, as an "example, if parents invoke their right to an independent educational evaluation of their child, and the evaluation requires observing the child in the educational placement, the evaluator may need to be provided access to the placement"); Letter to Savit, 64 IDELR 250 (appearing at Docket Entry 76-2) (finding that "it would be inconsistent with the IDEA for a public agency to have a policy giving third party evaluators only a two hour observation window, because such a limitation may restrict the scope of the [independent educational evaluation] and prevent an independent evaluator from fulfilling his or her purpose, unless the LEA also limits its evaluators to a two hour observation period").

The SRO's refusal to uphold the ALJ's discounting of Dr. Kurth (and Dr. Orlando) finds additional support due to the ALJ's selective application of this credibility factor. (<u>See, e.g.</u>, Docket Entry 17-1, Findings ¶ 78 (reflecting that, in same finding, ALJ discounted Plaintiffs' experts' testimony due to their failure to observe O.V. in his public school, yet fully credited Dr. Crossland's testimony notwithstanding Dr. Crossland's failure to observe O.V. not only in his public school, but in any educational setting).) Accordingly, the Durham Board's challenge to the SRO's treatment of these credibility findings lacks merit.

Finally, the Durham Board appears to assert that the SRO erred in rejecting the ALJ's finding that "Dr. Kurth misstated federal law and regulations several times in her testimony." (Docket Entry 109 at 12 (citing "ALJ Finding 98").) More specifically, the ALJ found that:

> Petitioners presented extensive expert testimony regarding the [LRE], largely arguing that students with low-incidence disabilities do not benefit from placement in special education classrooms. (Tr. Vol. I, 79, 152). However, in expressing their opinions, Petitioners' experts, particularly Dr. Kurth, took positions contrary to federal and state law.
>
> a. Dr. Kurth opined that IEP teams are required to attempt regular education placements before moving to more restrictive placements. (Tr. Vol. II, 264). Yet, guidance from the federal government establishes the opposite. *Letter to Cohen*, 25 IDELR 516 (OSEP, August 6, 1996); (Tr. Vol. XIII, 2436).
>
> b. Dr. Kurth also opined that the IDEA made no mention of the "continuum of alternative

61

placements," (Tr. Vol. VII, 1226), yet federal regulations and state policies use that exact phrase to describe a *requirement* for school districts. 34 CFR 300.115(a) ("Each public agency must ensure that a continuum of alternative placements is available to meet the needs of children with disabilities for special education and related services."); (Tr. Vol. XIII, 2434). These objectively incorrect positions diminish Dr. Kurth's overall credibility as an expert witness.

(Docket Entry 17-1, Findings ¶ 98 (emphasis in original).)

The SRO conducted a thorough examination of the record, providing a detailed explanation for why, in her view, the ALJ's and Durham Board's "assertions about Dr. Kurth's credibility due to her alleged misunderstanding about special-education laws are contrary to the overwhelming weight of the record evidence reviewed in its entirety." (Docket Entry 17-2, Findings ¶ 105; see id., Findings ¶¶ 104-28.) In so doing, she specifically addressed the testimony on which the ALJ relied in deciding that Dr. Kurth took "objectively incorrect positions" (Docket Entry 17-1, Findings ¶ 98), finding that the cited testimony did not, in fact, conflict with federal law (see Docket Entry 17-2, Findings ¶¶ 110-15, 117, 122-27). The SRO also examined Dr. Kurth's testimony more generally (see id., Findings ¶¶ 107-28), ruling that "[t]he record evidence overwhelmingly supports a finding that Dr. Kurth knew and understood the LRE mandate as expressed in the IDEA" (id., Findings ¶ 120) and that she displayed an "accurate substantive understanding of th[e] continuum [of alternative placements]" (id.,

Findings ¶ 127).  Accordingly, the SRO found that "a review of Dr.

Kurth's full testimony" revealed that the ALJ's finding

> that Dr. Kurth made credibility diminishing "errors" on
> the law[] lacks sufficient support in the record evidence
> taken as a whole.  Instead, Dr. Kurth's testimony, when
> considered in its entirety, reflects a prolific,
> intelligent, and thoughtful academic, particularly
> regarding the effective provision of special education to
> children with low-incidence disabilities.  She is
> credible to express opinions on the issue of whether the
> May 2015 IEP offered O.V. FAPE in the LRE.

(Id., Findings ¶ 128.)  Because the SRO "address[ed] each . . .

relevant factual finding made by the [ALJ] and explain[ed] why,

under the due weight standard, [she] chose[] to . . . not accept

that finding," N.P., 711 F. App'x at 718 (internal quotation marks

omitted), the SRO's finding on this point qualifies as "regularly

made" and remains entitled to due weight.  See id.; Sumter Cnty.,

642 F.3d at 485; see also Anderson, 470 U.S. at 575 (recognizing

propriety of considering "objective evidence" in evaluating

credibility determinations).

    The Court reaches that conclusion notwithstanding the fact

that the SRO overstated the situation in asserting (1) that "[t]he

record evidence overwhelmingly supports a finding that Dr. Kurth

knew and understood the LRE mandate as expressed in the IDEA"

(Docket Entry 17-2, Findings ¶ 120 (emphasis added)) and (2) that

the ALJ's contrary finding "lacks sufficient support in the record

evidence taken as a whole" (id., Findings ¶ 128 (emphasis added)).

More specifically, although, as the SRO discussed, Dr. Kurth

repeatedly correctly testified that the IEP team needed to only consider the general education setting (see, e.g., Docket Entry 17-2, Findings ¶¶ 112, 116), her testimony also at times suggested that the IEP team must first place the student in the general education classroom (see, e.g., Docket Entry 101-2 at 57-58 ("So again, the focus is not so much on the place but the delivery of appropriate supports and services in the general education setting with this understanding that the team would be providing lots of documentation about what supports and services they tried before removing a student from the general ed setting." (emphasis added))).

For instance, Dr. Kurth answered "yes" when asked, "is it your position that a student must first be put in the general education setting before any other setting is considered?" (id. at 58), even though her answer to the follow-on question of whether she "believe[d] all students should be placed first in a general education classroom" articulated her understanding of the IDEA as requiring "that the first placement to be considered is the general education setting" (id. (emphasis added); see also id. at 60-61 (explaining that she "teach[es] students to deliver special education services in the [LRE], which is the general education setting being considered first" (emphasis added))). The record also reflects the following exchange between the Durham Board's counsel and Dr. Kurth:

64

Q Is there any circumstance in which it would be appropriate for a student to receive instruction in a special education setting?

A That would be an individualized team meeting decision.

Q What would be the factors that would be considered by that team, in your opinion, to make that---

A (interposing) Sure.

Q ---decision?

A So the team would think of, again, the meeting — how they would meet the needs of the student in the general education setting and what constellation of supports and services would be needed in that setting and then take documented data describing what they tried, how they tried it, who implemented it, all of the factors that we have considered.

    And then if that service was not appropriate, they would try another service and they would keep doing that until they found the right constellation of supports that were necessary for the student, again, thinking that special education is just a constellation of services for a student.

    And if the team decided that we have really exhausted all of the options that we have available to us and they can document that they've tried and done a lot of trial and error to see what's necessary for that student and they realize it simply cannot be done in a general education setting, then they might choose to move a student to a more restrictive setting with the idea that they would continue to identify the supports and services the student needs to be successful that they might be again educated in the general education setting.

(Id. at 61-62 (emphasis added).) Given such testimony, the SRO's

characterizations of the record as "overwhelmingly" evidencing Dr.

Kurth's proper understanding of legal requirements (Docket Entry

17-2, Findings ¶ 120) and "lack[ing] sufficient support" (id.,

Findings ¶ 128) for the ALJ's finding that, "in expressing [her]

65

opinion[,] . . . Dr. Kurth[] took positions contrary to federal [law]" (Docket Entry 17-1, Findings ¶ 98), goes too far.  The Court therefore ascribes limited weight to this component of the SRO's credibility assessment.

Nonetheless, granting the appropriate weight to the SRO's other credibility findings, see Sumter Cnty., 642 F.3d at 485, and considering the deficiencies in the ALJ's contrary findings properly identified by the SRO, the Court declines the Durham Board's request to "restore[]" (Docket Entry 109 at 13) the ALJ's credibility findings regarding Dr. Kurth.  See S.H. v. Fairfax Cnty. Bd. of Educ., 875 F. Supp. 2d 633, 645 n.3 (E.D. Va. 2012) (explaining that, "[alt]hough the Hearing Officer's finding can be read as an overstatement or even a misstatement, it does not follow that [the witness] lacked a basis for her opinion or the Hearing Officer lacked a basis for crediting her," as well as that "a single factual error contained in an alternative basis for a credibility determination does not obligate the Court to ignore the Hearing Officer's explicit finding that [the witness] testified credibly").  In any event, contrary to the Durham Board's contentions, even the complete restoration of the ALJ's adverse credibility findings regarding Dr. Kurth would not "require[] a conclusion that the Board prevails on all issues" (Docket Entry 109 at 13).  First, as discussed above, the ALJ erroneously discounted Dr. Orlando's testimony for failure to observe O.V. at his public

66

school, a finding that the SRO properly overturned (see Docket Entry 17-2, Findings ¶ 201), and, as discussed below, the objective evidence supports O.V.'s greater progress in the general education setting. Accordingly, the Durham Board's credibility contentions do not entitle it to relief.

### ii. Data Challenge

Next, the Durham Board challenges the SRO's data analysis and conclusions. (See Docket Entry 109 at 13-16.) In particular, the Durham Board faults the SRO for examining "the progress monitoring data" (id. at 13), as well as for the "conclusions" that she "drew" from it (id. at 15). These contentions lack merit.

The Durham Board first criticizes the SRO for "delv[ing] deep into the data sheets" (id.), particularly when, the Durham Board asserts, M.P. and Dr. Kurth "admitted [they] did not analyze the data" (Docket Entry 121 at 3). As an initial matter, the Durham Board's characterization of M.P.'s and Dr. Kurth's testimony misses the mark. For example, M.P. testified that, although she did not formally "analyze data," each month she reviewed the "raw data and from the data that they collected[, O.V.'s progress] seemed to be better" in the general education setting than in the special education classroom, further explaining that the difference "was obvious." (Docket Entry 101-5 at 38.) Dr. Kurth likewise confirmed that, although she did not conduct a "formal analysis to determine if any differences were statistically significant"

67

(Docket Entry 101-3 at 9), she "examined O.[V.]'s data looking at trends . . . [as to] what happened across time, and then looked at comparisons of his accurate responses in the self-contained setting as compared to the inclusive setting" (id. at 8-9). (See also id. at 8 (testifying that Dr. Kurth "looked at the data in terms of looking broadly at trends and how he was performing and comparing data from one setting versus another").) In sum, both M.P. and Dr. Kurth testified that they evaluated the relevant data, which, per M.P., "obvious[ly]" reflected more progress in the inclusive setting.

Moreover, during its cross-examination, the Durham Board led M.P. through the same kind of analysis that it now faults the SRO for conducting. (Compare Docket Entry 101-5 at 39-52, with Docket Entry 17-2, Findings ¶¶ 130-47.)[21] In connection with that

_____

21 The Durham Board further faults the SRO for "conduct[ing] a statistical analysis of the data, an exercise that even Plaintiffs' own expert witness had said would be invalid." (Docket Entry 109 at 13.) This contention refers to the SRO's findings that:

> 147. Any parent or teacher knows, for example, that a 73% on sight-word identification with 70 words assessed (as was the case in the general-education classroom) is a better "grade" than a 43% on sight-word identification with only 40 words assessed (as was the case in the separate-education classroom). In fact, any parent or teacher knows, that only one of these two scores could earn a *passing* grade in the traditional sense.
>
> 148. But if one were to conduct a simple two-sample t-test as the [SRO] did, it would show that there wasn't a significant difference in O.V.'s performance between
> (continued...)

68

exercise, the ALJ found that, "[t]o evaluate progress or improvement, the trend of the data in each setting is actually more informative" (Docket Entry 17-1, Findings ¶ 74), and that the Durham Board's "cross-examination of Petitioner M.P. established that O.V.'s overall performance on specific objectives in each classroom setting showed O.V. made no improvement over time within the general education classroom, but made substantial improvement over time in the special education classroom" (id., Findings ¶ 75). As such, the SRO properly evaluated this data in "conduct[ing her] impartial review of the [ALJ's] findings and decision," N.C. Gen. Stat. § 115C-109.9(a).[22]

_____

21(...continued)
semesters in either his regular-education classroom or the separate-education classroom that can't otherwise be explained by normal variance in test performance, making the focus of [the Durham Board's] counsel's calculations as unremarkable as they appear when given a "commonsense" review. This "formal" statistical analysis is not complex; any layperson, like the [SRO], can complete it. Here's what it reveals on these facts: Assuming a natural variance in performance, O.V.'s change from 75.9% to 71% in the regular-education classroom is 30% likely to be explained by random variance. And O.V.'s change from 39.74% to 51.5% in the separate-education classroom, is even more likely, 45% likely, to be explained by random variance.

(Docket Entry 17-2, Findings ¶¶ 147-48 (emphasis in original) (footnote omitted).) Particularly considered in context, this singular finding (among 223 numbered findings of fact and 55 numbered conclusions (see generally Docket Entry 17-2)) does not render the SRO's ruling irregularly made.

22 In its "Reply to Plaintiffs' Response to [the Durham] Board's Motion for Judgment on the Administrative Record" (Docket
(continued...)

In so doing, the SRO discovered errors in the Durham Board's (and ALJ's) treatment of this data. For instance, the SRO explained that the Durham Board's "division of O.V.'s performance over the course of the school year [into September through December and January through May groupings] does not present, as [the Durham Board] characterized it, 'a comparison of first and second semester performance,'" given that O.V.'s semesters operated from August through January and February through June. (Docket Entry 17-2 at

---

22(...continued)
Entry 121) (the "Administrative Reply"), the Durham Board raises for the first time the argument that the percentage information the Durham Board relied upon in this cross-examination does not constitute "admitted evidence" from the hearing. (Id. at 4 (emphasis omitted).) The Durham Board provides no support for this new contention (see id. ("[N]o one testified about how those tables were compiled, nor are there any affidavits in the record to authenticate them; they are, therefore, not admitted evidence from the administrative hearing that can be considered by this Court. Furthermore, the ALJ rejected Plaintiffs' higher-percentage theory . . . ." (emphasis in original))), and it remains well-settled that "'an argument raised for the first time in a reply brief or memorandum will not be considered,'" Wolfe Fin. Inc. v. Rodgers, No. 1:17cv896, 2019 WL 203183, at *17 n.17 (M.D.N.C. Jan. 15, 2019) (collecting cases), report and recommendation adopted, No. 1:17cv896, 2019 WL 2465218 (M.D.N.C. Feb. 1, 2019). Enforcement of the rule against consideration of arguments first-raised in reply makes particular sense here, given that (1) the Administrative Reply reveals that the Durham Board explicitly relied upon such information in the administrative hearing (see Docket Entry 121 at 7 (explaining that, in the Durham Board's "Rule 41(b) motion to dismiss argument," its counsel contended that its "cross-examination of [M.]P. . . . made it very clear that at best that data was ambiguous in terms of where [O.V.] was making more progress")) and (2) the Durham Board bypassed at least four separate opportunities to properly raise any objection on this front (i.e., before the ALJ, before the SRO, or in either of the two initial briefs in support of its administrative judgment motions).

35 n.11.)  The SRO further found that, "if one changes the calculation to reflect *actual* semesters, it changes the trend line in favor of [Plaintiffs]."  (Id. (emphasis in original).)[23]

After conducting a detailed, thorough examination of the "'extensive'" (id., Findings ¶ 149) progress monitoring data (see id., Findings ¶¶ 130-49), the SRO found that "the weight of the objective evidence in the record" refuted any notion that O.V.'s experience in the general education setting "was not successful" (id., Findings ¶ 150 (emphasis and internal quotation marks omitted)).  (See also, e.g., id., Findings ¶ 137 ("O.V.'s performance in the inclusive setting consistently depicts a *substantial improvement* over his performance in the separate setting. . . .  The data simply cannot justify a finding that O.V. showed 'no improvement in the general education setting.'" (emphasis in original)).)  Indeed, as the SRO persuasively illustrated, the objective evidence in the record establishes that "O.V. is *much closer* to his goal in the inclusive setting than he is in the segregated one.  In other words, O.V. enjoys educational

---

23  The SRO further noted that, "even if one retains the inaccurate 'semester' division" that the Durham Board created, Plaintiffs "demonstrated the opposite conclusion on two [of the] goals and benchmarks."  (Id.)  As the SRO explained, "[t]hese facts undermine [the Durham Board's] argument and the [ALJ's] finding on this point.  Further, the data on its face reveals that O.V. performed overall at an irrefutably higher rate in the regular classroom than in the self-contained classroom."  (Id.)

benefits and higher achievement in the inclusive setting compared to the separate one . . . ." (Id. at 41 n.14.)

Nevertheless, the Durham Board asserts that one cannot conduct a "direct comparison of the raw numbers from each setting," on the theory that "[t]he data was not an apples-to-apples comparison because of the different levels of support and the different baselines from the beginning of the year." (Docket Entry 109 at 15.)[24] In other words, the Durham Board argues:

> O.V. should not get full credit, so to speak, for his superior performance in his regular-education classroom in 2014-2015 because he typically had 1:1 support in the regular classroom and did not have that support in the separate classroom. This theory does not logically justify removal to a segregated setting. Instead, it demonstrates that the 1:1 aide, combined with other special-education services provided, successfully achieved educational benefits in the regular classroom in 2014-2015, making that setting with O.V.'s nondisabled peers O.V.'s LRE.

(Docket Entry 17-2, Findings ¶ 159.)

_____

24  Notably, although she agreed that she would not consider the data sets from the general education and special education settings "directly comparable" (Docket Entry 101-14 at 33), as "they[ a]re being done under different conditions" (id. at 34), Dr. Crossland's description of the two environments suggests that O.V. should have obtained higher marks in the segregated setting than in the general education setting, which did not happen. (See id. (explaining that data collection in the segregated classroom "is being done in a smaller environment with a more direct set of instructions with no distractions that would take place in a larger classroom and with what should be a more highly trained teacher to do that," while "[t]he other is collected in a milieu or in a context of a classroom where noise [and other distractions are] present"); accord id. at 69).)

72

Next, the Durham Board contends that the SRO placed too much emphasis on the objective data, which reflects only one aspect of "the totality of the available information" (Docket Entry 109 at 16). (See id. at 14-16.) As an initial matter, even the Durham Board's witnesses emphasized the importance of such objective data in evaluating O.V.'s educational progress. (See, e.g., Docket Entry 101-11 at 133 (Ms. Bunn explaining that she tracked O.V.'s "progress in math and writing" on data sheets "[t]hrough the use of percentages"), 146 (explaining that she "determine[s] if a student is progressing at a sufficient rate for their annual goal . . . based on the data collection," which she clarified meant "numerical data on th[e] particular goal" under discussion); Docket Entry 101-14 at 50 (Dr. Crossland explaining that one should rely on "the analysis and presentation of [progress monitoring data] rather than [a] personal interpretation of it"), 70 (explaining that she "[l]ook[ed] at the progress monitoring data" to determine where O.V. "was making greater progress"); see also Docket Entry 37-5 at 1 (reflecting that, in response to M.P.'s offer to "just receiv[e] work samples" because "she believed that the graphing sheets teachers are using to graph data are a lot of work," Ms. Mader insisted that teachers "continue to use the IEP progress reporting data collection sheets because they are based on his IEP").) Moreover, in resolving this matter, the SRO considered more than just the "'extensive'" objective data, which "document[ed] O.V.'s

73

comparative success on assessment measures in his regular-education classroom compared to his separate classroom throughout the 2014-2015 school year" (Docket Entry 17-2, Findings ¶ 149). (See, e.g., id., ¶¶ 166-68 (discussing P.V.'s science lesson).)

Further, to the extent the Durham Board's contention boils down to the argument that, rather than considering the data itself, the SRO should have deferred to DPS staff members who "concluded that the data showed greater progress in the [separate] classroom" (Docket Entry 121 at 4; see also Docket Entry 17-2, Findings ¶ 179 (explaining that his "teachers opine that O.V.'s functioning is too low for inclusion because they compiled data to demonstrate that they prompted him and redirected him with great frequency [in the regular classroom] and because he seems happier and/or more content to them in the self-contained classroom")), that argument lacks merit. As the SRO correctly found in rejecting the Durham Board's "argu[ment] that the subjective views of O.V.'s teachers should be given more weight than the objective data documenting O.V.'s performance on assessments of his IEP goals and benchmarks" (Docket Entry 17-2, Findings ¶ 178):

> The inference O.V.'s teachers drew from their observations of O.V., that O.V. should be more segregated from his non-disabled peers, is contrary to their own data documenting O.V.'s academic achievements. O.V.'s teachers acknowledged that they lacked training on inclusion of children with disabilities like O.V.'s. And they refused to accept an opportunity to learn when M.P. offered to pay for a consultant to work with them. As a result, a finding that their subjective views justify removing O.V. to a more restrictive setting in the face

74

of objective data that O.V.'s achievement averages are higher in a regular-education classroom cannot be supported by the weight of the evidence contained in the whole record. As the [Supreme] Court explained in *Endrew F.*[,] deference to educators is premised upon the application of "expertise." In a situation like the one here, where educators acknowledge their lack of training and cannot offer a "cogent and responsive explanation" for their positions that conflict with objective data, they are outside their expertise.

(Id., Findings ¶ 185.)

In sum, the Durham Board fails to justify overturning the SRO's "overwhelming factual conclusion that 'numerical data collected over the course of the school year' supports O.V.'s progress in the regular-education setting while receiving special-education services" (Docket Entry 17-2, Findings ¶ 192).

### iii. 2015 FAPE Determination

The IDEA entitles children with disabilities to a FAPE in the LRE. See 20 U.S.C. § 1412(a)(l) & (5). As previously discussed, the SRO properly determined that O.V. made progress in the inclusive setting. (See, e.g., Docket Entry 17-2, Findings ¶ 137 ("O.V.'s performance in the inclusive setting consistently depicts a *substantial improvement* over his performance in the separate setting." (emphasis in original)); id., Findings ¶ 140 (explaining that, "on 7 of 8 goals and/or benchmarks on which O.V.'s teachers recorded an examinable quantity of objective assessment data, O.V. achieved higher scores and produced better results in the regular-education classroom compared to the separate-education classroom").) The evidence also establishes that, although "O.V.

75

often complete[d] accommodated and/or modified assignments in the regular classroom" (id., Findings ¶ 165), he "d[id] not *always* complete modified assignments" (id., Findings ¶ 166 (emphasis in original); see id., Findings ¶¶ 166-68 (discussing science lesson P.V. taught in O.V.'s regular education classroom)).

Moreover, as the SRO found, "[e]ven when the curriculum is modified, O.V.'s work need not be 'completely different,' despite his distinct level of functioning." (Id., Findings ¶ 169; see also id. (explaining how one could modify math curriculum so that "using the same sort of materials and lesson format [as the rest of the class], O.[V.] would be able to work on [his] math goal," and noting that such modification "was successfully implemented at O.V.'s current private placement where he is fully included in a regular classroom" (internal quotation marks omitted).)[25] Finally, it remains undisputed that "O.V. was not a disruptive force in the regular classroom or elsewhere" (id., Findings ¶ 103). (See also, e.g., id., Findings ¶¶ 195-96.) Accordingly, as the SRO correctly found (id., Findings ¶¶ 103, 193), by removing O.V. from the

_____

    25  Indeed, even O.V.'s regular education teacher testified that, although she did not receive "any special instructions about having O.[V.] in her class" or "much preparation" (Docket Entry 107-8 at 41), and "didn't have any training" on how "to work with students with disabilities" in the year she taught O.V. (id. at 42), she "modified what [she] could based on his needs," at least at the start of the year (id. at 53); however, "as the year [went] on and the work g[ot] harder it became very difficult to modify his lessons" because "it takes an extensive amount of time to work with O.[V.] and he's not the only one in [her] class" (id. at 53-54).

regular education classroom, the May 2015 IEP denied O.V. a FAPE in the LRE.  See Hartmann, 118 F.3d at 1001.

The Court will therefore deny the Durham Board's challenge to the SRO Decision.

## C. Plaintiffs' Administrative Motion

### i. Initial Matters

Plaintiffs devote the majority of their briefs in support of Plaintiffs' Administrative Motion to two issues:  the propriety of the SRO's decision regarding the May 2015 IEP and the appropriate remedy for the Durham Board's FAPE violation(s).  (See Docket Entries 113, 120.)[26]  In their opening brief, though, Plaintiffs also assert that the Durham Board "failed to provide O.V. a FAPE in the LRE from November 27, 2014, through June 12, 2015." (Docket Entry 113 at 13 (emphasis omitted).)  In part because of the limited discussion on this additional challenge, its precise contours remain unclear.  (See id. at 13-17.)  However, Plaintiffs appear to assert that the Durham Board's decision to educate O.V. partially in the segregated setting and its alleged failure to "provide O.V. with sufficient supplemental aids and services" (id. at 16 (emphasis omitted)) deprived O.V. of a FAPE by preventing him from making "appropriate progress 'in light of his circumstances'" (id.). (See, e.g., id. at 15-16 (maintaining that,

_____

26  More specifically, Plaintiffs argue in support of the SRO Decision's May 2015 IEP ruling, but challenge the remedy awarded for the Durham Board's FAPE violation(s).

77

despite "O.V.'s demonstrated ability to learn and retain more information in the inclusive setting, [the SRO] did not consider the impact of O.V.'s *de minimis* progress in the segregated setting when determining whether O.V.'s overall progress was appropriate in light of his circumstances," and that "O.V.'s progress under the more inclusive 2014-[20]15 IEP is undisputed, so any removal to a more restrictive setting is untenable"), 16 ("During the 2014-2015 school year, the *only* support [the Durham Board] provided O.V. in the general education classroom was 45 minutes of instruction by licensed special education teachers as mandated by the Mediation Agreement and the minimal supplemental aids and services of 'consistent redirection' and 'incremental rewards.' . . . Further, [the Durham Board] did not provide O.V. with assistive technology or an augmentative communication device during the 2014-2015 school year." (emphasis in original)), 17 ("Without assistive technology and appropriate supplemental aids and services, O.V. could not make progress appropriate in light of his circumstances, which include verbal apraxia.").)

In other words, Plaintiffs seem to assert that O.V. needed a fully inclusive setting with different services to "ma[k]e appropriate progress 'in light of his circumstances'" (id. at 16). As such, Plaintiffs apparently challenge the substantive decisions involved in the creation of the IEP on August 21, 2014. Because such claim arose before November 26, 2014, Plaintiffs cannot pursue

78

it now.  (See Docket Entry 61 at 2 (dismissing "[P]laintiffs' IDEA
. . . claims arising before November 26, 2014").)  Accordingly, in
addition to arguing in support of the SRO Decision's May 2015 IEP
ruling, Plaintiffs' Administrative Motion properly contests only
the remedies associated with the Durham Board's failure to provide
a FAPE in the LRE to O.V. in the May 2015 IEP.

### ii. Private Placement Issue

In this regard, Plaintiffs contend that they "are entitled to
reimbursement for Pinewoods and related costs" (Docket Entry 113 at
17 (emphasis omitted)) as a consequence of the Durham Board's
failure to provide a FAPE in the May 2015 IEP.  According to
Plaintiffs, the hearing officers "applied the wrong legal standard
in determining [that] O.V.'s private school placement was
inappropriate" (id. at 18).  Considered under the proper legal
standard, Plaintiffs maintain, the evidence establishes Pinewoods'
appropriateness (see id. at 19-21).  This contention possesses
merit.

### i. Relevant Evidence

### A. O.V.'s baseline

A psychoeducational report that DPS commissioned indicates
that, as of April 2014 (see Docket Entry 37-11 at 1), "[O.V. wa]s
a 2nd grade student, with a chronological age of 7 years, 10
months," but "a mental age" reflecting that "his cognitive skills
are that of the average 44 month old or 3 ½ year old."  (Id. at 5;

accord id. at 3 ("[O.V.]'s mental age (MA) is calculated to be that of a typical 44 month old or 3 ½ year old.").)[27]  In turn, O.V.'s August 2014 IEP reports:

**Student's overall strengths:**
[O.V.] is a pleasant and sweet boy who arrives to school in a good mood most days.  He is amused by animals and likes to move to music.  At home, he will initiate learning and ask for permission to use the ipad.  He is curious.

**Summarize assessment information . . . and review of progress on current IEP/IFSP goals:**
According to mCLASS assessments, [O.V.] has shown no evidence of growth since he first was evaluated with mClass at the end of first grade.  He has stayed at a PC, far below, level.  Since his 2nd grade, middle of year, mClass his growth with sight words has increased from 3/24 to 17/24 words on List A.  And from 0/24 to 5/24 words accurately recognized on List B.

A review of curriculum based data indicates that [O.V.], a second grade student, can identify numbers 1-20 in and out of sequence when asked orally without adult support. When the direction is given to write numbers 1-20 he will write one number and require prompting to continue to the next number.  He does not write two numbers in a row without adult prompting.  On a few occasions he has written the next number as soon as the adult prompts. However writing is a non-preferred task, therefore the adult must put the pencil in his hand and redirect from 5-10 times before he follows the adult direction.  He requires this level of prompting with each task given. He can write his numbers to 12 with 90% accuracy.  He can write his numbers from 13-20 with 70% accuracy.  He can verbalize written addition and subtraction problems, however he does not comprehend the meaning of the problems.  Identifying numbers to 20 and writing them are comparable to a mid-year kindergarten student (except that [O.V.] needs constant redirection to complete all tasks).

---

27  The report further notes that "[O.V.] appears to be significantly below average in height and weight when compared to his same aged peer group."  (Id. at 2.)

80

> IEP goal progress to be outlined in Present Levels
> section.
>
> **Parent's concerns, if any, for enhancing the student's
> education:**
> [O.V.]'s parents want to see [O.V.]'s communication
> continue to develop so that he can communicate with
> others. [M.P.] stated that he is happier now.
>
> **Parent's/Student's vision for student's future:**
> Parents recognize that he learns slower but expectations
> are for him to continue growth in learning without
> limitations.

(Docket Entry 37-3 at 1 (emphasis in original).)

The IEP further reports that "[O.V.] needs to learn to count
and write numbers to 30[ and] add and subtract within 10 using
objects or drawings. His inability to perform academic tasks
independently impedes his ability to function in the general
education setting." (Id. at 6.) Accordingly, the IEP establishes
as a goal that, "[g]iven numerals, or objects, [O.V.] will
independently rote count by 1's, 2's, and 5's to 30, and recognize
sets of numbers up to 10 with 80% accuracy in 3 out of 4 trials."
(Id.) As for reading, the IEP reports:

> Based on classroom observation and informal/formal
> assessments, [O.V.] is matching some cvc[28] words and
> sight words. At this time he is able to match five
> words, only when each word's first letter is different.
> Given the third quarter kindergarten sight word list, he
> can read up to 28 words. However, when given the same
> list on the very same day he may only identify 12 words.
> There does not appear to be any pattern with [O.V.]'s
> inconsistency in skill demonstration. He passed the
> lesson 80 assessment in the Reading Mastery kindergarten

---

28 "CVC" signifies "[c]onsonant vowel consonant." (Docket
Entry 101-10 at 91.)

program this grading period (he had to circle the letter sound or word that was said). He is becoming more consistent identifying the letter sounds, i.e., the first consonant of a word. Currently, he is not sounding out and blending word family words such as fat, rat, sat, bat, etc. There are times he reads other words but he isn't consistent across settings. Based on [O.V.]'s end of year MCLASS assessment, he is reading at level PC. His decoding weaknesses and limited sight word mastery are at the pre-early emergent reading level which impede his ability to access the general education curriculum. He needs individualized, skill-level instruction in order to meet his IEP goals.

(Id. at 8.) The IEP establishes as his goal that, "[g]iven explicit instruction, student will accurately identify kindergarten sight words, with 90% accuracy." (Id.; see also id. at 13 (discussing knowledge of letter sounds and establishing goal of, "[w]hen given explicit instruction, student will identify letter sounds with 100% accuracy on 3 out of 5 occasions").)

The IEP next reports that,

[b]ased on observations, data collection, and work completion rate, [O.V.] can complete written assignments when given constant redirection, hand-over-hand support, and/or with reward/point system. He is able to attend for less than 30 seconds, before requiring prompting/redirection. He is motivated by reward. His current level of function with task completion[] impedes him from accessing curriculum standards.

(Id. at 9.) Thus, it establishes a functional goal of, "[w]hen given a specific time-frame, [O.V.] will complete skill-level math, reading and writing assignments in 3 out of 5 situations." (Id.)

Aligning with the IEP, Ms. Turner testified that O.V.'s work during the 2014-2015 school year, "as far as sight words and letter sounds, [wa]s more of a kindergarten common core standard, not

82

second grade." (Docket Entry 107-8 at 34.) She further testified that "[i]t was very difficult to modify the [second grade] standards for him; his ability level was so far below a second grade ability level." (Id. at 35; see also id. (explaining that "[she] did the best that [she] could, but when you have children writing narratives and then he cannot sound out a sentence by himself, so [she] had to give him things that were more geared to what he could do").) Ms. Allen similarly testified that O.V.'s reading assignments involved "[w]orking on letter sounds and kindergarten sight words and trying to transfer those to beginning readers." (Docket Entry 101-12 at 68.)[29] She also testified that "especially after Christmas," the work in Ms. Turner's second grade classroom "was not anything that [O.V.] was working on hardly that was what the other students were doing because he wasn't there yet to do that, and his skills were more at a beginning kindergarten level." (Id. at 92.)[30]

_____

29  Ms. Allen also explained that, in the previous year, she had taught O.V. "in a mostly kindergarten group working on — in a Reading Mastery program, which was a kindergarten level reading program." (Id. at 74.)

30  In addition, Ms. Allen noted that, in Ms. Turner's class, "[O.V.] was not engaged with other students, and he didn't work in a group with the others." (Id. at 92-93.) Per Ms. Allen, the other students "tried to interact with O.[V.], but he didn't really respond to them. And then they became — as the year went on, they became more like little teachers to him to guide him to where he was supposed to be or to get him started on his work. And they tried to encourage him to begin or keep working or that kind of thing." (Id. at 68.) Ms. Turner noted a similar response pattern,
(continued...)

The Minutes from O.V.'s May 2015 IEP meeting likewise indicate that, at the end of the 2014-2015 school year, O.V. remained "several grade levels below and academically function[ed] in the kindergarten level." (Docket Entry 37-10 at 3.) The Minutes further reflect that O.V. regressed in a then-recent reading assessment, although "Ms. Bunn explained that this was mainly due to cooperation. He has increased his word recognition from 10 to 11 words." (Id. at 1; see id. ("[O.V.] scored a level RB (reading behaviors) at the beginning of the year but when recently assessed scored a <PC (below print concepts).").) In regard to his strengths, the Minutes indicate that he "is technology savvy, [his] handwriting is neat and legible and [he] is able to follow one step commands/directive. [O.V.] can identify all of the letters of the alphabet and is independent with self-help skills" and "is able to transition well to and from speech." (Id.) The Minutes further reflect M.P.'s goal for O.V., during the following school year, "to ask/request things in complete sentences," a goal that "Mr. Reitzes agree[d]" remained "realistic," as well as the fact that, long-term, "[M.P.] wants [O.V.] to be as normal as possible and as independent as possible." (Id.) As to the necessary

---

30(...continued)
explaining that the other students in her class would "try and make [O.V.] laugh and things like that, but there wouldn't be much communication with him," although "[h]e would smile at them or he would give a high five or whatever." (Docket Entry 107-8 at 76.)

84

"[a]commodations for general education program participation[,]"
the Minutes indicate that

> Assemblies, Lunch, Recess, and Specials
> (music/art/science/computer) will require teacher
> prompting (to eat or remain with group). [O.V.] is
> currently not attending music; he doesn't appear to like
> it and puts his hands over his ears so he has not been
> going this school year. However, the team would like to
> get him to go and participate in music next school year.
> [His private occupational therapist] will work with music
> as well. . . . He may need a heads up on transitions for
> preparation/prompting for those activities he needs.
> Transition: accommodations include: verbal warning.
> [M.P.] suggested giving him a verbal warning (5 minutes
> left), but he does not understand the concept of
> time. . . .

(Id. at 2-3.)

The corresponding IEP "[s]ummarize[s O.V.'s] assessment
information" and "progress on current IEP/IFSP goals" as follows:

> According to mClass assessments, at the beginning of the
> year, [O.V.] was reading on level RB (reading behaviors)
> which is kindergarten level. Currently [O.V.] is reading
> below PC (print concepts), which has stayed the same
> since the middle of the year assessment. [O.V.] has
> increased his word recognition by one word based on
> mclass [sic] assessment, at the beginning of the year he
> was able to identify 10 words on word list B and the end
> of the year he was able to identify 11 words on word list
> B. Progress towards previous IEP goals are as follows:
> although [O.V.] is consistent with counting to 19 in all
> settings, he continues to need adult support which
> includes hand over hand in order to count beyond 19, skip
> count by 2's and recognize sets of numbers. Based on
> previous short term objectives in writing, [O.V.] has
> shown progress with writing his last name. At the
> beginning of the 2014/2015 school year he was
> independently writing the letter V and he is now able to
> write Varl. Although [O.V.] has increased his letter
> sound knowledge, he continues to exhibit difficulty with
> blending sounds to read words. He has made progress
> toward his functional short term objective with stating

85

his first name but he continues to exhibit difficulty with stating his age, birth date and phone number.

(Docket Entry 37-8 at 1 (emphasis omitted).)

In regards to O.V.'s speech abilities, the IEP indicates that,

inter alia:

> During a recent speech class session [O.V.] was able to answer questions during a language activity using two word responses 2/10 times — when [O.V.] did not respond he was able to repeat the correct 1-2 word answer 8/8 times. This high level of participation by [O.V.] is becoming more and more typical in all sessions, both group and one-to-one. At times, [O.V.] expresses three word utterances with speech teacher support and, on occasion, spontaneously. During another recent speech class session, during a language game, [O.V.] was able to correctly express more than eight 1-2 word utterances to request objects/materials from other students. During recent push-in sessions in the classroom, [O.V.] has been able to answer a few questions when looking at and reading books with the speech teacher by pointing or, on occasion, verbally responding. [O.V.] typically responds to questions with one word. For example, when looking at a dinosaur book and when asked, "What is the dinosaur doing?", [O.V.] may correctly say "run" or "running." In speech class we are attempting to increase the length of his responses to "dinosaur running" or "He is running." For another example, when asked during a recent session what happened to the missing puzzle piece, [O.V.] correctly pointed to Curious George's stomach to indicate that George had swallowed the piece. [O.V.] is very engaged in book reading and often points out his favorite pictures and sometimes verbalizes what he sees using one word. When this happens, [O.V.] is able, on occasion, to repeat the speech teacher's expansion of a two word model. Overall, [O.V.] is making nice progress in speech class, seems happy and is regularly participating but continues to need support in increasing his length of utterance and with his overall language expression and comprehension in the academic setting. [O.V.]'s language delays negatively impact his ability to comprehend information and to fully participate in the academic setting.

(Id. at 4.)  Accordingly, the IEP establishes as a goal that, "[w]ith 80% accuracy when targeted, [O.V.] will increase the length of utterance, answer questions, and categorize objects and describe events/steps of an activity."  (Id.)  It provides as benchmarks that, with 80% accuracy, "O.V. will express 2-4 word utterances" in particular situations, "will categorize 3-4 related objects," and "will sequence 1-2 steps of familiar activity . . . with clinician support[;]" it also provides that O.V. "will describe actions, using 2-3 words, with visual support," but does not ascribe an accuracy percentage to this last objective.  (Id. at 5.)

As to O.V.'s present levels in math, the IEP states:

Although [O.V.] is consistent with counting to 19 in all settings, he continues to need adult support which includes hand over hand in order to count beyond 19, skip count by 2's and recognize sets of numbers.  Based on the IEP progress reporting form in a separate setting, [O.V.] is able to count to 19 two out of four trials with 63% accuracy.  When counting independently the lowest number he has counted to is 11 and the highest number he has counted to is 19.  When asked to skip count by 2's[, O.V.] is able to skip count to four, three out of four trials.  Given sets of manipulatives/objects [O.V.] is not able to recognize sets of numbers to 10 in the separate setting.  In the inclusion setting, [O.V.] is able to count to 19 independently two out of four trials based on the IEP progress reporting form.  He is also able to skip count by 2's to 10 with one on one adult support two out of four trials.  Within the inclusion setting, [O.V.] ranges from 66% to 100% with recognizing sets of numbers to 10.  [O.V.]'s intellectual disability impedes his ability to independently recognize number patterns and demonstrate number sense.  He is in need of constant repetition, re directions [sic], modeling and demonstrations teaching to make progress.  [O.V.] continues to need specialized instruction as he progresses through the curriculum.

87

(Id. at 9.)   It establishes as his goal that, "[g]iven manipulatives/objects, [O.V.] will independently add single digit numbers with sums up to 10 with 80% accuracy in 4 out of 5 trials."
(Id.)

> For writing, the IEP states:
>
> Based on previous short term objectives in writing, [O.V.] has shown progress with writing his last name. At the beginning of the 2014/2015 school year he was independently writing the letter V and he is now able to write Varl. Based on IEP progress reporting form, in the separate setting, when presented with letter sounds and asked to write the corresponding letter, [O.V.] has ranged from writing 0 letter sounds to 9 letter sounds, out of five occasions he has written 7 letter sounds on two occasions. [O.V.] is able to write numbers legibly to 19, three out of five occasions when prompted to write each individual number. When words are dictated, he is able to write 3 out of 15 (it, the, me) sight words independently in one out of three trials. In the inclusion setting, when dictated the letters of his last name, [O.V.] is able to write his last name with 80% or higher accuracy. In the separate setting, when dictated the letters of his last name, he is writing "Varlhsk"[31] 50% of the time. [O.V.]'s intellectual disability impacts his ability to process letters and corresponding letter sounds to independently generate and write words on paper. [O.V.] continues to need specialized instruction in writing as he progresses through the curriculum.

(Id. at 11.)  For his writing goal, the IEP provides that, "[g]iven verbal cues, [O.V.] will independently write words when dictated with 80% accuracy 4 out of 5 trials."  (Id.)

> In regard to reading, the IEP reports:

---

31 "Varlashkin" constitutes the proper spelling of this name. (Id. at 11.)

Case 1:17-cv-00691-LPA   Document 124   Filed 04/15/21   Page 88 of 218

> Based on the IEP progress reporting form, in the separate
> setting, [O.V.] is able to identify 12 out of 26 letter
> sounds which is 46% accuracy 1 out of 4 trials. With one
> on one instruction in the resource setting [O.V.] was
> able to identify 80% of his letter sounds on one occasion
> and the next occasion he was able to identify 38% of his
> letter sounds. Based on data collection in the separate
> setting, [O.V.] is not able to identify individual sounds
> (first, medial and final) within CVC patterned words.
> Although [O.V.] has increased his letter sound knowledge,
> he continues to exhibit difficulty with blending sounds
> to read words. Based on teacher observation, if [O.V.]
> knows a word he is able to read the whole word instead of
> identifying individual phonemes. [O.V.]'s intellectual
> disability impacts his ability to recall and apply
> reading strategies to independently identify and read
> words at grade level; he continues to need specialized
> instruction as he progresses through the curriculum.

(Id. at 13.) It sets as his goal that, "[g]iven picture cues,
[O.V.] will independently read sight words in any given text with
80% accuracy 4 out of 5 trials." (Id.) For his benchmarks, it
establishes that, (1) "[g]iven picture cues, [O.V.] will identify
CVC words with 80% accuracy 4 out of 5 trials," (2) "[g]iven 10
sight words, [O.V.] will identify 80% of words in isolation 4 out
of 5 trials," and (3) "[g]iven 5 sentences, [O.V.] will identify
and read sight words with 80% accuracy 4 out of 5 trials." (Id. at
13-14.)

Further, as to O.V.'s functional performance, the IEP states:

> Although [O.V.] has made progress toward his functional
> short term objectives with stating his first name[,] he
> continues to exhibit difficulty with stating his age,
> birth date and phone number. Based on IEP progress
> reporting f[or]m, [O.V.] is able to state his first name
> with 100% accuracy 4 out of 5 trials. When asked to
> state his age, [O.V.] is able to state his age with 100%
> accuracy 3 out of 4 trials. In the inclusion setting,
> [O.V.] is not stating his age. [O.V.] is currently at 0%

89

accuracy with stating the month/day of his birth date. Based on data collection and observation in the inclusion setting, [O.V.] is able to copy his phone number as well as identify the individual numbers from picture cues. He is not able to independently write his phone number without a visual. Based on the IEP progress monitoring form, in the separate setting, [O.V.] fluctuates between the amount of work he completes on a daily basis. Based on work samples and data collection, [O.V.] requires 31 or more re directions [sic] during a 20 minute period to start a task. During writing, [O.V.] ranges between 3-12 re directions [sic] to start and complete less than half of his writing assignments. During the math block, [O.V.] required 4 re directions [sic] to complete half of his work and on another occasion he required 35+ re directions [sic] to complete none of his math assignment. In the general education classroom, [O.V.] is ranging between 15-26 re directions [sic] within a 20 minute interval to complete all of his assignments; out of 7 assignments he was able to complete the entire assignment 5 of those times. In the inclusion setting [O.V.] is ranging from 2 re directions [sic] to 43 re directions [sic] within a 20 minute interval in order to start and/or complete assignments. [O.V.]'s intellectual disability impacts his ability to independently initiate a task and sustain attention for periods of time greater than 10 minutes in order to complete assignments. He continues to need specialized instruction to provide him with teaching strategies and constant re directions [sic] as he progresses through the curriculum.

(Id. at 15.) For his related goal, the IEP provides, "[g]iven academic tasks (math, reading, and writing), [O.V.] will begin a task within 5 minutes and independently work in 10 minute intervals 4 out of 5 trials." (Id.) For his benchmarks, the IEP states that, (1) "[g]iven verbal directions, [O.V.] will start a task within 5 minutes of directions given 4 out of 5 trials" and (2) "[O.V.] will maintain time on task for routine academic assignments within a 10 minute time frame with no more than 10 redirections 4 out of 5 trials." (Id.)

90

Finally, the record reflects that O.V. benefits from tangible, hands-on activities. For instance, Ms. Allen testified that she "made a little flip book for O.[V.], which he likes, to try to get him engaged. And so he could flip the word after he had read it, and he enjoyed that." (Docket Entry 101-12 at 90; see also id. (explaining that, "we would clip it where he didn't finish and we would start there the next day").) Ms. Allen further testified that "cutting and gluing . . . was his strength." (Id. at 163 (internal quotation marks omitted).) She elaborated: "he was always cooperative when he had a cut and paste activity if it was his level. . . . and copying, he was good at that also." (Id. at 164.) The May 2015 IEP Minutes similarly reflect Ms. Bunn's perspective "that [O.V.] participates well in her classroom, especially if it is a cut and paste activity." (Docket Entry 37-10 at 2; see also Docket Entry 107-8 at 38 (Ms. Turner explaining that she and her assistant "would try to include [O.V.] in crafty things that [they] did"); see also id. at 75-76 (discussing projects).)

The Minutes further reflect a discussion regarding O.V.'s functional abilities, noting that O.V. "can work if it is routine and he understands what he is supposed to do," but that his work ability "also depends on his mood and motivation. He understands the centers, the chart, and what the expectations are in the centers. He works hard in the cut and paste center because he likes it." (Docket Entry 37-10 at 2.) In response to this

observation, "[the private occupational therapist] suggested adding in cut and paste options for him at each center to get him into the activity.  She does this at home to get him engaged.  Then they will transition back and forth between difficult and easier tasks, and move around when he's sleepy."  (Id.)

As a final example, IEP Goal Progress List from the 2014-2015 school year states that, as of October 2014, "[O.V.] demonstrates increased engagement when participating in hands on skill based activities that involve drawing, coloring, cutting, assembling, matching, etc.  He participates well in small group activities, and is motivated to want to do the same activity as his peers." (Docket Entry 37-6 at 5.)  They further indicate, in May 2015, that

> [O.V.] needs verbal prompts to gather materials, sit in
> his chair, and to start working.  His ability to initiate
> working varies day to day.  He typically is motivated to
> participate in hands on activities that involve assembly
> crafts (cut, glue, color, etc.), and more readily begins
> working.  However, the length of time to complete tasks
> is usually more than the allotted time.  For example, he
> spent one hour completing the first part of a 3 part
> project, with the first step being to tear and glue paper
> to make an Earth.  He needed continual verbal prompts to
> keep working due to [i]nternal and external distractions.
> Given assembly type tasks with less steps or reduced
> complexity, he is able to complete them within a 30-45
> min. time frame.

(Id.)

## B. Pinewoods Experience

Developed originally for the education of mentally disabled children (see Docket Entry 101-6 at 8), the Montessori approach provides a hands-on, multisensory educational experience in

92

multiage group settings (see id. at 7). Montessori education focuses on each child as an individual, meeting the child at his or her academic, social, and emotional level (see id. at 16) and then "creating works and maintaining the environment so that each child can move and progress as an individual in the classroom" (id. at 8). Montessori does not "classify according to grade" (id. at 9), but instead contains "multiage range classes" (id. at 11), on the premise that "children c[an] learn from each other and that they d[o]n't necessarily need to be defined by an age or a grade because every child [i]s an individual. So a child at 3 could be reading if that's how their brain developed and be on the same level as a similar child who [i]s 5 years of age" (id. at 12). In Montessori classrooms, younger students learn in part by observing older students and older students reinforce their knowledge, in part, by teaching younger students. (See id.)

Pinewoods Montessori divides its elementary school into three groups: extended day (i.e., kindergarten), lower elementary, and upper elementary. (Id. at 15-16.) The lower elementary class contains students generally ranging in age from 6 to 9, and the upper elementary class typically contains students ranging in age from 9 to 12. (See id. at 7, 16, 40.) Pinewoods determines a child's placement by conducting an assessment prior to enrollment to ascertain the child's level "academically, socially and emotionally" (id. at 16). Regardless of their placement, children

93

do not "work through the Montessori curriculum at the same pace."
(Id. at 15.)  Instead, each child receives his or her "own work
plan designed specifically for where they are in each academic area
of the classroom."  (Id.; see also id. at 26 (explaining that work
plans "[a]re based on each child's individual academic levels in
the classroom and following the — the set forth curriculum and the
Montessori philosophy").)   The Montessori teacher creates work
plans each day (id. at 26), such that, "if you took the daily work
plans of a student and you lined them up day after day, [it would]
become a record of that student's progress" (id. at 93).  (See id.
at 93-94.)   Similar to how the daily work plans reflect each
child's progress, the Montessori "curriculum in and of itself"
serves as "a long-term written plan" for a child's education.  (Id.
at 90.)[32]

_____

32    Pinewoods's Head of School described the general
Montessori curriculum as follows:

> [T]wo of the nontraditional areas are practical life and
> sensorial.  Practical life teaches practical life skills
> such as spooning, pouring, tonging and then it moves
> along.  You know, children can learn how to use
> screwdrivers, you know, hammer nails, all types of
> things, and it progresses as they get older as to what
> types of skills that they would need in everyday life.
> It was about preparing them to be citizens of the world.
>
>     For sensorial, it [i]s a very multisensory approach
> to where the materials are designed to be very hands-on.
> Things are natural, wooden.  There is some color coding
> to the materials.  It allows for exploration of spatial
> awareness as well as explores all the different senses
> such as taste, smell, muscle memory, all those
>                                         (continued...)

94

Montessori schools use a "three period lesson" approach in teaching students.  (<u>Id.</u> at 14.)

----

        *****

So there's the math curriculum, which is a big component in Montessori, which teaches hands-on types of math skills.  So it's very important for children to learn through concrete [sic] first by using hands-on materials and then moving forth toward abstract concepts in math materials.  All the math materials are color coded, and they build upon each other as children move throughout ages and the programs because we don't classify according to grade.

The same thing with language.  Again, there is color coding.  Everything is very multisensory.  We start with, you know, teaching sounds with sandpaper letters and objects and then build upon that with using something called a movable alphabet, where children actually get out letters to spell words or to write sentences before moving on to the abstract of doing it on paper.

With science and geography, again hands-on materials are a must in the classroom.  Geography — we do exploration of the world.  In elementary it starts with cosmic education so we have the Big Bang theory and early humans, and the same with science.  We usually — the teachers will create a lot of those materials, but again, it needs to be very hands-on in the classroom.  A lot of three part cards is what it's known as.

And then the same thing with art:  again, each skill builds upon another so children learn things such as gluing and cutting and painting and modeling with clay, and then as they get older, learning different mediums, different types of artists.

And the same with music[]. . . .

(<u>Id.</u> at 8-10.)

95

[In] three period lessons, the first period would be the introduct[ion] of the material, so telling the child, you know, this sound, for instance, is "ssss" which would represent the letter "S." And the second period would be can you point to the sound "ssss" and so the child would have to be able to identify it without verbally saying something. And then the third period would be what sound is this, and the child would have to come up with it on their own.

(Id.) Under the Montessori approach, students strive for mastery, which "means that a child truly understands a concept and would be able to teach it to someone else." (Id.) "[O]nce a child shows that they have knowledge and understand that concept, then [the teacher will] move forth to the next concept" in the curriculum. (Id. at 13.) However, even when students move on to new concepts, they continue to practice skills they already know. (See id. at 14-15.) For example, "[i]f a child is working with simple addition facts, with sums up to 10, and they show mastery of that concept, then the teacher could give them new addition problems with sums ranging between 10 and 20 but incorporate some of the addition problems that they had worked on before within that new lesson." (Id. at 15.)

Typically, lessons in a Montessori classroom "are presented as if to an individual or in small groups. There are some large group lessons, but usually the follow-up work will be more individualized if there are large group lessons." (Id. at 13.) Approximately "two to four" students participate in a small group lesson. (Id.) The Montessori approach utilizes various "Montessori materials"

96

(id. at 13), hands-on educational items with "a built in control of error" that "help the child be able to self-correct so that the teacher doesn't have to intervene" (id. at 14), as the Montessori approach "teach[es] the children to become independent self-learners" (id.).

O.V. utilizes the self-correcting aspect of the Montessori works. (See id. at 22.) For instance, in one geometry lesson, O.V., working independently without his teacher (see id. at 23),

> was working on making different polygons using sticks. The teacher had made cards with examples of polygons, and then he had to create the polygon underneath the cards. [Ms. Sewell[33]] observed him struggling — [she] think[s] it was a pentagon that he was trying to create. And he originally made it as a triangle, then looked at the card and noticed — and slid the sticks up to it and noticed that they weren't making the same shape. And then he got out more sticks to make the pentagon.

(Id. at 22-23.)

O.V.'s teacher provides him, and all her students, one-one-one instruction, but not for the entire day. (Id. at 59.) According to Ms. Sewell:

> [W]hen [O.V.] first started at Pinewoods he needed a lot of one-on-one with the teacher sitting beside him. And now when [she] walk[s] through the classroom, he is

---

33   Ms. Sewell, the Head of School at Pinewoods (id. at 5), observes O.V.'s class at least once a day (see id. at 27, 41) and also teaches him music once a week (id. at 27). In addition, she speaks with O.V.'s teacher "two or three times a week just to find out how O.[V.] is doing in the classroom as . . . . [they] want to make sure that [they] are meeting [his] needs and that [O.V. is] making progress." (Id. at 33.)

97

usually engaged at his work rug[34] and he's not — he does not have a teacher next to him. And it looks like he is completing his assignments.

(Id. at 33.) "Pinewoods d[oes] not feel that O.[V.] need[s] a one-on-one aid with him," as "[h]e is able to complete tasks independently now" and does not "require[] someone sit next to him to get his task completed or to stay on task." (Id. at 58; see also id. at 59 (explaining that "a child would need a one-on-one aid" either for behavioral reasons or "[i]f they needed one-on-one instruction in order to grasp a concept and to stay on task").)

O.V.'s lead teacher in lower elementary, Ms. Palacioz, holds a master's degree in education, "Montessori certification for lower elementary," and "North Carolina licensure." (Id. at 25-26.) In addition to reviewing more than 200 pages of O.V.'s DPS records (see id. at 94-95), Ms. Palacioz conducted an individual assessment of O.V. to determine "his baseline academic functioning" for his enrollment at Pinewoods (id. at 66). To "assess students' baseline academic functioning," a Pinewoods

_____

34  As Ms. Sewell explained:

    In Montessori, the children all have their own individualized works. They're all working on different things at different times. They can choose to sit at a desk or sit on the floor with a defined space by a work rug or a mat. And again, there is not a lot of group instruction because we feel like children should be able to move at their own pace.

(Id. at 18.)

98

teacher would sit down one on one with the child, use some of the math materials to assess the concepts that they know, do they know number recognition, how high can they count. You know, if they know a good amount, then they'll try to see what they can do with addition, which is the first operation. If they know addition, then they'll move to multiplication, so forth and so on through the four operations.

The same thing with language: they'll assess what sounds do they know; if they know sounds, can they blend sounds; if they can blend sounds, what level are they reading on and how much do they know in grammar area, that sort of thing.

(Id.)

More specifically, when O.V. started at Pinewoods, Ms. Palacioz assessed "where he was with handwriting, with language, with math, what he knew in geography, science. And she has given him lessons based on where she assessed that he was." (Id. at 24.) In this regard, Ms. Palacioz "develops a work plan for him daily that keeps him moving along from one assignment to the next. It's specifically designed for where he is in the academic areas." (Id.)[35] Moreover,

because he wasn't reading as far along as would be expected for his age according to more traditional standards, . . . she designed an individual work plan with pictures that showed his assignments so that he wouldn't necessarily have to read the assignments but would have the visual. And then she would put the writing next to it so that he could become familiar with what the wording was next to the pictures.

(Id. at 24-25.)

_____

35  Ms. Sewell examined and explained the samples of O.V.'s work at Pinewoods that appear in the record. (See id. at 103-08.)

99

As to the self-paced nature of Montessori work, Ms. Sewell explained:

> So each child has an individual work plan. So O.[V.]'s work plan, he may have language first. He's allowed to complete that task at his own pace as long as he is engaged and, you know, obviously not off task. He's allowed to take as much time as he needs to complete that task. And the teacher will come over if he needs reminders or if he needs help. And once he gets that task completed and he can get it checked off by the teacher, then he can move on to the next assignment.

(Id. at 25.) Notwithstanding this self-paced approach, it does not "take O.[V.] multiple days to complete an assignment." (Id.)

"[T]rained to note observations of children" (id. at 67), Montessori teachers monitor children's progress through their daily works and mastery of concepts. (See id. at 67, 93-94.) At Pinewoods, the teachers provide two "evaluation forms, one in the fall and one in early spring," as "progress reports to parents during the year." (Id. at 16.)[36] These evaluation forms, which

---

36    By the administrative hearing, O.V. had received one evaluation form (id. at 68), in February (see id. at 101); he did not receive a fall evaluation due to the timing of his enrollment at Pinewoods (see id. at 68, 101). For this evaluation, approximately "three and a half months into his enrollment at Pinewoods" (id. at 101), O.V.'s teacher used the evaluation form that Pinewoods "typically use[s] with kindergarten level students" (id. at 68; see id. at 69), as Pinewoods felt that the typical lower elementary form did not "accurately display[ O.V.'s] progress to his parents, which is the point of the evaluation form[,] because he missed many of the lessons that were given at the beginning of the school year. That's what the lower elementary progress form that [O.V.'s teacher] had used for th[e spring] semester was showing, the lessons that she had given in the fall and how the students had progressed from those lessons to the spring." (Id. at 68; see also id. at 101 (explaining that O.V.'s
(continued...)

100

teachers can tailor to the needs of the individual child (see id. at 16-17), reflect "what skills [children] have mastered and what skills they still have to work on" (id. at 67-68). However, Pinewoods teachers do not "create data sheets" to record either baseline assessments or progress monitoring data. (Id. at 67.)

Nor do they track information regarding prompting or redirecting children, including O.V. (see id. at 98-99), although they will redirect or prompt children (see id. at 17; see also id. at 126 (testifying that, in Dr. Orlando's observation, Pinewoods "did prompt O.[V.] to complete a task, but it was systematic in a least-to-most fashion")). The method of redirection "depend[s] on the child." (Id. at 17.) For instance, "some children need gentle reminders," such as "this is what is your assignment, please get back on task, where others may need a more firm voice or" what one could characterize as "more structure," but "[a]gain, it's just about the child." (Id.) Nevertheless, "it would usually be a reminder of what they're doing. If they seem to have several reminders, then the teacher may choose a different task or assignment for them to work on since

---

36(...continued)
evaluation form "show[s] where he's working. Again, it's hard to relate progress from the fall semester to the spring semester when he really wasn't enrolled in the fall semester. So it's not necessarily something that [Pinewoods] could accurately portray on the progress form because [they] . . . use a fall column and a spring column, but it would be able to show what he is working on").)

101

they're having trouble staying on the one that they had first assigned."  (Id.)[37]

In Ms. Sewell's experience, "[s]ometimes [O.V.] needs a little prompting" (id. at 28), perhaps "two or three" (id. at 40).  For example, "[w]hen [they] were playing the glockenspiels, [Ms. Sewell] said, 'O.[V.], pick up your mallets and we're going to play C.'"  (Id. at 39.)  Ms. Sewell does not record any data on these promptings; she "do[es]n't feel it necessary," as "it's not a problem to occasionally give a child direction so [she] do[es]n't know why [she] would need to keep data on that."  (Id. at 106.) She also does not perceive having to redirect a child "two or three times" in her thirty-minute class "as being an issue," particularly since she has "had to do it with other children."  (Id.)

O.V. receives speech therapy and occupational therapy at Pinewoods.  (Id. at 23.)  As Ms. Sewell explained,

> [O.V.] has a woman who comes from Emerge who is his speech therapist who comes in and works with him in the classroom one on one and works with him on speech one on one and then also getting him to do some speaking with some of his peers and his teacher.
>
> With occupational therapy, the occupational therapist comes in every Friday and works with him in the

---

37  Ms. Allen similarly testified to "chang[ing] the activity" when O.V. "[w]ould not do anything."  (Docket Entry 101-12 at 150-51.)  In addition, she "g[a]ve him [a] choice like of all the things [she] want[ed] him to do, [she] let him choose what he wanted to do first and then second until he had completed whatever he had to do.  And what was left, he knew he had to do the next day for that time period."  (Id. at 136.)  She also "would switch the activity to try to get him involved in something."  (Id. at 146.)

102

classroom with what he's working on, with the works that
have been designated by the teacher, and then she also
gives the teacher some suggestions of things that she can
do to enhance the assignments to help O.[V.].

(Id. at 23-24.) For example, the occupational therapist "has
talked about the need for some practical life activities that could
help develop his hand strength to help with handwriting," so during
the morning "break work," O.V. "can choose one of those activities
again to help develop his hand strength." (Id. at 24; see also,
e.g., id. at 71 (indicating that occupational therapist suggested
visual schedule that Ms. Palacioz creates for O.V.).) The
occupational therapist also encourages the use of "hands-on
materials with O.[V.]," such as a "movable alphabet," which "is
again very concrete with spelling, and he doesn't have to write it
but can actually use the letters to form words and to write
sentences," providing him "the opportunity to demonstrate [his]
knowledge of the word without the writing skill." (Id. at 84.)

As noted, Pinewoods "assess[es ]child[ren] based on where they
are academically when they come in," and, as such, Pinewoods
teachers "are not concerned with grade or age." (Id. at 44.)[38]
Thus, Ms. Sewell "didn't really have an understanding of [O.V.'s]

---

38    Nevertheless, Pinewoods "typically administer[s]
standardized tests for children who are considered ages — grade
levels three and up," a determination usually based on "age and
academic level." (Id. at 65.) Pinewoods did not consider O.V. to
function at that level in the 2015-2016 school year, so they
determined that "[h]e would not be taking" the standardized test
they administer that year. (Id. at 65-66.)

grade level" classification at DPS.  (Id.)  However, Pinewoods does

not "expect [O.V.] to necessarily be functioning on the age range

of the peers that are similar to his age, like [other] 9-year-

olds."  (Id. at 91.)  Further, Ms. Sewell "do[es]n't think [O.V.]

has an approximate grade level, but [Pinewoods] do[es]n't feel that

he's functioning on what is considered by North Carolina standards

or the public school standards as third grade level for a typical

child."  (Id. at 65.)[39]

Pinewoods did not recommend that O.V. transition to the upper

elementary classroom for the next school year, as it did not "feel

_____

        39    This perspective comports with, inter alia, Hillandale
records and teachers' testimony indicating that O.V. performed far
below grade level.  (See, e.g., Docket Entry 37-8 at 21
(reflecting, in May 2015 IEP, that "[b]ased on current levels of
performance [O.V.] is significantly below grade level," with "[a]ll
academics . . . at the foundational functioning level"); Docket
Entry 101-12 at 92 (Ms. Allen explaining that, in the latter half
of the 2014-2015 school year, "[O.V.'s] skills were more at a
beginning kindergarten level"); Docket Entry 107-8 at 63-65 (Ms.
Turner testifying that O.V.'s performance was "so far below second
grade level" and "his skill level is so far below the[ second
grade] standards" that he could not "meet [the] standards,"
providing as examples that "[t]he[] participate in a shared
research and writing project [standard]; he still is doing his
letter sounds, so being able to write a sentence is virtually
impossible for him" and "for a student who cannot even write a
complete sentence[,] would he be able to identify the main topic of
a text of paragraph" as per another standard, "no," for "when he
cannot produce a sentence on his own either verbally or writing,
. . . that does not meet standard"); see also, e.g., Docket Entry
107-8 at 66-67 (explaining that "a lot of his instruction was
geared towards his ability level so [Ms. Turner] was more concerned
about making sure he could sound out words and be able to read
sight words than trying to worry about him trying to identify how
a character in a story responds to major challenges when he can't
even read").)

104

that it's best for him socially, emotionally, or academically."
(Id. at 74-75.)  As to the social component of this determination,
Ms. Sewell explained that O.V. had "bonded with peers who are
younger than him in his current classroom and not bonded with the
three girls who will be moving up."  (Id. at 75.)  O.V. had also
bonded with Ms. Palacioz, his lower elementary classroom teacher.
(Id. at 96.)  On the academic side, in part because of his previous
lack of experience with Montessori, O.V. had not yet "mastered many
of the materials or the curriculum in the classroom," and "[wa]s
not on the level as many of the other peers who will be moving up."
(Id. at 75.)[40]  However, "there are a couple of other students [in
the lower elementary classroom] who are working on the same type of
math that O.[V.] was working on, and then there are some other
students who are doing some of the same type of handwriting skills
that he's working on."  (Id. at 49.)[41]  O.V. would also continue to
have one peer his age in the lower classroom for the next school
year.  (Id. at 75.)  In addition, students in the lower classroom

---

    40  "It typically takes a while" to "get[] acclimated to the
Montessori materials and [Montessori] approach" for children who
"ha[ve] been in a traditional setting because it is quite
different.  And if they haven't had the exposure to the materials,
then it's going to take some time to teach them having not had that
foundation in the primary classroom."  (Id. at 102.)

    41  Most of these students are "[a]round seven years of age,
and one is 9 who's working on the same type of math that [O.V.]'s
doing."  (Id.)

can "work[] on concepts that are covered in the upper elementary classroom." (Id. at 82.)

Ms. Sewell has personally observed O.V.'s progress at Pinewoods and has also received updates from Ms. Palacioz on O.V.'s progress. (Id. at 31, 33; see also id. at 64 (explaining that, based on her own observations and feedback from other teachers, Ms. Sewell feels "that he is making progression and is becoming very engaged and enthused by the work that he's doing in the classroom").)[42] For instance, in the music class, O.V. transitioned

_____

42 Although the ALJ originally sustained the Durham Board's hearsay objection to Ms. Sewell's report of O.V.'s teachers' communications with her regarding his progress (see id. at 31-32), the Durham Board thereafter "open[ed] the door" to such reports (id. at 56). In this regard, Ms. Sewell originally testified:

> [O.V.'s teachers] have communicated that they've seen a lot more growth socially, that he is speaking to the other children, still in short sentences, but he is definitely both verbally and, you know, gesturally communicating with the other children, interacting, playing games with the children on the playground, seems to be engaging sometimes with works in the classroom with some of the other students in the classroom, and they've definitely seen some academic progression as well.

(Id. at 31.) On the academic side, she reported:

> So when they first came in, they were working on ensuring that he knew concretely all of the sounds of the alphabet. And now they're working with spelling, the teacher dictating words. He was first spelling them with the movable alphabet, and now she's having him write them down as she dictates the words.
>
> There's definitely improvement in his handwriting and his ability to trace, and there has been progression with his math as well from, you know, his linear
>                                          (continued...)

106

from an observer role in his first few classes, in which he once placed his hands over his ears while the teacher played a musical sample, to actively and enthusiastically participating alongside the other students, including "playing along with the glockenspiel with the other students" (id. at 80). (See, e.g., id. at 79-80.) Moreover, aside from "[s]ometimes" needing "a little prompting, . . . [O.V.] seems to be holding his own with the other students in the [music] class." (Id. at 28.) That transition represents a significant improvement over O.V.'s music experience at Hillandale, where the May 2015 Meeting Minutes reflect that "[O.V.] is currently not attending music; he doesn't appear to like it and puts his hands over his ears so he has not been going this school year. However, the team would like to get him to go and participate in music next school year." (Id. at 79; accord Docket Entry 37-10 at 2-3.) O.V. also engages in verbal exchanges with the other students in music class (Docket Entry 101-6 at 33), and enjoys getting "some attention from the other children by making funny comments" (id. at 34).

Further, in addition to improving his linear counting, O.V. had progressed from addition with sums up to 10 "to sums with teen

---

42(...continued)
counting, how much he can count, to his addition. We've seen progression with the sums building as he's worked with addition.

(Id. at 31-32.)

107

numbers." (Id. at 83.)  In is first few months at Pinewoods, O.V. also progressed from "working with a lot of sounds and isolations of beginning consonant sounds at the beginnings of words" to "spelling words" and even writing down some words his teacher dictates.  (Id.)  He also developed his ability to work independently:

> [W]hen he initially started [Ms. Palacioz] said she would present the lesson and then often she would have to sort of sit through [sic] to make sure that he followed through on his assignment.  She would have to sort of sit along with him.  But now she is able to present the lesson and usually walk away and allow him to finish his work independently and can come back just to check his work.

(Id. at 84.)[43]

P.V. and M.P. similarly testified to O.V.'s progress at Pinewoods.  (See, e.g., Docket Entry 101-4 at 146 (confirming that M.P. has "observed academic progress").)  For example, P.V. testified that Pinewoods was "developing his speech pattern, and

---

43    O.V.'s May 2015 IEP reflects O.V.'s difficulty at Hillandale independently initiating tasks and sustaining attention for more "than 10 minutes in order to complete assignments." (Docket Entry 37-8 at 15; see also Docket Entry 37-10 at 2 (May 2015 Meeting Minutes indicating that "[O.V.] will not want to do work if he doesn't have someone right at his side").)  The IEP identifies as a goal that, "[g]iven academic tasks (math, reading, and writing), [O.V.] will begin a task within 5 minutes and independently work in 10 minute intervals 4 out of 5 trials." (Docket Entry 37-8 at 15.)  It also specifies as objectives that (1) "[g]iven verbal directions, [O.V.] will start a task within 5 minutes of directions given 4 out of 5 trials" and (2) "[O.V.] will maintain time on task for routine academic assignments within a 10 minute time frame with no more than 10 redirections 4 out of 5 trials."  (Id.)

108

that's improving." (Id. at 15.)  P.V. also expressed that O.V.'s work at Pinewoods remained more challenging than at Hillandale. (See id. at 16-17.)  P.V. further testified that, as of March 2016, O.V. could independently read books (such as *Hop on Pop* or *Go, Dog, Go*" (id. at 8)) that he has read before and could read and understand at least words with which he was familiar in new books. (See id. at 7-9.)  In addition, O.V. "start[ed] to be introduced [to] concepts of multiplication" and "start[ed] to get the idea of what multiplication is, which is based on a foundation of addition. So he's starting to grasp that concept." (Id. at 10.)  Moreover, O.V. could "add single digit numbers without help," as well as simple two-digit numbers.  (Id.)[44]  O.V. also "copies words that[are] being shown" and can do the same when "being verbally dictated," at least for short "three, four letter[] words that he would be familiar with." (Id. at 12.)[45]  Additionally, he can write

---

44  For reference, the May 2015 IEP specified as O.V.'s math goal that, "[g]iven manipulatives/objects, [O.V.] will independently add single digit numbers with sums up to 10 with 80% accuracy in 4 out of 5 trials." (Docket Entry 37-8 at 9.)

45  The May 2015 IEP states that, "[w]hen words are dictated, [O.V.] is able to write 3 out of 15 (it, the, me) sight words independently in one out of three trials." (Docket Entry 37-8 at 11.)  It further identifies as O.V.'s annual academic goal that, "[g]iven verbal cues, [O.V.] will independently write words when dictated with 80% accuracy 4 out of 5 trials." (Id.)  As the two relevant objectives, it specifies that O.V. "will accurately write 26 out of 26 letters when letter sounds are dictated to him with 4 out of 5 trials" and that, "[w]hen letter sounds are dictated, [O.V.] will write corresponding letters to independently generate words with 80% accuracy 4 out of 5 trials." (Id. at 12.)

109

dictated sentences and, "without copying or being dictated," he can also "write a sentence." (Id.)

As to O.V.'s enthusiasm and engagement at Pinewoods, P.V. explained that "when [P.V. has] come to pick [O.V.] up, [P.V. has] seen him [] work[ing] directly with the teacher. [P.V. has] seen O.[V.] coming up to the teacher and showing the teacher something he was interested in. [P.V.] ha[d] never seen that prior to [Pinewoods]." (Id. at 16.)[46] P.V. further noted that he had seen "O.[V.] surrounded by other kids even when [they a]re outside of the classroom," explaining that even when they have been "out and about" in other settings, children from Pinewoods will come greet O.V. (Id.)

M.P., who likewise observed O.V. at Pinewoods (see id. at 144), also testified regarding his progress, including in comparison to Hillandale (see, e.g., id. at 144-45). For example, M.P. testified:

> [A]t Pinewoods [O.V.] does geometry. Geometry, he learn how many sides of a square, how many sides of a pentagon, and how many sides of hexagon, and he learn how to write that. He learn how to make model of it.
>
> And when you tell him to make a square with even number of sticks, he know how to make a square. No, actually, not even — give him a whole bunch. He know a square has four sides, so he would make a model. And he

---

46 In this regard, P.V. testified that he observed O.V. at Hillandale when, inter alia, P.V. took lunch with him, dropped him off at his classroom in the morning, and participated in a science fair in Ms. Turner's classroom. (See, e.g., Docket Entry 101-3 at 173, 224-25; Docket Entry 101-4 at 21.)

110

learned how to write square and he learned that is a
square, four sides, the same way for pentagon or hexagon.
These are the things [M.P.] didn't see at Hillandale.

          * * * * *

     O.[V.] did geography also.  It's amazing how they
can teach him geography at Pinewoods with puzzle with —
first he did puzzle parts.  He will put Asia in a slot.
He will put Africa in a different slot.  And then he
color code it.  So when he see Asia, he know that's
yellow.  And when he say — when [his parents] say about
Asia, he remember that's yellow for Asia.

     And he learn how to trace it, and he know on the
map, the seven continents on the map, where Asia is
supposed to be, where Africa is supposed to be.  And he
can visualize that and draw it by using a stencil on his
own and then write the word down and color them.

          * * * * *

     O.[V.] does spelling also, which he didn't do at
Hillandale either.  He learn spelling by the teacher
giving him picture, maybe for example a ladybug, and then
he will pick out what is a bug, the word "bug."  And then
he matches with that.

     And then he copy it, and then you take all of that
away and dictate that to him and so that he can do that.
So he start to learn spelling.  He learn how to memorize
the word by doing spelling, which never happened at
Hillandale.

          * * * * *

     He — since he was at Pinewoods, he was — he was
invited to his first birthday party.  And [M.P.] even
wrote on his invitation "O.[V.]'s first birthday party"
since he came to Pinewoods.  And he went out with his
friends, little girls, and they dig dinosaur bones.  And
he plays football with the boys . . . .

     Usually when [M.P. and P.V.] come and pick [O.V.] up
is at the end of the day.  And the teachers always get
them outside for [the parents] to pick [O.V.] up when the
weather is nice.  So [M.P.] saw him with all the kids.
And then he didn't want to come home because he just want

                         111

to play with the other two girls or the boys that teach him how to play football or soccer.

And when [M.P.] go[es] into the class all [M.P.] hear[s] and see[s] is O.[V.] this, O.[V.] that. All the kids talk about O.[V.], O.[V.] this, O.[V.] that, and [M.P.] hear[s] all about O[.V.]. And he's a part — a member of the class.

(Id. at 144-46.)[47]

M.P. also testified to O.V.'s ability to read independently, explaining that, "[i]f you rewrite a story with all the sight words he knows, he can read independently." (Id. at 150.) M.P. further explained that when O.V. reads an unfamiliar book, he tries to sound out words that he does not already know. (Id. at 152.) M.P. identified geometry and multiplication as the most advanced math skill O.V. has learned "for now," providing "3 times 5" as an example of the "type of [multiplication] problem [M.P.] giv[es] him." (Id.; see also id. at 153.) She expressed her belief that O.V. can count to 100 without assistance, although "he can miss some number[s] because," due to his apraxia, "he cannot say [them]" (id. at 153),[48] and explained how O.V. handles two-digit addition. (See id. at 153-54.) She further confirmed that O.V. can "write his last name without assistance" (id. at 154)[49] and can copy a

_____

47 M.P. speaks English as a second language. (See, e.g., Docket Entry 17-2 at 45 n.15.)

48 The May 2015 IEP indicates that, at most, O.V. "is able to count to 19" in at least some trials. (Docket Entry 37-8 at 9.)

49 The May 2015 IEP reflects O.V.'s inability to (continued...)

112

sentence, write a dictated sentence, and can, with context, write a sentence without someone "telling him what to write" (id. at 155; see id. 155-56 (elaborating on O.V. writing sentence in context of discussing Scooby Doo movie)).

Plaintiffs' experts, Dr. Kurth and Dr. Orlando, conducted two separate multihour observations of O.V. at Pinewoods, one a three-hour examination in January and the other lasting "about four hours, three to four hours" (Docket Entry 101-7 at 12) in February. (See Docket Entry 101-6 at 121, 125, 133; Docket Entry 101-7 at 8, 12.)  Those observations encompassed some interactions between O.V. and his occupational therapist.  (See, e.g., Docket Entry 101-7 at 150-51 (testifying to occupational therapist's presence for "an hour to an hour and a half" (id. at 150) in February observation, only 50% of which time she spent "within an arm's length of O.[V.]" (id. at 151)); Docket Entry 101-6 at 121-24 (noting occupational therapist's presence during math activity but not in remainder of January observation).)

Dr. Orlando described her observations and O.V.'s skills in the context of the activities that she observed, which included a math activity (that involved counting beads, writing the number of beads, and coloring the beads on his worksheet), outdoor play, an indoor activity involving play-doh (where O.V. used cookie cutters

_____

49(...continued)
independently write his last name.  (See Docket Entry 37-8 at 11.)

113

to cut out shapes), and a group activity where "students had to present items to [the teacher] in exchange for other items, and they would do this as the teacher called upon each student" (Docket Entry 101-6 at 123), a task in which the students had "different criteria" and that "was all about being reinforced for completing different work that they had to do in the classroom as well as work that they completed at home" (id. at 124). (See id. at 121-24, 132-35.) In regard to the last activity, Dr. Orlando elaborated that O.V.'s goal

> was to, one, learn the names of his classmates and to follow directions from his teacher. He was very engaged in this activity, as were all the students. He was appropriate.
>
> It gave him lots of opportunities to practice saying students' names, saying things like, "Can I have it," or . . . some sort of prompt for the student, and then saying something to the teacher so it was an opportunity for lots of practice in particular skills.

(Id. at 124.) Dr. Orlando further explained that, during O.V.'s math activity, two girls engaged in similar activity came over to O.V. and "model[ed] counting the beads." (Id. at 133-34.)

In addition, Dr. Orlando provided the following "examples of O.[V.]'s pragmatic abilities" (id. at 126):[50]

---

50 Pragmatics constitute "th[e] social communication part" of communication, namely, "the person's ability to use language to communicate in social situations." (Docket Entry 101-5 at 142.) According to Dr. Orlando, "in [her] interactions with [O.V.], he's got some pretty good social skills. So that can really be capitalized on to help him to learn." (Id. at 143.)

114

He was engaging in back and forth conversations with the occupational therapist and the teacher, with the students in the class and with me. And back-and-forth conversations of several turns that it showed the use of gestures and eye gaze and some word approximations and gestures and types of communication forms.

(Id.) She elaborated upon one example of O.V. utilizing his pragmatic skills:

First when [she] met him at his home and interacted with him, he was — he was on his iPad. And [they] were — [she] went over to look at what he was doing on his iPad. And [they] just — [they] pointed to some things. And he said hello to [her].

He jointly attended to the iPad with [her]. [They] had the eye — joint eye gaze. . . . [she] would ask something, not verbally, but ask him to show [her] something, and he would point to it and look at [her] to make sure that [she] had seen what he was looking at, so — and [they] had sort of this back and forth going on.

When [she] observed him at school, . . . he had some clay and he was cutting it in these particular shapes. That was an activity given him — to him by his teacher. And he was cutting these shapes. And [she] came over to talk to him about those shapes.

And it was like clay that he was molding and — or cutting, and then [she] started molding, and he was — [she] was sort of modeling like a train. And [she] just sort of put something together and then he said — he said — he said train or a word approximation of what [she] interpreted as the word "train."

And then he put it with another word, and [she] couldn't really interpret what that word was, but he was persistent about it. And then he touched this sort of form that [she] had created to make a train. He touched it and sort of touched like an end of it, and he made like a blowing sound like "phoo" and sort of did this movement.

And [she] said, "Do you mean smoke?" And he said, "Yes." And [she] said, "Do you mean smoke train?" And he said, "Yes." So [she] d[id]n't know what smoke train

115

is.  Well, [she] didn't — [she] do[es] now.  And so [she] Googled that on [her] phone and — just images and found some pictures, and [she] said, "Is this what" — "Are you talking about any of these array of pictures?"  And he said, "Yes," and he touched one.

       [They] looked at it and apparently it is a story that he is familiar with.  And so [they] talked about the train in the picture, and he would talk about different parts and then sort of use word approximations to label the different parts of the picture that [they] were looking at.

(Docket Entry 101-5 at 144-46.)[51]  O.V. also asked Dr. Orlando, "not specifically using his – using complete words, but through gestures and word approximation[,] he asked [her] to write [ghost train] on the model of the clay train that [she] had made.  And then also he asked [her] to put his initials on the bottom of the train so we would know that it was his."  (Docket Entry 101-6 at 128.)

She also explained that in this interaction:

[O.V.] worked very hard to try to explain to [her] the concept of [the train] and, you know, in terms of describing the smoke and using eye gaze and gestures and word approximations.  And when [she] would give him feedback about what [she] thought he — he could gather from what [she] said [that] did not understand what he was saying.  And so he would try again.

       So he engaged in, you know, several communicative forms such as requesting and commenting and questioning and being persistent and saying — refusing such as saying no.  Those are all communicative functions that — and with a variety of communication forms which are the

_____

51  In her testimony the following day, Dr. Orlando clarified that she had "erroneously described it as the smoke train, but it was smoke that he was describing.  It was called the ghost train.  That was what [she] Googled was ghost train."  (Docket Entry 101-6 at 127.)

116

things like gestures, pointing, word approximations and used those appropriately to convey a message.

(Id. at 127.)

Dr. Orlando also provided examples of the prompting she observed (see id. at 125), explaining "that the school did prompt O.[V.] to complete a task, but it was systematic in a least-to-most fashion" (id. at 126). Dr. Orlando did not count the frequency of the prompting, but indicated that she did not "observe anyone prompting [O.V.] 98 times in ten minutes." (Id.)

Dr. Orlando further explained that, in terms of O.V.'s communication progress, "having appropriate models for language, behavior, and engagement in social and academic skills is beneficial. And so being in a general education classroom with the provision of all of those typical models for language, behavior, academic and social interaction would be beneficial." (Id. at 113.) Per Dr. Orlando, experience in the general education setting also benefits children like O.V. with limited disabilities both academically and in terms of their "overall progress." (Id. at 114.) In this regard, she explained:

> What [they] know in the literature is that being exposed to typical models and having access to the general education that's being taught to general education peers is beneficial for all students including those with limited disabilities. And not — not having those models would not provide you with the necessary models that you would need to see what does typical discourse look like for same age peers, typically developing peers.

        * * * * * *

117

> . . . . So for children who have disabilities,
> including those who have limited disabilities, having
> access to the general education curriculum plus those
> nondisabled peers and the way that those nondisabled
> peers are interacting with academics as well as
> interacting with each other and with the teacher is
> beneficial for students as it provides them with these
> models for what instruction would look like.

(Id.; see also id. at 114-15 (explaining that, even when "similar standards are being taught in the special education classroom, the lack of access to those typically developing peers and the model of the way that those peers are interacting with the instructor, the instruction, and the curriculum would create that — that it is a different experience for the student with disabilities and students with limited disabilities who are segregated").)

Finally, based on her "expertise," Dr. Orlando declared Pinewoods "an appropriate placement for O.V." for "several reasons." (Id. at 128.) She explained:

> One, it has students of a grade level which he was in at
> the time that [she] observed him. The teacher was able
> to provide instruction to him on a variety of course
> topics. He was engaged. He was able to get related
> service there. That related service provider was also
> able to consult with the educator to — on specific
> strategies that might support O.[V.] when the related
> service provider is not present.
>
> There were other students who were typically
> developing present in the classroom that were interacting
> with him. He was provided with many opportunities to
> interact with the students. He was provided many models
> of academic and social discourse.
>
> And he was able to function like in the example of
> his coming into the classroom and putting away his jacket
> and putting — and getting his glasses out of his
> backpack. And that he was able to do with — [Dr.

118

Orlando] do[es]n't recall there being any prompting for
him to complete that. It was a matter of him following
what was protocol for every child that came into the
classroom.

(Id. at 128-29.)[52]

Dr. Kurth similarly discussed her observations of O.V.'s
experience at Pinewoods (see, e.g. Docket Entry 101-7 at 8-20, 147-
67), explaining that "[she] spent a couple of hours at Pinewoods
during just a regular school day and [she] was able to observe
O.[V.] in several different activities" (id. at 8). Dr. Kurth
elaborated:

> [she] observe[d] O.[V.] across different activities and
> working with different people. O.[V.] — [she] saw him
> sitting next the teacher actually during the morning kind
> of warmup routine or greeting routine where the teacher
> was reading to everybody. So all of the students were
> sitting in a circle on a carpet, and O.[V.] was sitting
> . . . right next to the teacher.

_____

52 In this regard, Dr. Orlando had previously testified that
she "observed [O.V.] coming into the classroom [in the morning].
He removed his jacket. He was able to — and put away his backpack.
He was able to get his glasses out of his backpack and put them
on." (Id. at 121.) "At that time students were engaging in a
variety of activities. O.[V.] sat on the floor. All of the
students have — could have locations on the floor where they did
their work, and he — he sat down and was given some tasks to do."
(Id.) By contrast, at the "beginning of the" 2014-2015 school year
at Hillandale, O.V. "refused to come in the classroom. It was a
struggle every morning to get him in. Sometimes [M.P.] would
physically pick him up and carry him and put him in the seat. Most
of the time he would put his head down." (Docket Entry 107-8 at
29.) "Once [they] had someone else start bringing him in the
morning, whether it was the principal or another teacher coming
in in the morning, he still would come in but he would most of the
time refuse to unpack his backpack and get — turn his folder in and
things of that nature, even after several reminders." (Id. at 30.)

119

And so the teacher would read and then kind of show the pictures to all of the students who were sitting in the circle. And O.[V.] was listening and looking at the pictures. And there was a little boy sitting next to O.[V.] who would — they would kind of comment together . . . about what they were seeing in the pictures.

And after that activity — and [Dr. Kurth] do[es]n't think it lasted more than ten minutes, the teacher sort of explained that there were these options and what the students could go work on and here's how they should prioritize what they should choose to work on during the morning. And O.[V.] went to a math area in the classroom. And there were several of these things, like work station things in the classroom.

And he started working on math and some literacy activities. And [Dr. Kurth] saw him do a lot of that with [an occupational therapist] . . . . [who] happened to be there that day. So [Dr. Kurth] saw O.[V.] doing skip counting and adding and subtracting using different beads for his math.

[O.V.] had a visual schedule that was provided for him that [the occupational therapist] and the teacher had created first thing that morning. [Dr. Kurth] saw them talk about that. And so O.[V.] would sort of just proceed through that schedule. And when he finished something, he would cross off that he had done it. And so he did this math activity with counting . . . and then writing number sentences, so — addition sentences really.

And then he moved on to — there was a map activity that he did. It was kind of like a fine motor task really, because it was placing puzzle pieces in a map is the best way [to] say it. It was a map of North America.

And then he also did a writing — he was given pictures and was writing down the word for the pictures. And he ended up using those pictures and the words that he had generated to write sentences.

. . . [The teacher and occupational therapist] were really impressed with how well [O.V.] did it because he was able to write and spell many of those words independently and . . . they just commented that they were really impressed that he was able to do that that day.

120

. . . [T]hat activity probably lasted an hour or two. [Dr. Kurth is] not really certain. And then there was a whole class art assignment. And the students were supposed to . . . . kind of make a coloring book. And so they had objects that they would trace—

(Id. at 8-10.) Dr. Kurth continued:

And so the students had a bunch of objects that the art teacher had brought in. And they were supposed to trace those objects in overlapping patterns, really, and then they could color them in. So it was kind of like adult coloring book sort of, if you've ever seen those in the grocery store or something. It was something that looked kind of like that they were making.

So O.[V.] participated in that activity as well, and he sat at a table with a bunch of other boys at that time, and he . . . participated just as they did in doing this lesson. And then after that art, the students transitioned back to doing more independent work, so they had different assignments. Some kids were writing a paragraph. There was a paragraph that they had to finish or, you know, just other math or reading activities.

And so O.[V.] then went back to his work area. And as [Dr. Kurth] recall[s], he was still — he was still working on some of his math at that time, but [she did not] remember the details of what he did. And that's about the time that [she] had to leave.

(Id. at 11-12.)

Dr. Kurth also discussed in more detail O.V.'s interactions with other students (id. at 152-55), as well as his interactions with the occupational therapist and Ms. Palacioz (see, e.g., id. at 12-18, 150-67) and their interactions with each other (see, e.g., id. at 14-15). Dr. Kurth further explained that she conducted an "ecological assessment," in which one identifies "step-by-step what happens during the day, then what typical kids do, and then what O.[V.]'s response was, and . . . then if there was a discrepancy,

121

. . . what supports you would need or skills you would need to be taught so that there was no longer a discrepancy." (Id. at 149.) Dr. Kurth summarized the findings of this assessment as follows:

> [Dr. Kurth] saw O.[V.] . . . participating in a variety of different activities that included whole group and independent individual and transitioning between activities.
>
> And in summary what [she] found was that O.[V.] was very successful in participating in all of those activities and there were very few instances in which some other skill would need to be taught or extra adaptation brought in because the school had already done a lot of those simple things.
>
> So they had a checklist of activities for him to do. They had a visual schedule. They had work spaces set up. It was nothing extraordinary, but it was the small setting that he needed to be independent and successful in that setting.

(Id. at 149-50; see also, e.g., id. at 14 (explaining how occupational therapist used "a countdown timer so that O.[V.] knew how much time he had to finish [an] activity," describing that timer as "really a powerful thing for him," in that "it mattered to him to finish before the timer was up"), 152 (explaining that occupational therapist did not bring timer, which "[wa]s there in the classroom," and that Dr. Kurth observed Ms. Palacioz and another student using timer with O.V.).)

Additionally, Dr. Bell and Dr. Kurth conducted a joint two-hour observation of O.V. at Pinewoods in April 2016. (See Docket

122

Entry 101-10 at 74; see also Docket Entry 37-22 at 1, 8.)[53]  Dr.
Bell and Dr. Kurth provided very different characterizations and
interpretations of the events they observed.  For instance, Dr.
Bell testified that she observed O.V. engaged in a "drawing thing
for an hour" (Docket Entry 101-10 at 88; see also Docket Entry 37-
22 at 2 ("OV continues coloring the pictures of cut out dinosaurs
on his poster board.")), which she "d[id]n't see how it was
connected to any academic task" (Docket Entry 101-10 at 88).

    She further perceived O.V.'s interactions with other students
during this drawing activity, which included one girl drawing a
dinosaur that O.V. placed on his poster board (see Docket Entry 37-
22 at 2), as involving "a synthetic peer structure." (Docket Entry
101-10 at 92.)  For the majority of the remaining hour of the joint
observation, Ms. Palacioz worked one-on-one with O.V. on his math
and writing activities, tasks that Dr. Bell interpreted as

_____

    53  The observation began approximately thirty minutes after
O.V. arrived at school, carrying a "poster board [that] looked like
it had paper items glued to it, perhaps a homework or school
project." (Docket Entry 37-22 at 1.)  When Dr. Bell and Dr. Kurth
arrived in the classroom, Ms. Palacioz was "talking to a student
about his work plan for the day" and O.V. was "walk[ing] to the
space . . . . [that] appear[ed] to be his work area – there [wa]s
a mini carpet/mat down that he place[d] the poster board on" and
"beg[an] coloring" the pictures "on his poster board." (Id.)  His
work area also contained a "d[inosaur] head statue/figurine" and a
"d[inosaur] book." (Id. at 2.)  (Dr. Bell's testimony and notes
variously refer to the creatures involved in O.V.'s work as dragons
or dinosaurs (see, e.g., id. at 1-2), but she later clarified that
his work involved "drawings of dinosaurs that are colored[,]
. . . . not dragons" (Docket Entry 101-10 at 228 (noting that,
although, in her view, "[t]hey look like a dragon," they constitute
"individual[ly labeled] dinosaurs")).)

123

involving a high level of prompting and producing a low level of work. (See Docket Entry 37-22 at 5-8; Docket Entry 101-10 at 84-88.)[54] In Dr. Bell's view, "[n]othing" about Pinewoods's "learning environment was well suited to O.[V.]'s needs" (Docket Entry 101-10 at 88), as she "believe[d]" that "the educational opportunities O.[V.] received at Pinewoods during" her observation were "extremely limited, not individualized" (id. at 92; see also id. ("It was O.[V.] doing something — some things completely and utterly different and not connected to any of his peers.")). Dr. Bell also viewed O.V. as "pretty isolated" (id. at 95), testifying that there "was never an opportunity for [him] to go out and initiate conversation with peers because he was in his spot the entire time" (id. at 92; see also id. ("He didn't even maneuver the classroom physically other than getting up and going to get the bag of the plastic dinosaurs [for his math activity] with the teacher.")). Finally, Dr. Bell explained that she does not perceive the Montessori environment as appropriate for "where [O.V.] is now," given that Montessori students have more

_____

54  The math activity involved the creation of number sentences using dice and plastic dinosaurs as manipulatives. (See, e.g., Docket Entry 37-22 at 5-6.) At the start of the writing activity, "O.V. yawn[ed]" and confirmed to the teacher that he was "'[s]leepy,'" so they "g[o]t up and walk[ed] to [another] portion of the classroom" where they "thr[e]w a ball back and forth" for a few minutes before resuming the writing activity. (Id. at 7-8; cf. Docket Entry 37-10 at 2 (indicating that, at May 2015 IEP meeting, private occupational therapist recommended having O.V. "move around when he's sleepy").)

124

"expectations for more independence and working on their independent work plans," and, in her view, "O.[V.] is not there." (Id. at 96.)

However, Dr. Bell's notes from this observation identify multiple instances of O.V. leaving his work mat area, including when he and the teacher's assistant went to retrieve two girls from the library because, per the teacher's assistant, "O.V. want[ed ]one [of them] to draw a dinosaur for him" (Docket Entry 37-22 at 2), as well as when O.V. and Ms. Palacioz walked to another portion of the classroom to throw a ball (see id. at 7-8; see also id. at 2 (indicating that O.V. "walk[ed] away" from his mat and "goes to two boys on the floor and points to their work area" to indicate that he "was looking for a writing board to color")). The notes also reflect that, at various points during the observation, O.V. interacted with other children, verbally and otherwise (see, e.g., id. at 1 (indicating near start of observation that a girl approached O.V.'s work area and "OV initiates 'hi'"), 2-4 (detailing O.V.'s interactions with girls from library); see also id. at 4-5 (noting that four girls "work[ed] on something to do with mammals — creating posters with information about a specific animal; drawing pictures from images on the laptop[s with which they were working and]; taping drawings onto large paper" while sitting "about 3-4 feet from OV" during his drawing activity)).

125

Moreover, Dr. Bell admitted that she has never taught in a Montessori school and lacks "formal[] train[ing] in the Montessori curriculum." (Docket Entry 101-10 at 226; see also id. at 231 (conceding lack of "familiar[ity] with all the different parts of a lesson" and "individual expectations . . . of the students").) She also denied "familiar[ity] with the Great Lessons of Montessori," including the "second grade lesson which would be the Coming of Life." (Id. at 227.) She further acknowledged that the poster board on which O.V. worked during her observation contained both individually labeled cutout "drawings of dinosaurs that are colored" (id. at 228), as well as multiple children's names "written at the bottom of it," including "two female names, possibly" the two girls working with O.V. during her observation (id. at 229).

Dr. Kurth also testified regarding this joint observation. (See Docket Entry 101-14 at 105-20.) She disagreed with Dr. Bell's interpretation of the events that they observed. (See, e.g., id. at 105-06.) For instance, Dr. Kurth disputed Dr. Bell's assertion that O.V.'s work qualified as "completely and utterly different and not connected to any of his peers" (Docket Entry 101-10 at 92). Rather,

> [Dr. Kurth] know[s] from the Montessori curriculum at
> Pinewoods that students were studying an evolution unit.
> And so part of that unit was looking at the evolution of
> life on earth, and so our dinosaurs are part of that
> evolutionary history.

126

And students in Montessori programs can learn about content at their own pace and the method of learning that suits them. And so what [Dr. Kurth] believe[s they] saw actually was O.[V.] learning about dinosaurs in one way of learning. And the girls that were sitting next to him had books about mammals and primates and so forth that they were learning about and that also fits into that evolution unit. That was most likely what this activity was derived from.

So what [Dr. Kurth] saw was O.[V.] working on something that was part of a unit or a lesson of study and fits well into that idea of self-directed learning that would occur in a Montessori classroom.

(Docket Entry 101-14 at 108; see also id. at 108-09 (noting that "the teacher did this math activity with O.[V.] in which he selected dinosaurs, which to [Dr. Kurth] felt like an extension of a previous lesson about dinosaurs that was perhaps something he was interested in").)

Dr. Kurth also perceived "the prompting that happened during the math activity" differently than Dr. Bell did. (Id. at 108.) More specifically,

what [Dr. Kurth] saw [during this activity] was a student who had been taught to be prompt dependent. And so there were several times that [Dr. Kurth] noted in [her] notes that O.[V.] would kind of hover over the page and look expectantly at the teacher as if he was waiting for her to tell him what to do. And to [Dr. Kurth] that is a strong indication of years and years and years of being taught to wait and be prompted for every step.

And a few times he even made what appeared to be a mistake on purpose. For example, he wrote the letter h instead of the number 4, and he started laughing. And when the teacher saw that, she laughed too and said, "That's silly. That's an h, not a 4" or something. And [Dr. Kurth] could interpret that as a way of him initiating social interaction with the teacher.

127

Again, [Dr. Kurth] think[s] he probably knew how to write the number 4, but was joking in his way about what — you know, to elicit this interaction with his teacher. And you can imagine with a student with limited verbal skills that he would take unusual steps perhaps to initiate those kinds of interactions.

(Id. at 109-10.)

Dr. Kurth further testified that

[O.V.] seemed to be initiating interactions with the[ other children] and working on, you know, his history content, for, you know, lack of a better word, and then social communication skills throughout, so — and it was a very natural thing for him to be doing, that he was not in any way being bothered by that sort of interaction.

(Id. at 111; see also, e.g., id. at 119-20 (describing interactions).) Moreover, based on her observations of O.V. "smiling and laughing and interacting with other students," Dr. Kurth "say[s] that he did appear to be happy." (Id. at 113.)

In addition, Dr. Kurth explained that, although "[Pinewoods] was certainly probably a very different set-up than O.[V.] was used to," Dr. Kurth "felt that [O.V.] was really doing a remarkable job of understanding th[e Montessori] expectations" for "being a student and being a learner." (Id.) By way of example, she noted:

[W]hen the teacher asked [O.V.] if he was done [with his dinosaur project] and he said no and chose to continue to work on the task, that's a basic sort of principle in Montessori schools as well. And O.[V.] was learning to exert that sort of self-determination and self-learning that is really important sort of for everybody. So [Dr. Kurth] thought there was a lot of good opportunities being provided to O.[V.] in that classroom.

(Id.) Dr. Kurth also stated that O.V.'s math activity qualified as inclusive instruction, which she characterized "as having a student

128

have their learning needs met in a general education setting, meaning supports and services are brought to that student so they can participate at their level." (Id. at 116.) Dr. Kurth further opined that O.V.'s teacher "has a foundation" for inclusive instruction, notwithstanding that, "if [Dr. Kurth] were to work with this teacher and provide her pointers on how should could do [inclusive instruction] in different ways, [Dr. Kurth] would certainly do that." (Id.)

### C. June 2016 IEP

Finally, the administrative record reflects that DPS conducted IEP meetings for O.V. in May and June of 2016. (See Docket Entry 105-1 at 7.) The IEP Team Meeting Minutes from the June 2016 session provide for O.V.'s enrollment in the fourth grade at Hillandale for the 2016-2017 school year. (See, e.g., id. at 14 (noting that on regular end of grade test O.V. would "be given a 4th grade reading passage"), 15 (discussing "what Science looks like in 4th grade").) They also reflect that O.V. had learned "to tell time by 30 minutes" using a clock, such that, if "told the time, he can move the clock to the hour and half hour," and had also learned to "tell[] time with an analog clock." (Id. at 10.) In addition, O.V. "understand[s] when it is time to go to lunch or recess." (Id.) O.V. had also developed an "enjoy[ment of] writing." (Id. at 12.)

129

Per the Minutes, O.V. "[wa]s working on double digit[]" addition at Pinewoods (id. at 9) and his "sight word vocabulary ha[d] increased" (id. at 8). He had also learned to state his birthdate. (Id. at 12.) Further, although the absence of Ms. Palacioz from the meeting and the "lack [of] critical clarifying information" regarding O.V.'s Pinewoods work samples presented challenges in developing his IEP goals for the 2016-2017 year (id. at 8), the IEP Team determined that an IEP goal "based on decoding/word attack" qualified as "appropriate" for O.V. for the following year, with a specific goal of "reading 4 out of 5 words in 3 out of 4 consecutive trials" established. (Id.; see also id. ("Ms. Bunn stated that this piece was difficult for her to write, as when she last worked with him he was working on CVC words.").) Finally, as a supplemental aid, "[m]anipulatives w[ere] added to each area of the curriculum" (id. at 13). (See id. at 12.)

### ii. Administrative Findings

Largely mirroring the Durham Board's proposed decision (compare Docket Entry 17-1, Findings ¶¶ 109-24, Conclusions ¶¶ 50-55, with Docket Entry 205-1 at 47-49, 56-57), the ALJ found:

> 109. On September 28, 2015, Petitioners P.V. and M.P. provided Respondents written notice of their intent to enroll O.V. in a private school, and seek tuition reimbursement from DPS. (Pet'rs Resp. Opp'n Resp't's Mot. Partial Summ. J. and Cross-Mot. Partial Summ. J. Ex. 13.) On or around November 9, 2015, Petitioners withdrew O.V. from the [DPS], and enrolled him at a private school, Pinewoods Montessori. (Tr. Vol. IV, 661)

130

110. Pinewoods Montessori School offers a hands-on, multisensory approach and defined curriculum "to appeal to all types of learners." (Tr. Vol. VI, 896, 897, 899) The Montessori model allows for multi-age group settings. (Tr. Vol. VI, 896, 897) The Montessori model was originally designed, and the materials created, based on the founder's work with students with mental disabilities. (Tr. Vol. VI, 897)

111. While O.V.'s teacher from Pinewoods did not testify at the contested case hearing, the Head of the Pinewoods, Jennifer Sewell, did. Ms. Sewell explained that at Pinewoods, O.V. has his "own individualized works," and is permitted to work on a lesson that is appropriate for his development and needed for his individualized progress, because the Montessori concept provides for each student to work on different content at different times. (Tr. Vol VI, 907)

112. Sewell noted that O.V.'s teacher uses both the built-in materials associated with a Montessori Curriculum (i.e., metal insets to strengthen the pincer grasp, help students form letters the correct way, and learn geometrical shapes) (Tr. Vol VI, 919), as well as materials and "works," or "any assignment or activity," designed by the individual teacher to support a student's individual needs. (Tr. Vol VI, 918) O.V. works independently, in groups with non-disabled peers, and with the assistance of supplemental aids and services including visual supports, such as a timer and checklist of tasks. (Tr. Vol. VI, 922)

113. Ms. Sewell explained that Pinewoods'[s] approach to redirecting O.V. appropriately, incorporated the premise that[,] should O.V. require several reminders on a particular task[,] O.V.'s "teacher may choose a different task or assignment for [O.V.] to work on since [he is] having trouble staying on the one that [the teacher] had assigned first." (Tr. Vol. VI, 906)

114. Further, [Ms.] Sewell described how O.V.'s teachers designed a plan to meet O.V.'s unique needs, thus allowing him to progress through the entire Montessori academic curriculum working in a classroom with his non-disabled peers. (Tr. Vol VI. 913, 914) While O.V. is permitted to work on a particular assignment as long as is needed for him to complete the assignment, due to the supports available to O.V., it

131

does not take him multiple days to complete assignments. (Tr. Vol. VI, 914)

115. Ms. Sewell occasionally observed O.V.'s classroom for brief periods of time, but was unable to speak definitively regarding O.V.'s skill level or his progress in that classroom. (Tr. Vol. VI, 916, 930). She explained that the school did not believe O.V. was ready to move on to the 4th grade, and that he would be repeating the 3rd grade in the 2016-17 school year. (Tr. Vol. VI, 954)

116. Pinewoods provided progress reports to Petitioners to monitor O.V.'s progress, and provided Petitioners an individualized profile of O.V. that was individually tailored to O.V.'s strengths, weaknesses, and areas of progress. (Tr. Vol VI, 905, 906) However, Ms. Sewell did not present any progress monitoring data at hearing exhibiting O.V.'s performance at Pinewoods as Pinewoods does not appear to keep such data. (Tr. Vol. VI, 956-958).

117. At hearing, Ms. Sewell provided a limited number of work samples as an Exhibit. These samples showed O.V.'s activities in coloring, counting, single-digit addition, copying letters and words, and possibly some basic vocabulary (P. 89 at 1770-1795). However, because O.V.'s teacher from Pinewoods did not testify at hearing, no meaningful context regarding O.V's samples was provided.

118. Witnesses for Petitioners confirmed that Pinewoods does not provide the related services, such as speech therapy and occupational therapy, that O.V. received from the [DPS]. Instead, Petitioners have contracted a private occupational therapist to visit O.V. at Pinewoods once a week. O.V.'s teachers work with his private therapist to provide necessary modifications or accommodations. (Tr. Vol. VI, 912, 913, 924-925, 1110, 1113)

119. Both of Petitioners' experts conducted observations of O.V. in the Pinewoods setting. It is notable, however, that both observations took place during the one time each week when O.V.'s private occupational therapist was working with O.V. individually in the classroom. (Tr. Vol. VI, 1022; Tr. Vol. VII, 1105)

132

120. Based on an Order from the [ALJ], Dr. Bell and Dr. Kurth conducted a joint observation of O.V. on April 20, 2016, more than five months after O.V. had transferred to Pinewoods. Dr. Bell's contemporaneous observation notes identified significant concerns regarding the Pinewoods program, including that O.V. appeared to have a workspace separate from his classmates where he spent most of his time in the classroom. Dr. Bell thought that the little peer interaction O.V. had, seemed contrived by the teaching assistant, and the other students did not treat O.V. as a peer. She observed O.V. spend over an hour coloring by himself. O.V.'s teacher did little direct instruction with O.V., and was unable to get much work out of him when she did work with him. (R.12 at 1-9)

121. On rebuttal, Dr. Kurth disagreed with Dr. Bell's interpretation of the events, though the underlying facts were not in dispute. (Tr. Vol. XIV, 2543-44). Dr. Kurth did not provide any written summary of her April 20, 2016th observations at hearing.

122. Based on the evidence presented regarding the Pinewoods program, it is noteworthy that the issues Petitioners complained about regarding Respondent's program were even more present at Pinewoods. While Petitioners criticized Respondent's progress monitoring data, Pinewoods provided no data at all. While Petitioners criticized Respondent's individual education plan and lesson plans for O.V., no written plan was presented from Pinewoods other than general testimony that such plans existed. While Petitioners criticized Respondent's teachers' training, there is no evidence that the Pinewoods instructor had any experience or training at all in working with students with disabilities, let alone students with challenges as substantial as O.V.'s. While Petitioners criticized the number of redirections provided by Respondent's staff, Dr. Bell counted much higher rates of verbal redirection by the Pinewoods teacher during her observation in April 2016. (R.12 at 6).[55]

_____

55 During Ms. Palacioz's work with O.V., Dr. Bell conducted two "samples of the prompting and actually timed it" (Docket Entry 101-10 at 86). Per Dr. Bell, Ms. Palacioz prompted O.V. six times in the initial one minute timed sample and eight times in the
(continued...)

123. Based on the few work samples provided from Pinewoods, O.V. continued working on the same skills he had been working on when he left DPS, including counting, single-digit addition, copying short words from models, cut-and-paste activities, and basic vocabulary. (P.89 at 1170-1795). Further, Pinewoods had already deemed O.V. unready to move on to the next grade level (Tr. Vol. VI, 954), which calls into question Petitioners' assertion that O.V. made academic or functional progress at Pinewoods.

124. Other than Petitioners' witnesses' general testimony regarding O.V.'s progress, there is little to no evidence that O.V. benefitted from, or made progress in the Pinewoods program. Records and testimony established that O.V. requires substantial individual support, direct instruction, and repetition of skills in a structured environment. By nature, a Montessori program is relatively unstructured, generally self-paced, and self-determined by the student. There was no evidence establishing that O.V.'s teacher had any specific training regarding how to work with him. The scant evidence of O.V.'s teacher's direct instruction of O.V. showed insufficient time spent instructing O.V., ineffective techniques, and a lack of meaningful assignments.

(Docket Entry 17-1, Findings ¶¶ 109-24 (certain brackets in original).) The ALJ then concluded:

50. The appropriateness of a unilateral private placement is a subsequent consideration that requires the Petitioners to first establish that the program offered by the Respondent was legally insufficient. *M.S. ex rel. Simchick v. Fairfax Cty. Sch. Bd.*, 553 F.3d 315, 324 (4th Cir. 2009). Based on Conclusions of Law 1-48, Petitioners have failed to make this threshold showing, and therefore, the [ALJ] need not address the issue of private placement.

51. Nevertheless, because th[e ALJ] received evidence regarding the issue of the private placement, and made factual Findings of Fact related thereto, the

---

55(...continued)
latter one minute timed sample. (Id. at 86-87.)

[ALJ] will make provisional Conclusions of Law regarding this issue.

   52. For reimbursement to be available, Petitioners must prove that their unilateral private placement is appropriate to meet the student's needs. *See M.S. ex rel. Simchick v. Fairfax Cty. Sch. Bd.*, 553 F.3d 315, 324 (4th Cir. 2009).

   53. Based on Findings of Fact 99-107 [sic] and other evidence in the record, Petitioners have failed to present substantial evidence that the Pinewoods Montessori program was appropriate to meet O.V.'s unique needs. Petitioners presented no educational plans from Pinewoods, and no progress monitoring data from Pinewoods. Petitioners did not call O.V.'s teacher at Pinewoods, who would be in the best position to speak to his abilities and progress or lack thereof, to testify. With only general testimony from the Head of Pinewoods, and conflicting expert testimony about observations totaling only a few hours of O.V.'s entire academic year to rely on, the [ALJ] cannot conclude that Petitioners have met their burden on this issue.

   54. The lack of related services provided at Pinewoods Montessori contributes to its inappropriateness. O.V. received weekly occupational therapy, monthly physical therapy, and speech therapy 2-3 times per week in the [DPS]. Petitioners' own expert, Dr. Orlando, recommended daily speech therapy for O.V. Yet at Pinewoods, O.V. received occupational therapy once a week and speech therapy once a month.

   55. To the extent that a decision on this issue is required, the [ALJ] concludes that the private placement at Pinewoods Montessori was not an appropriate placement for O.V.

(Id., Conclusions ¶¶ 50-55.)

In turn, the SRO found:

   217. The burden of proof to show that Petitioners' private-school placement is appropriate rests with Petitioner. *See Schaffer v. Weast*, 546 U.S. 49, 62 (2005).

135

218. The IDEA provides that a school district may be required to retroactively fund private-school tuition for a child with a disability if (1) the district failed to offer FAPE and (2) the private-school program obtained by the parent was appropriate. [20] U.S.C. § 1412(a)(10)(C).

219. Petitioners satisfied their burden of proof that Respondent failed to offer FAPE in O.V.'s May 2015 IEP, but the record is equally divided on whether his private-school placement at Pinewoods Montessori was appropriate. ·

220. Petitioners['] experts and Respondent's expert, Dr. Bell, observed O.V. in his private-school placement.

221. These experts had quite polar views of the adequacy of this placement.

222. O.V.'s teacher in this setting did not testify, although the Head of School who had been in O.V.'s classroom there, did.

(Docket Entry 17-2, ¶¶ 217-22 (footnote omitted).)[56] She thereafter concluded:

53. Retroactive tuition reimbursement is available to families of children with disabilities when (1) the district failed to offer FAPE to the child and (2) the private-school program obtained by the parent was appropriate. [20] U.S.C. § 1412(a)(10)(C).

54. Petitioners satisfied their burden to establish that Respondent failed to offer FAPE in O.V.'s May 2015 IEP. But the record is equally divided on whether O.V.'s private-school placement is appropriate.

55. With equally divided testimony in the record, and the burden of proof on the Petitioners, the [SRO] concludes that the ALJ's decision in favor of Respondent

_____

56 In another portion of her decision, the SRO also found that "O.V.'s current private placement where he is fully included in a regular classroom," namely Pinewoods, "successfully implemented" one of Dr. Kurth's examples for modifying O.V.'s math curriculum. (Docket Entry 17-2, Findings ¶ 169.)

136

on this issue is adequately supported by an independent review of the entire record.

(Docket Entry 17-2, Conclusions ¶¶ 53-55.)

### iii. Analysis

"A district court has the power to 'grant such relief as [it] determines is appropriate,' 20 U.S.C.A. § 1415(i)(2)(C)(iii), in light of a school system's failure to provide educational benefit to a disabled student. This language confers 'broad discretion' on the court in fashioning an appropriate remedy." M.S., 553 F.3d at 325 (brackets in original) (citing, inter alia, Draper v. Atlanta Indep. Sch. Sys., 518 F.3d 1275, 1283-90 (11th Cir. 2008)). As such, a "district court [i]s free to fashion appropriate relief for [a student] regardless of the options offered in the discussion of [an] administrative law judge." Draper, 518 F.3d at 1285.

Further, under the IDEA, when a state "fails to provide a FAPE, [a] child's parent[s] may remove the child to a private school and then seek tuition reimbursement from the state." Lawson, 354 F.3d at 320. "The parent may recover if (1) the proposed IEP was inadequate to offer the child a FAPE and (2) the private education services obtained by the parents were appropriate to the child's needs." Id. "A parental placement is appropriate if the placement is 'reasonably calculated to enable the child to receive educational benefits,' or stated somewhat differently, if 'the private education services obtained by the parents were appropriate to the child's needs.'" Sumter Cnty., 642 F.3d at 488

137

(citation omitted).  Further, "[t]o qualify for reimbursement under the IDEA, parents need not show that a private placement furnishes every special service necessary to maximize their child's potential."  Frank G. v. Board of Educ. of Hyde Park, 459 F.3d 356, 365 (2d Cir. 2006); see also id. ("'The test for parents' private placement is not perfection.'").

A preponderance of the evidence standard applies to the question of a placement's appropriateness.  See 20 U.S.C. § 1415(i)(2)(C)(iii).  In evaluating the appropriateness of a private placement, the Court should consider, inter alia, the restrictiveness of the placement, see, e.g., Sumter Cnty., 642 F.3d at 488, as well as the child's actual progress at the private placement, see M.S., 553 F.3d at 327.  Finally, just "because a given educational placement is allegedly more appropriate than another, it does not follow that the less appropriate program is not 'appropriate' within the meaning of the [IDEA]."  Hessler by Britt v. State Bd. of Educ. of Md., 700 F.2d 134, 139 (4th Cir. 1983).

Plaintiffs contend that "[t]he ALJ applied the wrong legal standard in determining O.V.'s private school placement was inappropriate."  (Docket Entry 113 at 18.)  In particular, Plaintiffs assert that the ALJ erroneously "focused on how the program at Pinewoods compared to the program in the DPS" (id.) and "relie[d] on unsubstantiated assumptions about [Pinewoods's]

138

methodology" (id. at 17 (citing L.H. v. Hamilton Cnty. Dep't of Educ., 900 F.3d 779, 797-798 (6th Cir. 2018))). According to Plaintiffs, "[t]he evidence in the record is clear that O.V.'s educational program at Pinewoods provided full inclusion and was reasonably calculated to enable [him] to receive educational benefits," rendering it an appropriate placement. (Id. at 21.)

The Durham Board responds that "the issue was not the standard or the Montessori program, or even a comparison between the DPS program and Pinewoods, but rather [] Plaintiffs' failure to put on sufficient evidence — no educational plans, no progress monitoring data, and no testimony from anyone teaching O.V. core academic content." (Docket Entry 116 at 13.) According to the Durham Board, the "L.H. decision is irrelevant to this case" (id. at 7 (capitalization and underlining omitted)). In the Durham Board's view, had the ALJ's finding "that 'a Montessori program is relatively unstructured, generally self-paced, and self-determined by the student' . . . been the sole reason for the ALJ's decision, Plaintiffs' concern would be fair." (Id. at 7-8.) However, per the Durham Board, "[t]he problem was not the Montessori program itself, it was the lack of evidence presented by Plaintiffs" (id. at 8), a determination "clarified in Conclusion 53," when the ALJ stated:

> Petitioners presented no educational plans from
> Pinewoods, and no progress monitoring data from
> Pinewoods. Petitioners did not call O.V.'s teacher at
> Pinewoods . . . With only general testimony from the Head

139

of Pinewoods, and conflicting expert testimony about observations totaling only a few hours of O.V.'s entire academic year to rely on, the undersigned cannot conclude that Petitioners have met their burden on this issue.

(Id. (ellipsis in original) (internal quotation marks omitted) (quoting Docket Entry 17-1, Conclusions ¶ 53).)

Like this matter, the referenced case involved a student with Down Syndrome whose parents transferred him to a Montessori school ("TMS") beginning in the third grade after a dispute arose between his parents and public school officials regarding the officials' plan to remove him from inclusive education for his core academics. See L.H., 900 F.3d at 784-88. As relevant here, that decision states:

> [T]he district court found that the public school placement at Red Bank CDC violated the IDEA, but denied the parents reimbursement for the move to private school at TMS because it found TMS inappropriate under the IDEA. Despite finding that "L.H. has made some academic progress at TMS[,] . . . appears to be doing well behaviorally and socially, and the setting is certainly less restrictive than the CDC placement proposed by [the school district,] HCDE," the court rejected TMS because "the Montessori instructional approach is not sufficiently structured for L.H.'s individualized needs." Specifically, the court held that "L.H. needs systematic, intensive instruction on a number of 'building-block' skills [that] the Montessori instructional approach is not designed to provide."
>
> The court supported this conclusion with testimony from six HCDE teachers, staff, or experts: . . . . Each of these interested witnesses opined that TMS was inappropriate because the Montessori approach does not have a "systematic structure," see id. at *25 (citing as "undisputed fact that TMS offers little in the way of systematic instruction"), and L.H. needed a systematic, structured learning environment, in order to work on basic building-block skills, through frequent repetition,

140

intense one-on-one instruction, and repeated prompting and reinforcement.

Whether or not the Montessori approach is as "structured" in its own way as the public school approach (i.e., the Red Bank CDC) is in its way, the record is clear that L.H. had a personalized curriculum at TMS and a paraprofessional aide dedicated just to him, such that he was working at his own pace with frequent repetition, intense one-on-one instruction, and repeated prompting and reinforcement. The district court relied on HCDE's claims that the Montessori approach fails to provide this ambiguous "systematic structure"; those claims appear both overblown and unreliable. In fact, the parents' expert, Dr. Whitbread, testified that the Montessori approach is "a curriculum that is well-suited for children with Down syndrome in many respects," and good for L.H. in particular. The court appears to have rejected TMS, at least in part (though a critical reading reveals it to be much more than merely in part) because the court rejects the Montessori approach in general. Under such a view, no Montessori school is qualified to teach a student with Down Syndrome. That cannot be.

Regarding an individual evaluation of L.H. during his schooling at TMS, the district court recognized that he was mainstreamed all the time at TMS and was benefiting from it, but emphasized that the benefits of mainstreaming alone are not sufficient. . . .

. . . . [T]he district court relied on its credibility assessments and HCDE's contrary views of L.H.'s progress at TMS to discount TMS's evidence that L.H. had made appropriate academic progress. But the court did not discuss L.H.'s parents' views about L.H.'s progress at TMS or their overall satisfaction with it.

*****

We conclude that the educational program at TMS satisfied the IDEA and, therefore, L.H.'s parents were entitled to reimbursement. The district court erred in holding otherwise.

141

L.H., 900 F.3d at 796-99 (footnotes, emphasis, and certain citations omitted) (certain brackets and first ellipsis in original).

As in L.H., the ALJ deemed Pinewoods problematic in part because, "[b]y nature, a Montessori program is relatively unstructured, generally self-paced, and self-determined by the student." (Docket Entry 17-1, Findings ¶ 124.) She further faulted Plaintiffs for failing to produce information that Montessori schools do not possess. (Compare id., Conclusions ¶ 53 ("Petitioners presented no educational plans from Pinewoods, and no progress monitoring data from Pinewoods."), with Docket Entry 101-6 at 26, 67, 90, 93-94 (explaining that Montessori teachers create daily works plans for students that function as "a record of th[e] student's progress" (id. at 93) and that overarching Montessori "curriculum in and of itself" serves as "a long-term written plan" for each child's education (id. at 90), as well as that, "trained to note observations of children" (id. at 67), Montessori teachers monitor children's progress through their daily works and mastery of concepts rather than "creat[ing] data sheets" (id.) to record progress monitoring data).)

Moreover, the ALJ erroneously evaluated Pinewoods through a public school lens, misconstruing the evidence in the process. In particular, the ALJ stated that "[Ms. Sewell] explained that [Pinewoods] did not believe O.V. was ready to move on to the 4th

142

grade, and that he would be repeating the 3rd grade in the 2016-17 school year." (Docket Entry 17-1, Findings ¶ 115 (citing "Tr. Vol. VI, 954").) She then found that "Pinewoods had already deemed O.V. unready to move on to the next grade level (Tr. Vol. VI, 954), which calls into question Petitioners' assertion that O.V. made academic or functional progress at Pinewoods." (Id., Findings ¶ 123). However, the cited testimony neither states that O.V. "would be repeating the 3rd grade" (id., Findings ¶ 115) nor that he remained "unready to move on to the next grade level" (id., Findings ¶ 123). Rather, the cited testimony reflects that — in accord with every other professional who assessed O.V. — Pinewoods "d[id]n't feel that [O.V.]'s functioning on what is considered by North Carolina standards or the public school standards as third grade level for a typical child." (Docket Entry 101-6 at 65.) In addition, Ms. Sewell did not indicate that O.V. would not be advancing in his educational pursuits for the following school year; rather, she testified that Pinewoods had determined that O.V. should not transition to the upper elementary classroom for the next school year, as it did not "feel that it's best for him socially, emotionally, or academically." (Id. at 74-75.)[57] It remains undisputed that O.V. entered Pinewoods operating, at best, at a kindergarten level. Accordingly, the lower elementary

_____

57     In this regard, it bears noting that the relevant transcript contains no mention of the fourth grade. (See Docket Entry 101-6.)

143

classroom provided ample room for O.V.'s academic advancement (see, e.g., Docket Entry 37-22 at 2-5 (Dr. Bell's notes describing other students' academic activities within lower elementary classroom during joint observation)) without necessitating the transition of a child functioning mentally and physically "significantly below . . . his same aged peer group" (Docket Entry 37-11 at 2; see id. at 2-3) into a classroom containing the oldest and most academically advanced students at Pinewoods. In any event, DPS determined that O.V. made sufficient progress in his year at Pinewoods to advance to the fourth grade for the following school year. (See Docket Entry 105-1 at 14-15.)

Moreover, both the ALJ and the SRO failed to discuss M.P.'s and P.V.'s testimony regarding O.V.'s progress at Pinewoods. (See Docket Entry 17-1, Findings ¶¶ 109-24, Conclusions ¶¶ 50-55 (containing no discussion of or citation to such testimony); Docket Entry 17-2, Findings ¶¶ 217-23, Conclusions ¶¶ 53-55 (same).) Instead, the ALJ discussed only Ms. Sewell's and the various experts' testimony regarding O.V.'s experience at Pinewoods before concluding:

> Petitioners did not call O.V.'s teacher at Pinewoods, who would be in the best position to speak to his abilities and progress or lack thereof, to testify. With only general testimony from the Head of Pinewoods, and conflicting expert testimony about observations totaling only a few hours of O.V.'s entire academic year to rely on, the [ALJ] cannot conclude that Petitioners have met their burden on this issue.

144

(Docket Entry 17-1, Conclusions ¶ 53.)  The SRO similarly mentioned only the testimony from the experts and Ms. Sewell (see Docket Entry 17-2, Findings ¶¶ 217-23 (noting that "[t]he[] experts had quite polar [opposite] views of the adequacy of th[e] placement" (id., Findings ¶ 221))) before stating:

> With equally divided testimony in the record, and the burden of proof on the Petitioners, the [SRO] concludes that the ALJ's decision in favor of Respondent on this issue is adequately supported by an independent review of the entire record.

(Id., Conclusions ¶ 55.)

The ALJ and SRO erred by "not discuss[ing O.V.]'s parents' views about [O.V.]'s progress at [Pinewoods] or their overall satisfaction with it." L.H., 900 F.3d at 798.  This failure significantly undercuts the ALJ's and SRO's resulting determination that Plaintiffs failed to establish the appropriateness of Pinewoods, a question determined on a preponderance of the evidence standard.  (See Docket Entry 17-1, Conclusions ¶ 53; Docket Entry 17-2, Conclusions ¶ 55.)  The Fourth Circuit has made clear that parental testimony, even if "not very extensive, and . . . short on details and specifics," can suffice to establish a placement's appropriateness.  Sumter Cnty., 642 F.3d at 489.

Sumter Cnty. involved the removal of an autistic child to a home placement after the school district failed to provide required applied behavioral analysis (the "ABA") therapy, see id. at 481-82, with the school district contending on appeal both that the home

145

placement did not satisfy the LRE requirement and that "the parents failed to present sufficient evidence that the home placement was reasonably calculated to provide an educational benefit to [the child]," id. at 487. As explained by the dissenting judge, in that case

> the only evidence provided as to the design of the educational program provided for T.H. at home was the testimony of his mother, May Baird. Baird testified that she had hired Laura Walkup, "a young woman who has experience working in an ABA program," to work with T.H. during the school week. When pressed on cross-examination, she admitted that she was unsure how many hours Walkup worked with T.H. during a given week, stating that her husband "would be a better one to answer that." Indeed, Baird indicated throughout her testimony that she was "not the best one to answer" questions regarding the details of the services provided to T.H. because she is "often not home." However, Baird was able to approximate that Walkup worked with T.H. for "20 to 30 hours" per week.
>
> Notably, Baird failed to elaborate on the details of the educational services provided by Walkup. Problematically, she made no mention of the goals of the therapy, indicating merely that Walkup was "working on specific objectives." This lack of specificity stands in stark contrast to the IEPs developed for T.H., which include pages of detailed educational objectives related to, *inter alia*, his "socialization skills," "classroom work skills," "general knowledge and comprehension skills," "daily living skills," and "functional communication skills." Moreover, Baird provided no testimony regarding how the program was designed to measure progress toward the unidentified "specific objectives," or how much progress was required to demonstrate accomplishment of said objectives. In short, given that the Court is asked to consider whether the program designed for T.H. would meet his "unique needs," without more clarification of the contents of the program, I cannot answer that question affirmatively.
>
> In addition, Baird made no mention of the services other than ABA therapy, if any, that were provided for

146

T.H. at home. As noted by the School District, there was "no evidence that speech-language therapy or occupational therapy, two related services included in the school IEP as supportive services . . . were provided in the home program." To be sure, given T.H.'s autism, properly administered ABA therapy was a necessary component of any plan reasonably calculated to confer on him an educational benefit. But the ill-defined nature of that therapy counsels us to remand this matter to the district court for the fact-finding necessary to determine whether its provision was sufficient to demonstrate the appropriateness of home-placement.

That said, the evidence concerning therapy was not the only evidence offered concerning the program in place to educate T.H. at home. Baird also testified about opportunities provided for T.H. to socialize. Presumably, this testimony was given in an attempt to demonstrate compliance with the [LRE] requirement. But, even under an appropriately relaxed restrictiveness inquiry, there was insufficient evidence to demonstrate that the home-placement program would provide T.H. with adequate opportunities to interact with children who are not disabled. This point is acknowledged, in part, by the majority opinion which states that "more detailed evidence of the nature of the community outings and the manner in which the parents were using the outings to improve T.H.'s social skills would have been preferable."

Indeed, scant evidence was provided regarding opportunities for T.H. to interact with non-disabled children. Baird testified that the therapist hired to work with T.H. "fairly regularly" took him "for social opportunities on playgrounds and stuff around locally." She also indicated that T.H.'s father took the child into the community "on a daily basis." However, Baird, who was not present during these outings, was unable to testify as to their duration. Also, her testimony is unclear regarding the frequency with which T.H. interacted with non-disabled children during these trips into the community. If undefined periods of socialization with other children, regardless of whether or not they are disabled, are sufficient to satisfy the "[LRE] requirement," that requirement is rendered a nullity.

In sum, where there was insufficient evidence as to how the plan designed to educate a child at home is

147

calculated to actually provide an educational benefit, it was error for the district court to say that the "calculation" was reasonable. Accordingly, this matter should be remanded so that the district court can further examine the contents and structure of the plan proposed during home-placement. Without more evidence explaining the contents of the plan, a conclusion regarding its adequacy cannot be drawn absent considerable speculation.

Id., at 490–92 (Wynn, J., concurring and dissenting) (footnotes and citation omitted) (ellipsis in original).

Notwithstanding the identified deficiencies, the panel majority found that "the evidence established that T.H. was receiving intensive ABA therapy, the kind of therapy that the District through its IEPs had concluded was necessary to provide T.H. with an appropriate education, and that T.H. was responding well to the program. Under these circumstances, . . . the evidence was sufficient, if barely, to support the district court's conclusion." Id. at 489 (majority opinion); see also id. at 488 ("T.H.'s mother, herself board-certified in ABA therapy, testified that T.H. was receiving approximately 30 hours per week of ABA services provided by an experienced ABA line therapist; that the parents and the ABA therapist made sure T.H. had sufficient opportunities to interact with other children; and that T.H. was progressing both educationally and behaviorally under the home program, in that he was happier, learning more, and was no longer engaging in the problematic behaviors like wiping his face until it bled.").

148

Here, P.V. and M.P. testified specifically regarding O.V.'s progress at Pinewoods. For instance, P.V. testified that, as of mid-March 2016 (see Docket Entry 101-4 at 1), O.V.'s mathematic skills had increased, such that he could "add single digit numbers without help," as well as simple two-digit numbers, and had "start[ed] to get the idea of what multiplication is, which is based on a foundation of addition" (id. at 10). P.V. further testified that O.V.'s reading had improved, such that he could independently read books (such as "*Hop on Pop* or *Go, Dog, Go*" (id. at 8)) that he had read before and could read and understand at least words with which he possessed familiarity in new books. (See id. at 7-9.) Similarly, his writing had improved to the point that he could "cop[y] words that[ are] being shown" as well as write "verbally dictated" words, at least for short "three, four letter[] words that he would be familiar with" (id. at 12), and could both write dictated sentences as well as, "without copying or being dictated, . . . write a sentence" (id.). P.V. further testified that O.V. remained enthused and engaged at Pinewoods, where he received more challenging work than at Hillandale, and where he was "developing his speech pattern, and that's improving" (id. at 15). (See id. at 16-17.)

M.P. likewise testified to O.V.'s progress, as of mid-March 2016, at Pinewoods. For example, according to M.P., O.V. had begun learning geometry, i.e., both how to make models of and write the

149

name for various shapes, such as squares, pentagons, and hexagons. (See id. at 144.)  Per M.P.'s testimony, O.V. also now knew of "the seven [continents] on the map, where Asia is supposed to be, where Africa is supposed to be.  And he can visualize that and draw it by using a stencil on his own and then write the word down and color them."  (Id. at 145.)  M.P. further testified that O.V. received instruction on spelling and memorizing words through spelling. (See id.)  In addition, O.V. reportedly engaged with the other students in his class and had even been "invited to his first birthday party."  (Id. at 146.)  According to M.P., O.V. also had improved his reading ability, such that, "[i]f you rewrite a story with all the sight words he knows, he can read independently" (id. at 150), as well as that he tried to sound out words he did not know in unfamiliar books (id. at 152; accord id. at 8-9 (P.V. testifying that O.V. "[i]s starting to get [the] concept of breaking down the words and understanding how to say the syllable[s]").)  M.P. similarly testified that O.V. can "add single digit numbers without assistance" and had begun learning two-digit addition (id. at 153-54), as well as multiplication, providing "3 times 5" as an example of the "type of [multiplication] problem [M.P.] giv[es] him" (id. at 152; see also id. at 153).  Finally, M.P. expressed her belief that O.V. could count to 100 without assistance (id. at 153), and confirmed that O.V. can both "write his last name without assistance" (id. at 154) and can copy a

150

sentence, write a dictated sentence, and can, with context, write a sentence without someone "telling him what to write" (id. at 155).

Considering the entire record, Plaintiffs have met their burden of proving by a preponderance of the evidence that Pinewoods constitutes an appropriate placement for O.V. See Sumter Cnty., 642 F.3d at 485 (recognizing that court can weigh factors differently and reach different conclusions than ALJ); Doyle, 953 F.2d at 105 ("After giving the administrative fact-findings such due weight, if any, the district court then is free to decide the case on the preponderance of the evidence, as required by the statute."); see also L.H., 900 F.3d at 798-99 (concluding that private placement satisfied standard where "[the student] has made some academic progress at [the private school,] . . . appears to be doing well behaviorally and socially, and the setting is certainly less restrictive than the [public school's proposed] placement" (emphasis added) (internal quotation marks omitted) (ellipsis in original)). Pinewoods provides the type of inclusive, hands-on educational environment that motivates O.V. to engage in his academic studies. (See, e.g., Docket Entry 37-6 at 5 ("[O.V.] demonstrates increased engagement when participating in hands on skill based activities that involve drawing, coloring, cutting, assembling, matching, etc. He participates well in small group activities, and is motivated to want to do the same activity as his

151

peers.").)  Pinewoods also permits O.V. to decide the order of his
academic tasks, an effective strategy for him (see, e.g., Docket
Entry 101-12 at 136 (Ms. Allen testifying that she provided O.V.
"[a] choice like of all the things [she] want[ed] him to do, [she]
let him choose what he wanted to do first and then second until he
had completed whatever he had to do")), and lets him work at his
own pace, in recognition of his need for "[e]xtended time" in
completing his assignments (Docket Entry 37-8 at 19).  Moreover,
Pinewoods provides aids, such as the manipulatives, visual
schedule, and timer, to help him work independently, in accordance
with his May 2015 IEP goals (see id. at 15; see also Docket Entry
37-10 at 3 (explaining, in May 2015 Meeting Minutes, that O.V.'s
"goals are about weaning to get him to be more independent")).
(See, e.g., Docket Entry 37-6 at 5 (observing that O.V. "typically
is motivated to participate in hands on activities that involve
assembly crafts (cut, glue, color, etc.), and more readily begins
working"); Docket Entry 101-6 at 22-23 (describing O.V. using
polygon cards to successfully create a pentagon); (Docket Entry
105-1 at 13 (adding manipulatives as supplemental aids in "each
area of the curriculum" in June 2016 IEP).)

The record further reflects that O.V. improved in his ability
to work independently at Pinewoods.  (See Docket Entry 101-6 at 58
(Ms. Sewell explaining that O.V. "is able to complete tasks
independently now" and does not "require[ that] someone sit next to

152

him to get his task completed or to stay on task"); see also id. at 84 (explaining that, when O.V. started at Pinewoods, his teacher would have to sit with him "to make sure that he followed through on his assignment[,] . . . . [b]ut now she is able to present the lesson and usually walk away and allow him to finish his work independently and can come back just to check his work").)  It also indicates that O.V. had improved his speech at Pinewoods.  (See, e.g., Docket Entry 101-4 at 15 (P.V. testifying that Pinewoods was "developing [O.V.'s] speech patterns, and that's improving").)[58] In addition, he had begun participating in music at Pinewoods (compare Docket Entry 37-10 at 2-3 (indicating that O.V. did not participate in music at Hillandale because "he doesn't appear to

_____

    58   As the ALJ noted, O.V. receives speech therapy less frequently at Pinewoods than at Hillandale.  (See Docket Entry 17-1, Conclusions ¶ 54.)  However, unlike in Sumter Cnty., the record reveals that O.V. at least received speech therapy at his private placement.  See Sumter Cnty., 642 F.3d at 491 (dissenting opinion) (explaining that "there was no evidence that speech-language therapy or occupational therapy, two related services included in the school IEP as supportive services . . . were provided in the home program" (internal quotation marks omitted)).  Moreover, the record reflects that the inclusive environment at Pinewoods provided "appropriate models for language, behavior, and engagement in social and academic skills [that wa]s beneficial" to O.V.'s "communication progress."   (Docket Entry 101-6 at 113.) Accordingly, the decreased frequency of his speech services does not prevent Pinewoods from qualifying as an appropriate placement. See Sumter Cnty., 642 F.3d at 489 (majority opinion) (affirming appropriateness of private placement); see also Frank G., 459 F.3d at 365 (explaining that, "'[t]he test for parents' private placement is not perfection,'" and that, "[t]o qualify for reimbursement under the IDEA, parents need not show that a private placement furnishes every special service necessary to maximize their child's potential").

like it and puts his hands over his ears," but "the team would like to get him to go and participate in music next school year"), with Docket Entry 101-6 at 79-80 (explaining that, during his first music class at Pinewoods, O.V. placed his hands over his ears for "one of the samples [the teacher] played" (id. at 79), but subsequently began happily participating in music, including "playing along with the glockenspiel with the other students" (id. at 80)).) O.V. also appears to have increased his enjoyment of writing while at Pinewoods. (Compare Docket Entry 105-1 at 12 (indicating that O.V. did not want to stop writing to go outside at Pinewoods), with Docket Entry 37-3 at 1 (indicating that "writing is a non-preferred task, therefore the adult must put the pencil in his hand and redirect from 5-10 times before he follows the adult direction").)

In addition, O.V.'s academic and functional skills improved at Pinewoods. For instance, he began sounding out words, a new skill. (Compare Docket Entry 37-3 at 8 (noting that O.V. "is not sounding out and blending word family words"), and Docket Entry 107-8 at 35 (observing O.V. "cannot sound out a sentence by himself"), and Docket Entry 37-8 at 13 ("[I]n the separate setting, [O.V.] is not able to identify individual sounds (first, medial and final) within CVC patterned words. Although [O.V.] has increased his letter sound knowledge, he continues to exhibit difficulty with blending sounds to read words. Based on teacher observation, if [O.V.]

154

knows a word he is able to read the whole word instead of identifying individual phonemes."), <u>with, e.g.,</u> Docket Entry 101-4 at 152 (indicating that, when O.V. reads an unfamiliar book, he tries to sound out unfamiliar words), <u>and</u> Docket Entry 105-1 at 8 (establishing, for 2016-2017 school year, reading goal "based on decoding/word attack" that focuses on consonant blends).) He also increased his sight word vocabulary, including such words as "Frankenstein" (Docket Entry 105-1 at 8), and began spelling words and writing dictated words (<u>see, e.g.,</u> Docket Entry 101-4 at 145 (describing example of how O.V. learned spelling and word memorization at Pinewoods); Docket Entry 101-6 at 83 (explaining that, in his first months at Pinewoods, O.V. progressed from "working with a lot of sounds and isolations of beginning consonant sounds at the beginnings of words" to "spelling words" and even writing down some words his teacher dictates).) O.V. also developed his ability to write dictated sentences, as well as, "without copying or being dictated, . . . [to] write a sentence." (Docket Entry 101-4 at 12.)

O.V. also improved his performance in mathematics. For instance, he learned basic elements of geometry, progressed from single-digit to double-digit addition, started learning multiplications, and improved his ability to count to 100 independently. (<u>Compare, e.g.,</u> Docket Entry 101-6 at 83, <u>and</u> Docket Entry 101-4 at 10, 144-45, 152-54, <u>with</u> Docket Entry 37-8 at

155

21 (reflecting that at Hillandale, O.V. "[wa]s able to count to 19").) He also began exploring geography. (See Docket Entry 101-4 at 145.) In addition, he learned to write his last name without assistance (id. at 154), to say his birthdate (see Docket Entry 105-1 at 12), and to understand and tell time (see id. at 10). Finally, he remained happy and engaged with his schoolwork, teachers, and classmates at Pinewoods. (See, e.g., Docket Entry 101-4 at 16, 146; Docket Entry 101-6 at 75, 96.)

In sum, the Court finds that Plaintiffs proved by a preponderance that Pinewoods "is reasonably calculated to enable [O.V.] to receive educational benefits," Sumter Cnty., 642 F.3d at 488 (internal quotation marks omitted), rendering it O.V.'s "stay put" placement until the Durham Board establishes that it can provide a FAPE in the LRE, see id. at 487, and making reimbursement appropriate, see id. at 487 n.3.[59] Plaintiffs request reimbursement for the costs and fees associated with O.V.'s education, including certain compensatory services, to date at Pinewoods. (See Docket Entry 112 at 1-2; Docket Entry 113 at 22.) Although the Durham Board criticizes the ALJ's decision to allow Plaintiffs to pursue reimbursement (see Docket Entry 109 at 26 (asserting that "Plaintiffs did not appropriately include th[e reimbursement] issue in the original Petition and never amended that Petition;

_____

59 This resolution moots Plaintiffs' challenges to the ALJ's and SRO's decisions on remand, which depended on a determination that Pinewoods did not constitute an appropriate placement.

156

therefore, [reimbursement] should have been foreclosed to them from the start")), the Durham Board does not contest the duration of the requested reimbursement, should Pinewoods constitute an appropriate placement. (See Docket Entries 109, 111, 118, 121.) However, the current record does not disclose information regarding O.V.'s educational experiences at Pinewoods for the entire time for which Plaintiffs seek reimbursement. Accordingly, the Court requires more information before it can authorize the reimbursement for the requested period. See, e.g., Florence Cnty. Sch. Dist. Four v. Carter by & through Carter, 510 U.S. 7, 11 (1993) (affirming reimbursement for three years of private education where student made "'significant progress'" during such education); M.S., 553 F.3d at 324 (directing year-by-year examination of private placement). The Court will therefore direct further evidentiary submissions on this issue.

In addition, the Court will require the parties to hold an IEP meeting to develop a new IEP for O.V. that provides a FAPE in the LRE. This meeting should occur as soon as reasonably practicable, taking into account both the duration of O.V.'s absence from the DPS educational system and the current public health situation. In preparation for this IEP meeting, the Durham Board must (1) "[r]equest all available educational information from O.V.'s current educational placement;" (2) "[s]eek input from O.V.'s current teachers and service providers regarding his current

157

academic and functional needs, his present educational setting, and any supplementary aids or services currently being provided to him;" and (3) "[o]ffer to have [O.V.'s current teachers and] any relevant private providers participate in the IEP meeting and make reasonable efforts to schedule the meeting such that desired participants can attend." (Docket Entry 105-1 at 240.) The Durham Board must also "[o]btain the services of, or contract with a mutually agreed upon 'Inclusion Specialist'[60] to assist in the development of an IEP for O.V., and provide assistance to the IEP team and parents for" (id.) the 2021-2022 school year.[61]

---

    60 The SRO Decision on Remand defines an Inclusion Specialist as "[a]n individual who has successful classroom experience including children with intellectual disabilities in the regular classroom environment to the maximum extent possible. Their expertise is based on actual practice in addition to theory. This would exclude academics who do not have extensive K-12 classroom teaching experience." (Id. at 238 n.1.) Neither party challenged this definition on appeal. (See Docket Entry 113 at 22-26; Docket Entry 116 at 16-17; Docket Entry 120 at 9-10.) However, because (1) the parties all relied on experts involved in the education of special education teachers (see, e.g., Docket Entry 101-1 at 45-46 (Dr. Kurth); Docket Entry 111-7, ¶ 2 (Dr. Crossland)) and (2), as discussed below, the Inclusion Specialist must evaluate the training of any DPS general education teacher involved in O.V.'s education, the Court broadens the definition of Inclusion Specialist to encompass academics comparable to Dr. Marilyn Friend, who conducted, at DPS's request, a study, with accompanying recommendations, on its inclusive practices (see Docket Entry 101-1 at 84-88).

    61 The Court finds this duration appropriate given the unusual pandemic-related disruptions of the current school year, which approaches completion, and because the record reflects that, during O.V.'s last full year in DPS schools, DPS teachers unilaterally altered O.V.'s regular education experience "as the year [went] on and the work g[ot] harder," making it more
(continued...)

158

In formulating O.V.'s IEP(s) during this period, the Durham Board must, in good faith, "[g]ive first consideration to educating O.V. in the general education setting, with removal from his non-disabled peers only for the portions of his school day when O.V. cannot be successfully educated in the general education setting with supplementary aids and services." (Id.) In so doing, the IEP Team must carefully consider the Inclusion Specialist's recommendations regarding educating O.V. in the general education setting.

If O.V. enrolls in a DPS school, "the Inclusion Specialist shall [make reasonable efforts to monitor O.V.'s progress and shall] provide information to the IEP team and parents to assist them in further refinement and development of O.V.'s IEP. This could be in the form of a written report and/or in an IEP meeting." (Id. at 239 (internal quotation marks omitted).) Further, "'[i]f,

_____

61(...continued)
"difficult to modify his lessons" (Docket Entry 107-8 at 53). In addition, the Court declines to overturn the ALJ's decisions admitting the deposition testimony that the Durham Board challenges in its response in opposition to Plaintiffs' Administrative Motion (see Docket Entry 116 at 13), particularly given the Durham Board's failure to raise such argument in not only its own challenge to the SRO Decision (see Docket Entries 109, 121), notwithstanding its assertion that it "included [its objection] as a basis for its civil action in this case" (Docket Entry 116 at 13), but also its affirmative reliance on the disputed deposition testimony in support of its summary judgment motion (see Docket Entry 111 at 6 (citing Docket Entry 107-8 (i.e., Turner deposition testimony))). See, e.g., United States v. Al-Hamdi, 356 F.3d 564, 571 n.8 (4th Cir. 2004) ("It is a well settled rule that contentions not raised in the argument section of the opening brief are abandoned.").

159

after development of [a] new IEP, [Plaintiffs] choose to enroll O.V. in a DPS school[, the Durham Board] must identify [any] general education teachers who will teach O.V. core academics, and [the Durham Board, with input from the Inclusion Specialist,[62] must] evaluate their training and experience regarding modification of the general curriculum and classwork for students with intellectual disabilities.  If any lack of training or experience is identified, [the Durham Board] must ensure that O.V.'s teachers receive such training prior to or immediately upon O.V.'s [enrollment in their class]."  (Id. at 240.)

Plaintiffs further request their costs and attorney's fees, "plus pre-judgment interest accrued on their expenditures for privately funding O.V.'s private school program from the date of the expenditures to the date of this Court's decision."  (Docket Entry 112 at 1-2.)  The IDEA authorizes "the [C]ourt, in its discretion, [to] award reasonable attorneys' fees as part of the costs . . . to a prevailing party who is the parent of a child with a disability."  20 U.S.C. § 1415(i)(3)(B)(i)(I).  The Durham Board

---

62  Because DPS failed to train Mr. Montgomery and Ms. Turner on working with students with disabilities, on understanding O.V.'s disabilities, and/or on including O.V. in the regular education classroom (see Docket Entry 107-8 at 41-42, 45, 55-56; Docket Entry 107-14 at 17-18, 25), and rejected M.P.'s offer of a specialist to provide necessary work modifications (see Docket Entry 37-10 at 3), equity requires the Inclusion Specialist's participation in the evaluation of O.V.'s DPS general education teachers' training.  See Burlington, 471 U.S. at 374 (observing that "equitable considerations are relevant in fashioning relief").

160

does not challenge Plaintiffs' entitlement to attorney's fees (see Docket Entry 116), and the Court finds appropriate an award of reasonable attorney's fees to Plaintiffs under 20 U.S.C. § 1415(i)(3)(B)(i)(I). However, the Court defers consideration of the amount of attorney's fees and any prejudgment interest pending resolution of the reimbursement issue.

## II. Summary Judgment Motions

### A. Summary Judgment Standard

"The [C]ourt shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). The movant bears the burden of establishing the absence of such dispute. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

In analyzing a summary judgment motion, the Court "tak[es] the evidence and all reasonable inferences drawn therefrom in the light most favorable to the nonmoving party." Henry v. Purnell, 652 F.3d 524, 531 (4th Cir. 2011) (en banc). In other words, the nonmoving "party is entitled 'to have the credibility of his evidence as forecast assumed, his version of all that is in dispute accepted, [and] all internal conflicts in it resolved favorably to him.'"

161

<u>Miller v. Leathers</u>, 913 F.2d 1085, 1087 (4th Cir. 1990) (en banc) (brackets in original) (quoting <u>Charbonnages de France v. Smith</u>, 597 F.2d 406, 414 (4th Cir. 1979)).  If, applying this standard, the Court "find[s] that a reasonable jury could return a verdict for [the nonmoving party], then a genuine factual dispute exists and summary judgment is improper."  <u>Evans v. Technologies Applications & Serv. Co.</u>, 80 F.3d 954, 959 (4th Cir. 1996).

However, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."  <u>Anderson</u>, 477 U.S. at 248.  Moreover, "the non-moving party may not rely on beliefs, conjecture, speculation, or conclusory allegations to defeat a motion for summary judgment."  <u>Lewis v. Eagleton</u>, No. 4:08cv2800, 2010 WL 755636, at *5 (D.S.C. Feb. 26, 2010) (citing <u>Baber v. Hospital Corp. of Am.</u>, 977 F.2d 872, 874-75 (4th Cir. 1992)), <u>aff'd</u>, 404 F. App'x 740 (4th Cir. 2010); <u>see also</u> <u>Pronin v. Johnson</u>, 628 F. App'x 160, 161 (4th Cir. 2015) (explaining that "[m]ere conclusory allegations and bare denials" or the nonmoving party's "self-serving allegations unsupported by any corroborating evidence" cannot defeat summary judgment).  Finally, factual allegations in a complaint or court filing constitute evidence for summary judgment purposes only if sworn or otherwise made under penalty of perjury.  <u>See</u> <u>Reeves v. Hubbard</u>, No. 1:08cv721, 2011 WL

162

4499099, at *5 n.14 (M.D.N.C. Sept. 27, 2011), <u>recommendation</u> <u>adopted</u>, slip op. (M.D.N.C. Nov. 21, 2011).

## **B. Section 504 & ADA Claims**

### **i. Initial Matters**

Plaintiffs attempt to raise a claim under "Title II of the ADA's effective communication regulation" (Docket Entry 115 at 20 (emphasis omitted)) in their brief in support of Plaintiffs' Summary Judgment Motion. (See <u>id.</u> at 20-22.) As the Durham Board contends (<u>see</u> Docket Entry 118 at 1-2), Plaintiffs failed to raise this claim in their Amended Complaint, where they focused their ADA claim on the Durham Board's "segregation" of O.V. into the special education classroom (<u>see</u> Docket Entry 36, ¶¶ 380-83). Nowhere in their ninety-page Amended Complaint, which quotes copiously from statutes and regulations, do Plaintiffs mention either the "effective communication regulation" or "28 C.F.R. § 35.160(b)[]" (Docket Entry 115 at 20). (<u>See generally</u> Docket Entry 36.)[63]

The Fourth Circuit has made clear "that a plaintiff may not raise new claims after discovery has begun without amending his complaint." <u>Wahi v. Charleston Area Med. Ctr., Inc.</u>, 562 F.3d 599, 617 (4th Cir. 2009). Moreover, parties cannot use their summary judgment briefing to amend their complaints. See <u>Robinson v.</u>

---

[63] Focused exclusively on the decisions on remand from the administrative hearing, the Supplemental Complaint likewise presents no Title II effective communication claim. (<u>See</u> Docket Entry 45.)

163

<u>Bowser</u>, No. 1:12cv301, 2013 WL 5655434, at *3 (M.D.N.C. Oct. 16, 2013). "In essence, this means that the Court will not allow Plaintiff[s] to raise a new argument at the summary judgment stage, the basis of which was not evident from the [Amended] Complaint." <u>Id.</u> The Court will therefore decline to consider Plaintiffs' effective communication claim.

### ii. Discrimination Claims

Turning to Plaintiffs' original ADA and Section 504 claims, the parties each move for summary judgment. (<u>See</u> Docket Entry 110 at 1; Docket Entry 114 at 1.) In particular, Plaintiffs assert that the Durham Board "knowingly placed O.V. on a trajectory that is contrary to the purposes of Section 504 and the ADA" (Docket Entry 115 at 11 (emphasis omitted)) and displayed both gross misjudgment and bad faith in its treatment of him (<u>id.</u> at 15-19; <u>accord</u> Docket Entry 119 at 11-17). In turn, the Durham Board asserts that most of the conduct upon which Plaintiffs rest their claims occurred outside the relevant time period and the remaining conduct does not amount to bad faith or gross misjudgment. (<u>See, e.g.</u>, Docket Entry 122 at 5 ("Of the examples cited in Plaintiffs' brief[ (Docket Entry 115 at 17-19)], several pre-date the relevant time period here, and the rest are matters of honest dispute between the parties."); <u>see also, e.g.</u>, Docket Entry 118 at 3 ("The [Durham] Board asks that this Court strictly hold Plaintiffs to the relevant time period, and disregard any and all efforts to import

164

into this case matters that fall outside the statute of limitations or were resolved via settlement.").) The Durham Board's contentions possess merit.

Section 504 and Title II of the ADA both prohibit disability-based discrimination against qualified individuals. See 29 U.S.C. § 794(a) ("No otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance . . . ."); 42 U.S.C. § 12132 ("[N]o qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."). Moreover:

> Because the language and purpose of both Acts is substantially the same, the same analysis applies to claims brought under both statutes. To establish a violation of either statute, a plaintiff must prove: (1) that []he has a disability; (2) that []he is otherwise qualified for the benefit or program in question, and (3) that []he was excluded from the benefit or program due to discrimination solely on the basis of the disability.

_Shirey ex rel. Kyger v. City of Alexandria Sch. Bd._, No. 99-1127,
229 F.3d 1143, 2000 WL 1198054, at *4 (4th Cir. 2000) (unpublished)
(citation omitted).[64]

Importantly, these Acts "do[] not create any general tort
liability for educational malpractice." _Barnett v. Fairfax Cnty._
_Sch. Bd._, 721 F. Supp. 755, 756 (E.D. Va. 1989), _aff'd sub nom._
_Barnett by Barnett v. Fairfax Cnty. Sch. Bd._, 927 F.2d 146 (4th
Cir. 1991). Accordingly, "[t]o prove discrimination in the
education context, 'something more than a mere failure to provide
the "free appropriate education" required by [IDEA] must be
shown.'" _Sellers by Sellers v. School Bd. of City of Manassas_, 141
F.3d 524, 529 (4th Cir. 1998) (final set of brackets in original).
More specifically, in "the context of education of handicapped
children," a plaintiff must show "either bad faith or gross
misjudgment" to establish a Section 504 (or ADA) violation. _Id._
(internal quotation marks omitted). Moreover, although "[w]hat
constitutes bad faith or gross misjudgment in this context has not
been well defined," _K.D. ex rel. J.D. v. Starr_, 55 F. Supp. 3d 782,
790 (D. Md. 2014); _see also id._ at 790-91 (collecting and analyzing
cases), "[t]he 'bad faith or gross misjudgment' standard is

---

64 The Durham Board contests only the third element, namely
whether O.V. "was excluded . . . due to discrimination solely on
the basis of [his] disability," _id._ (_See, e.g._, Docket Entry 111
at 13-14 (arguing that Plaintiffs cannot show that any differential
treatment occurred "_solely_ on the basis of disability" (_id._ at 13)
(emphasis in original)).)

166

extremely difficult to meet, especially given the great deference to which local school officials' educational judgments are entitled," Doe v. Arlington Cnty. Sch. Bd., 41 F. Supp. 2d 599, 609 (E.D. Va. 1999), aff'd sub nom. Doe ex rel. Doe v. Arlington Cnty. Sch. Bd., 210 F.3d 361 (4th Cir. 2000). "Such a high bar in this specific context is justified by the delicate role that courts play in reviewing education decisions." K.D., 55 F. Supp. 3d at 789.

Further, as the Fourth Circuit has explained:

> The reference in the Rehabilitation Act to "discrimination" must require[] . . . something more than an incorrect evaluation, or a substantively faulty individualized education plan, in order for liability to exist. Experts often disagree on what the special needs of a handicapped child are, and the educational placement of such children is often necessarily an arguable matter. That a court may, after hearing evidence and argument, come to the conclusion that an incorrect evaluation has been made, and that a different placement must be required under [IDEA], is not necessarily the same thing as a holding that a handicapped child has been discriminated against solely by reason of his or her handicap.

Sellers, 141 F.3d at 529 (certain internal quotation marks omitted) (final set of brackets in original) (rejecting contention that negligence suffices to establish liability under Section 504).

Here, Plaintiffs' ADA and Section 504 claims remain limited to conduct "arising on or after November 26, 2014." (Docket Entry 61 at 1.) However, the vast majority of the conduct upon which Plaintiffs rely for their discrimination claims occurred prior to the relevant period. For instance, Plaintiffs assert that, "[d]espite the defined purposes of Section 504[ and the ADA], [the

167

Durham Board] placed O.V. on a trajectory leading to anything but fulfillment of these goals when he was three (3) years old due to his disability." (Docket Entry 115 at 11-12; <u>see also, e.g.</u>, <u>id.</u> at 12 ("[Durham Board] placed O.V. on this trajectory — when he was three (3) years old — without ever considering another trajectory.").) Plaintiffs further assert that, because, "[f]rom O.V.'s enrollment in DPS, [the Durham Board] discriminated against O.V. by excluding him" from the general education classroom (<u>id.</u> at 14) — and, in so doing, "ignored all available research regarding effective practices for educating students with O.V.'s disabilities, ignored all data on the long-term impact of segregating students with O.V.'s disabilities, and even ignored its own data documenting O.V.'s higher rate of learning in the inclusive setting" (<u>id.</u> at 15) — "O.V. did not develop appropriate academic, social, and communication skills, and has experienced stunted academic, communication, and social growth" (<u>id.</u>). O.V. enrolled as a preschooler in the DPS in 2009 (<u>see, e.g.</u>, Docket Entry 17-2, Findings ¶ 30), but Plaintiffs' Section 504 and ADA claims reach only a few months of O.V.'s second year in second grade (specifically, November 26, 2014, through early June 2015 (<u>see, e.g.</u>, Docket Entry 37-8 at 1; Docket Entry 37-6 at 1)),[65] rendering Plaintiffs' trajectory-based contentions untimely.

_____

65 Plaintiffs raise no claims specific to the few months of third grade that O.V. attended at Hillandale. (<u>See, e.g.</u>, Docket Entry 115 at 1-27 (containing no discussion of third-grade year).)

168

Plaintiffs additionally maintain that the Durham Board acted improperly "[d]uring the 2013-2014 school year" both by placing O.V. "behind a cardboard partition segregated from his classmates at the back of the room" (Docket Entry 115 at 16) and by "not updat[ing] O.V.'s IEP to reflect his more inclusive placement; thereby preventing the inclusive placement from becoming O.V.'s stay-put placement" (Docket Entry 119 at 13; accord Docket Entry 115 at 4). Plaintiffs also take issue with O.V.'s 2013-2014 teachers' alleged lack of training (see, e.g., Docket Entry 115 at 16) and assert that, at a meeting in June 2014 (see Docket Entry 101-4 at 118),[66] "in the presence of Dr. Bell and [the Durham Board's] attorney, [the Durham Board] falsely informed O.V.'s parents that if O.V. took the EXTEND 1 test, he could not be in a general education classroom" (Docket Entry 115 at 18 (footnote omitted) (citing Docket Entry 101-4 at 119)). These events all fall outside the relevant time period.

Plaintiffs next contend that, "[k]nowing they were not co-teaching, [the Durham Board] falsely informed O.V.'s parents that

---

66  Although the meeting minutes do not reflect this discussion (see Docket Entry 106-15), M.P. testified that Ms. Mader stated at the IEP meeting in June 2014 that, "if O.[V.] took the EXTEND 1 test . . . .[,] he could not be in the general education classroom." (Docket Entry 101-4 at 119; see also id. at 118.) Per M.P., neither Dr. Bell nor the Durham Board's attorney corrected Ms. Mader's statement, but M.P.'s attorney, present at the meeting (see id. at 118), "said it was not true and she fought for that" (id. at 119).

co-teaching 'was already happening.'"  (Id. at 18.)[67]  Ms. Mader made this statement at a meeting on September 24, 2014.  (See Docket Entry 37-5 at 1-2.)  Plaintiffs also assert that, at that meeting, the Durham Board "falsely informed O.V.'s parents that O.V. could not be educated on the modified curriculum with his nondisabled peers and could not receive modified work in the inclusive setting."  (Docket Entry 115 at 17-18 (citing Docket Entry 37-5 at 2).)  This conduct likewise falls outside the relevant period.

Similarly, the redirection examples upon which Plaintiffs rely most heavily for their contention that the Durham Board "engaged in a purposeful effort to create a false record of O.V.'s inability to function and make progress" (Docket Entry 115 at 19) all pre-date the relevant time period (see id. (asserting that "[o]ne of O.V.'s teachers redirected him 98 times in ten minutes, or approximately once every six seconds"); see also Docket Entry 101-5 at 185-88 (discussing notes reflecting 98 redirections); cf. Docket Entry 37-25 at 74 (reflecting 98 redirections between 9:10 and 9:20 on

_____

        67   The August 2014 PWN mentions co-teaching (see, e.g., Docket Entry 37-2 at 1 ("The IEP team agreed to follow the mediation agreement created 7/22/14. . . . [O.V.] will spend 205 minutes per day in general ed classroom.  45 mins of this will be in guided reading and math instruction with a co-teaching model.")), but the corresponding IEP does not (see Docket Entry 37-3 at 1-25).  Accordingly, Plaintiffs do not contend that, in neglecting to co-teach O.V., the Durham Board acted in bad faith by failing to execute the IEP.  (See, e.g., Docket Entry 115 at 17-19.)

170

November 24, 2014)). (Compare Docket Entry 119 at 14 (citing ("[Docket Entry] 37-25 at 37, 40, 43, 47, 49 (documenting the staggering amount of times O.V.'s teachers redirected him)")), with Docket Entry 37-25 at 37, 40, 43, 47, 49 (redirection data for August 27, 2014, September 2, 2014, September 5, 2014, September 17, 2014, and September 19, 2014, respectively).) Accordingly, such redirection data cannot support Plaintiffs' Section 504 and ADA claims.

The remaining redirection data upon which Plaintiffs rely reflects significantly lower redirection amounts (see Docket Entry 115 at 19 (citing Docket Entries 106-19, 106-20, 106-21, 107-1, and "Ex. 8")), ranging from a low of zero to a high of 59 over a twenty-minute period or a low of one and a high of 35 over a fifteen-minute period (see Docket Entries 106-19, 106-20, 106-21, 107-1, 115-7; see also Docket Entry 115-8 (containing DPS statistics)). In addition, the cited material provides relatively few incidents of redirection at or near the high end of these data sets. (See Docket Entries 106-19, 106-20, 106-21, 107-1, 115-7.) In any event, occurring less frequently than (at a minimum) every twenty seconds, the specified redirections do not constitute the "sort of rapid fire prompting" (Docket Entry 101-5 at 185) that Plaintiffs' speech expert identified as problematic for a person with apraxia (id. at 184-85). Particularly given that even Plaintiffs' expert witness testified that O.V. qualified as "prompt

171

dependent" (Docket Entry 101-14 at 109), the (timely) redirection data does not establish that the Durham Board "engaged in a purposeful effort to create a false record of O.V.'s inability to function and make progress" (Docket Entry 115 at 19) or otherwise acted in bad faith.

Plaintiffs further argue that the Durham Board acted contrary to "all available research" (id. at 15) regarding proper education of children with intellectual disabilities, thereby demonstrating gross misjudgment.  (See, e.g., id. at 12-15; see also, e.g., Docket Entry 119 at 14 ("[The Durham Board's] continued refusal to acknowledge that no research supports its position to segregate O.V. only further demonstrates its ongoing departure from accepted professional standards." (emphasis omitted)).)  In particular, Plaintiffs maintain that "there is no extant research to support the [Durham Board's] actions of segregating O.V. from his nondisabled peers" (Docket Entry 115 at 14); that "all research" regarding "students with low incidence disabilities" indicates that such children "ma[k]e more progress while in the general education classroom" (id. at 4; accord Docket Entry 119 at 5 (asserting: "[M]ore than forty (40) years of research confirm[s] the same poor outcomes for students with disabilities who are segregated from their nondisabled peers.  There is no empirical research to support better outcomes for segregated students." (citation omitted) (emphasis in original))); and that the Durham Board "ignored all

172

available research regarding effective practices for educating students with O.V.'s disabilities" (Docket Entry 115 at 15).

However, although she could not identify specific articles, Dr. Bell testified that "there's existing research out there that contradicts" Dr. Kurth's assertion "that there is no empirical research to support the segregation of students with low incidence disabilities from their nondisabled peers." (Docket Entry 101-10 at 144.) In this regard, Dr. Bell explained that "[t]here are other schools of thought and research on that" (id.) and that articles exist regarding "both ends of — philosophically on Dr. Kurth's and the extreme of full inclusion and many, many other professionals in the field who believe that a continuum is appropriate for federal law" (id. at 145). As such, Dr. Bell has "read multiple articles and research that support the need for a continuum of services for students." (Id. at 144.)

In turn, Dr. Crossland explained that "it's very controversial and it's not well known what the effects of inclusion are because [they] haven't been able to study it in a comparative way." (Docket Entry 101-14 at 6-7.) Dr. Crossland also directly disputed Dr. Kurth's (and Plaintiffs') assertion that forty years of empirical research indicates that "students with significant disabilities, including intellectual disability, perform better when they're taught in a general education classroom than when they're taught in a separate setting" (id. at 10 (internal

173

quotation marks omitted)).  (See id. at 11.)  As Dr. Crossland explained, "on face value there could not be 40 years of research because the law has only been in place for 41 years.  So it would have been very difficult to begin doing empirical research one year after [the law] was implemented, in [her] judgment."  (Id.)  In addition, the research that Dr. Crossland "ha[s] studied over the years also would not be considered empirical in the way that we would allow one thing to happen to one group and another thing to happen to another group.  It is usually done by comparing progress that has been made by non-disabled peers with those persons who have been identified as having disabilities.  (Id.)  Moreover, "[m]ost of that research is done with adolescents or in high school settings and most of it has been done with students who have autism or more severe forms of disabilities or with very mild forms of disabilities."  (Id. at 11-12; accord id. at 7.)  Thus, "there is not a large body of research that relates to" individuals like O.V. who "hav[e] a moderate intellectual disability."  (Id. at 12; see id. at 18.)

Further, although Dr. Crossland is "not aware of large scale studies that have been published that talk about the detrimental effects on elementary students to inclusion" (id. at 65), she explained that "[t]he research evidence is not definitive about anything" (id. at 93).  Nevertheless, "[t]here's a large body of research related to direct instruction for all students, whether

174

they have special needs or not.  And that is probably the leading instructional approach is that it is something that needs to be done in a direct way, and one needs to then reinforce, and that you don't move to the next level of skills unless some mastery has been attained.  But it's not confined just to special populations." (Id. at 101-02.)  Moreover, the research "is almost overwhelming about the need for small group instruction for certain kinds of skills in certain kinds of students."  (Id. at 102.)[68]

However, "the controversial hot button that is being tripped right now" (id. at 7) in the special education realm is the issue of "full inclusion," which "is the belief there should be no continuum of services, that every student should be in the general or regular classroom because it is every student's right to be there irrespective of the level of services they need or the disability that they have.  And any services that are required are pushed in." (Id. at 7-8.)  Dr. Crossland elaborated:

> Well, there is a continuum and a controversy surrounding the continuum of people who — all special education people, professionals with whom [she is] familiar and most teachers, understand that [their] job is to be out of a job, hopefully.
>
> So the notion is that [they] want to approximate the general or regular education classroom and curriculum when appropriate and to the maximum extent that [they] can for each individual child.

---

68  Direct and small group instruction can occur in both regular and segregated education settings.  (See id. at 103.)

175

So there is a notion that one can start with a small amount of inclusion all the way up to the more radically held, and not widely supported by evidence that [she is] aware of, notion of full inclusion, which is when we do not have an individual student in special education essentially. They are enrolled in and maintained in the general education classroom. And any services that they have are pushed in to them, but they are not pulled out. Those are people who are known as full inclusionists.

(Id. at 6.) This full inclusion approach "is largely based in [Dr. Crossland's] opinion on the social value that comes from having a student in the full general education classroom [rather] than the educational value of having them in there." (Id. at 8.)[69]

Against this backdrop, Plaintiffs' research-related contentions fail to establish that the Durham Board acted with gross misjudgment in educating O.V. in both the regular education

_____

69 In Dr. Crossland's view:

the theme that linked [Plaintiffs'] expert depositions . . . and the testimony that [she has] read appears to be driven by a full inclusionist approach, which is the job of the school, in their opinion, is to always put the child or the student into the regular general education classroom.

And whatever needs that student has must be addressed in that environment and that pull-out services are not appropriate, that one trains the teacher or teachers in that classroom to handle the needs, and in the more extreme perspective on that, that occupational therapy services are to be delivered in the general or regular education classroom, that speech and language services are to be delivered in there, and possibly physical therapy services, that adapted PE should take place only in the context of the general regular education curriculum.

(Id. at 9-10.)

176

and separate education classrooms in the 2014-2015 school year and in proposing to adjust the locations of O.V.'s various special services (compare Docket Entry 37-3 at 18-19, with Docket Entry 37-8 at 21)[70] and transition all of his academic subjects to the "Exceptional Children Classroom" (Docket Entry 37-8 at 21) for the 2015-2016 school year.

Next, Plaintiffs contend that the Durham Board "repeatedly lied to and misled O.V.'s parents regarding O.V.'s educational program and trajectory in the DPS." (Docket Entry 115 at 17.) As relevant here, Plaintiffs point to the Durham Board's "fail[ure] to inform O.V.'s parents that O.V. would not receive a high school diploma if he remained on the modified curriculum after O.V.'s parents expressed their wish for O.V. to go to college," as well as its telling O.V.'s parents "that O.V. made more progress in the segregated setting than in the inclusive setting," as evidence that the Durham Board "acted in bad faith." (Id. (emphasis omitted).) In regard to the first asserted failure, the first page of the May 2015 Meeting Minutes indicates that:

---

70  For instance, physical therapy switched from 20 minutes 10 times a year in the "Exceptional Children Classroom" for the 2014-2015 school year (Docket Entry 37-3 at 18-19) to 20 minutes 6 times a year in the "General Education Classroom" for the following school year (see Docket Entry 37-8 at 21), while occupational therapy switched from the general education and therapy classrooms in the 2014-2015 year (see Docket Entry 37-3 at 18) to the segregated classroom for the following year (see Docket Entry 37-8 at 21).

Next year, [M.P.] would like O[.V.] to ask/request things in complete sentences. She believes it is realistic and Mr. Reitzes agrees. [M.P.] has no limit for him long term, as she cannot be with him forever. She wants him to learn what he can now as she and his dad will not be with him forever. She wants him to be as normal as possible and as independent as possible. She would like him to be independent to go to college and drive a car. He can ride a horse on a trail for an hour independently with other kids, so they know he is capable of doing more.

(Docket Entry 37-10 at 1.)

The next sentence in the Minutes states that "[s]pecial factors were reviewed" (id.), followed by a discussion of O.V.'s "[p]resent levels/goals" (id.; see id. at 1-3.) The Minutes then reflect a discussion of the end of grade testing options for third-grade students, as follows:

[O.V.] will be going to third grade next year, which means he will be taking an EOG. There are two options: the regular EOG for reading and math, or Extend 1 which is directly linked to the alternate curriculum. Ms. Bates explained that all children in all schools must take either the EOG in reading and math or Extend 1 in reading and math. [The elementary coordinator] explained the Extend 1 EOG h[a]s 2 assessors to 1 student, where passages are read aloud and students are given picture cards to choose to represent their answer choice. Ms. Kehoe[, O.V.'s private occupational therapist,] explained that she gave him visual motor evaluation where he was allowed to point to his answer choices (which is what he would do for [E]xtend 1 as well). Ms. Mader continued to explain that although he may not have anxiety about testing he would not be appropriate for the EOG and could not recommend he take that test. Others at the table agreed. Team agreed he would take the Extend 1 assessment; standard administration. District wide assessments: [O.V.] will take any Extend 1 version of any district wide assessments available. [O.V.] will be assessed with Mclass without any accommodations. [O.V.] will take the alternate assessment due to being several

178

grade levels below and academically functioning in the kindergarten level.

(Id. at 3.)  The Minutes contain no further discussion of the Extend 1 versus regular EOG testing issue or of any curriculum implications associated with the Extend 1 test.  (See id. at 1-4.)

However, the June 2016 IEP Meeting Minutes reflect the following discussion regarding the end of grade testing issue:

> For state-wide testing, the team first presented EOG participation for reading and writing.  This is what students would take where students are assessed with the standard course of study with accommodations.  However, modifications would not be made.  NCEXTEND1 would be assessing students on the extended content standards with manipulatives and modifications.  Is it appropriate for [O.V.] to take the regular EOG or modified version with the NCEXTEND1[?]  Ms. Baker[, the parent advocate,] asked if this would get him a diploma.  Dr. Bell asked, "What we have outlined in these two sessions, would that get him to accessing the regular standards?  Even now, with 3rd grade state standards, and where he is performing[,] there is a significant difference from where he is currently performing and the grade level standards."  He took the beginning of grade tests in the Fall and just drew on his answer sheet, according to [O.V.'s Hillandale third-grade general education teacher (see Docket Entry 105-1 at 7)].  He did not have any accommodations and could not access the test independently.  For reading, he would have to read the tests but could receive extended time.  Dr. Bell stated that based on where she knows O.V. is, it would be appropriate for him to access the NCEXTEND1.  He is not able to access the EOG with accommodations as he is not being instructed even close to that level.  She understands that [M.P.] wants him to graduate with a diploma.  Mr. Reitzes stated that he would feel bad giving him the EOG at the end of the year.  The proposal was for his statewide participation to be the NCEXTEND1.  Ms. Vidas[, the occupational therapist,] stated that each year, we would discuss this.  Ms. Baker asked how often is someone given the NCEXTEND1 test and come off of it.  Dr. Bell stated that it is reviewed yearly and decisions are made on an individualized basis.  Ms. Bunn stated that one of her students moved off of the

179

NCEXTEND1 to regular EOG tests. There are some released
items online from 2 years ago that a parent can
access. . . . Ms. Vidas stated that it wouldn't hurt for
[M.P.] to take a look at the released items online and
have him do some practice tests at home. Mr. Reitzes
stated that with multiple choice items with a seeds and
plants activity, he would reduce the number of items, and
he was having trouble with the modifications. Dr. Bell
stated that it is a big decision and [M.P.] has a goal
for him long term and we are making decisions about him
right now. Ms. Baker stated that she has given the
NCEXTEND1 and it is not the same. However, Ms. Bunn
stated that there are passages on that test that students
have to read and there are fractions. Ms. Baker stated
that she is not sure what to say as she wants to support
[M.P.]. In her mind, it wouldn't make a big difference.
She sees what Ms. Reitzes is saying but her fear is that
she knows that students who take NCEXTEND1 do not often
get off of it and that is not the pathway for a diploma
and she doesn't know what O.V. will be able to do in the
future. Ms. Baker stated that there are students in
regular ed who are not able to access the EOG as
well. . . . Ms. Bunn stated that [O.V.] is working on
CVC words and on the test he will be given a 4th grade
reading passage. The [IEP Team] determined, without
parent and advocate agreement[,] that O.V. will
participate in the NCEXTEND1 state-wide test.

(Docket Entry 105-1 at 13-14.)

Juxtaposing these Minutes reveals the flaw in Plaintiffs'
diploma argument. The Minutes reflect no discussion regarding the
diploma-related implications of a modified curriculum at the May
2015 Meeting (see Docket Entry 37-10 at 1-4), and Plaintiffs do not
assert that the Durham Board affirmatively lied to them about this
issue (see Docket Entry 115 at 17). As such, Plaintiffs
effectively argue that M.P.'s identification of her long-term
college attendance goal for O.V., a rising third-grader, somehow
triggered an affirmative obligation for the Durham Board to alert

180

her that, if O.V. remained on the modified curriculum associated with the Extend 1 test until he graduated from high school, he would not secure the diploma necessary for college enrollment. Yet, which curriculum O.V. studied remained subject to change on a yearly basis, and at least one of the IEP Team members had personal experience with a student transitioning from the Extend 1 to regular EOG test. (See Docket Entry 105-1 at 13; see also Docket Entry 37-10 at 1 (reflecting Ms. Bunn's participation in May 2015 IEP Meeting).) Accordingly, Plaintiffs have not established that the Durham Board acted in bad faith by failing to volunteer at the May 2015 meeting that O.V. — an elementary school student as to whom even Plaintiffs' advocate acknowledged an inability to "know what [he] will be able to do in the future" (Docket Entry 105-1 at 14) — would not graduate with a diploma if he utilized a modified curriculum throughout his high school education.

Plaintiffs further argue that the Durham Board erroneously informed O.V.'s parents that he "made more progress in the segregated setting than in the inclusive setting." (Docket Entry 115 at 17 (citing Docket Entry 37-10 at 3).) As evidence for this assertion, Plaintiffs identify Ms. Mader's May 2015 statement that "the data shows that he made more progress in the EC classroom" (id. (internal quotation marks omitted); see Docket Entry 37-10 at 3). As an initial matter, the context of this statement suggests that, rather than strictly focusing on his scores in each setting,

181

it rests on a more holistic evaluation of O.V.'s educational experience, including factors such as his relative independence in the segregated classroom (see, e.g., Docket Entry 37-10 at 3 ("Ms. Kehoe is concerned that he would not have a one on one (Ms. Mader explained that is the most restrictive environment). Ms. Haase explained that his goals are about weaning to get him to be more independent. In Ms. Bunn's classroom he would have a lower student/teacher ratio which will provide him with more individualized support. The data shows that he is more successful in Ms. Bunn's classroom than any other environment thus far.")), as well as his failure to write (aside from his last name) in the regular classroom (id.). In any event, the mere fact that Ms. Mader may have erroneously interpreted the data does not itself establish bad faith. See Sellers, 141 F.3d at 529.[71] Accordingly,

_____

71    Plaintiffs further contend that the Durham Board's rejection of M.P.'s offer of a specialist to modify O.V.'s work establishes bad faith. (See Docket Entry 115 at 18.) Considered in context, this event does not reflect bad faith:

> [M.P.] would like [O.V.] to continue with the one on one support in the general classroom he had this year (she is referring to Ms. Haase in the regular classroom with him). [M.P.] would like him to work on communication and feels that would best be met in the regular classroom. Ms. Haase explained that during the times he is in the classroom for instruction it is not time to talk, it is quiet time, and she has to be very quiet with him to ensure others are not disturbed. [M.P.] explained its about what he hears, not just want he says. Because we do not know what he does and doesn't know because of his apraxia. She feels the communication is better and is the biggest hurdle, she doesn't care about reading, math,
>
> (continued...)

Plaintiffs have not shown that the Durham Board acted in bad faith by, during the relevant period, "repeatedly l[ying] to and misle[ading] O.V.'s parents regarding O.V.'s educational program and trajectory in the DPS" (Docket Entry 115 at 17).

Plaintiffs further assert that the Durham Board's failure "to train O.V.'s teachers to appropriately assess and meet O.V.'s needs" (id. at 15-16) constituted bad faith. More specifically, Plaintiffs contend that "[t]eacher training was 'essential' for facilitating the inclusion of O.V. with his nondisabled peers and developing a program to meet his needs" (id. at 15) and that, "[d]uring the 2014-15 school year, the lack of training led to

_____

71(...continued)
or writing. Ms. Mader explained that it is our duty to care about reading, math, and writing. He is getting communication at lunch, recess, and specials when he can dialogue with his peers. During academic times it is not appropriate for him in the general education classroom, it is more of isolation. Ms. Haase is teaching him one on one because of where he is academically. [M.P.] asked about co-teaching. It is not co-teaching because his skills are so below other peers in the class and it is not educationally appropriate for him to sit in the general education classroom. [M.P.] asked if she can bring a specialist in to modify his work for him. It was explained that she can't and we are all specialist and are able to modify work. Ms. Kehoe asked if Ms. Haase would be able to go to the EC classroom (Ms. Bunn's classroom) to provide [O.V.] with one on one instruction. That would not happen as we do not pull EC teachers into an EC classroom with another EC teacher. Ms. Kehoe is concerned that he would not have a one on one (Ms. Mader explained that is the most restrictive environment). Ms. Haase explained that his goals are about weaning to get him to be more independent. . . .

(Docket Entry 37-10 at 3 (emphasis added).)

183

O.V.'s teachers employing inappropriate redirection techniques, acting in frustration with O.V., and failing to even plan for his instruction" (id. at 16 (citing redirection data, "(special education teacher recording 'Did nothing!' after working with O.V.)[,] . . . (lesson plans from segregated classroom with no lesson plans on O.V.'s grade level (second))," and "De 32 Resp't's Ex. 37, at 5-8 (demonstrating the *only* notes O.V.'s regular education teacher took on O.V. related to O.V.'s negative behaviors)" (emphasis in original) (lone bracket omitted))).[72] As previously discussed, the timely redirection data does not reflect bad faith. In addition, the "'Did nothing!'" notation upon which

---

72    The Docket Entry and page citations Plaintiffs proffer here (and elsewhere) do not correspond to the correct electronic Docket Entries and/or pin citations. (Compare, e.g., id. at 16 (citing "Ex. 7, 8 at 867, DE 107-11 (special education teacher recording 'Did nothing!' after working with O.V.)] [sic]; DE 32 [Pet'rs' Ex. 75 [[Bunn] lesson plans[);] . . . DE 32 [Resp't's Exs. 34, 35, 36, 37]" (redirection data); "De 32 [Resp't's Ex. 37, at 5-8 (demonstrating the *only* notes O.V.'s regular education teacher took on O.V. related to O.V.'s negative behaviors)]" (emphasis and certain brackets in original)), with Docket Entries 115-7, 115-8, 107-11, and Docket Entry 32 (notice of manual filing).) The Court previously cautioned the parties that, "[i]f [it] cannot locate the parties' evidence, it cannot use such material in resolving the[ir m]otions, regardless of the parties' descriptions thereof in their supporting memoranda" (Docket Entry 99 at 3). (See id. at 1-6 (explaining problems of manual filing, denying request to manually file Administrative Record, and authorizing parties to file summary judgment motions "with corrected Docket Entry citations to the electronically filed Administrative Records" (id. at 6)). To the extent possible, the undersigned has located the relevant materials among the voluminous record, but see Fed. R. Civ. P. 56(c)(3) (explaining that, in ruling on summary judgment motions, "[t]he [C]ourt need consider only the cited materials"); however, certain materials could not be located.

184

Plaintiffs rely occurred outside the relevant time period. (See Docket Entry 37-25 at 74 (emphasis in original).) It also appears that the Turner notes that Plaintiffs reference fall outside the relevant window. (See Docket Entry 111-2 at 1-4.) So too do any failures to train teachers prior to and for the first few months of O.V.'s second year in second grade.

In addition, Plaintiffs have not established that a lack of training — rather than the fact that Ms. Bunn taught the third-through-fifth-grade segregated classroom[73] — caused a "fail[ure] to even plan for [O.V.'s] instruction" (Docket Entry 115 at 16) in the form of Ms. Bunn's electronic lesson plan book that references only "3rd/4th Grade" and "5th Grade" schedules (see, e.g., Docket Entry 107-11 at 3 ("3rd/4th Grade Writing 5th Grade Specials 9:10am - 10:00am")). (See Docket Entry 115 at 16.)[74] Moreover, Ms. Bunn testified that the relevant "lesson plans are for" her, "to keep [her] on track through the school day" (Docket Entry 101-11 at 103), and that she also "plan[s] for each student" (id.), which she

---

73 Plaintiffs do not claim that O.V.'s placement in this segregated classroom constituted bad faith. (See, e.g., Docket Entry 115 at 1-27 (lacking such contention).) Nor, given Plaintiffs' critical views of the kindergarten-through-second-grade segregated classroom (see, e.g., Docket Entry 106-15 at 2 (characterizing classroom as "chaotic and not successful")) does the Durham Board's decision to place O.V. in a different segregated classroom, with his same-age peers, reflect bad faith.

74 It also bears noting that various academic items, such as the "Literacy Block 10:00am-11:30am" (Docket Entry 107-11 at 3), "Math 1:30pm - 2:30pm" (id. at 4), and "Science 2:30pm - 3:15pm" (id.), do not specify any grade levels.

185

tracks "[o]n their data sheets; each student has a data notebook with data sheets in them" (id. at 104). Further, contrary to Plaintiffs' contentions (see Docket Entry 115 at 15-16), at least some of O.V.'s teachers testified to either receiving "trainings specifically relevant to [their] work with O.[V.]" (Docket Entry 101-11 at 91 (Ms. Bunn); see also Docket Entry 101-13 at 35 (noting that Mr. Reitzes received training on apraxia and various other speech topics)) or "trainings specifically address[ing] inclusion" (Docket Entry 101-12 at 62), albeit perhaps not during the 2014-2015 school year. For instance, Ms. Allen testified to "start[ing] inclusion . . . in the system" (id. at 63) and to providing training on inclusion at various state and national conferences in the early 1990s (see id. at 63-64).

Conversely, Ms. Turner testified that she did not receive training (1) on "work[ing] with students with disabilities" during the 2014-2015 school year (Docket Entry 107-8 at 42), (2) "on coteaching" or "developing curriculum through coteaching" (id. at 45), or (3) "on apraxia of speech," something which she did "[n]ot really" understand (id. at 55). Plaintiffs, however, have not shown that such lack of training satisfies the "high bar" for proving bad faith, K.D., 55 F. Supp. 3d at 789, particularly given that O.V. "was very rarely in [Ms. Turner's] classroom during an academic period without another teacher with him" (Docket Entry

107-8 at 36) and "most of his academic needs were met with his EC teachers inside [Ms. Turner's] classroom" (id. at 53).

Finally, Plaintiffs contend:

> Perhaps the clearest example of [the Durham Board] acting in bad faith was [its] decision to increase the number of minutes that O.V. would be segregated from his nondisabled peers after his mother left the IEP meeting — once [the Durham Board] realized that the lower number of minutes would result in a placement of "resource" instead of "separate." *Compare* DE 37-8 at 21 *with* DE 37-10 at 4.

(Docket Entry 115 at 19; see also Docket Entry 119 at 12 (asserting that "[the Durham Board] increased the amount of service delivery outside of the general education classroom after O.V.'s mother left the IEP meeting to guarantee O.V.'s placement on the curriculum would be 'separate,'" and that "[t]he act of increasing the service delivery outside of the IEP meeting was done in bad faith to ensure O.V.'s placement would be 'separate,' guaranteeing O.V.'s segregation from his non-disabled peers for at least sixty-one percent (61%) of the school day").)

This contention rests on the fact that the May 2015 Meeting Minutes specify that O.V. will receive "75 minutes [of] Reading . . . in the EC classroom" (Docket Entry 37-10 at 4), but the May 2015 IEP specifies that he will receive "90 Minutes" of "Reading" in the "Exceptional Children Classroom" (Docket Entry 37-8 at 21). Plaintiffs ascribe ill-intent to this discrepancy, claiming that the Durham Board increased O.V.'s reading time by 15 minutes on the IEP to change him from the "resource" to "separate" classification.

187

(See, e.g., Docket Entry 115 at 19.)  In turn, the Durham Board
contends:

> The record indicates, and the ALJ so found, that there
> was a technological failure during the meeting and that
> the IEP paperwork had to be reconstructed by hand.
> DE17-1, ¶¶96-97, p.21.  While the discrepancy exists,
> there is no evidence to suggest any ill motive related
> thereto.  There is no evidence proving which of the two
> is correct.  A mistake, whether in the minutes or in the
> IEP itself, is not "bad faith."

(Docket Entry 122 at 5-6.)

As the Durham Board argues, the May 2015 Meeting Minutes
reflect that, during the service delivery discussion (see Docket
Entry 37-10 at 3-4), the CECAS system went "down and the rest of
the meeting [had to] be captured in the Minutes" (id. at 4 (all-cap
font omitted)).  Nevertheless, the Minutes reflect that the
participants discussed O.V.'s math and reading service delivery and
determined that such education would occur in the separate
classroom.  (See id. at 3-4.)  The Minutes explicitly note that
"[O.V.'s] time away from nondisabled peers puts him on the separate
placement continuum," which "is a change from the resource level of
support."  (Id. at 4.)  The Minutes further reflect that "[M.P.]
wants to make sure it is noted that she does not agree with this
final decision."  (Id.; see also id. ("[M.P.] is not sure about the
parent/teacher conferences yet as she does not agree with today's
decision.").)  Accordingly, rather than reflecting a nefarious
change by the Durham Board, it appears that the Meeting Minutes (or
the IEP) contain a mere typographical error regarding the length of

188

O.V.'s reading segment.  In any event, the Minutes make clear that, regardless of the specific duration of his reading segment, the decisions made in M.P.'s presence at that meeting placed O.V. "on the separate placement continuum."  (Id.)  Thus, Plaintiffs' "clearest example of [the Durham Board] acting in bad faith" (Docket Entry 115 at 19) misses the mark.

In sum, Plaintiffs failed to establish that the Durham Board acted with bad faith or gross misjudgment during the relevant period.[75]  The Court will therefore grant the Durham Board summary judgment on Plaintiffs' Section 504 and ADA discrimination claims.

### iii. M.P.'s Retaliation Claim

Finally (as to Title II and Section 504), M.P. pursues a retaliation claim.  "[R]etaliation claims under § 504 are subject to the same standard as ADA retaliation claims." S.B. ex rel. A.L. v. Board of Educ. of Harford Cnty., 819 F.3d 69, 78 n.6 (4th Cir. 2016).  For such claims:

Absent direct evidence of retaliation, [a plaintiff] may proceed under the familiar burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973), making a prima facie case of retaliation by showing (1) that [s]he engaged in protected activity, (2) that the [defendant] took an adverse action against h[er], and (3) that the adverse action was causally connected to h[er] protected activity.  If [the

---

75  As consideration of Plaintiffs' proffered expert reports from Dr. Ann Turnbull (Docket Entry 115-3) and Sara Jo Soldovieri (Docket Entry 115-4) does not alter this determination, the Court finds it unnecessary to resolve "[t]he [Durham] Board['s] object[ions] to the[se] expert reports" (Docket Entry 118 at 12 (emphasis omitted)).

189

plaintiff] can meet this burden, then the [defendant] must articulate a "legitimate nonretaliatory reason for its actions," at which point the burden shifts back to [the plaintiff] to "demonstrate that the proffered reason is a pretext for forbidden retaliation."

Id. at 78 (citation, parallel citation, and footnote omitted).

M.P. identifies two ways that the Durham Board allegedly retaliated against her "after Plaintiffs challenged the June 2014 IEP team decision to return O.V. to the separate setting" (Docket Entry 123 at 11).[76]  First, "[she] was required to obtain the principal's permission, which was never granted, to observe O.V.'s separate classroom." (Docket Entry 115 at 7.)  Second, the Durham Board "implemented a specific procedure for O.V.'s drop-off at school that prevented [M.P.] from accessing O.V.'s separate education classroom." (Id. (emphasis added).)[77]

_____

76  The Durham Board does not dispute that M.P. satisfied the first element of a prima facie retaliation claim.  (See Docket Entry 111 at 20.)

77  The Amended Complaint does not differentiate between O.V.'s classrooms in alleging M.P.'s retaliation claim. (See Docket Entry 36, ¶ 375 ("[The Durham Board] retaliated against Plaintiff M.P. for asserting her rights by imposing unwritten rules and procedures to limit Plaintiff M.P.'s access to O.V.'s classroom when [the Durham Board] did not impose the same restrictions on the parents of other students.").)  M.P.'s affidavit likewise does not differentiate between O.V.'s classrooms in describing the school drop-off procedures. (See Docket Entry 115-9, ¶¶ 16-20 (detailing restrictions on M.P.'s ability "to walk O.V. into his classroom each day" (id., ¶ 16)).)  However, the memorandum in support of Plaintiffs' Summary Judgment Motion clarifies that M.P.'s retaliation claim applies only to restrictions on her access to O.V.'s special education classroom. (See Docket Entry 115 at 7 ("[The Durham Board] limited O.V.'s mother's access to O.V.'s separate classroom once O.V.'s parents began formally advocating
(continued...)

190

A review of the record quickly dispenses with the second asserted retaliatory action. Most obviously, rather than going to Ms. Bunn's separate education classroom upon arrival at school, O.V. went to Ms. Turner's general education classroom. (See, e.g., Docket Entry 107-8 at 29-30.) Moreover, Ms. Turner testified that, for at least some unspecified portion of time at the beginning of the school year,[78] M.P. brought O.V. into Ms. Turner's classroom. (Id. at 29 (indicating that "[s]ometimes [M.P.] would physically pick him up and carry him and put him in [his] seat"); see also id. at 30 ("Once we had someone else start bringing him in the morning, whether it was the principal or another teacher coming in in the morning, he still would come in but he would most of the time refuse to unpack his backpack and get — turn his folder in and things of that nature, even after several reminders.").) Shannon Gill, who served as the "Assistant Principal at Hillandale Elementary School during the 2014-[20]15 school year" (Docket Entry

---

77(...continued)
for their son and filed a due process petition. Specifically, O.V.'s mother was required to obtain the principal's permission, which was never granted, to observe O.V.'s separate classroom. Additionally, [the Durham Board] implemented a specific procedure for O.V.'s drop-off at school that prevented his mother from accessing O.V.'s separate education classroom." (citations omitted)).)

78    In this regard, the Durham Board relies on what it describes as "[n]otes from the general education teacher" that "indicate that M.P. physically carried O.V. into her classroom on numerous days in October 2014." (Docket Entry 111 at 6; see Docket Entry 111-2 at 1-4 (indicating that M.P. brought O.V. into classroom through at least October 23, 2014).)

111-4, ¶ 2), averred that, "[d]uring the first few months of the 2014-[20]15 school year, [M.P.] would often walk O.V. to his classroom, and even carried him into the classroom some days." (Id., ¶ 3.)  Accordingly, M.P. fails to establish a prima facie case that the Durham Board retaliated against her June 2014 advocacy on O.V.'s behalf (see Docket Entry 123 at 11) by "implement[ing] a specific procedure for O.V.'s drop-off at school that prevented [M.P.] from accessing O.V.'s separate education classroom" (Docket Entry 115 at 7 (emphasis added)) in the 2014-2015 school year.

Retaliation via denial of access to O.V.'s special education classroom presents a closer question.  According to M.P., "[d]uring the 2012-[20]13 and 2013-[20]14 school years, [she] frequently volunteered at O.V.'s school and visited his special education classroom during the day without the need to obtain permission from the principal."  (Docket Entry 115-9, ¶ 8.)[79]  She further avers:

> During the 2014-[20]15 school year, O.V.'s special education teacher, Ms. Bunn, required that [M.P.] have permission from the principal's office to visit the classroom during the school day.
>
> When [M.P.] attempted to schedule an observation of the special education classroom where [her] son, O.V., was taught, the principal was consistently unable to meet with [her] to schedule the observation.

___

79  At the administrative hearing, M.P. testified that she served as the room parent for O.V.'s separate education classroom in the 2013-2014 school year.  (Docket Entry 101-5 at 25.)

Despite requesting access through meetings with the principal, [M.P.] was never granted permission from the principal's office to visit the classroom after the Settlement Agreement was signed.

(Id., ¶¶ 13-15 (internal paragraph numbering omitted).)[80]

The Minutes from the first parent-teacher conference indicate that "Ms. Bunn said that [M.P.] is more than welcome to come to the classroom and sit with [O.V.] to help him complete his work." (Docket Entry 37-5 at 2.)  However, shortly after this statement, the Minutes reflect that "[P.V.] shared that we would also need to wean [M.P.] out so that [O.V.] is more independent and releases authority to the teachers so that he will work for them without [M.P.] being there."  (Id.)

In turn, Ms. Gill averred that

As a standard school procedure, [the school] required all parents to sign in at the office when they visited the school.  Administrative permission was required to observe a specific classroom.  Other than for specific volunteering opportunities, [the school] w[as] generally very hesitant to allow parent[s] to observe classes in session because of the significant student privacy issues involved, and did not often approve such requests.  [Ms. Gill] do[es] not have any recollection of [M.P.] requesting to observe in Ms. Bunn's classroom.

_____

80  M.P. testified at the administrative hearing that one time during her volunteering at Hillandale she was "in the hallway where Ms. Bunn's classroom is," and Ms. Bunn "personally invite[d her] during that time that [she] w[as] in the hallway to come into her room," which M.P. did, but O.V. was not in Ms. Bunn's classroom "at the time."  (Docket Entry 101-5 at 26.)  M.P. emphasized that Ms. Bunn did not invite her into the classroom "to observe."  (Id.)

193

(Docket Entry 111-4, ¶ 6.)  Ms. Bates, the Hillandale principal during the 2014-2015 school year (see Docket Entry 118-2, ¶ 2), similarly averred:

> All parents who wished to observe classes were required to arrange for the observation with the school administration.  Observations were not permitted when it would be disruptive to the children's education.  [M.P.] was respected, and treated as any other parent, with allowances for meeting O.V.'s needs.  To the best of [Ms. Bates's] knowledge, she was never refused a request to observe Ms. Bunn's classroom.

(Id., ¶ 5.)

In addition, Ms. Gill averred that, throughout the year that O.V. spent in Ms. Bunn's classroom, M.P. "remained an active participant in the school, including volunteering with the PTA. She was present in the school consistently, often multiple times per week, throughout the 2014-[20]15 school year." (Docket Entry 111-4, ¶ 5.)  Ms. Bates similarly testified that, "[t]hroughout the time that O.V. attended Hillandale," M.P. "was a consistent volunteer at the school, and often walked O.V. to class, unpacked his backpack for him, and ate with him at lunch." (Docket Entry 118-2, ¶ 3.)  Further, Ms. Bates specifically testified that M.P. "continued to be an active volunteer at the school" during the 2014-2015 school year.  (Id., ¶ 4.)  M.P. likewise acknowledged that she continued to volunteer at Hillandale after the June 2014 mediation, but maintained that school staff "did not allow [her] to volunteer with O.V.'s special education classroom or even observe that classroom." (Docket Entry 115-9, ¶ 23.)

194

In sum, the record reflects that, in the year M.P. served as room parent in O.V.'s segregated classroom, she "frequently volunteered at O.V.'s school and visited his special education classroom during the day without the need to obtain permission from the principal." (Id., ¶ 8.) However, the following year, with O.V. in a different segregated classroom, his new teacher "required that [M.P.] have permission from the principal's office to visit the classroom during the school day." (Id., ¶ 13.) School policy required parents to obtain permission to observe individual classrooms, and, aside from specific volunteering activities, the school rarely granted such permission due to student privacy concerns and the risk of disruption. (See Docket Entry 111-4, ¶ 6; Docket Entry 118-2, ¶ 5.) Whether M.P. made such request and the administration denied it remains disputed. (Compare Docket Entry 115-9, ¶¶ 14-15, with Docket Entry 111-4, ¶ 6, and Docket Entry 118-2, ¶ 5.)

Regardless, this record does not establish that the Durham Board prevented M.P. from observing O.V.'s segregated classroom during the 2014-2015 school year in retaliation for her advocacy on O.V.'s behalf. Even assuming that temporal proximity between the June 2014 mediation and the start of the new school year, in which O.V.'s new teacher required school authorization for observations of O.V.'s segregated classroom, sufficed to support a prima facie case of retaliation, the school's policy of requiring permission

195

for observations, and its practice of rarely granting such permissions given the risk of disruption and associated student privacy concerns, constitutes a legitimate reason for the disputed actions. As a result:

> The burden now shifts to [M.P.] to demonstrate that this explanation is pretextual, and that the decision to [require and not provide permission for observing O.V.'s segregated classroom] in fact was causally linked to h[er] protected activity. But there simply is no record evidence to support that proposition. While the temporal proximity between [M.P.'s] protected activity and [the implementation of this policy in Ms. Bunn's classroom] may be sufficient to make an initial prima facie showing of causation, timing alone generally cannot defeat summary judgment once a[ defendant] has offered a convincing, nonretaliatory explanation. Without more than h[er] own assertions, [M.P.] cannot meet h[er] burden at summary judgment.

S.B., 819 F.3d at 79 (citations omitted).

Accordingly, the Court will grant the Durham Board's request for summary judgment on M.P.'s retaliation claim.

## C. Settlement Agreement

Plaintiffs finally assert that the Durham Board breached the parties' Settlement Agreement in two respects. (See, e.g., Docket Entry 115 at 24-25.) First, Plaintiffs contend that the Durham Board failed to provide co-teaching for O.V. during his guided reading and math instruction in the 2014-2015 school year. (See, e.g., id. at 24.) Second, Plaintiffs contend that the Durham Board failed to provide O.V. the compensatory services that the Settlement Agreement specifies. (See, e.g., id. at 24-25.) For its part, the Durham Board maintains that it initially attempted to

196

deliver co-teaching to O.V. using a traditional co-teaching method, but had to abandon that approach in favor of "a less traditional model" (Docket Entry 111 at 25) that nonetheless "fit one of the co-teaching models defined by DPS's guidance to staff" (id. at 26). (See, e.g., id. at 24-26.) The Durham Board further responds that, although it "is technically accurate" that "O.V. did not receive all of the compensatory services described in the settlement agreement" (id. at 28), Plaintiffs cannot recover because they allegedly "forfeited the remainder of O.V.'s compensatory services" by not notifying the Durham Board of O.V.'s withdrawal from Hillandale and then failing to "request[] that compensatory services resume" (id.). (See, e.g., id. at 28-29.)

**i. Relevant Standards**

Under North Carolina law, "[t]he elements of a claim for breach of contract are (1) existence of a valid contract and (2) breach of the terms of that contract." Lake Mary Ltd. P'ship v. Johnston, 145 N.C. App. 525, 536, 551 S.E.2d 546, 554 (2001) (internal quotation marks omitted).[81] In interpreting an agreement, "the following central principles" apply:

> The goal of construction is to arrive at the intent of the parties when the contract was written. Where a contract defines a term, that definition is to be used. If no definition is given, non-technical words are to be given their meaning in ordinary speech, unless the

---

81 The Settlement Agreement specifies that it "shall be governed by and interpreted in accordance with the laws of the State of North Carolina." (Docket Entry 17-4 at 3.)

197

context clearly indicates another meaning was intended. The various terms of the contract are to be harmoniously construed, and if possible, every word and every provision is to be given effect . . . . If the meaning of the contract is clear and only one reasonable interpretation exists, the courts must enforce the contract as written; they may not, under the guise of construing an ambiguous term, rewrite the contract or impose liabilities on the parties not bargained for and found therein.

Duke Energy Corp. v. Malcolm, 178 N.C. App. 62, 65, 630 S.E.2d 693, 695 (internal quotation marks and brackets omitted) (ellipsis in original), aff'd, 361 N.C. 111, 637 S.E.2d 538 (2006); see also Lake Mary, 145 N.C. App. at 534, 551 S.E.2d at 553 ("The court is to interpret a contract according to the intent of the parties to the contract, unless such intent is contrary to law. If the plain language of a contract is clear, the intention of the parties is inferred from the words of the contract." (internal quotation marks and citation omitted)).

Whether a contractual ambiguity exists "is a question of law." Duke Energy, 178 N.C. App. at 65, 630 S.E.2d at 696. In other words, "when a question arises regarding contract interpretation, 'whether . . . the language of a contract is ambiguous or unambiguous is a question for the court to determine[.]' In making this determination, 'words are to be given their usual and ordinary meaning and all the terms of the agreement are to be reconciled if possible[.]'" Myers v. Myers, 213 N.C. App. 171, 175, 714 S.E.2d 194, 198 (2011) (internal quotation marks and citation omitted) (brackets and ellipsis in original). "An ambiguity exists where

198

the language of a contract is fairly and reasonably susceptible to either of the constructions asserted by the parties." Duke Energy, 178 N.C. App. at 65, 630 S.E.2d at 696 (internal quotation marks omitted). "Stated differently, a contract is ambiguous when the 'writing leaves it uncertain as to what the agreement was . . . .'" Salvaggio v. New Breed Transfer Corp., 150 N.C. App. 688, 690, 564 S.E.2d 641, 643 (2002) (ellipsis in original) (quoting Barrett Kays & Assocs., P.A. v. Colonial Bldg. Co., Inc. of Raleigh, 129 N.C. App. 525, 528, 500 S.E.2d 108, 111 (1998)). "Where an ambiguity exists, the object of contract construction is to ascertain the intention of the parties from the expressions used, the subject matter, the end in view, the purpose sought, and the situation of the parties at the time." Hemric v. Groce, 169 N.C. App. 69, 77, 609 S.E.2d 276, 283 (2005) (internal quotation marks and brackets omitted). Finally, "[if] an agreement is ambiguous and the intention of the parties is unclear, interpretation of the contract is for the jury." Barrett Kays, 129 N.C. App. at 528, 500 S.E.2d at 111 (internal quotation marks omitted).

### ii. Co-Teaching Issue

The Settlement Agreement[82] mandates that O.V. "spend 205 minutes per day in a general ed classroom. Forty-five minutes of this will be in guided reading and math instruction with a co-

_____

    82    The Settlement Agreement incorporates the Mediation Agreement that the parties executed on July 22, 2014. (See Docket Entry 17-4 at 2.)

teaching model." (Docket Entry 17-4 at 6.) At their depositions in September 2015, O.V.'s teachers all expressed awareness of co-teaching's requirements and testified that they did not co-teach O.V. during the 2014-2015 school year. (See Docket Entry 107-8 at 44-45 (Ms. Turner); Docket Entry 107-10 at 51-53 (Ms. Bunn); Docket Entry 107-12 at 48-50 (Ms. Haase); Docket Entry 107-13 at 61-63 (Ms. Allen).)

For example, Ms. Bunn defined co-teaching as "hav[ing] a regular teacher and a special ed teacher teaching together in the classroom." (Docket Entry 107-10 at 51.) She explained that she had co-taught at her previous school, an experience in which she "was in a general ed classroom with the regular ed teacher and [they] might would tag team on teaching whatever [they] were teaching that day" (id. at 52). (See id. at 51-52.) However, Ms. Bunn testified that she (1) did not co-teach with Ms. Turner, (2) was not consulted about how to co-teach by Ms. Turner, Ms. Allen, or Ms. Haase, and (3) was not consulted "about how to develop coteaching curriculum" or "about how to modify the common core" (id. at 53). (See id. at 52-53.) Ms. Turner agreed that she did not co-teach with Ms. Bunn (or with Ms. Allen or Ms. Haase); in fact, Ms. Turner testified that she has never co-taught. (See Docket Entry 107-8 at 45.) Ms. Turner further stated that she did not receive any training on co-teaching or "on developing

curriculum through coteaching" (id.), and also did not receive "much preparation" for having O.V. in her class (id. at 41).

In turn, Ms. Haase testified that "coteaching is sort of two heads are better than one [approach] and so it's two people looking at a group of students and taking the same lesson and figuring out ways to adapt it or modify it for different styles of learning." (Docket Entry 107-12 at 49.) She explained that she co-taught at another school, an experience she described as:

> So [they] would plan [their] lessons for the week and then [they] would sort of, [they] would just do [their] planning together and then divide the class or kind of think about different ways to approach the lesson when needed, you know, knowing the needs of the levels of [their] group.

(Id.) Her deposition continued:

Q. Did you coteach O.[V.] with Miss Turner?

A. So coteaching is when the lesson is the same for all and O.[V.]'s level of function is such that he requires adapted curriculum.

Q. So did you coteach in Miss Turner's class?

A. We did not coteach in that classroom.

Q. Did you coteach in Mr. Montgomery's class?

A. No.

Q. Did you coteach with Miss Taylor, the assistant?

A. Did two teachers teach O.[V.], no.

Q. Or coteaching as you understand coteaching?

A. No.

201

Q. Since this coteaching experience were you consulted about how to coteach by anyone with regard to O.[V.] or O.[V.]'s class?

A. My colleagues all have coteaching experience, so I was not consulted.

Q. Did you develop any coteaching lesson plans during the 2014[-20]15 academic year?

A. No.

(Id. at 49-50.)

Finally, Ms. Allen testified at her deposition that:

A. I've done coteaching.

Q. You have. Can you define in your own words what coteaching is?

A. They're different ways to do it. Coteaching you can have — you can teach one day and the other teacher in the class can teach another. You can split it up half and half. You can also I found more effective for the teacher that is assigned that class starts off the lesson and then I would interject with a different way to do that concept.

    And then we also — it's like we — the room is ours together. So we monitor all the students in the classroom.

Q. When did you do coteaching previously?

A. I've done it at my current school for math in the fifth grade and I was an inclusion teacher for two years for 7th grade in Texas. And when I started years ago at Parkwood I started inclusion with several students of all grade levels that were — they were all different multi handicaps.

Q. So you've been a coteacher in a variety of environments?

A. I did not coteach in that environment. I will say I did go in and if it was something we'd plan ahead, they would tell me what they were doing so I knew when to take

202

them in when it was appropriate for my students and I
modified what they were doing.

Q. So that was not coteaching?

A. It was not where I stood up in front of the class and
taught, no.

Q. So did you coteach with Miss Turner?

A. No.  Basically we would have, but if you are not with
O.[V.], he will not pay attention and so that was really,
if you wanted him to work on his goals or if you want[ed]
him to listen most of the time to the lesson he would not
without someone directly beside him.

Q. So how long did you and Miss Turner do lesson plans to
coteach?

A. I thought I answered that question.

Q. Well, you said that you would have — maybe this is a
better question.  Did you attempt coteaching with Miss
Turner?

A. Not exactly.  I would walk in and modify whatever.  I
was there first thing in the morning.  So it was usually
during their morning work time and if it was something
that O.[V.] could participate in, we would try to do
that.

     And as the year went on it became more difficult
because the curriculum gets more difficult and so a lot
of the time we would work on his goals for literacy that
he needed.

(Id. at 61-63.)

     Aligning with the teachers' testimony, the May 2015 Meeting

Minutes state:

     During academic times it is not appropriate for [O.V.] in
     the general education classroom, it is more of isolation.
     Ms. Haase is teaching him one on one because of where he
     is academically.  [M.P.] asked about co-teaching.  It is
     not co-teaching because his skills are so below other
     peers in the class and it is not educationally

203

> appropriate for him to sit in the general education
> classroom. [M.P.] asked if she can bring a specialist in
> to modify his work for him. It was explained that she
> can't and we are all specialist and are able to modify
> work.

(Docket Entry 37-10 at 3.)

Nonetheless, at the administrative hearing in July 2016, the Durham Board's counsel presented Ms. Allen with a DPS "EC Newsletter" dated October 3, 2013 (Docket Entry 37-20 (the "Newsletter")), which describes six models of co-teaching (see id. at 1, 3-4).[83] (See Docket Entry 101-12 at 94.) Ms. Allen stated that the "[o]ne teaching, one assisting" model in that Newsletter "approximate[d] what [she] w[as] doing with O.[V.]." (Id. at 94-95 (emphasis added).)[84] The Newsletter defines co-teaching as, inter alia, involving at least two educators or certified staff who "share instructional responsibility" (Docket Entry 37-20 at 3), "[f]or a single group of students . . . [f]or specific content (objectives)[, and w]ith mutual ownership, pooled resources, and

---

83   The Durham Board does not suggest, let alone provide any evidence, that Plaintiffs ever saw the Newsletter or that anyone from DPS ever informed them that different co-teaching models exist. (See generally Docket Entries 111, 118, 122.) For her part, M.P. testified to knowing only one definition of co-teaching, which she described as "when an EC teacher and a regular teacher collaborate to design lesson plan[s] and stay in the same room all day long to help for inclusion." (Docket Entry 101-5 at 36.)

84   Ms. Allen stated that she lacked the ability to use "traditional models of co-teaching with O.[V.] . . . . [b]ecause his skill level was so far below of what you could have modified for most of the lessons; not all, but most at the — and definitely by the second half of the school year." (Id. at 95.)

204

joint accountability" (id.).  It further describes the "[o]ne teaching, one assisting" model, which it cautions "[s]hould be used sparingly" (id. at 4 (emphasis omitted)),[85] as

- One person would keep primary responsibility for teaching while the other <u>circulates</u> providing assistance

- <u>One teacher</u> plans and <u>instructs, and one provides adaptations</u> and other support as needed

- Requires very little joint planning

- Can result in one teacher, most often the general education teacher[,] taking the lead role the majority of the time

- Can also be distracting to students especially those who may become dependent on the <u>drifting</u> teacher

(<u>Id.</u> (emphasis added).)

In light of Ms. Allen's testimony at the administrative hearing, the Durham Board asserts that it did not breach the Settlement Agreement.  (<u>See</u> Docket Entry 111 at 23-26.)  More specifically, the Durham Board argues that, although O.V.'s teachers abandoned "traditional models of co-teaching" by at least "'the second half of the school year'" (id. at 25), it "is undisputed that O.V. received instruction in the general education classroom with a general education teacher teaching and a special education teacher supporting instruction" and "the model being used

_____

85  No such caution appears on any other model.  (<u>See</u> <u>id.</u> at 1, 3-4.)

at the end of the school year fit one of the co-teaching models defined by DPS's guidance to staff, and staff members justified their decision to teach in that model based on O.V.'s intensive level of need" (id. at 26).[86]  This contention falls short.

As a preliminary matter, all of O.V.'s teachers testified that they did not engage in co-teaching O.V. during the 2014-2015 school year.  This testimony coheres with the May 2015 Meeting Minutes.  It also supports the conclusion that O.V.'s education during the 2014-2015 school year did not accord with the "ordinary" — i.e., "traditional," see, e.g., Synonyms of Ordinary, Oxford English

---

[86]  The Durham Board also urges the Court to defer to the ALJ Decision, which found that

> Despite confusion and imprecision in the use of the term "co-teaching" by various staff members, the documentary evidence and testimony indicated that the team attempted to co-teach O.V., that academic necessity prompted the one-on-one teaching, and that the one-on-one model employed in this case technically met the definition of "co-teaching" as promulgated by the district.

(Docket Entry 17-1, Findings ¶ 66.)  The ALJ's finding on this point does not control Plaintiffs' breach of contract claim. First, the SRO found that "[w]hether O.V., in fact, received instruction in a co-teaching model is disputed by the parties and the record."  (Docket Entry 17-2, Findings ¶ 68.)  More significantly, the ALJ did not examine whether the Durham Board complied with its co-teaching obligations under the Settlement Agreement.  (See, e.g., Docket Entry 17-1, Findings ¶ 67 ("Most importantly, O.V.'s IEP did not require 'co-teaching.'  It required only that O.V. receive specialized instruction from a special education teacher within the regular education classroom for those time periods.  This service was provided throughout the year." (citation omitted)).)  As such, the ALJ's finding that "the one-on-one model employed . . . technically met the definition of 'co-teaching' as promulgated by the district" (id., Findings ¶ 66 (emphasis added)) does not resolve the issue here.

Dictionary, https://www.lexico.com/synonyms/ordinary (last visited Apr. 15, 2021) (identifying "traditional" as synonym for "ordinary") — understanding of "co-teaching." Because the Settlement Agreement does not define "co-teaching" (see generally Docket Entry 17-4), the ordinary — i.e., "traditional" — understanding of that word governs its interpretation, see Duke Energy, 178 N.C. App. at 65, 630 S.E.2d at 695.

In any event, as Ms. Allen's testimony at the administrative hearing conceded, O.V.'s educational experience at best "approximate[d]" (Docket Entry 101-12 at 94) a co-teaching method. (See id. at 94-96.) To "approximate" does not mean to equal; rather, it means "to come near to," Approximate, Merriam-Webster Unabridged Dictionary, https://unabridged.merriam-webster.com/unabridged/approximate (last visited Apr. 15, 2021); see also Approximate, Oxford English Dictionary, https://www.lexico.com/en/definition/approximate (last visited Apr. 15, 2021) ("Close to the actual, but not completely accurate or exact."). Further, as Ms. Allen's testimony reflects, her instruction of O.V. did not actually satisfy the requirements of the identified (disfavored) co-teaching method. For instance, the assisting teacher in the "[o]ne teaching, one assisting" model "circulates" and "drift[s]" (Docket Entry 37-20 at 4) around the shared "group of students" (id. at 3) to "provid[e] assistance" (id. at 4). However, Ms. Allen testified that she did not

207

"circulate in the classroom" (Docket Entry 101-12 at 95), but
rather remained with O.V., who purportedly would not work without
a teacher beside him (see id. at 95-96; accord Docket Entry 107-13
at 62 (testifying that, "if you are not with O.[V.], he will not
pay attention," and so to ensure he worked or listened to lessons,
he needed "someone directly beside him")).

In addition, although the relevant co-teaching model envisions
one teacher instructing while the other provides adaptations and
support (see Docket Entry 37-20 at 4), Ms. Allen testified that,
instead of working on the curriculum that Ms. Turner taught, "a lot
of the time [Ms. Allen and O.V.] would work on his goals for
literacy that he needed" (Docket Entry 107-13 at 63).  On a similar
note, Ms. Turner testified that she rarely taught O.V.; instead,
his special education teachers provided the vast majority of his
academic instruction.  (See, e.g., Docket Entry 107-8 at 36 ("So he
was very rarely in my classroom during an academic period without
another teacher with him."), 41 ("[W]ith having the other EC
teachers in there, they took care of a lot of his academic
instruction."), 53 ("I modified what I could based on his needs[;]
. . . . at the beginning of the year it was a little bit easier to
do that, but as the year goes on and the work gets harder it became
very difficult to modify his lessons.  And like I stated before,
most of his academic needs were met with his EC teachers inside the
classroom."); see also id. at 47 (explaining that her input at IEP

meetings "was mostly how he does socially in the classroom more so than academically").)

Accordingly, the Durham Board's contention that "the model being used at the end of the school year fit one of the co-teaching models defined by DPS's guidance to staff" (Docket Entry 111 at 26) lacks merit. Therefore the Court will award Plaintiffs summary judgment as to the Durham Board's liability for breaching the Settlement Agreement's co-teaching provision.

### iii. Compensatory Services Issue

Next, the parties agree that the Durham Board did not provide the 194 hours of compensatory services that the Settlement Agreement specifies (Docket Entry 17-4 at 8), but they disagree whether this constitutes a breach for which Plaintiffs may recover. (See, e.g., Docket Entry 111 at 28-29; Docket Entry 115 at 24-25.) In particular, the parties dispute whether Plaintiffs provided appropriate notice regarding O.V.'s absence from compensatory services at Hillandale. (See Docket Entry 111 at 28-29; Docket Entry 119 at 19-21.) As discussed below, a material factual dispute exists on this issue.

As relevant here, the parties' Mediation Agreement, which their Settlement Agreement incorporates (see Docket Entry 17-4 at 2), provides:

> 4. Speech services to be delivered in the gen ed classroom will be increased from 7 sessions to 14 sessions per reporting period for 15 minutes.

209

* * * * *

     7. The parties chose not to address the issue of compensatory ed at this mediation. The parents and staff will discuss the need for compensatory education services for the time period from kindergarten through December 2013 at the monthly parent teacher conferences. All compensatory education services would be developed and delivered by the end of the school year in <u>June 2016</u>. These will be services that are not monetary payments to the parents. If they are unable to agree on how and when these are delivered, the parties will ask for mediation to address that issue.

(<u>Id.</u> at 6-7 (emphasis added); <u>see also</u> <u>id.</u> at 1 (noting that, under Mediation Agreement, compensatory "services [are] to be implemented before June 2016").)

    The Settlement Agreement further states that the Durham Board "agrees to provide a total of 194 hours of compensatory education services to O.V. as described in the chart attached hereto and fully incorporated herein as Exhibit B." (<u>Id.</u> at 2.) Although the Mediation Agreement specifies that all compensatory services must occur by June 2016, Exhibit B provides that "[d]epending on scheduling, Summer 2016 services may run into July 2016." (<u>Id.</u> at 8.) Finally, the Settlement Agreement states:

     An exact schedule for the times and location(s) of the services provided during summer 2015 and 2016 shall be determined by mutual agreement of the Petitioners and Respondent's Director of Exceptional Children. Scheduling for the speech services to be provided during lunch and recess will be determined in consultation with the school administration at O.V.'s elementary school.

     Compensatory sessions cancelled due to school closing or absence of the instructor will be rescheduled. Sessions cancelled due to the absence of the student <u>with less than 24 hours' notice</u> will not be rescheduled. In

210

the event O.V. <u>misses two (2) consecutive sessions</u> <u>without proper notice</u>, the sessions will be discontinued until Petitioners provide notice to Respondent's Elementary Director for Exceptional Children requesting to continue the sessions. Any sessions missed during a lapse pursuant to this section will not be rescheduled. In the event O.V. will require transportation to access the compensatory services, Respondent will arrange to provide such transportation.

(<u>Id.</u> at 2 (emphasis added) (parenthetical lettering omitted).)

According to the Durham Board,

It is undisputed that O.V. stopped attending DPS schools on or about November 9, 2015. <u>It is also</u> <u>undisputed that Plaintiffs did not at that time notify</u> <u>the school of his withdrawal or give notice of his</u> <u>absences from compensatory service sessions.</u> Finally, it is undisputed that Plaintiffs never requested that compensatory services resume. As such, by simple operation of the [S]ettlement [A]greement's express terms, Plaintiffs forfeited the remainder of O.V.'s compensatory services and have no claim of breach. Even so, Dr. Kristin Bell contacted Plaintiffs by letter in August 2016 to offer a portion of the missed compensatory services at that time, and Plaintiffs still did not request that services resume.

Because the [Durham] Board abided by the strict terms of the agreement, and Plaintiffs failed to communicate an interest in resuming services prior to the expiration of the time period for their fulfillment, Plaintiffs have waived any claim to those hours and cannot maintain an action for breach.

(Docket Entry 111 at 28-29 (emphasis omitted) (emphasis added).)[87]

---

[87] Apart from its reference to Dr. Bell's letter, the Durham Board cites no evidence in support of these propositions. (<u>See</u> <u>id.</u>) Moreover, "[s]tatement[s] in briefs are not evidence," <u>Dillon</u> <u>v. BMO Harris Bank, N.A.</u>, No. 1:13cv897, 2014 WL 911950, at *2 (M.D.N.C. Mar. 10, 2014) (collecting cases). <u>See also</u> <u>Reeves</u>, 2011 WL 4499099, at *5 n.14 (explaining that, unless "sworn or made under penalty of perjury," factual allegations in court filings "do not constitute evidence").

More specifically, Dr. Bell sent a letter to Plaintiffs on August 11, 2016 (see Docket Entry 111-3 at 1), which states in relevant part:

> As indicated in the terms of the agreement under Section l(d), sessions cancelled due to the absence of the student without notice would not be rescheduled. If [O.V.] missed two consecutive sessions without proper notice, the sessions would be discontinued until you provided notice to me that you wished them to resume. Any sessions missed during that lapse would not be rescheduled. [O.V.] stopped coming to school on or about November 9, 2015. You have not at any time made a request that compensatory services resume. As such, DPS has determined that the remaining hours of in-school compensatory services were missed and will not be rescheduled.
>
> Although we still have not received any request to resume services, because summer services are independent of school attendance, I do want to extend one more invitation for you to receive the remaining summer services from the agreement. DPS is willing to schedule the remaining 36 hours of compensatory services over the summer at mutually agreeable times. As such, please contact me immediately if you wish to schedule these services. If I do not hear from you by Monday, August 22, 2016, I will interpret your lack of response to be a waiver of the remaining services under the [S]ettlement [A]greement.

(Id. at 3 (emphasis added).)

By letter dated August 18, 2016, M.P. responded to Dr. Bell's letter, disputing the assertion that "'O.V. stopped coming to school on or about November 9, 2015,'" explaining that "O.V. stopped attending school at Hillandale Elementary School on or about November 9, 2015, but he did not 'stop[] coming to school.' In fact, as you know, because you observed him at his new school, O.V. started attending a different elementary school (i.e.,

212

Pinewoods Montessori School) on or about November 9, 2015."
(Docket Entry 82-3 at 4 (brackets in original).)  The letter
continues:

> Regarding the provision of services during the
> academic year, the Settlement Agreement states:
> "Scheduling for the speech services to be provided during
> lunch and recess will be determined in consultation with
> the school administration at O.V.'s elementary school."
> For the remainder of the 2014-15 academic year, and prior
> to November 9, 2015, "O.V.'s elementary school" was
> Hillandale Elementary School.  Beginning November 9,
> 2015, "O.V.'s elementary school" was Pinewoods Montessori
> School.  To my knowledge, no one from the Durham Public
> Schools ever "consulted with the school administration"
> at Pinewoods Montessori ("O.V.'s elementary school") to
> determine the "[s]cheduling for the speech services to be
> provided during lunch and recess" once O.V. began
> attending a different elementary school.

> Therefore, your letter's contention that O.V. has
> somehow forfeited his right to receive the services under
> the Settlement Agreement based on O.V. attending a
> different elementary school is incorrect, and your
> failure to provide such services during the school year
> is another material breach of the Settlement Agreement.

> As stated in your letter, summer services are
> independent of school attendance.  At no point prior to
> receipt of your letter did anyone from the DPS contact me
> to arrange compensatory services for O.V. during the
> summer of 2016.  By your calculation, O.V. is owed the
> remainder of his in-school compensatory services and
> thirty-six (36) hours of summer services.  Your letter
> misleadingly states that you wanted to "extend one more
> invitation to receive the remaining summer services from
> the agreement."  Your August 11, 2016, letter was, as you
> know, the *first* invitation for O.V. to receive
> compensatory services for the summer of 2016.  As no one
> from the DPS contacted us to arrange compensatory
> services for the summer of 2016, our family arranged
> private services for O.V.

> The fact that you sent the August 11, 2016, letter
> (1) on the day following the denial of the DPS' Motion to
> Dismiss our breach of contract claim, and (2) with just

213

two (2) weeks remaining in the summer of 2016, was disingenuous; it was a transparent attempt to avoid any future liability for these compensatory services. The DPS' failure to provide these services during summer 2016 is yet another material breach of the Settlement Agreement.

(Id. at 4-5 (emphasis in original).)

In addition to reiterating the positions expressed in this letter (see, e.g., Docket Entry 119 at 19-20), Plaintiffs assert that they provided notice of their plan to withdraw O.V. from Hillandale and enroll him in Pinewoods, thereby giving "notice that O.V. would no longer be attending school and, therefore, would be absent from any compensatory services provided at O.V.'s school in the DPS." (Id. at 19.) In particular, Plaintiffs offer an affidavit from M.P., which avers that, "[o]n September 26, 2018 [sic], [she] gave notice to DPS that [she] intended to withdraw O.V. from the school district, after which he would be absent from school and unable to receive compensatory speech services." (Docket Entry 115-9, ¶ 25 (emphasis added).) The affidavit provides no further details regarding the notice M.P. avers she provided. (See id.)

In sum, the record contains (1) an unsupported assertion in the Durham Board's briefing that Plaintiffs failed to provide notice of either O.V.'s withdrawal from Hillandale or associated absence from compensatory services; (2) a letter from Dr. Bell that fails to address whether Plaintiffs provided notice of O.V.'s withdrawal and associated absence from compensatory services at

214

Hillandale; and (3) an affidavit from M.P. averring that she provided notice of O.V.'s withdrawal and associated absence from compensatory services at Hillandale. However, the affidavit provides no details regarding the purported notice, thereby preventing a determination of whether Plaintiffs' notice qualifies as "proper notice" under the Settlement Agreement. As such, a material factual dispute exists regarding whether Plaintiffs provided satisfactory notice of O.V.'s transfer to Pinewoods and associated absence from compensatory services at Hillandale in November 2015. Further, in regard to the issue of the "36 hours of compensatory services" that the Durham Board owed O.V. for the summer of 2016 (Docket Entry 111-3 at 3), Dr. Bell's "offer" to provide such services (Docket Entry 111 at 28) came after the period for providing such services expired. (See Docket Entry 17-4 at 7-8.)

Accordingly, the Durham Board's argument that Plaintiffs waived the 2016 summer compensatory services lacks merit and material issues of fact preclude summary judgment on Plaintiffs' compensatory services breach of contract claim.[88]

_____

88  The Durham Board also references but fails to develop an argument that Plaintiffs committed a material prior breach of the Settlement Agreement "by filing the August 2015 due process petition." (Docket Entry 111 at 29.) "As a general rule, if either party to a bilateral contract commits a material breach of the contract, the non-breaching party is excused from the obligation to perform further. Whether a breach is material or immaterial is ordinarily a question of fact." Hatteras/Cabo
(continued...)

215

## CONCLUSION

The Durham Board did not afford O.V. a FAPE in the LRE in his May 2015 IEP, Plaintiffs' discrimination and retaliation claims fail as a matter of law, and Plaintiffs cannot pursue their challenge to O.V.'s August 2014 IEP or their new Title II effective communication claim. In addition, Plaintiffs proved that Pinewoods qualified as an appropriate private placement for the 2014-2015 school year, but the record contains insufficient information to fully resolve Plaintiffs' reimbursement request. Finally, material factual disputes exist regarding Plaintiffs' compensatory-services breach of contract claim, but the record establishes that the Durham Board breached the Settlement Agreement's co-teaching obligations.

**IT IS THEREFORE ORDERED** that the Durham Board's Administrative Motion (Docket Entry 108) is **DENIED.**

**IT IS FURTHER ORDERED** that Plaintiffs' Administrative Motion (Docket Entry 112) is **GRANTED IN PART** and **DENIED IN PART** as follows:

---

88(...continued)
Yachts, LLC v. M/Y EPIC, 423 F. Supp. 3d 181, 189 (E.D.N.C. 2019) (internal quotation marks omitted). Moreover, "'[f]ailure to perform an independent promise does not excuse nonperformance on the part of the other party.'" Williams v. Habul, 219 N.C. App. 281, 293-94, 724 S.E.2d 104, 112 (2012) (brackets in original). In the absence of a developed argument on this fact-specific issue, the Durham Board cannot secure summary judgment in its favor on Plaintiffs' compensatory services breach of contract claim. See Celotex Corp., 477 U.S. at 323.

216

(1) the Durham Board failed to provide O.V. a FAPE in the LRE in the May 2015 IEP;

(2) Pinewoods constitutes an appropriate private placement for the 2014-2015 school year, entitling Plaintiffs to reimbursement for that period.

(3) Upon determination of the reasonable amount of Plaintiffs' expenses, including attorney's fees, incurred in pursuing the May 2015 IEP matter, the Durham Board shall bear such expenses.

(4) The parties shall hold an IEP meeting, as soon as reasonably practicable, to develop a new IEP for O.V. that provides a FAPE in the LRE.

(5) In preparation for this IEP meeting, the Durham Board must (a) "[r]equest all available educational information from O.V.'s current educational placement;" (b) "[s]eek input from O.V.'s current teachers and service providers regarding his current academic and functional needs, his present educational setting, and any supplementary aids or services currently being provided to him;" and (c) "[o]ffer to have [O.V.'s current teachers and] any relevant private providers participate in the IEP meeting and make reasonable efforts to schedule the meeting such that desired participants can attend." (Docket Entry 105-1 at 240.)

(6) The Durham Board must "[o]btain the services of, or contract with a mutually agreed upon 'Inclusion Specialist' to assist in the development of an IEP for O.V., and provide assistance to the IEP team and parents for" (id.) the 2021-2022 school year.

(7) In formulating O.V.'s IEP for the 2021-2022 school year, the Durham Board must, in good faith, "[g]ive first consideration to educating O.V. in the general education setting, with removal from his non-disabled peers only for the portions of his school day when O.V. cannot be successfully educated in the general education setting with supplementary aids and services." (Id.) In so doing, the IEP Team must carefully consider the Inclusion Specialist's recommendations regarding educating O.V. in the general education setting. The Inclusion Specialist shall observe O.V. in his current educational placement in preparation for developing the IEP.

(8) "'If, after development of [a] new IEP, [Plaintiffs] choose to enroll O.V. in a DPS school[, the Durham Board] must identify [any] general education teachers who will teach O.V. core academics, and [the Durham Board, with input from the Inclusion Specialist, must] evaluate their training and experience regarding modification of the general curriculum and classwork for students with intellectual disabilities. If any lack of training or experience is identified, [the Durham Board] must ensure that O.V.'s teachers receive such training prior to or immediately upon O.V.'s [enrollment in their class].'" (Id. at 240.)

**IT IS FURTHER ORDERED** that the parties shall confer and shall file, on or before May 13, 2021, a notice setting forth their joint or individual proposals regarding appropriate procedures for addressing the outstanding reimbursement issues.

**IT IS FURTHER ORDERED** that the Durham Board's Summary Judgment Motion (Docket Entry 110) and Plaintiffs' Summary Judgment Motion (Docket Entry 114) are **GRANTED IN PART** and **DENIED IN PART** as follows: summary judgment is entered in favor of the Durham Board on Plaintiffs' discrimination and M.P.'s retaliation claims and in favor of Plaintiffs as to liability on their breach of contract claim regarding the Settlement Agreement's co-teaching provisions, but summary judgment is denied to both the Durham Board and Plaintiffs on Plaintiffs' compensatory-services breach of contract claims, due to the existence of a material factual dispute.

This 15th day of April, 2021.

/s/ L. Patrick Auld
**L. Patrick Auld**
**United States Magistrate Judge**